UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANTONIO L. GIORDANO, | ) |
| JOHN MONTECALVO, | ) |
| PASQUALE CONFREDA, | ) |
| and COVENTRY HEALTH CENTER | ) |
| ASSOCIATES, LTD. | ) |
| | ) |
| Defendants. | ) |
| | ) |

CA 09- 432 ML

## COMPLAINT

As and for its Complaint against Defendants, Antonio L. Giordano ("Giordano"), John

Montecalvo ("Montecalvo"), Pasquale Confreda ("Confreda"), and Coventry Health Center

Associates ("CHC Associates"), the United States, on behalf of the Department of Housing and

Urban Development ("HUD"), alleges as follows:

### SUMMARY

1.     The United States brings this action for monetary damages for money illegally diverted

from Mt. St. Francis Health Center ("MSF") and Coventry Health Center ("CHC"), two nursing

homes that were part of HUD's insured multifamily housing program.

2.     As part of the insured multifamily housing program, MSF and CHC enjoyed the

benefit of HUD's mortgage insurance.  In consideration for HUD's mortgage insurance, each

nursing home was governed by a regulatory agreement that restricted the use of project assets.

3.     Mt. St. Francis Associates ("MSF Associates"), the owner of MSF, used at least

1

$4,314,098 in violation of its regulatory agreement.

4.    Giordano and Montecalvo (the "MSF Defendants") are liable under 12 U.S.C. § 1715z-4a ("section 1715z-4a") for double the value of MSF assets used in violation of the regulatory agreement ($8,628,196), plus costs (including attorney's fees) related to this action.

5.    CHC Associates, the owner of CHC, used at least $1,858,100 in violation of its regulatory agreement.

6.    CHC Associates, Giordano, Montecalvo, and Confreda (the "CHC Defendants") are liable under section 1715z-4a for double the value of CHC assets used in violation of the regulatory agreement ($3,716,200), plus costs (including attorney's fees) related to this action.

## PARTIES

7.    Plaintiff United States is the sovereign; with respect to the mortgage insurance and related regulatory agreements, the United States has acted through HUD.

8.    Defendant CHC Associates is a Rhode Island limited partnership.

9.    At all times relevant to this action, CHC Associates owned CHC.

10.    At all times relevant to this action, CHC Associates was a signatory of and party to a regulatory agreement under HUD's insured multifamily housing program governing the operation of CHC.

11.    At all times relevant to this action, CHC Associates, through its ownership of CHC, exercised custody, control, and / or possession over CHC and its operations.

12.    At times relevant to this action, CHC Associates was a person within the meaning of section 1715z-4a(a)(2).

13.    On information and belief, CHC Associates's current address is 10 Woodland Drive,

2

Coventry, RI 02816.

14.  At all times relevant to this action, Defendant Giordano was the general partner of MSF Associates and a general partner of CHC Associates.

15.  On behalf of MSF Associates and as its general partner, Giordano was a signatory of and party to a regulatory agreement governing the operation of MSF.

16.  At all times relevant to this action, through his position as general partner of MSF Associates, Giordano exercised custody, control, and / or possession over MSF and its operations.

17.  At all times relevant to this action, and through his position as general partner of CHC Associates, Giordano exercised custody, control, and / or possession over CHC and its operations.

18.  On information and belief, Giordano's current address is 229 Potter Road, North Kingston, RI 02852-1641.

19.  At times relevant to this action, Defendant Montecalvo was the assistant administrator of MSF, the general manager of Sterling Health Care Management Company ("Sterling"), the management agent of MSF and CHC, and the President of Coventry Health Continuum, Inc. ("Coventry Continuum"), the lessee and operator of CHC.

20.  At all times relevant to this action, and through his positions as assistant administrator of MSF and as general manager of Sterling, Montecalvo exercised custody, control and / or possession over MSF and its operations.

21.  At all times relevant to this action, and through his positions as general manager of Sterling and as President of Coventry Continuum, Montecalvo exercised custody, control and /

3

or possession over CHC and its operations.

22.   On information and belief, Montecalvo's current address is 181 Cedar Hollow Road, Wakefield, RI 02879-1486.

23.   At all times relevant to this action, Defendant Confreda was a general partner of CHC Associates.

24.   At times relevant to this action, Confreda was the Vice-President, Secretary, and Treasurer of Coventry Continuum.

25.   At all times relevant to this action, and through his positions as general partner of CHC Associates and as Vice-President, Secretary, and Treasurer of Coventry Continuum, Confreda exercised custody, control and / or possession over CHC and its operations.

