**<u>Exhibit 2</u>**

# AUDIT REPORT



Mount Saint Francis Health Center
Federal Housing Administration Loan Number 016-43077
Woonsocket, Rhode Island

2006-BO-1004

March 3, 2006

OFFICE OF AUDIT, REGION 1
Boston, Massachusetts



| | |
|---|---|
| Issue Date | March 3, 2006 |

| | |
|---|---|
| Audit Report Number | 2006-BO-1004 |

TO:       Ellen R. Connolly, Director of Boston Multifamily Housing Hub, 1 AHMLA
          Margarita Maisonet, Acting Director, Departmental Enforcement Center, CV

FROM:     *John A. Dvorak*
          John A. Dvorak, Regional Inspector General for Audit, 1AGA

SUBJECT:  Mount Saint Francis Health Center
          Federal Housing Administration Loan Number 016-43077
          Woonsocket, Rhode Island

We audited Mount Saint Francis Health Center (project), located in Woonsocket, Rhode Island, to determine whether the owner complied with its U.S. Department of Housing and Urban Development (HUD) regulatory agreement and other applicable laws and regulations.

We identified $4,402,305 in questionable cash disbursements and accrued expenses made by the project. We found that (1) under the direction of the owner and the identity-of-interest management agent, the project made questionable cash disbursements of $1,646,669 and accrued questionable expenses of $192,487 while in a non-surplus-cash position, and (2) The owner and identity-of-interest management agent billed $1,162,150 and $1,288,745, respectively, for services not provided (unsupported). In addition, the general manager of the management agent received a salary as the assistant administrator of the nursing home for a total of $112,254 in unnecessary expenses.

In accordance with HUD Handbook 2000.06, REV-3, within 60 days, please provide us, for each recommendation without a management decision, a status report on (1) the corrective action taken, (2) the proposed corrective action and the date to be completed, or (3) why action is considered unnecessary. Additional status reports are required at 90 days and 120 days after report issuance for any recommendation without a management decision. Also, please furnish us copies of any correspondence or directives issued because of the audit.

Should you or your staff have any questions, please contact Michael Motulski, Assistant Regional Inspector General for Audit, at (617) 994-8380.

# Executive Summary

We audited Mount Saint Francis Health Center (project), located in Woonsocket, Rhode Island. The primary purpose of our audit was to determine whether the project operated in accordance with the U.S. Department of Housing and Urban Development's (HUD) regulatory agreement and other applicable laws and regulations.

### Audit Results

We identified $4,402,305 in questionable costs incurred. The project disbursed and accrued questionable costs for non-project-related expenses, loan repayments, partnership management fees, and unnecessary services while the project was in a non-surplus-cash position. Of the $4,402,305 in questioned costs, we classified $1,024,148 as ineligible project costs, $2,743,728 as unsupported costs, and $634,429 as unnecessary project costs (see appendix A).

The owner/management agent caused the conditions identified above by failing to operate the project in accordance with HUD's regulatory agreement and other applicable laws and regulations. The owner/management agent disregarded prudent business practices and exploited weak management controls.

As a result of these disbursements and accruals, the project encountered financial problems resulting in

- Late mortgage payments,
- Lack of funds to adequately fulfill its payroll obligations, and
- Failure to pay approximately $3,741,000 in payroll taxes to the Internal Revenue Service.

In addition, these actions resulted in federal tax liens on the property and generated several thousand dollars in unnecessary interest penalties and legal fees.

### Disbursements and Payables

The owner and management agent disbursed $1,646,669 in questionable expenses to identity-of-interest and non-identity-of-interest entities while the project was in a non-surplus-cash position. The project improperly disbursed $978,675 to identity-of-interest entities and $667,994 to non-identity-of-interest entities (see finding 1). We consider these disbursements to be in violation of applicable federal statutes and HUD regulations. The

2

disbursements were not for reasonable or necessary goods and services.

In addition, the project had accrued $192,487 in questionable expenses as of December 31, 2003, for services we determined to be ineligible, unsupported, or unnecessary.

