of these advances. According to the regulatory agreement, the project could not pay back advances from operations except from surplus cash unless the HUD office approved the payments. HUD did not approve repayment of these loans to Consultants Associates, Inc. Therefore, we determined these payments totaling $244,720 to be ineligible.

**My Place, Inc. (Identity-of-Interest)**

The project disbursed $272,200 to My Place, Inc., which is owned and operated by the owner's daughter. The project paid My Place, Inc., to provide social services, educational services, administrative consulting services, promotional activities, and a comprehensive child-care program. However, our review determined that this contract was not properly procured and the services provided were not reasonable or necessary operating expenses.

My Place, Inc. provided incentive programs for project employees to show appreciation for the staff. For example, it held parties for the staff and their families, conducted raffles, and provided gifts of nominal value to project employees. It did not provide child-care services but, rather only provided referrals for child-care needs and for support services on an as-needed basis. My Place, Inc., provided seminars for the staff; however, the seminars were subcontracted out to Delta Consultants. The project had a human resources department on site that could have provided these services.

We determined that My Place, Inc.'s services were not necessary and reasonable operating expenses of the nursing home. Therefore, we classified $268,200 as unnecessary payments to My Place, Inc. We also identified one payment to My Place, Inc., for $4,000 based on a memo from the administrator to the accounts payable clerk. The project did not provide any further explanation or support for this disbursement. In addition, as of December 31, 2003, the project had accrued $95,800 payable to My Place, Inc., for services related to the contract for employee relations and a community outreach program, which we determined to be unnecessary expenses.

**Construction Software, Inc. (Identity-of-Interest)**

The project disbursed $47,280 to Construction Software, Inc., an identity-of-interest company. According to the monthly invoices, Construction Software, Inc., provided the following services:

14

- Accounting and general ledger review,
- Review of monthly reports,
- Submission of monthly reports to HUD,
- Review of input for financial statements, and
- Review of quarterly operations report

However, the business office manager at the project stated that these tasks were performed in house. The administrator and business office manager acknowledged that Construction Software, Inc., employees never worked at or came to the nursing home at any time, although the project paid Construction Software, Inc., $960 per month. Further, according to the administrator, who approves the payments, he was not sure what services Construction Software, Inc., provided and did not know whether it performed any work at the project. The administrator believed it provided computer software to Sterling.

Therefore, we consider payments of $46,080 unnecessary since the duties were performed by in-house staff and the project's accountants. In addition, we identified a payment to Construction Software, Inc., for $1,200 based on a memo from the administrator to the accounts payable clerk. The project did not provide any further explanation or support regarding the services provided for this disbursement.

**Hillside Health Center (Identity-of-Interest)**

We identified one disbursement of $104,520 to Hillside Health Center, an identity-of-interest nursing home. This disbursement was to repay a loan Hillside Health Center made to the project for a mortgage payment. Neither the project nor Hillside Health Center notified HUD of this advance. According to the regulatory agreement, the project could not pay back advances from operations except from surplus cash unless the HUD office approved such payment. HUD did not approve repayment of these loans to Hillside Health Center (as it was unaware of the advances). Therefore, we determined this disbursement to be ineligible.

**Sterling (Management Agent) (Identity-of-Interest)**

We determined that the project disbursed $109,812 in questionable costs to Sterling. Of this amount, the project disbursed $95,000 for loans to Sterling without HUD approval and in direct violation of the regulatory agreement. Therefore, we determined these disbursements

15

to be ineligible because the project was in a non-surplus-cash position.

Furthermore, the project disbursed $14,812 to Sterling for questionable miscellaneous expenses. Our review of these expenses disclosed $6,141 in ineligible expenses, which included services that were the responsibility of the management agent and should have been paid from the management fee. The remaining $8,671 was classified as unsupported. Sterling submitted invoices to the project for expenses it incurred. However, Sterling did not provide us with original invoices from the vendors for these costs as requested. (See finding 2 for the management agent fee.)