26.   On information and belief, Confreda's current address is 108 Wood Avenue, Coventry, RI 02816.

### JURISDICTION

27.   This Court has subject matter jurisdiction over this action under title 28 U.S.C. §§ 1331, 1367 because the claims asserted herein arise under or are so related to claims arising under title 12 U.S.C. § 1715z-4a(a)(1) and federal common law as to form part of the same case or controversy.

28.   This Court also has subject matter jurisdiction over this action under title 28 U.S.C. § 1345 because the United States commenced it.

### VENUE AND SERVICE OF PROCESS

29.   Venue is proper in this district under title 28 U.S.C. § 1391(b).

## FACTUAL BASIS FOR CLAIMS

### MSF: Purchase and Finance

30.    MSF is a 194-bed nursing home located in Woonsocket, Rhode Island.

31.    MSF Associates, a Rhode Island limited partnership, purchased MSF on or about November 9, 1983.

32.    In conjunction with the purchase, MSF Associates executed a mortgage deed and mortgage note with Rhode Island Housing and Mortgage Finance Corporation for the amount of $6,129,900.

33.    On or about July 13, 1995, MSF Associates re-financed its loan obligation through Suburban Mortgage Associates, Inc. ("Suburban Mortgage") for the amount of $8,622,900 and executed a new mortgage deed and mortgage note (collectively, the "MSF Mortgage").

34.    HUD insured the MSF Mortgage under title II, Section 232 of the National Housing Act.

35.    In consideration for HUD's mortgage insurance, MSF Associates entered into a Regulatory Agreement for Multifamily Housing Projects with HUD on or about July 14, 1995 (the "MSF Regulatory Agreement"), a true and correct copy of which is attached hereto as Exhibit 1.

36.    At all times relevant to this action, MSF Associates was a signatory to and bound by the MSF Regulatory Agreement.

37.    Paragraph 6(b) of the MSF Regulatory Agreement prohibits owners and / or their agents from transferring or disposing of any personal property of the nursing home or paying out any funds while in a nonsurplus cash position without HUD's prior written approval, except for

5

reasonable operating expenses and necessary repairs.

38.    Paragraph 6(e) of the MSF Regulatory Agreement prohibits owners from making, receiving or retaining any distribution of project assets or income while the project is in a nonsurplus cash position, without HUD's prior written approval.

39.    HUD makes a yearly determination as to the surplus or nonsurplus cash position.

40.    At all times relevant to this action, MSF was in a nonsurplus cash position.

41.    Paragraph 6(f) of the MSF Regulatory Agreement prohibits owners, except for natural persons, from engaging in any other business or activity or incurring any liability or obligation not in connection with the project.

### MSF: Management and Operation

42.    Beginning on or about November 14, 1984, Health Management Services Company ("Health Management") was the management agent of MSF.

43.    Pursuant to its management agreement with Health Management (the "Health Management-MSF Management Agreement"), MSF compensated Health Management for its services by paying it "3 percent of net patient revenue."

44.    On or about April 29, 1993, MSF Associates entered into a management agreement with Giordano (the "Giordano-MSF Management Agreement").

45.    On or about April 29, 1993, MSF Associates and Giordano submitted to HUD a Project Owner's & Management Agent's Certification of Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents" (the "Giordano-MSF Management Agent Certification").

46.    In the Giordano-MSF Management Agent Certification, MSF Associates disclosed that

it would pay a "special fee" to Giordano equal to three percent of net patient revenue.

47.    The "special fee" paid to Giordano was in addition to the management fee paid to Health Management.

48.    By signing the Giordano-MSF Management Agent Certification, MSF Associates and Giordano acknowledged that no fees were allowed to be paid under the Giordano-MSF Management Agreement once HUD terminated that agreement.

49.    On or about January 1, 1995, MSF Associates entered into a management agreement with Sterling (the "Sterling-MSF Management Agreement").

50.    On or about January 1, 1995, MSF Associates and Sterling submitted a Project Owner's & Management Agent's Certification of Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents" (the "Sterling-MSF Management Agent Certification").