**Disbursements and Payables to Owner/Identity-of-Interest Management Agent**

Our review disclosed that the owner and identity-of-interest management agent, Sterling Health Care Management Company (Sterling), did not perform the services required by their management agreements. As a result, neither the owner nor Sterling earned its annual management fees. Instead, project staff and consultants managed the project by performing the services described in the management agreements.

**Owner Did Not Earn Fees**

The owner was compensated at 3 percent of net patient revenue for services. According to the management agent profile submitted to HUD, the services provided by the owner were peculiar to the project's status as a special-purpose and regulated facility. However, our review determined that the services identified in the management agent profile were either identical or similar to the services identified in the project's management agreement with Sterling. Additionally, we determined that neither the owner nor Sterling provided the services required according to their management agreements. Instead, staff at the project and consultants performed these services. During our audit period, the owner billed the project $1,162,150 in unnecessary partnership management fees. We questioned $1,053,550 in payments to the owner and an additional $108,600 in accrued payables (see finding 2).

**Management Agent Did Not Earn Fees**

Sterling was also compensated at 3 percent of net patient revenue. It agreed to provide services (under the management agreement) that were performed by project employees or subcontracted out. The management agent billed the project $1,288,745 in unnecessary management fees during our audit period. We questioned $1,248,668 in payments to the management agent and an additional $40,077 in accrued payables (see finding 2).

**Disbursements to Assistant Administrator**

In addition, the general manager of Sterling received $112,254 from the project as the assistant administrator of the nursing home during our audit period. The duties of the assistant administrator duplicated the duties of the

3

Appropriate revisions were made to the audit report where deemed necessary. We included a complete copy of the auditee's responses in appendix B of the report along with our evaluation.

# Table of Contents

Management Memorandum                                                        1

Executive Summary                                                           2

Introduction                                                               7

Findings

1. The Owner and Identity-of-Interest Management Agent Diverted
   Funds from the Project                                                 11

2. The Owner/Identity-of Interest Management Agent and Assistant
   Administrator Received and Accrued $2,563,149 for Services Not
   Provided                                                              24

Management Controls                                                      31

Appendixes

   A. Summary of Questioned Costs                                        33
   B. Auditee Comments and OIG's Evaluation                              34

6

administrator and business office manager and were similar to those required of the management agent (Sterling). Therefore, the assistant administrator position was not a necessary and reasonable project expense according to the regulatory agreement. These unnecessary payments place the HUD insured mortgage at risk and threaten the project's financial viability. (See finding 2)

**Recommendations**

We recommend that the director, Rhode Island Multifamily Program Center,

- Pursue the recovery of double the amount of questionable cash disbursements to identities-of-interest as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.
- Obtain from the owner justification supporting the cash disbursements for unsupported costs.
- Obtain from the owner adequate justification for disbursements that were deemed unnecessary to the nursing home.
- Pursue the recovery of questionable distributions to non-identities-of-interest.
- Take appropriate action to prevent payment of ineligible and unnecessary cash disbursements after our audit period, including the payment of questionable accrued payables.
- Develop and implement procedures that ensure only eligible expenses are paid from project funds and that documentation is maintained to support the eligibility and the amount of operating funds expended.
- Remove the management agent in accordance with the management certification and HUD regulations.
- Pursue all applicable administrative sanctions against the owner, management agent, and identity-of-interest companies, specifically debarment.

**Findings and Recommendations Discussed**

We discussed the findings in this report with the responsible auditee officials, as well as HUD program officials during the course of the audit. We provided our draft audit report to the owner's general partner on November 10, 2005, requesting written comments by November 28, 2005 and offered to conduct an exit conference if one was desired. On November 21, 2005, we received a letter from the owner's legal counsel requesting a 60 day extension. We granted an extension to December 14, 2005 and received the auditee's written response that day via FAX through the owner's legal counsel.

4

# Introduction

Mount Saint Francis Health Center (project) is a 194-unit nursing home for the elderly and disabled, located in Woonsocket, Rhode Island. It is owned and operated by Mount St. Francis Associates, a Rhode Island for-profit limited partnership. Under Section 232 of the National Housing Act, the U.S. Department of Housing and Urban Development (HUD) insured a mortgage for $6,129,900 on November 9, 1983 (Federal Housing Administration Loan Number 016-43044).