**Suburban Mortgage Associates, Inc. (Identity-of-Interest)**

The project disbursed $5,050,617 to Suburban Mortgage Associates, Inc., an identity-of-interest company, for mortgage payments and operating loss loan payments during our audit period. We determined a portion of the disbursements totaling $22,326 to be ineligible project expenses. The ineligible amounts included late charges due to mortgage and/or operating loss loan payments after the 15th of the month and bank charges for returned check fees. Additionally, we noted that the project submitted numerous letters to Suburban Mortgage Associates, Inc., with its regular mortgage payments, requesting Suburban Mortgage Associates, Inc., to hold the check until a specified time, usually between the 16th and 21st of the month.

**Director of Purchasing Salary (Identity-of-Interest)**

The director of purchasing was previously the general partner of the owner. Currently, he is the vice president of two identity-of-interest companies, Gregory Building Company and Mast Construction. The project created the director of purchasing position at the project in October 2001. The director of purchasing was hired a few days after submitting an application and used the general manager of Sterling as his reference.

There was no clear distinction between the director of purchasing position and the following positions at the nursing home:

- Medical supply clerk, who responsibilities included purchasing all medical supplies for the facility. The

16

medical supply clerk stated that he does not interact with the director of purchasing and has never met him.

- Maintenance director, who is involved with researching and purchasing major capital equipment. The maintenance director stated that the director of purchasing helped him contact the "right" companies when a job needed to be completed.

The amount of major capital equipment purchased does not appear to justify a position at the project for 20 hours per week at $47 per hour. Further, the maintenance director and administrator performed these tasks as necessary. In addition, according to paragraph 2, section 2.2 (c), of the management agreement between the owner and Sterling, the management agent was to arrange contracts for the purchase of all medical supplies and dietary, office, and other items required to operate the facility.

According to the Director of Purchasing's time cards, he worked the same hours every week at the project. However, while conducting our audit fieldwork, we never observed the director of purchasing at the project. The general manager of Sterling stated the director of purchasing worked at the management agent site.

Based on our review, we concluded that the director of purchasing position was not necessary. We identified $108,570 in unnecessary payments to the director of purchasing during our audit period. (See related finding 2 for unnecessary salary to the assistant administrator.)

**Disbursements to Non-Identity-of-Interest Vendors**

Our audit further identified $667,994 in questionable cash disbursements and $96,687 in questionable accrued payables to non-identity-of-interest vendors for services and other costs that were not necessary and reasonable expenses of the project. These disbursements were in direct violation of the regulatory agreement. The cash disbursements and payables were for various legal services, auditing and accounting services, renovations, unnecessary employee benefits, and late payments.

**Chaine des Rotisseurs**

The project disbursed $3,525 to Chaine des Rotisseurs, an organization which the project owner exerted control. The disbursements were related to employee entertainment for dinners in excess of $75 per person. Therefore, we

17

**Legal Expense**

concluded that the $3,525 was not for reasonable operating expenses or necessary repairs of the project.

The project made $88,035 in questionable cash disbursements to two law firms during our audit period.

- Adler, Pollock, and Sheehan – the project disbursed $78,536 in ineligible expenses and $250 in unsupported expenses to Adler, Pollock, and Sheehan, the nursing home's principal law firm. These ineligible disbursements were for

  - Legal services totaling $44,226 related to the project's nonpayment of payroll taxes to the Internal Revenue Service. Legal expenses related to this situation were not a reasonable and necessary expense of the project since it should have paid its payroll taxes in a timely manner.

  - Legal services totaling $19,310 regarding a zoning appeal for the expansion of the property. The costs of expanding the facility were not an allowable expense of the project, and HUD consent should have been obtained for these expenses. HUD did not consent to any payment from the operating account.

  - Legal services totaling $15,000 related to dismissing the owner and Consultants, Inc., as general partners of Edmund Place Associates in May 2000. This is a legal matter of the partnership for Edmund Place–a different HUD-insured project that defaulted in April 2000—not the project.

  - Legal services totaling $250 that were not properly supported to determine whether they were necessary and reasonable project expenses.