51.    In the Sterling-MSF Management Agent Certification, MSF Associates disclosed that it would pay a "special fee" to Sterling equal to three percent of net patient revenue.

52.    On or about January 1, 1995, Sterling replaced Health Management as the management agent of MSF.

53.    By signing the Sterling-MSF Management Agent Certification, MSF Associates and Sterling acknowledged that no fees were allowed to be paid under the Sterling-MSF Management Agreement once HUD terminated that agreement.

54.    At all times relevant to this action, MSF staff, not Giordano, performed the services that were to be provided by Giordano under Giordano-MSF Management Agent Agreement and / or Giordano-MSF Management Agent Certification.

7

55.   At all times relevant to this action, MSF staff, not Sterling, performed the services that were to be provided by Sterling under the Sterling-MSF Management Agreement and / or Sterling-MSF Management Agent Certification.

56.   On or about October 2001, MSF hired Montecalvo to be the assistant administrator of the nursing home.

57.   At all times relevant to this action, the MSF Defendants had full control over MSF's ownership, operation, and management.

58.   On or about June 21, 2006, Giordano filed a petition to appoint a receiver for MSF Associates in the Rhode Island Superior Court in a case docketed as Case No. P.B. 06-3301 (the "MSF Receivership).

59.   On or about February 13, 2008, the United States removed the MSF Receivership to federal district court.

60.   The MSF Receivership is currently pending in this court, Judge William E. Smith presiding, C.A. No. 08-00048 S.

### MSF: Audit

61.   From September 2003 to March 2004, HUD's Office of the Inspector General ("OIG") conducted an audit of MSF to determine whether project assets were used in compliance with the MSF Regulatory Agreement.

62.   OIG's on-site audit of MSF ("MSF Audit") covered the period from January 1, 2000 to December 31, 2003 (the "MSF Audit Period").

63.   OIG published its findings in an audit report on March 3, 2006 (the "MSF Audit

8

Report"), a true and correct copy of which is attached hereto as Exhibit 2.

64.    In the MSF Audit Report, OIG identified $4,061,141 in project assets used in violation of the MSF Regulatory Agreement during the MSF Audit Period.

65.    MSF Associates also used $252,957 of project assets in violation of the MSF Regulatory Agreement after the MSF Audit Period.

66.    In total, MSF Associates used project assets totaling $4,314,098 in violation of the regulatory agreement.

67.    In particular, MSF Associates and the MSF Defendants used project assets to disburse at least $978,675 to persons or entities with personal ties to the ownership and management of the project ("identity-of-interest entities") in violation of the MSF Regulatory Agreement.

68.    In particular, MSF Associates and the MSF Defendants used project assets to disburse at least $2,655,429 to Giordano, Montecalvo, and Sterling in violation of the MSF Regulatory Agreement, including $240,857 after the MSF Audit Period.

69.    In particular, MSF Associates and the MSF Defendants also used project assets to disburse at least $679,994 to other various payees in violation of the MSF Regulatory Agreement, including $12,000 after the MSF Audit Period.

**MSF: Illegal Disbursements to Identity-of-Interest Companies**

70.    The MSF Defendants and MSF Associates used project assets to disburse $978,675 to eight different identity-of-interest entities in violation of the MSF Regulatory Agreement.

71.    The MSF Defendants and MSF Associates used project assets to disburse $69,247 to Consultants, Inc. ("Consultants"), a Rhode Island corporation.

72.    Antonio A. Giordano, Giordano's son ("Giordano II"), was the President of

9

Consultants at all times relevant to this action.

73. These disbursements made to Consultants violated the MSF Regulatory Agreement, including (but not limited to) Paragraphs 6(b) and 6(f).

74. The MSF Defendants and MSF Associates used project assets to disburse $244,720 to Consultants Associates, Inc. ("Consultant Associates"), a Rhode Island corporation.

75. Giordano II was the President of Consultants Associates at all times relevant to this action.

76. These disbursements made to Consultants Associates violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

77. The MSF Defendants and MSF Associates used project assets to disburse $272,200 to My Place, Inc. ("My Place"), a Delaware corporation.

78. Mary D. Gentili ("Gentili"), Giordano's daughter, was the President of My Place at times relevant to this action.

79. These disbursements made to My Place violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

80. The MSF Defendants and MSF Associates used project assets to disburse $47,280 to Construction Software, Inc. ("Construction"), a Rhode Island corporation.