Congress established the Section 232 nursing home program in 1969. HUD's Office of Multifamily Housing administers the program. The program's primary purpose is to insure mortgages made by private lending institutions. These mortgages are used to finance construction or renovation of nursing homes and assisted living and rest homes for the elderly.

Congress established the program to

- Conserve and increase the supply of nursing homes, intermediate care facilities, and board and care homes,
- Provide credit enhancement through insurance of mortgages for new or substantially rehabilitated projects, and
- Purchase or refinance existing Section 232-insured projects with or without repair

The nursing home program is unique because in many instances, there can be several parties involved in the arrangement as follows:

- HUD/insurer
- The mortgagee/lender
- The mortgagor/owner of the property/borrower
- The operating entity/lessee/operator
- The management agent/manager

In addition, the owner, management agent, and operating entity may have an identity-of-interest relationship. An identity-of-interest relationship exists when companies/partnerships are owned and/or controlled through common ownership and/or management. For the project, an identity of interest relationship exists among the owner, lender, management agent and companies that provided services to the nursing home. A listing of related companies and their officers is provided as Attachment F to this report. Identity-of-interest relationships can result in a control structure that may not be sufficient to ensure identity-of-interest transactions are at "arms length" and in the best interest of the project or HUD.

On November 1, 1984, the project entered into a management agreement with Health Management Services Company. Health Management Services Company was a Rhode Island-based management company not affiliated with the owner. Health Management Services Company was compensated at 3 percent net patient revenue for its services. On August 17, 1993, HUD approved a project owner's and management agent's certification for multifamily housing project for identity-of-interest agents, which lists the project's general partner (owner) as the management agent. The owner was to be compensated at 3 percent of net patient revenue for

7

services required by the special-purpose nature of the facility. This partnership management fee was in addition to the management fee received by Health Management Services Company.

On January 1, 1995, the owner entered into a management agreement with Sterling Health Care Management Company (Sterling), an identity-of-interest company that provided a management fee of 3 percent of net patient revenue. Sterling replaced Health Management Services Company as the management agent. Therefore, since January 1, 1995, the owner and identity-of-interest related management agent have had full control over the project's ownership, operations, and management.

On July 13, 1995, the owner refinanced the existing HUD-insured mortgage for $8,622,900 (Federal Housing Administration Loan Number 016-43077). On July 14, 1995, the owner signed a new regulatory agreement. The final endorsement, which occurred on July 10, 1996, reduced the mortgage amount to $8,616,900. After payoff of the existing mortgage, the project used the remaining proceeds to rehabilitate the project. As of December 1, 2003, the unpaid principal balance of the mortgage was $8,359,468.

On June 22, 1999, the project received an operating loss (working capital) loan insured by HUD for $1,103,600 (Federal Housing Administration Loan Number 016-15011). The regulatory agreement was amended on June 22, 1999, to include the operating loss loan. Suburban Mortgage Associates, Incorporated, an identity-of-interest company, financed and serviced both the mortgage and operating loss loan. As of December 1, 2003, the unpaid principal balance of the operating loss loan was $1,071,940.

| Audit Objectives | The overall audit objective was to determine whether the project operated according to HUD's regulatory agreement and other applicable laws and regulations. |
|---|---|
| Audit Scope and Methodology | To accomplish the audit objectives, we |

- Reviewed federal requirements, including the *Code of Federal Regulations*, HUD handbooks, and civil statutes.

- Reviewed the project's project files maintained by the HUD Rhode Island Multifamily Program Center; specifically, the reserve fund for replacements account; mortgage instruments; management certification/management agreement; regulatory agreement; monthly accounting reports, and independent public accountants' reports for fiscal years ending December 31, 1999 through 2002 (2003 reports had not been prepared as of March 2004).

■ Interviewed the management agent, nursing home staff, and HUD personnel to obtain procedures for administration, procurement, maintenance, cash receipts, cash disbursements accounting, and computer procedures to determine whether the project had adequate management controls in place to operate in accordance with the regulatory agreement.