- George Babcock Esquire – the project disbursed $9,249 in ineligible expenses to George Babcock Esquire. These disbursements were for legal services related to lawsuits filed against Health Facilities Associates, the limited partner of the owner, the general partner of

18

Health Facilities, and the general partner of the owner. Therefore, these costs were not necessary and reasonable expenses of the project. As of December 31, 2003, the project had accrued $6,775 in payables to George Babcock Esquire. The invoices related to these payables were related to the lawsuits mentioned above, which we determined to be ineligible project expenses.

**Accounting Expenses**

The project disbursed a total of $263,832 to Lefkowitz, Garfinkel, Champi & DeRienzo. P.C., from January 1, 2000, to December 31, 2003. Although the costs appear to be for eligible accounting services, we classified the total costs as unsupported due to the following:

- Expenses were invoiced in a manner that did not allow the cost to be reconciled to a specific contract. Instead, services provided and costs billed and paid under different contracts were combined on invoices. Further, the project made partial payments on these invoices and did not identify how to apply the payments.

- The project was only able to provide us with two contracts covering only one year between the project and Lefkowitz, Garfinkel, Champi & DeRienzo for our audit period. One contract was for professional services to "audit the Partnership's balance sheet as of December 31, 2001 and the related statements of loss...and...audit the Partnership's compliance with specific requirements applicable to the major HUD-assisted programs for the year ended December 31, 2001." The second contract was an assistance contract "to assist REAC [the Real Estate Assessment Center] in determining whether the electronic submission of certain information agrees with the corresponding hard copy documents included within the Consolidated Audit Guide for Audits of HUD Programs." The administrator stated that Sterling might have the rest of the contracts. However, since the project made payments on these contracts, a copy should have been available at the project to ensure invoices were accurate according to the terms of the contract.

19

As of December 31, 2003, the project had accrued $4,388 in payables to Lefkowitz, Garfinkel, Champi & DeRienzo. The invoices for these payables are all related to accounting services, which are currently unsupported.

Upon receipt of adequate supporting documentation, HUD should perform a review of the necessity and reasonableness of these disbursements and payables.

**Renovations**

O. Ahlborg and Sons, Inc., was the general contractor during the HUD-approved rehabilitation of the project in 1995. After the renovations of the project, it refinanced its HUD-insured mortgage. According to the management agent, the rehabilitation exceeded the HUD-approved mortgage amount. Therefore, the project issued a promissory note for $200,000 to O. Ahlborg and Sons, Inc., on December 20, 1995. The note was payable upon demand and not secured by the property and no payment terms were specified. The interest on the note accrued at 10 percent of the unpaid balance per year. HUD did not approve this obligation; however, the project has been making payments on this note since 1996. It should have issued a HUD-approved surplus cash note, and payments should have only been made on this note if the project was in a surplus-cash position. The project paid O. Ahlborg and Sons, Inc., $223,308 on this promissory note while the project was in a non-surplus-cash position. Therefore, we determined that these disbursements were ineligible project expenses. As of December 31, 2003, the remaining principal balance was $85,524.

**Various Individual Payments**

Our review of 90 questionable disbursements to various non-identity-of-interest vendors disclosed $86,802 in ineligible expenses. The ineligible costs consist of benefits to employees, including Christmas parties, luncheons, gifts, and flowers, and penalties and interest for late tax payments while the nursing home was in a non-surplus-cash position. We further identified $2,492 in unsupported expenses. The project was not able to support the costs to determine whether they were eligible, necessary, and reasonable expenses for nursing home operations.

**Consequences of Diverting Project Funds**

The above deficiencies are contrary to the regulatory agreement, management certifications, and HUD handbooks. Project diversions are a serious matter and a direct breach of the owner's and management agent's

20

fiduciary responsibilities to the project and to HUD. The owner and management agent's actions contributed to

- Late mortgage payments, which resulted in late penalties;
- Lack of funds to make payroll obligations; and
- Failure to pay payroll taxes to the Internal Revenue Service, which resulted in liens on the property of approximately $3,700,000 and unnecessary interest penalties and legal fees.

These actions raise concerns pertaining to the owner and management agent's ability to comply with HUD regulations.

The diversion of project funds jeopardizes the project's financial condition, and the funds must be repaid to diminish potential insurance claims against HUD.

21

**Auditee Comments**

We received the auditee's comments to our audit on December 15, 2005 and are located in Appendix B of this report.