81. Montecalvo was the President of Construction at all times relevant to this action.

82. These disbursements made to Construction violated the MSF Regulatory Agreement, including (by not limited to) Paragraph 6(b).

83. The MSF Defendants and MSF Associates used project assets to disburse $104,520 to Hillside Health Center ("Hillside"), a Rhode Island limited liability company.

84.   Montecalvo was the Manager of Hillside at all times relevant to this action.

85.   These disbursements made to Hillside violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

86.   The MSF Defendants and MSF Associates used project assets to disburse $109,812 to Sterling.

87.   Montecalvo was the Manager of Sterling.

88.   These disbursements made to Sterling violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

89.   The MSF Defendants and MSF Associates used project assets to disburse $22,326 to Suburban Mortgage.

90.   At times relevant to this action, Giordano was the Executive Vice President of Suburban Mortgage and held a 50 percent ownership interest in the company.

91.   These disbursements made to Suburban Mortgage violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

92.   The MSF Defendants and MSF Associates used project assets to disburse $108,570 to Peter Castriotta ("Castriotta"), the Purchasing Director for MSF.

93.   These disbursements made to Castriotta violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

### MSF: Illegal Disbursements of "Partnership" and "Management Fees"

94.   The MSF Defendants and MSF Associates used project assets to disburse $2,655,429 to themselves, or entities under their ownership, possession and / or control, in violation of the MSF Regulatory Agreement.

95.   The MSF Defendants and MSF Associates used project assets to disburse $1,186,777 to Giordano, including $133,227 after the MSF Audit Period.

96.   These disbursements violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b) and Paragraph 6(e).

97.   The MSF Defendants and MSF Associates used project assets to disburse $1,338,707 to Sterling, including $107,730 after the MSF Audit Period.

98.   These disbursements to Sterling violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

99.   The MSF Defendants and MSF Associates used project assets to disburse $17,691 to Management Realty Service, Inc. ("MRS"), a Rhode Island corporation.

100.   Gentili was the President of MRS at times relevant to this action.

101.   These disbursements to MRS violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

102.   The MSF Defendants and MSF Associates used project assets to disburse $112,254 to Montecalvo.

103.   These disbursements to Montecalvo violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

### MSF: Other Illegal Disbursements

104.   The MSF Defendants and MSF Associates used project assets to disburse $679,994 to other entities in violation of the MSF Regulatory Agreement.

105.   The MSF Defendants and MSF Associates used project assets to disburse $78,786 to Adler, Pollock & Sheehan ("Adler Pollock").

106.  These disbursements made to Adler Pollock violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

107.  The MSF Defendants and MSF Associates used project assets to disburse $9,249 to George Babcock ("Babcock").

108.  These disbursements made to Babcock violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

109.  The MSF Defendants and MSF Associates used project assets to disburse $3,525 to Chaine des Rotisseurs ("Chaine").

110.  These disbursements made to Chaine violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

111.  The MSF Defendants and MSF Associates used project assets to disburse $263,832 to Lefkowitz, Garfinkel, Champi & DeRienzo ("Lefkowitz Garfinkel").

112.  These disbursements made to Lefkowitz Garfinkel violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

113.  The MSF Defendants and MSF Associates used project assets to disburse $235,308 to O. Ahlborg & Sons, Inc ("O. Ahlborg"), including $12,000 after the MSF Audit Period.

114.  These disbursements made to O. Ahlborg violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

115.  The MSF Defendants and MSF Associates used project assets to disburse $89,294 to other various payees.

116.  These disbursements to other various payees violated the MSF Regulatory Agreement, including (but not limited to) Paragraph 6(b).

13

## CHC: Purchase and Finance

117.  CHC was a 344-bed nursing home located in Coventry, Rhode Island.

118.  CHC Associates purchased CHC on our about October 16, 1981.

119.  To purchase CHC, CHC Associates borrowed $8,667,300 (the "CHC Loan").

120.  On or about May 24, 1994, after other refinances of the CHC Loan, CHC Associates refinanced its loan for the amount of $15,308,700,

121.  In conjunction with this final refinance, CHC Associates executed a mortgage deed and a mortgage note on or about May 24, 1994 (collectively, the "CHC Mortgage").