■ Tested management controls relevant to the audit through inspection, review, and analysis of documents and records and evaluated the effects of any exceptions.

■ Reviewed the project's books and records to determine a) the reliability of information, b) the appropriateness of disbursements, and c) the sampling methods to be used to test payroll and disbursements for the necessity and reasonableness of costs.

■ Reviewed a statistical sample of payroll errors to determine whether payroll funds were properly used and deducted from the employee's net pay.

■ Tested a sample of transactions, within the audit period, from the operating account for unusual and questionable disbursements. Our sample was based on high-dollar value and risk. Our results relate only to those items reviewed.

■ Reviewed 100 percent of disbursements and accruals related to a) identity-of-interest vendors and individuals; b) non-identity-of-interest vendors providing legal, audit, and accounting services; c) vendors for renovations; and d) activity from the reserve fund for replacements account.

■ Reviewed the project's last two inspections performed by HUD's Real Estate Assessment Center on March 2, 2000, and May 15, 2003, and an inspection performed by Suburban Mortgage Associates on November 11, 2000. We also conducted a walk-through inspection of the facility on September 23, 2003, and inspected the maintenance systems with the maintenance director on December 30, 2003, to determine the physical condition of the project.

9

■ Reviewed the land records for the project maintained at the Office of the City Clerk (Woonsocket, Rhode Island) for liens and discharges.

The audit was conducted on site between September 2003 and March 2004 and covered the period from January 1, 2000, to December 31, 2003. When appropriate, the audit was extended to include other periods. We conducted our audit in accordance with generally accepted government auditing standards.

Finding 1

# The Owner and Identity-of-Interest Management Agent Diverted Funds from the Project

The owner and management agent of the project directed the payment of $1,646,669 in questionable cash disbursements between January 2000 and December 2003. In addition, the project had accrued $192,487 in questionable expenses as of December 31, 2003. The owner and management agent diverted operating funds to identity-of-interest entities of the project and paid for non-project-related expenses; loan repayments; and ineligible, unsupported, or unnecessary services while the project was in a non-surplus-cash position. This constituted a direct violation of HUD's regulatory agreement. The owner and management agent disregarded prudent business practices and exploited weak management controls. This misuse of funds places the HUD-insured mortgages in jeopardy and threatens the project's financial viability. The owner and management agent's actions contributed to (1) late mortgage payments, which resulted in late fee penalties; (2) lack of funds to make payroll obligations; and (3) failure to pay payroll taxes to the Internal Revenue Service, which resulted in approximately $3,741,000 in federal liens being placed on the property and unnecessary interest penalties and legal fees.

**Program Regulations**

HUD has issued regulations governing the insurance programs. These regulations provide for HUD to regulate and restrict the borrower by means of a regulatory agreement as long as HUD insures the mortgage. The regulatory agreement requires that owners shall not pay out any project funds except for reasonable operating expenses and necessary project repairs. The agreement further states that the owner shall not transfer any personal property of the project without prior HUD approval.

The *United States Code* at 12 U.S.C. Sec. 1715z-4a stipulates that HUD may recover any assets or income used by any person in violation of a regulatory agreement applicable to a multifamily project insured by HUD. For purposes of this statute, the "use of assets or income" includes any use not established by records and documentation as a reasonable or necessary operating expense of the project. For purposes of a mortgage insured under Title II of the National Housing Act, the term "any person" refers to any person or entity which owns a project, including stockholders, and any beneficial owner, officer, director, or partner of an entity owning the project. The U.S. government may recover double the value of any

11

assets and income of the project that have been used in violation of the regulatory agreement, plus all related costs such as reasonable attorney and auditing fees.