**OIG Evaluation of Auditee Comments**

Our evaluation of the auditee's comments has not changed our audit position. Our responses are located in Appendix B of this report, starting on page 129.

**Recommendations**

We recommend that the director, Rhode Island Multifamily Program Center:

1A. Pursue the recovery of double the amount of $533,954 in ineligible costs to identities-of-interest from the owner/management agent, as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

1B. Obtain adequate documentation from the owner/management agent for the cash disbursements for unsupported costs of $21,871 costs to identities-of-interest or pursue the recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

1C. Pursue the recovery of double the amount of $426,375 in unnecessary costs to identities-of-interest and non- identities-of-interest from the owner/management agent, as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

1D. Pursue the recovery of $397,895 in ineligible costs to non-identities-of-interest.

1E. Obtain justification from the owner/management agent supporting the cash disbursements for unsupported costs of $266,574 to non-identities-of-interest or pursue recovery of this amount.

1F. Take appropriate action to prevent payments of ineligible and unnecessary cash disbursements after our audit period, including the payment of questionable accrued payables to identities-of-interest of $95,800. If they have been paid, pursue the

22

recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

1G. Take appropriate action to prevent payments of ineligible accrued payables to non-identities-of-interest of $92,299. If they have been paid, pursue the recovery of this amount.

1H. Obtain adequate documentation from the owner/management agent for the $4,388 in unsupported accrued payables or pursue recovery of this amount.

1I. Remove the management agent (Sterling) in accordance with the management certification and HUD regulations.

1J. Develop and implement procedures that ensure only eligible expenses are paid from project funds and that documentation is maintained to support the eligibility and the amount of operating funds expended.

In addition, we recommend that HUD's Departmental Enforcement Center

1K. Pursue all applicable administrative sanctions against the owner, management agent, and identity-of-interest companies, specifically debarment.

23

Finding 2

# The Owner/Identity-of-Interest Management Agent and Assistant Administrator Received and Accrued $2,563,149 for Services Not Provided

The owner and identity-of-interest management agent (Sterling) did not perform the services required by their management agreements. As a result, neither the owner nor Sterling earned its annual management fees. Instead, project staff and consultants performed the services described in their management agreements. In addition, the general manager of the management agent received a salary from the project as the assistant administrator of the nursing home. The duties of the assistant administrator are the same as the duties of the administrator and business office manager positions and similar to those required of the owner and management agent. During our audit period:

- The owner billed the project $1,162,150 in questionable partnership management fees,
- The management agent billed the project $1,288,745 in questionable management fees, and
- The assistant administrator received $112,254 in unnecessary salary costs.

The owner and management agent disregarded prudent business practices and exploited weak management controls. These unsupported fees and unnecessary salaries place the HUD-insured mortgage at risk and threatens the project's financial viability.

## Costs Must Be Reasonable and Necessary

The regulatory agreement states that owners shall not pay out any project funds except for reasonable operating expenses and necessary project repairs.

The *United States Code* at 12 U.S.C. Sec. 1715z-4a stipulates that HUD may recover any assets or income used by any person in violation a regulatory agreement applicable to a multifamily project insured by HUD. For purposes of this statute, the "use of assets or income" includes any use not established by records and documentation as a reasonable or necessary operating expense of the project. For purposes of a mortgage insured under Title II of the National Housing Act, the term "any person" refers to any person or entity which owns a project, including stockholders, and any beneficial owner, officer, director, or partner of an entity owning the project. The U.S. government may recover double the value of any assets and income of the project that have been used in

24

violation of the regulatory agreement, plus all related costs such as reasonable attorney and auditing fees.

**Maintenance of Books and Accounts**

Both the regulatory agreement and the certificate executed by the borrower, at the time the mortgage is insured, contain provisions that accounts of mortgaged property operations be kept in accordance with the requirements of the HUD secretary and in such form as to permit a speedy and effective audit. Further, the borrower or owner agrees that "The mortgaged property, equipment, buildings, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the HUD Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents."