122.  HUD insured the CHC Mortgage under title II, Section 232 of the National Housing Act.

123.  In consideration for HUD's mortgage insurance, CHC Associates entered into a Regulatory Agreement for Multifamily Housing Projects with HUD on or about May 24, 1994 (the "CHC Regulatory Agreement"), a true and correct copy of which is attached hereto as Exhibit 3.

124.  Paragraph 6(b) of the CHC Regulatory Agreement prohibits owners and their agents from transferring or disposing of any personal property of the nursing home or paying out any funds while in a nonsurplus cash position without HUD's prior written approval, except for reasonable operating expenses and necessary repairs.

125.  Paragraph 6(e) of the CHC Regulatory Agreement prohibits owners from making, receiving or retaining any distribution of project assets or income while the project is in a nonsurplus cash position, without HUD's prior written approval.

126.  HUD makes a yearly determination as to the surplus or nonsurplus cash position of

14

projects under its insured multifamily housing program.

127.   At all times relevant to this action, CHC was in a nonsurplus cash position.

128.   Paragraph 6(f) of the CHC Regulatory Agreement prohibits owners, except for natural persons, from engaging in any other business or activity or incurring any liability or obligation in connection with the project.

### CHC: Management and Operation

129.   Beginning in 1987, Coventry Continuum leased and operated CHC.

130.   At all times relevant to this action, Coventry Continuum was an identity-of-interest entity under the ownership, control, and possession of the CHC Defendants.

131.   As the lessee and operator of CHC, Coventry Continuum entered into several management agreements with various management agents.

132.   On or about May 28, 1993, Coventry Continuum entered into a management agreement with Health Management (the "Health Management-Coventry Continuum Management Agreement").

133.   On or about May 28, 1993, Coventry Continuum and Health Management signed and submitted a "Project Owner's & Management Agent's Certification of Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents" (the "Health Management-Coventry Continuum Management Certification").

134.   On or about April 1, 1997, Coventry Continuum entered into a management agreement with Sterling (the "Sterling-Coventry Continuum Management Agreement").

135.   On or about April 1, 1997, Coventry Continuum and Sterling signed and submitted a "Project Owner's & Management Agent's Certification of Multifamily Housing Projects for

Identity-of-Interest or Independent Management Agents" (the "Sterling-Coventry Continuum Management Certification").

136.  At all times relevant to this action, the CHC Defendants had full control over CHC's ownership, operations, and management.

137.  By August 1999, CHC Associates defaulted on its obligations under the CHC Mortgage.

138.  On or about June, 28, 2000, the CHC Mortgage was assigned to HUD.

139.  On or about February 19, 2001, Coventry Continuum, d/b/a/ Brookside Villa was placed in receivership in Rhode Island Superior Court.

140.  HUD sold the CHC Mortgage for a loss of $6,292,520 on or about September 6, 2002.

## CHC: Audit

141.  From July 2003 to February 2004, OIG conducted an audit of CHC to determine whether project assets were used in compliance with the CHC Regulatory Agreement.

142.  OIG's on-site audit of CHC (the "CHC Audit") covered the period from May 5, 1995 to August 22, 2003 (the "CHC Audit Period").

143.  OIG published its findings in an audit report on March 28, 2006 (the "CHC Audit Report"), a true and correct copy of which is attached hereto as Exhibit 4.

144.  In the CHC Audit Report, OIG identified $1,858,100 in project assets that was used in violation of the CHC Regulatory Agreement.

145.  In particular, CHC Associates used project assets to disburse at least $1,421,859 to identity-of-interest entities in violation of the CHC Regulatory Agreement.

146.  CHC Associates also used project assets to disburse at least $436,241 to other persons

or entities in violation of the CHC Regulatory Agreement.

### CHC: Illegal Disbursements

147. The CHC Defendants used project assets to disburse $1,421,859 to at least eight different identity-of-interest entities and at least three persons with an ownership interest in CHC in violation of the CHC Regulatory Agreement.

148. The CHC Defendants used project assets to disburse $15,000 to Giordano in violation of the CHC Regulatory Agreement.

149. These disbursement made to Giordano violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b) and Paragraph 6(f).

150. The CHC Defendants used project assets to disburse $53,880 to Construction.

151. These disbursements made to Construction violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

152. The CHC Defendants used project assets to disburse $89,400 to Consultants.

153. These disbursements made to Consultants violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

154. The CHC Defendants used project assets to disburse $182,500 to Giordano, Confreda, and other CHC Associates partners.