**Cash Disbursements and Accrued Payables**

The owner and management agent directed disbursements of operating funds of the project in the form of loan repayments, payments for services that were ineligible, unsupported, and/or unnecessary. From January 2000 to December 2003, we identified a total of $1,646,669 in questionable cash disbursements while the project was in a non-surplus-cash position. Of the total $1,646,669 in questioned costs, we classified $931,849 as ineligible project costs, $288,445 as unsupported costs and $426,375 as unnecessary project costs. The following chart further summarizes the questionable disbursements from the project.

| Summary of questionable cash disbursements | | | | | |
|---|---|---|---|---|---|
| Payees | Disbursement | Questioned costs | | | Total paid |
| | | Ineligible | Unsupported | Unnecessary | |
| Consultants, Inc. | Loan/payments | $61,247 | $8,000 | $0 | $69,247 |
| Consultants Associates | Loan/payments | $244,720 | $0 | $0 | $244,720 |
| My Place, Inc. | Emp. relations | $0 | $4,000 | $268,200 | $272,200 |
| Construction Software, Inc. | Acct. services | $0 | $1,200 | $46,080 | $47,280 |
| Hillside Health Center | Loan/payments | $104,520 | $0 | $0 | $104,520 |
| Sterling | Loan/expenses | $101,141 | $8,671 | $0 | $109,812 |
| Suburban Mortgage, Inc. | Late fees | $22,326 | $0 | $0 | $22,326 |
| Director of purchasing | Payroll | $0 | $0 | $108,570 | $108,570 |
| Adler, Pollock & Sheehan | Legal fees | $78,536 | $250 | $0 | $78,786 |
| George Babcock | Legal fees | $9,249 | $0 | $0 | $9,249 |
| Chaine des Rotisseurs | Entertainment | $0 | $0 | $3,525 | $3,525 |
| Lefkowitz, Garfinkel, Champi & DeRienzo | Acct. fees | $0 | $263,832 | $0 | $263,832 |
| O. Ahlborg & Sons, Inc. | Renovations | $223,308 | $0 | $0 | $223,308 |
| Various vendors | Various | $86,802 | $2,492 | $0 | $89,294 |
| Grand total | | $931,849 | $288,445 | $426,375 | $1,646,669 |

In addition, as of December 31, 2003, the project had a total of $192,487 classified as accrued payables for services that we determined were ineligible, unsupported, or unnecessary.

12

| Payee | Questioned payables | | | Total payables |
|---|---|---|---|---|
| | Ineligible | Unsupported | Unnecessary | |
| George Babcock | $6,775 | $0 | $0 | $6,775 |
| Lefkowitz, Garfinkel, Champi & DeRienzo | $0 | $4,388 | $0 | $4,388 |
| O. Ahlborg & Sons, Inc. | $85,524 | $0 | $0 | $85,524 |
| Non-identity-of-interest subtotal | $92,299 | $4,388 | $0 | $96,687 |
| My Place, Inc. (identity-of-interest) | $0 | $0 | $95,800 | $95,800 |
| **Grand total** | **$92,299** | **$4,388** | **$95,800** | **$192,487** |

## Disbursements to Identity-of-Interest Entities

The owner, management agent (Sterling) and the lender (Suburban Mortgage Associates, Inc.) all have identity-of-interest relationships. In addition, several other identity-of-interest companies have business connections with the project. These identity-of-interest relationships created an environment that made it possible for the owner/management agent to direct questionable cash disbursements with little risk of detection. To accomplish this end, the owner/management agent disregarded prudent business practices and exploited weak management controls.

We identified $978,675 in questionable cash disbursements to identity-of-interest companies during our audit period and $95,800 in accrued payables as of December 31, 2003, as explained below.

## Consultants, Inc. (Identity-of-Interest)

The project disbursed $69,247 to Consultants, Inc., for loan repayments and unsupported costs while in a non-surplus-cash position. Neither the project nor Consultants, Inc. notified HUD of these advances. According to the regulatory agreement, the project could not pay back advances from operations except from surplus cash unless the HUD office approved the payments. HUD did not approve repayment of these loans to Consultants, Inc., (as it was unaware of the advances). Therefore, we determined these payments totaling $61,247 to be ineligible. The project also paid $8,000 to Consultants, Inc., in unsupported costs.

## Consultants Associates, Inc. (Identity-of-Interest)

The project disbursed $244,720 to Consultants Associates, Inc., for loan repayments while in a non-surplus-cash position. Consultants Associates, Inc., made loans to the project to cover mortgage and payroll obligations. Neither the project nor Consultants Associates, Inc., notified HUD

13