**Unsupported Owner Partnership Management Fees**

On August 17, 1993, HUD approved a project owner's and management agent's certification for multifamily housing project for identity-of-interest agents, which lists the general partner (owner) of the project as the management agent. The owner was compensated at 3 percent of net patient revenue for services required by the special-purpose nature of the facility. These fees were in addition to the management fee of 3 percent of net patient revenue to the management agent.

According to the management agent profile submitted to HUD, the services provided by the owner were peculiar to the project's status as a special-purpose and regulated facility. However, our review determined that the owner's services identified in the management agent profile were either identical or similar to the services identified in the project's management agreement with Sterling. Further, the owner subcontracted with Consultants, Inc., an identity-of-interest entity controlled by the owner, for a substantial portion of the services. The owner is the president of Consultants, Inc. Other personnel include the general manager of Sterling (also the assistant administrator) and the owner's son.

Additionally, our review determined that neither the owner nor Sterling provided the services required according to its management agreements. Instead, staff at the project and consultants performed these services.

25

The owner billed the project $1,162,150 in partnership management fees during our audit period. We identified $1,053,550 in payments to the owner. In addition, as of December 31, 2003, the project had accrued $108,600 payable to the owner for partnership management fees. We determined that the partnership management fees to the owner are unsupported due to the lack of evidence that required services were performed.

**Unsupported Management Fees**

On January 1, 1995, the owner entered into a management agreement with Sterling (an identity-of-interest management agent). As compensation for these services, the owner paid Sterling 3 percent of net patient revenue.

During our audit period, the management agent billed the project $1,288,745 for management fees. The project paid $1,248,668 in management fees. It paid $1,230,977 to Sterling and $17,691 to Management Realty Services, another identity-of-interest company. According to the general manager of Sterling, while Sterling was being set up in 1995, the project paid Management Realty Services for management services. The general manager advised that the same employees worked for both Management Realty Services and Sterling. As of December 31, 2003, the project had recorded an additional $40,077 as an accrued payable to Sterling related to the management fee. Due to the lack of adequate documentation of services provided, we determined that the management fees were unsupported project costs.

According to the management agreement, Sterling is responsible for keeping the nursing home running smoothly and in conformity with HUD requirements. However, our review determined that project staff and/or consultants performed these responsibilities and were paid directly by the project as explained below.

**Project Staff**

The project had the following positions on site at the facility:

- Administrator,
- Business office manager,
- Accounts payable clerk,
- Accounts receivable clerk, and
- Human resources director

26

**Consultants**

According to the nursing home administrator and the business office manager, project nursing home staff carried out the majority of the owner and management agent functions. These functions included such tasks as:

- Analyzing and solving nursing home problems;
- Recruiting, hiring, and supervising nursing home personnel; and
- Monitoring project operations by visiting the nursing home or analyzing project performance reports

The project also paid consultants to perform the work described in the management agreement. The management agreement stated under section 3, "Statements and Reports," that the management agent shall perform these tasks or cause them to be performed. For example, Lefkowitz, Garfinkel, Champi & DeRienzo, P.C., a non-identity-of-interest company, performed accounting services; these services included preparation of Medicaid and Medicare cost reports and correspondence with HUD. Before 2003, Sterling had an individual in charge of financial reports. Later, Lefkowitz, Garfinkel, Champi & DeRienzo, P.C., took over this responsibility; however, Sterling did not pay for these services from the management fee. Instead, the project directly paid for these services.

As these services described above were the responsibility of the owner and Sterling according to the management agreements, the services should have been paid with management fees rather than directly by the project. Instead, the project paid two or three times for these services including:

- Salaries to the staff employed by and located at the project or fees to consultants,
- Partnership management fees to the owner, and
- Management fees to the management agent

We concluded that the administrator, business office staff, and human resources personnel are on site daily and actively performing the tasks described under their job descriptions. We further determined that Sterling did not perform any of the services required by the management agreement and did not have the necessary staff to perform these services. As a result, we concluded that the partnership management fee and management fee were unsupported project costs.