155. These disbursements violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b) and Paragraph 6(f).

156. The CHC Defendants used project assets to disburse $59,810 to Gregory Building Company ("Gregory Building").

157. Giordano II was the President of Gregory Building at times relevant to this action.

158.   These disbursements made to Gregory Building violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

159.   The CHC Defendants used project assets to disburse $250,025 to Management Reality Service ("MRS").

160.   These disbursements to MRS violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

161.   The CHC Defendants used project assets to disburse $267,041 to My Place.

162.   Gentili was the President of My Place at times relevant to this action.

163.   These disbursements made to My Place violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

164.   The CHC Defendants used project assets to disburse $22,816 to Simon & Winsor Interiors ("Simon & Winsor").

165.   Gentili was the President of Simon & Winsor at times relevant to this action.

166.   These disbursements made to Simon & Winsor violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

167.   The CHC Defendants used project assets to disburse $464,700 to Sterling.

168.   These disbursements made to Sterling violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

169.   The CHC Defendants used project assets to disburse $16,687 to MSF.

170.   These disbursements made to MSF violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

171.   The CHC Defendants used project assets to disburse $436,241 to other various non-

identity-of-interest payees.

172. These disbursements made to other various non-identity-of-interest payees violated the CHC Regulatory Agreement, including (but not limited to) Paragraph 6(b).

**COUNT I: AGAINST GIORDANO AND MONTECALVO FOR THE DISBURSEMENT OF PROJECT ASSETS IN VIOLATION OF THE MSF REGULATORY AGREEMENT**

173. The United States incorporates each allegation asserted in the paragraphs numbered [1]-[116] above.

174. At all times relevant to this litigation, Giordano was a "person" as defined in section 1715z-4a(a)(2).

175. At all times relevant to this litigation, Montecalvo was a "person" as defined in section 1715z-4a(a)(2).

176. While MSF was in a nonsurplus cash position, Giordano used project assets in violation of the MSF Regulatory Agreement.

177. Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to recover from Giordano double the value of project assets used in violation of the MSF Regulatory Agreement, plus costs (including attorneys fees) relating to this action.

178. While MSF was in a nonsurplus cash position, Montecalvo used project assets in violation of the MSF Regulatory Agreement.

179. Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to recover from Montecalvo double the value of project assets used in violation of the MSF Regulatory Agreement, plus costs (including attorney fees) relating to this action.

## COUNT II: AGAINST GIORDANO FOR THE DEBTS
## OWED BY MSF ASSOCIATES

180.  The United States incorporates each allegation asserted in the paragraphs numbered

[1]-[116] above.

181.  Under R.I. GEN. LAWS §§ 7-13-24(b), 7-12-26, Giordano, as a general partner of MSF

Associates, is personally liable for the debts and obligations of MSF Associates arising under

section 1715z-4a as a result of its violation of the MSF Regulatory Agreement.

## COUNT III: AGAINST CHC ASSOCIATES, GIORDANO, MONTECALVO, AND
## CONFREDA FOR THE DISBURSEMENT OF PROJECT ASSETS IN
## VIOLATION OF THE CHC REGULATORY AGREEMENT

182.  The United States incorporates each allegation asserted in the paragraphs numbered

[1]-[29], [117]-[172] above.

183.  At all times relevant to this action, CHC Associates is a "person" as defined in section

1715z-4a(a)(2).

184.  At all times relevant to this action, Giordano was a "person" as defined in section

1715z-4a(a)(2).

185.  At all times relevant to this action, Montecalvo was a "person" as defined in section

1715z-4a(a)(2).

186.  At all times relevant to this action, Confreda was a "person" as defined in section

1715z-4a(a)(2).

187.  While CHC was in a nonsurplus cash position, CHC Associates used project assets in

violation of the CHC Regulatory Agreement.

188.  Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to

recover from CHC Associates double the value of project assets used in violation of the CHC Regulatory Agreement, plus costs (including attorneys fees) relating to this action.

189.   While CHC was in a nonsurplus cash position, Giordano used project assets in violation of the CHC Regulatory Agreement.

190.   Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to recover from Giordano double the value of project assets used in violation of the CHC Regulatory Agreement, plus costs (including attorneys fees) relating to this action.