27

**Unnecessary Assistant Administrator Salary**

The general manager of Sterling was also paid $112,254 for the assistant administrator position at the project during our audit period. The general manager of Sterling has served as the assistant administrator at the nursing home since October 2001. According to the current administrator, the owner and management agent created the assistant administrator position to ensure a licensed individual was available to run the facility in the administrator's absence. The assistant administrator holds a nursing home administrator's license from the State of Rhode Island. Regardless of whether the administrator is in the office, the project pays the assistant administrator for 20 hours every week.

All of the tasks assigned to the assistant administrator are also assigned to the administrator and/or the business office manager, with the exception of the following task contained in his job description: "Assume overall administrative responsibility for the facility operations while the Administrator is away from the facility. May assume direct supervision of specific departments under the guidance of the Administrator." Additionally, the duties identified in administrator, assistant administrator, and business office manager job descriptions are also similar to those of the management agent. Therefore, not only was the project paying the management agent 3 percent of net patient revenue for services provided by staff at the project, it was also paying the general manager a salary for these services. In addition, according to the owner's management agent profile, the general manager was also employed by Consultants, Inc., the company used by the owner to perform several of his partnership management tasks.

**Assistant Administrator Did Not Justify His Hours/Duties**

According to the assistant administrator's time cards, he worked the same hours every week at the project. However, during the course of conducting our audit fieldwork, we never observed the assistant administrator at the project. The assistant administrator stated he worked in the capacity of assistant administrator at the management agent site, reviewed reports, worked with project staff, or worked on behalf of the project at least 20 hours per week; however, regardless of the hours worked, he received a salary of $856 every week. The assistant administrator was not able to provide a clear distinction between his duties as the management agent and assistant administrator. During

28

this time, the project was in a non-surplus-cash position, and this salary was not a necessary or reasonable operating expense. Therefore, we questioned the salary of $112,254 to the assistant administrator.

**Auditee Comments**

We received the auditee's comments to our audit on December 15, 2005 and are located in Appendix B of this report.

**OIG Evaluation of Auditee Comments**

Our evaluation of the auditee's comments has not changed our audit position. Our responses are located in Appendix B of this report, starting on page 129.

**Recommendations**

We recommend that the director, Rhode Island Multifamily Program Center:

2A.    Obtain adequate documentation from the owner/management agent for cash disbursements of $1,053,550 in unsupported partnership management fees paid to the owner or pursue the recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

2B.    Obtain adequate documentation from the owner/management agent for unsupported accrued payables of $108,600 payable to the owner or pursue the recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

2C.    Obtain justification from the owner/management agent supporting the cash disbursements for unsupported costs paid to the owner/management agent of $1,248,668 or pursue the recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

2D.    Take appropriate action to prevent unnecessary cash disbursements after our audit period, including the payment of questionable accrued payables to the management agent of $40,077. If they have been

29

paid, pursue the recovery of double this amount as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

2E.    Pursue recovery of double the amount of $112,254 in questionable salary payments paid to the assistant administrator as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.

30

# Management Controls

In planning and performing our audit, we obtained an understanding of the management controls used by the management agent, Sterling, and those in place at the project that were relevant to our audit objectives. We reviewed the management control systems to determine our auditing procedures and not to provide assurance on management controls.

Management controls consist of a plan, organization, methods, and/or procedures adopted by management to ensure that resource use is consistent with laws, regulations, and policies; that resources are safeguarded against waste, loss, and misuse; and that reliable data are obtained, maintained, and fairly disclosed in reports.

**Relevant Management Controls**

We determined the following management controls were relevant to our audit objectives:

- Management controls over the appropriateness of project expenditures, specifically assuring compliance with the provisions of the regulatory agreement, the management agent certification, applicable laws and regulations, and other HUD regulations.

- Management controls over controls over payroll.

- Assuring the safeguarding of project assets.

We assessed the relevant controls identified above.

It is a significant weakness if management controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet an organization's objectives.

**Significant Weaknesses**

Based on our review, we believe the following items are significant weaknesses:

- Management controls over the appropriateness of project expenditures, specifically assuring compliance with the provisions of the regulatory agreement, the management agent certification, applicable laws and regulations, and other HUD regulations (See findings 1 and 2).

- Assuring the safeguarding of project assets (See finding 1).

31

We discussed the specific weaknesses in the Findings section of this report.