191.   While CHC was in a nonsurplus cash position, Montecalvo used project assets in violation of the CHC Regulatory Agreement.

192.   Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to recover from Montecalvo double the value of project assets used in violation of the CHC Regulatory Agreement, plus costs (including attorneys fees) relating to this action.

193.   While CHC was in a nonsurplus cash position, Confreda used project assets in violation of the CHC Regulatory Agreement.

194.   Under section 1715z-4a(a)(1) and section 1715z-4a(c), the United States is entitled to recover from Confreda double the value of project assets used in violation of the CHC Regulatory Agreement, plus costs (including attorneys fees) relating to this action.

## COUNT IV: AGAINST GIORDANO AND CONFREDA
### FOR THE DEBTS OWED BY CHC ASSOCIATES

195.   The United States incorporates each allegation asserted in paragraphs numbered [1]-[29], [117]-[172] above.

196.   Under R.I. GEN. LAWS §§ 7-13-24(b), 7-12-26, Giordano, as a general partner of CHC

Associates, is personally liable for the debts and obligations of CHC Associates arising under section 1715z-4a as a result of its violation of the CHC Regulatory Agreement.

197.   Under R.I. GEN. LAWS §§ 7-13-24(b), 7-12-26,  Confreda, as a general partner of CHC Associates, is personally liable for the debts and obligations of CHC Associates arising under section 1715z-4a as a result of its violation of the CHC Regulatory Agreement.

## COUNT V: AGAINST GIORDANO AND MONTECALVO
## FOR UNJUST ENRICHMENT

198.   The United States incorporates each allegation asserted in the paragraphs numbered [1]-[116] above.

199.   Giordano and Montecalvo received project assets in violation of the MSF Regulatory Agreement which they are not entitled to retain.

200.   Retention or use of these assets constitutes an unjust enrichment.  Thus, Giordano and Montecalvo were unjustly enriched at the expense of the United States.

201.   The United States is entitled to reimbursement of these assets.

## COUNT VI: AGAINST GIORDANO AND CONFREDA FOR UNJUST ENRICHMENT

202.   The United States incorporates each allegation asserted in the paragraphs numbered [1]-[29], [117]-[172] above.

203.   Giordano and Confreda received project assets in violation of the CHC Regulatory Agreement which they are not entitled to retain.

204.   Retention or use of these assets constitutes unjust enrichment.  Thus, Giordano and Confreda were unjustly enriched at the expense of the United States.

205.   The United States is entitled to reimbursement of these assets.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays:

A.      For a judgment against the MSF Defendants, jointly and severally, for $8,628,196,which is twice the value of MSF assets that were used in violation of the MSF Regulatory Agreement, plus interest;

B.      For a judgment against Giordano for the debts owed by MSF Associates for its violations of section 1715z-4a.

C.      For a judgment against the CHC Defendants, jointly and severally, for $3,716,200, which is twice the value of CHC assets that were used in violation of the CHC Regulatory Agreement, plus interest;

D.      For a judgment against Giordano and Confreda, jointly and severally, for the debts owed by CHC Associates under Count III of this complaint;

E.      For reimbursement of the amount by which any MSF Defendant was unjustly enriched by payments made to him by MSF Associates.

F.      For reimbursement of the amount by which Giordano and / or Confreda was unjustly enriched by payments made to him by CHC Associates or Coventry Continuum.

G.      For all Plaintiff's costs related to this action including (but not limited to) reasonable attorney and auditing fees;

H.      For all other relief this Court deems just and proper.


Dated:  September 15, 2009                          Respectfully submitted,

TONY WEST                                            /s/ J. Reed Clay, Jr.
Assistant Attorney General                          J. CHRISTOPHER KOHN
                                                     RUTH A. HARVEY
Luis M. Matos                                        J. REED CLAY, JR.
Acting United States Attorney                        Commercial Litigation Branch
                                                     Civil Division
DULCE DONOVAN                                        United States Department of Justice
Acting First Assistant U.S. Attorney / Civil Chief  P.O. Box 875
Fleet Center                                         Ben Franklin Station
50 Kennedy Plaza, 8th Floor                          Washington, D.C. 20044-0875
Providence, RI 02903                                 (202) 307-0958
                                                     john.clay@usdoj.gov


                                                     Attorneys for the United States