# Summary of Questioned Costs

| | Type of questioned cost | | |
|---|---|---|---|
| Recommendation number | Ineligible [1] | Unsupported [2] | Unnecessary/unreasonable [3] |
| 1A | $533,954 | | |
| 1B | | $21,871 | |
| 1C | | | $426,375 |
| 1D | $397,895 | | |
| 1E | | $266,574 | |
| 1F | | | $95,800 |
| 1G | $92,299 | | |
| 1H | | $4,388 | |
| 2A | | $1,053,550 | |
| 2B | | $108,600 | |
| 2C | | $1,248,668 | |
| 2D | | $40,077 | |
| 2E | | | $112,254 |
| Totals | $1,024,148 | $2,743,728 | $634,429 |
| Total questioned costs | | $4,402,305 | |

1. Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law; contract; or federal, state, or local polices or regulations.

2. Unsupported costs are those costs charged to a HUD-financed or HUD-insured program or activity when we cannot determine eligibility at the time of audit. Unsupported costs require a decision by HUD program officials. This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of departmental policies and procedures.

3. Unnecessary/unreasonable costs are those costs not generally recognized as ordinary, prudent, relevant, and/or necessary within established practices. Unreasonable costs exceed the costs that would be incurred by a prudent person in conducting a competitive business.

33

# Auditee Comments and OIG's Evaluation

<u>Ref to OIG Evaluation</u>                                    <u>Auditee Comments</u>

ADLER POLLOCK & SHEEHAN P.C.

One Citizens Plaza, 8th floor
Providence, RI 02903-1345
Telephone 401-274-7200
Fax 401-751-0604 / 351-4607

175 Federal Street
Boston, MA 02110-2890
Telephone 617-482-0600
Fax 617-482-0604

www.apslaw.com

December 14, 2005

**_VIA FACSIMILE AND REGULAR MAIL_**

John A. Dvorak
Regional Inspector General for Audit
U.S. Department of Housing & Urban Development
Office of Inspector General for Audit, Region 1
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street, Room 370
Boston, MA 02222-1092

Dear Mr. Dvorak:

This office is counsel to Mt. St. Francis Associates ("MSF") in connection with the draft Audit Report forwarded to MSF on November 10, 2005. As requested, MSF provides the following comments to the Report.[1] As discussed below, all payments made by MSF reflect necessary and reasonable operating expenses to ensure continuity of quality care to the resident population. Therefore, there is no basis for the recommended reimbursement and other relief in the Audit Report.

<u>Claimed Ineligible Costs (page 32 of draft Audit Report)</u>

**Recommendation Number 1A – $533,954 Claimed Ineligible Costs Paid to IOI Companies**

1. $305,967 – loan repayment to Consultants, Inc.

**Comment 1**

This money was paid to Consultants, Inc. to repay short-term advances by Consultants, Inc. to MSF for necessary and reasonable operating expenses including mortgage and payroll obligations. These loans and repayment were fully disclosed to HUD on MSF's monthly reports filed with HUD. HUD never questioned or objected to these transactions and as such, approved them as they were disclosed with the monthly filings. Such loans by IOI companies were made, in part, to ensure that the mortgage would not go in default.

---

[1] By correspondence dated November 23, 2005 to Edward Maggiacomo, you enlarged the time within which to respond to the draft audit report to December 14, 2005. This response is based on information presently available.



STATE CAPITAL
GLOBAL LAW FIRM GROUP

Member firms of the State Capital Global Law Firm Group practice
independently and not in a relationship for the joint practice of law.

34

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 2

These loans were voluntarily made on a short-term basis in order to ensure that MSF made its mortgage and payroll obligations when there was not enough cash flow to do so. Without these advances, MSF would not have been able to meet its obligations, which could have compromised the care of the patient population. The loan payments were advanced for the operation of the nursing home subject to repayment upon receipt of Medicaid reimbursement. Moreover, the loan payments and reimbursement were disclosed to HUD. HUD did not question or object to the short-term advance, thereby approving same.

2. $104,520 to Hillside Health Center

**Comment 2**

This disbursement was to repay a loan by Hillside Health Center to MSF in order for MSF to meet a mortgage payment obligation and, therefore, was a necessary and reasonable operating expense. The loan was for three days since the receipt of the Medicaid reimbursement to MSF was not received and the mortgage had to be paid. This loan and repayment were disclosed on the monthly reports filed by MSF with HUD. Moreover, HUD was informed of this transaction at the time and did not question or object to the short-term advance, thereby approving same.

3. $109,812 to Sterling Health Care Management (SHCM)

**Comment 3**

This disbursement included repayment of a loan made by SHCM to MSF for necessary and reasonable operating expenses. This loan and repayment were disclosed by MSF to HUD on the monthly filings. HUD did not question or object to this loan and repayment necessary for reasonable operating expenses. MSF cannot respond to the $14,812 for claimed questionable miscellaneous expenses without documentation. Upon receipt of same, MSF will respond accordingly.

4. $22,326 – Late fees to Suburban Mortgage Associates, Inc.

**Comment 4**

Each month the mortgage is paid from the monthly Medicaid check for services provided for the previous month. The payment is usually received between the 15th and 21st of each month. When the Medicaid check was received after the mortgage payment due date, the mortgage payment, by necessity, was likewise paid late, resulting in a late fee. Therefore, this payment was a reasonable operating expense in order to ensure compliance with the mortgage. Moreover, while the assessment of the late fees is from Suburban Mortgage Associates, Inc., which services the mortgage, the funds actually go to the investor of the mortgage, which is not an IOI firm.

| Ref to OIG Evaluation | Auditee Comments |
|---|---|

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 3

**Recommendation 1D – Claimed Ineligible Costs Paid to Non-IOI Companies totaling $397,895 (page 32)**

**Comment 5**

1. $78,536 – Legal fees to Adler Pollock & Sheehan P.C.

MSF made these payments to its legal counsel, Adler Pollock & Sheehan P.C. $44,226. These costs were incurred for legal services relating to MSF's non-payment of payroll taxes to the IRS. Because of other obligations required to ensure the requisite care to the patients at MSF, the payroll taxes were not paid. As a result, legal services were required to address the issue with the IRS in an attempt to mitigate against adverse consequence to MSF. Likewise, $19,310 was for legal services in connection with the zoning appeal for the expansion of the property, a reasonable operating expense. MSF is not aware of the reference to the $15,000 related to dismissing the owner and Consultants, Inc. as general partners of Edmund Place in May 2000 and requests that HUD forward documentation so that MSF may respond. The same is true for the legal services totaling $250. More information is needed in order to respond further.

**Comment 6**

2. George Babcock legal fees - $9,249

These fees were for certain defense costs covered under a policy of insurance. As soon as the management company became aware of Mr. Babcock's invoices, the processing of any unpaid invoices was stopped as Mr. Babcock's services were covered under a policy of insurance.

**Comment 7**

3. O. Ahlborg & Sons, Inc. $223,308 for renovations

As set forth in the Audit Report, Ahlborg was the general contractor during the HUD-approved rehabilitation of MSF in 1995. Such rehabilitation was necessary in order to ensure patient care. The promissory note was executed to document the outstanding obligation, which could not be made as and when due because of cash flow problems. This obligation was disclosed to HUD in all the monthly reports, HUD did not question or object to the existence of the note or repayment under the terms of the note. This payment was for necessary and reasonable operating expenses in connection with the necessary rehabilitation.

**Comment 8**

4. $86,802 – Various Vendors

The Audit Report references 90 questionable disbursements to various non-IOI vendors, disclosing $86,802 in claimed ineligible expenses. In order to properly respond, MSF needs an itemization of the claimed questionable disbursements. Without specific reference, MSF cannot respond further.

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 4

1G – $92,299 – Claimed Ineligible Accrued Payables

**Comment 6**
    1. $6,775

As of December 31, 2003, MSF had accrued $6,775 in payables to George Babcock. As set forth in Section 2 on Page 3, when this payable was discovered by the management company, the payable was removed and never paid.

**Comment 7**
    2. $85,524

This amount reflects accrual for the balance of the Ahlborg & Sons promissory note. See Section 3 on Page 3.

Claimed Unsupported Disbursements in the Amount of $2,743,728

1B – Claimed Unsupported Costs Paid to IOI Companies Totaling $21,871

**Comment 9**
    1. $8,000 paid to Consultants, Inc.

MSF is not aware of this payment and requires more information from the HUD audit work papers in order to respond.

**Comment 9**
    2. $4,000 paid to My Place, Inc.

MSF believes this was improperly coded. The payment should have reduced the accounts payable for a previously accrued expense.

**Comment 9**
    3. $1,200 paid to Construction Software, Inc.

MSF believes this payment was improperly coded. The payment should have reduced the accounts payable for a previously accrued expense.

**Comment 3**
    4. $8,671 paid to SHCM

MSF believes this payment is reimbursement for expenses that SHCM incurred on behalf of MSF. At times SHCM purchased items in bulk for all nursing home facilities it managed. This payment would reflect MSF's portion. MSF needs additional information from the HUD audit work papers in order to respond further.

37

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 5

**1E – $266,574 – Claimed Unsupported Costs**

**Comment 10**

1. $263,832 to LGC&D for accounting fees

LGC&D provided required accounting services to MSF, all of which were reasonable and necessary operating expenses of the facility. Attached at Tab 1 are the engagement letters from LGC&D dated January 2, 2001, January 7, 2002, January 25, 2002, May 14, 2002, January 13, 2003, and February 13, 2003. As set forth therein, LGC&D performed necessary accounting services to MSF, all of which constitute reasonable and necessary operating expenses.

**Comment 11**

2. $2,492 – various vendors

The Audit Report simply references various vendors, noting "We further identified $2,492 in unsupported expenses." MSF needs additional information from the HUD audit work papers in order to respond, including who the vendors are and the check numbers and dates in order to respond further.

**Comment 5**

2. $250 to Adler Pollock & Sheehan

MSF requires additional information from the HUD audit work papers in order to respond further, including the check number and date of payment.

**1H. $4,388**

**Comment 10**

As of December 31, 2003, MSF accrued $4,388 in payables to LGC&D. See engagement letters attached at Tab 1 and response above. This payment reflects necessary and reasonable operating expenses on behalf of the facility.

**$2,450,895 (2A through 2D, page 32)**

**Comment 12**

1. $1,053,550 and $108,600 accrued as payable as of December 31, 2003 to Project Owner.

As referenced in the draft Audit Report on page 24, on August 17, 1993, HUD approved a Project Owner's and Management Agent Certification for Multifamily Housing Projects for Identity of Interest or Independent Management Agents, which lists the general partner (owner) of MSF as the management agent. A copy of the agreement is attached at Tab 2. The owner was compensated at 3% of net patient revenue for services required by the special purpose nature of the facility. These fees are in addition to the management fee of 3% of the net patient revenue to

38

Ref to OIG Evaluation                    Auditee Comments

**Comment 12**

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 6

the management agent. As set forth in the agreement, the special fees were disclosed and approved by HUD:

> The agent, as managing general partner, is compensated at the rate of 3% of net patient revenue, for services required by the special purpose nature of the facility. See Adler Pollock & Sheehan letter to Providence Office Manager dated May 5, 1989 and Powell, Goldstein, Frazier & Murphy letter to Providence Office Manager dated July 24, 1992.

> The compensation to the agent is exclusive of compensation to Health Management Services, Inc. also at the rate of 3% of net patient revenue under a management agreement dated November 1, 1984 as amended as of April 1, 1989.

Moreover, the attachment to the agreement approved by HUD discloses the Management Agent Profile. See Attachment at Tab 2.

These fees reflect necessary and reasonable operating expenses of MSF disclosed and approved to HUD. In addition, monthly reports of revenue and disbursements were submitted to HUD, these items were never questioned or objected to and as such, HUD approved the payment of such items.

2. $1,248,668 disbursed for management fees and $40,077 accrued for SHCM services (page 32)

$1,239,077 was disbursed to SHCM and $17,691 disbursed to its predecessor, Management Realty Services. $40,077 was accrued as a payable to SHCM on December 31, 2003.

These payments were made to Management Realty Services and subsequently to SHCM as the management company approved by HUD. See agreement and management agreement attached at Tab 3. The management agreement was disclosed to and approved by HUD. The payments were an operating expense necessary for operation of the nursing home. In addition, monthly reports of the revenue and disbursements were submitted to HUD, these items were never questioned or objected to, and thereby approved by HUD.

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 7

**Claimed Unnecessary Unreasonable Costs Totaling $634,429**

**Comment 13**

    1. $268,200 disbursed to My Place, Inc.

The Management Agent Certification Agreement approved by HUD expressly lists My Place, Inc. in paragraph 14. My Place, Inc. was approved by HUD, was fully disclosed and monitored on a monthly basis to HUD. A description of My Place, Inc. services is attached at Tab 4 and confirmed in the draft Audit Report at page 14. These services include, by way of example and without limitation, employee relations, morale and counsel, all of which were reasonable and necessary for the operation of the nursing home. For example, the provision of such employee services among other things ensured continuity of care, which would keep the costs down. Likewise, the provision of such services was instrumental in fighting against union organization and the accompanying increased costs that would occur.

Payments to My Place, Inc. were disclosed on a monthly basis to HUD through the monthly HUD reports of revenue and disbursements and HUD was well aware of this contract and payment, not only through the monthly HUD reports, but also through the independent audits and the HUD reviews over the years.

**Comment 14**

**1C — $46,080 disbursed to Construction Software, Inc.**

CSI was disclosed to HUD in paragraph 14 of the Management Agreement and provided necessary and reasonable expenses paid out of operations. CSI was approved by HUD, was fully disclosed to and monitored on a monthly basis by HUD, and the services, including, without limitation, systems specialization, were ordinary and necessary for operation of the nursing home.

**Comment 15**

**1C – $3,525 to Chaine Des Rotisseurs**

First, Chaine Des Rotisseurs is not an IOI company. See attached description of the organization at Tab 5. This disbursement was to reward managers of the facility for quality work. Such managers were identified by the administrator of the facility and this was a necessary and reasonable operating expense to ensure employee satisfaction, contributing to the well-being of the nursing home operation.

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 8

**Comment 16**

**1C – $108,570 payable to the Director of Purchasing**

This payment reflects the necessary and reasonable expense item operations to ensure that purchasing of all capital equipment and repairs to the building were accomplished properly and at appropriate costs. The Director of Purchasing had detailed knowledge of the history and mechanics of the building as he had been involved in several capacities since MSF's inception. Moreover, if his services were not performed and compensated, costs would have been much higher. These costs were audited, approved and reimbursed by the State of Rhode Island Medicaid program. The job description for this position is attached at Tab 6.

**1F – $95,800**

**Comment 13**

$95,800 accrued at 12/31/03 for services of My Place, Inc. See Section 1 on page 7.

**2E – $112,254 – Payroll for the Assistant Administrator from October 2001 to December 31, 2003.**

**Comment 17**

A Rhode Island licensed Administrator is required pursuant to the controlling rules. In the absence of the Administrator, the Assistant Administrator filled this role. See Job Description at Tab 7. These services were necessary and reasonable expenses for operation of the nursing home, and these costs were audited, approved and reimbursed by the State of Rhode Island Medicaid program.

**Summary**

**Comment 18**

For the reasons set forth above, all of the identified costs were reasonable and necessary for the operation of the nursing home to ensure the health, safety and welfare of the patient population. Moreover, all of the costs were disclosed to HUD, approved by HUD, monitored on a monthly basis and, therefore, approved as reasonable and necessary for the operation of the nursing home. Moreover, as noted on page 8 of the draft Audit Report, on June 22, 1999, MSF received an operating loss (working capital) loan insured by HUD for $1,103,600 (FHA Loan Number 016-15011). Therefore, all expenses incurred prior to that date were disclosed, reviewed and approved by the local office of HUD.

With respect to those costs which are claimed unsupported or unnecessary/unreasonable, MSF will provide any requested documentation upon identification of same. Based upon the foregoing, MSF disagrees with each of the findings and asks that they be revised to accurately reflect 1) that the costs of the services rendered to the nursing home were necessary and

41

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK &SHEEHAN P.C.

December 14, 2005
Page 9

reasonable, and were disclosed to and approved by HUD, and 2) that the recommendations be rescinded.

Should you have any questions, please contact us.

Sincerely,

*Pat K Rocha*

PATRICIA K. ROCHA

PKR:dh

Attachments

cc:    Antone Giordano
       Edward L. Maggiacomo, Esq.

*364593_1.doc*

Ref to OIG Evaluation                    Auditee Comments

Tab 1



Lefkowitz, Garfinkel, Champi & DeRienzo P.C.
Certified Public Accountants / Business Consultants

Principals
Jerome I. Lefkowitz, CPA
Stephen M. Garfinkel, CPA
Frank J. Champi, CPA
Richard J. DeRienzo, CPA
Jerrold N. Derbianz, CPA, PFS
Peter Mizel, CPA
Stephen W. Geremia, CPA

January 2, 2001

Mr. Antone L. Giordano, General Partner
Mount Saint Francis Health Center Associates
4 Joseph Street
Woonsocket, RI 02895

Dear Mr. Giordano:

Thank you for continuing to engage Lefkowitz, Garfinkel, Champi & DeRienzo P.C. (LGC&D) as the independent auditors and third-party reimbursement consultants for Mount Saint Francis Health Center Associates (a Limited Partnership) (the Partnership). This letter confirms our understanding of the terms and objectives of our engagement and the nature and the limitations of the services we will provide in connection with the Partnership's years ended December 31, 1999 and 2000.

### Our Responsibilities

We will audit the Partnership's separate balance sheets as of December 31, 1999 and 2000 and the related separate statements of income (loss), partners' equity (deficiency) and cash flows for each of the years then ended. We also will audit the Partnership's compliance with specific requirements applicable to its major HUD-assisted program for each of the years ended December 31, 1999 and 2000.

We will plan and perform the audits in accordance with auditing standards generally accepted in the United States of America, standards for financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States, and the Consolidated Audit Guide for Audits of HUD Programs (the Guide) issued by HUD. Those standards and the Guide require that we obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Accordingly, a material misstatement might remain undetected. In our audits, we will examine, on a test basis, evidence supporting the amounts and disclosures in the financial statements and evaluate the overall financial statement presentation. Using professional judgment, we will decide what, how much and when to test, and what the results mean.

The separate financial statements will include such supplementary data as may be required by HUD. This data will be presented for the purpose of additional analysis and will be subjected to the auditing procedures applied in the audits of the basic financial statements.

43

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone Giordano, General Partner
January 2, 2001
Page 2

### Our Responsibilities (continued)

We will update our understanding of the Partnership's internal control. Our purpose is to plan the audits and determine the nature, timing, and extent of the audit procedures needed to be performed to express our opinion on the financial statements, express our opinion on compliance with specific requirements applicable to its major HUD-assisted program, and to report on internal control in accordance with the provisions of the Guide, and not to provide assurance on, or identify significant deficiencies in, internal control.

We will perform tests of control, as required by the Guide, to evaluate the effectiveness of the design and operation of internal control relevant to preventing or detecting material noncompliance with specific requirements applicable to HUD-assisted programs.    Our procedures will be substantially less in scope than would be necessary to render an opinion on internal control and, accordingly, we will not express an opinion on internal control.

We will perform procedures, as required by the Guide, to test compliance with Fair Housing and Non-Discrimination requirements applicable to HUD-assisted programs. Our procedures will be substantially less in scope than would be necessary to render an opinion and, accordingly, we will not express an opinion. However, we will report instances of noncompliance, or report that the results of our tests disclosed no instances of noncompliance that are required to be reported under the Guide.

An audit is not designed to detect error or fraud, including irregularities, illegal acts or theft that is immaterial to the financial statements. Accordingly, we will not design our audits or perform procedures to detect error or fraud that is not material to the financial statements. Error or fraud is considered to be material only if its magnitude, individually or in the aggregate, is such that a reasonable person relying on management's presentation of the Partnership's financial statements would be influenced by its inclusion or omission. Materiality is determined annually and applies to the Partnership's financial statements taken as a whole. Our engagement excludes services designed to detect error or fraud that is not material to the Partnership's financial statements, which are available under a separate engagement at substantial additional cost.

If for any reason, we are unable to complete the audits or form an opinion on the Partnership's financial statements or on its compliance with specific requirements applicable to its HUD-assisted program, we may decline to express an opinion or issue reports as a result of this engagement.

We will also prepare the Partnership's federal and state income tax returns for the year ended December 31, 2000. The income tax returns will be prepared from the Partnership's general ledger. We will not express an opinion or other form of assurance on the income tax returns.

44

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone Giordano, General Partner
January 2, 2001
Page 3

### Our Responsibilities (continued)

We will use our judgment in resolving questions where the tax laws are unclear or where there may be conflict between the taxing authorities' interpretation of the law and what seem to be other supportable positions. We will discuss alternatives with Mr. John Montecalvo and we resolve such questions in the Partnership's favor, if Mr. Montecalvo and we believe there is a reasonable justification for the position being taken.

In accordance with requirements of the Secretary of Health and Human Services (HHS), we will retain our books and records (that are necessary to certify the nature and extent of the fee for our services) for the necessary time periods and allow the necessary access to such books and records by the duly authorized agents of the Secretary of HHS, the Comptroller General and their duly authorized representatives.

Our workpapers for this engagement are the property of LGC&D and constitute confidential information. However, as required by Government Auditing Standards, we are required to make certain workpapers and other documents in our possession related to our audit reports, or photocopies thereof, available to duly authorized agents of the Comptroller General of the United States, the Secretary of HUD, the HUD Inspector General, or other cognizant agencies, and their duly authorized representatives, upon request for their regulatory oversight purposes. In addition, we may be requested by third parties to make certain workpapers and other documents in our possession related to this engagement (or photocopies thereof) available to duly authorized agents of Secretary of HHS, the Comptroller General and their duly authorized representatives and/or representatives of other third party auditors. We retain our workpapers and other documents for the necessary time periods and provide to the appropriate duly authorized agents and their representatives access to, or photocopies of, requested workpapers and other documents under the supervision of LGC&D personnel and at a location designated by our Firm.

Your signing this letter constitutes both your acknowledgment of our requirement to provide such access and your permission to make requested workpapers and other documents, or to provide photocopies thereof, available to the appropriate duly authorized agents and their representatives for the purpose described in the preceding two paragraphs. We will advise Mr. Montecalvo if such requests are made.

As required by Government Auditing Standards, we have previously provided to you under separate cover a copy of our Firm's latest Peer Review Report dated June 11, 1998.

### Other Communications to the Partnership

We will communicate in writing to Mr. Montecalvo and/or you any matters coming to our attention that, in our judgment, represent significant deficiencies in the Partnership's internal control, which could adversely affect its ability to record, process, summarize, and report financial data. We also will communicate in writing to Mr. Montecalvo and/or you any significant irregularities or fraud that may come to our attention, as well as any comments relative to third-party reimbursement planning, compliance and/or strategies.

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone Giordano, General Partner
January 2, 2001
Page 4

### The Partnership's Responsibilities

The management of the Partnership is responsible for the financial statements and for maintaining effective internal control that will, among other things, help assure the preparation of financial statements in conformity with accounting principles generally accepted in the United States of America and help assure that HUD-assisted programs are managed in compliance with applicable laws and regulations. Management also is responsible for identifying and ensuring that the Partnership complies with the provisions of laws and regulations and contracts, and specific program requirements related to its activities, including HUD-assisted programs.

Although we can advise the Partnership, Sterling Health Care Management Co., LLC (Sterling), the management agent, and Mr. Montecalvo, it is management's responsibility to adopt sound accounting policies, maintain an adequate and efficient accounting system, safeguard assets, and devise policies to detect and prevent fraud.

Management's and Sterling's responsibility for financial reporting includes establishing a process to prepare the accounting estimates included in the financial statements. Management judgments are necessary, and are typically based on its knowledge and experience about past and current events, and its expected courses of action.

Management and Sterling are responsible to make available to us all correspondence, inspection and other reports issued by HUD, as well as the Partnership's response, corrective action plan, or similar correspondence to HUD.

In the event that we issue a schedule of findings and questioned costs, HUD requires that the Partnership and the management agent develop and transmit to them a corrective action plan. In addition, to the extent there were findings from prior years, the Partnership and the management agent are required to comment on the status of corrective action taken on these prior findings.

At the completion of our audits, management will provide us with representation letters confirming, among other things, that management is responsible for the Partnership's financial statements and compliance with provisions of laws, regulations and contracts, and specific program requirements, that have a direct and material effect on the financial statements and HUD-assisted programs, and the detection and prevention of fraud resulting from both fraudulent financial reporting and misappropriation of assets.

Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in the representation letters that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to each of the years ended December 31, 1999 and 2000 are immaterial, both individually and in the aggregate, to the Partnership's financial statements taken as a whole.

Management and Sterling are responsible for making all financial records and related information available to us. The Partnership, its General Partner and Sterling agree to release, indemnify, defend, and hold harmless LGC&D and its principals and personnel from any liability or claim, and pay any legal fees and other costs incurred by LGC&D, as a result of LGC&D's reliance on any misrepresentations made by the Partnership, its General Partner or Sterling.

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone Giordano, General Partner
January 2, 2001
Page 5

### The Partnership's Responsibilities (continued)

We will provide Ms. Evelyn Perez and Ms. Jeanne Frappier with a list of required schedules before the audits begin. Ms. Perez, Ms. Frappier, and the Partnership's staff will prepare the requested schedules and analyses. Timely completion of the audits depend on preparing schedules and analyses timely and accurately, and providing us on a concurrent basis with trial balances, subsidiary listings of accounts receivable and accounts payable, and other supporting data for each of the years ended December 31, 1999 and 2000. If there are delays in preparing this material, if schedules must be continually revised, and/or if we are not able to perform on a concurrent basis both financial statement audits, our fees will increase. We will advise Mr. Montecalvo of any difficulties or delays in completing the engagement.

### Fees and Payment Arrangements

Our fees will be based on our customary rates for these services, plus out-of-pocket costs. Invoices will be submitted every two weeks as the work progresses. We shall make every effort to keep our time and expenses to the absolute minimum commensurate with the needs of this engagement.

Based upon information presently available to us, we estimate that our fees for the above services will range from $43,000 to $50,000, plus customary out-of-pocket costs not to exceed $2,000.

The Partnership will make minimum weekly payments to LGC&D of $1,000, commencing with the week beginning January 1, 2001. Should the Partnership fail to make any required weekly payment, we reserve the right to suspend our audits and/or not release the financial statements until such time as the Partnership brings the weekly payments current on a cumulative basis.

### Additional Services

The Partnership is required to electronically submit to the HUD Real Estate Assessment Center (REAC) its audited financial statements (or portions thereof) for the each of the years ended December 31, 1999 and 2000. The due date for electronic submission is March 31, 2001. Under HUD guidelines, management may contract with LGC&D or a third party to perform the electronic submission at agreed upon fees, which are deemed allowable project costs by HUD. Under certain circumstances, HUD will require LGC&D to perform an attestation agreed-upon procedures engagement under AICPA Statement on Standards for Attestation Engagements No. 4 where LGC&D compares the electronically submitted data in the REAC staging database to the hard copy of the financial statements and supplementary data.

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone Giordano, General Partner
January 2, 2001
Page 6

#### Additional Services (continued)

Should services other than those covered by this letter be required or requested, such as the electronic submission to REAC or assistance in compiling or commenting on the Partnership's third-party costs reports for the year ended December 31, 2000, we will discuss with Mr. Montecalvo before beginning the work the extent of these services and the basis for additional fees. LGC&D reserves the right to require a retainer and/or an increase to the minimum weekly payments prior to our performing such additional services.

#### Agreement

Please sign and return the enclosed two copies of this letter to signify your understanding of the arrangements and as authorization for us to proceed.

We look forward to a continuing and mutually beneficial association.

Very truly yours,

LEFKOWITZ, GARFINKEL, CHAMPI & DeRIENZO P.C.

Stephen M. Garfinkel, Principal
Certified Public Accountant

ACCEPTED:

By:

Date:  2/1/01

f:\.\garfinkel\engletter\ny00.doc

48

Ref to OIG Evaluation                    Auditee Comments

 **LG C&D**

Lefkowitz, Garfinkel, Champi & DeRienzo P.C.
Certified Public Accountants / Business Consultants

 *cc: PF*

**Principals**
Jerome L. Lefkowitz, CPA
Stephen M. Garfinkel, CPA
Frank J. Champi, CPA
Richard J. DeRienzo, CPA
Jerrold N. Dorfman, CPA, PFS
Peter Merci, CPA
Stephen W. Geremia, CPA

January 7, 2002

Mr. Antone L. Giordano, General Partner
Mount Saint Francis Health Center Associates
4 Joseph Street
Woonsocket, RI 02895

Dear Mr. Giordano:

We are pleased to confirm our understanding of the nature and limitations of the services we are to provide for Mount Saint Francis Health Center Associates (the Partnership) for the year ended December 31, 2001.

We will apply the agreed-upon procedure, which was agreed to by the Partnership and the U.S. Department of Housing and Urban Development, Real Estate Assessment Center (REAC).

We will compare the electronic submission with the corresponding hard copy documents. The results of the performance of our agreed-upon procedure indicate agreement or non-agreement of electronically submitted information and hard copy documents.

This engagement is solely to assist REAC in determining whether the electronic submission of certain information agrees with the corresponding hard copy documents included within the *Consolidated Audit Guide for Audits of HUD Programs* issued by the U.S. Department of Housing and Urban Development, the *Uniform Financial Reporting Standards for HUD Housing Programs*, and the *Industry User Guide for the Financial Assessment Subsystem – Submission (FASSUB)* reporting package. Our engagement to apply agreed-upon procedures will be performed in accordance with the attestation standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the specified users of the reports. Consequently, we make no representation regarding the sufficiency of the procedures described above either for the purpose for which these reports have been requested or for any other purpose. If, for any reason, we are unable to complete the procedures, we will describe any restrictions on the performance of the procedures in our reports.

Because the agreed-upon procedures specified above do not constitute an examination, we will not express an opinion on compliance with the electronic submission requirements. In addition, we have no obligation to perform any procedures beyond those specified above.

10 Weybosset Street ▪ Suite 700 ▪ Providence, Rhode Island 02903 ▪ Tel (401) 421-4800 ▪ 1-800-927-LGCD ▪ Fax (401) 421-0643

49

Ref to OIG Evaluation                          Auditee Comments

Mr. Antone L. Giordano, General Partner
January 7, 2002
Page 2

A copy of the reporting packages required by HUD, which includes the auditors' reports, is available in its entirety from the Partnership. We take no responsibility for the security of the information transmitted electronically to the U.S. Department of Housing and Urban Development, REAC.

Our reports are intended solely for the information and use of the Partnership and the U.S. Department of Housing and Urban Development, REAC, and is not intended to be and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

At the conclusion of our engagement, we will request certain written representations from management about compliance with the electronic submission requirements. You agree to hold us harmless from any liability and costs from misrepresentations made to us by management.

We understand that you will provide us access to the Partnership's electronic submissions and corresponding hard copy documents for the year ended December 31, 2001, we deem necessary to complete our engagement.

The workpapers for this engagement are the property of Lefkowitz, Garfinkel, Champi & DeRienzo P.C. (LGC&D) and constitute confidential information. However, we may be requested to make certain workpapers available to the Secretary of Housing and Urban Development, the U.S. Department of Housing and Urban Development (HUD) Inspector General and the General Accounting Office (GAO) or their representatives, pursuant to authority given to them by law or regulation. Access to such workpapers will be provided under the supervision of LGC&D's personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to HUD or GAO representatives. HUD and the GAO may distribute the photocopies or information contained therein to others, including other governmental agencies.

Our fees for these services will be based on the actual time spent at our standard hourly rates, plus travel and other out-of-pocket costs such as report reproduction, typing, postage, etc. Our standard hourly rates vary according to the degree of responsibility involved and the experience level of the personnel assigned to your audit. Our invoices for these fees will be rendered upon completion and are payable upon presentation. Ms. Tammy Anderson from our office will be your contact person for these engagements.

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone L. Giordano, General Partner
January 7, 2002
Page 3

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy of this letter and return it to us.

Very truly yours,

LEFKOWITZ, GARFINKEL, CHAMPI & DeRIENZO P.C.

*Michael E. Criscione*

Michael E. Criscione, Principal
Certified Public Accountant

MEC/mp

ACCEPTED:

By: _____

Date: _____2-02-0√_____

51

Ref to OIG Evaluation                           Auditee Comments



Lefkowitz, Garfinkel, Champi & DeRienzo P.C.
Certified Public Accountants / Business Consultants

*CC:PF*

Principals
Jerome L. Lefkowitz, CPA
Stephen M. Garfinkel, CPA
Frank J. Champi, CPA
Richard J. DeRienzo, CPA
Jerold N. Dorfman, CPA, PFS
Peter Mezzi, CPA
Stephen W. Gerenia, CPA

January 25, 2002

Mr. Antone L. Giordano, General Partner
Mount Saint Francis Health Center Associates
4 Joseph Street
Woonsocket, RI 02895

Dear Mr. Giordano:

Thank you for continuing to use Lefkowitz, Garfinkel, Champi & DeRienzo P.C. (LGC&D) as the independent auditors and third-party reimbursement consultants for Mount Saint Francis Health Center Associates (a Limited Partnership) (the Partnership). This letter confirms our understanding of the terms and objectives of our engagement and the nature and the limitations of the services we will provide.

### Our Responsibilities

We will audit the Partnership's balance sheet as of December 31, 2001 and the related statements of loss, partners' equity deficiency and cash flows for the year then ended. We also will audit the Partnership's compliance with specific requirements applicable to its major HUD-assisted program for the year ended December 31, 2001.

We will plan and perform the audit in accordance with auditing standards generally accepted in the United States, standards for financial audits contained in <u>Government Auditing Standards</u>, issued by the Comptroller General of the United States, and the <u>Consolidated Audit Guide for Audits of HUD Programs</u> (the Guide) issued by HUD. Those standards and the Guide require that we obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Accordingly, a material misstatement might remain undetected. In our audit, we will examine, on a test basis, evidence supporting the amounts and disclosures in the financial statements and evaluate the overall financial statement presentation. Using professional judgment, we will decide what, how much and when to test, and what the results mean.

The financial statements will include such supplementary data as may be required by HUD. This data will be presented for the purpose of additional analysis and will be subjected to the auditing procedures applied in the audit of the basic financial statements.

10 Weybosset Street ■ Suite 700 ■ Providence, Rhode Island 02903 ■ Tel (401) 421-4800 ■ 1-800-927-LGCD ■ Fax (401) 421-0643

52

Ref to OIG Evaluation                                    Auditee Comments

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 2

### Our Responsibilities (continued)

We will update our understanding of the Partnership's internal control. Our purpose is to plan the audit and determine the nature, timing, and extent of the audit procedures needed to be performed to express our opinion on the financial statements, express our opinion on compliance with specific requirements applicable to its major HUD-assisted program, and to report on internal control in accordance with the provisions of the Guide, and not to provide assurance on, or identify significant deficiencies in, internal control.

We will perform tests of control, as required by the Guide, to evaluate the effectiveness of the design and operation of internal control relevant to preventing or detecting material noncompliance with specific requirements applicable to HUD-assisted programs. Our procedures will be substantially less in scope than would be necessary to render an opinion on internal control and, accordingly, we will not express an opinion on internal control.

We will perform procedures, as required by the Guide, to test compliance with specific requirements applicable to transactions related to non-major HUD-assisted programs, if any, selected as part of performing our audit of the financial statements or our consideration of internal control used to administer HUD-assisted programs, and to test compliance with Fair Housing and Non-Discrimination requirements applicable to HUD-assisted programs. Our procedures will be substantially less in scope than would be necessary to render an opinion and, accordingly, we will not express an opinion. However, we will report instances of noncompliance, or report that the results of our tests disclosed no instances of noncompliance that are required to be reported under the Guide.

An audit is not designed to detect error or fraud, including irregularities, illegal acts or theft that is immaterial to the financial statements. Accordingly, we will not design our audit or perform procedures to detect error or fraud that is not material to the financial statements. Error or fraud is considered to be material only if its magnitude, individually or in the aggregate, is such that a reasonable person relying on management's presentation of the Partnership's financial statements would be influenced by its inclusion or omission. Materiality is determined annually and applies to the Partnership's financial statements taken as a whole. Our engagement excludes services designed to detect error or fraud that is not material to the Partnership's financial statements, which are available under a separate engagement at substantial additional cost.

If, for any reason, we are unable to complete the audit or form an opinion on the Partnership's financial statements or on its compliance with specific requirements applicable to its major HUD-assisted program, we may decline to express an opinion or issue reports as a result of this engagement.

We will also prepare the Partnership's federal and state income tax returns for the year ended December 31, 2001. The income tax returns will be prepared from the Partnership's general ledger. We will not express an opinion or other form of assurance on the income tax returns.

53

Ref to OIG Evaluation                                    Auditee Comments

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 3

### Our Responsibilities (continued)

We will use our judgment in resolving questions where the tax laws are unclear or where there may be conflict between the taxing authorities' interpretation of the law and what seem to be other supportable positions. We will discuss alternatives with Mr. John Montecalvo and we resolve such questions in the Partnership's favor, if Mr. Montecalvo and we believe there is a reasonable justification for the position being taken.

In accordance with requirements of the Secretary of Health and Human Services (HHS), we will retain our books and records (that are necessary to certify the nature and extent of the fee for our services) for the necessary time periods and allow the necessary access to such books and records by the duly authorized agents of the Secretary of HHS, the Comptroller General and their duly authorized representatives.

Our workpapers for this engagement are the property of LGC&D and constitute confidential information. However, as required by Government Auditing Standards, we are required to make certain workpapers and other documents in our possession related to our audit reports, or photocopies thereof, available to duly authorized agents of the Comptroller General of the United States, the Secretary of HUD, the HUD Inspector General, or other cognizant agencies, and their duly authorized representatives, upon request for their regulatory oversight purposes. In addition, we may be requested by third parties to make certain workpapers and other documents in our possession related to this engagement (or photocopies thereof) available to duly authorized agents of Secretary of HHS, the Comptroller General and their duly authorized representatives and/or representatives of other third party auditors. We retain our workpapers and other documents for the necessary time periods and provide to the appropriate duly authorized agents and their representatives access to, or photocopies of, requested workpapers and other documents under the supervision of LGC&D personnel and at a location designated by our Firm.

Your signing this letter constitutes both your acknowledgment of our requirement to provide such access and your permission to make requested workpapers and other documents, or to provide photocopies thereof, available to the appropriate duly authorized agents and their representatives for the purpose described in the preceding two paragraphs. We will advise Mr. Montecalvo if such requests are made.

As required by Government Auditing Standards, we are enclosing a copy of our Firm's latest Peer Review Report dated June 7, 2001.

### Other Communications to the Partnership

We will communicate in writing to Mr. Montecalvo and/or you any matters coming to our attention that, in our judgment, represent significant deficiencies in the Partnership's internal control, which could adversely affect its ability to record, process, summarize, and report financial data.

54

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 4

### Other Communications to the Partnership (continued)

We also will communicate in writing to Mr. Montecalvo and/or you any significant irregularities or fraud that may come to our attention, as well as any comments relative to third-party reimbursement planning, compliance and/or strategies.

### The Partnership's Responsibilities

The management of the Partnership is responsible for the financial statements and for maintaining effective internal control that will, among other things, help assure the preparation of financial statements in conformity with accounting principles generally accepted in the United States of America and help assure that HUD-assisted programs are managed in compliance with applicable laws and regulations. Management also is responsible for identifying and ensuring that the Partnership complies with the provisions of laws and regulations and contracts, and specific program requirements related to its activities, including HUD-assisted programs.

Although we can advise the Partnership, Sterling Health Care Management Co., LLC (Sterling), the management agent, and Mr. Montecalvo, it is management's responsibility to adopt sound accounting policies, maintain an adequate and efficient accounting system, safeguard assets, and devise policies to detect and prevent fraud.

Management's and Sterling's responsibility for financial reporting includes establishing a process to prepare the accounting estimates included in the financial statements. Management judgments are necessary, and are typically based on its knowledge and experience about past and current events, and its expected courses of action.

Management and Sterling are responsible to make available to us all correspondence, inspection and other reports issued by HUD, as well as the Partnership's response, corrective action plan, or similar correspondence to HUD.

In the event that we issue a schedule of findings and questioned costs, HUD requires that the Partnership and the management agent develop and transmit to them a corrective action plan. In addition, to the extent there were findings from prior years, the Partnership and the management agent are required to comment on the status of corrective action taken on these prior findings.

At the completion of our audit, management will provide us with a representation letter confirming, among other things, that management is responsible for the Partnership's financial statements and compliance with provisions of laws, regulations and contracts, and specific program requirements, that have a direct and material effect on the financial statements and HUD-assisted programs, and the detection and prevention of fraud resulting from both fraudulent financial reporting and misappropriation of assets.

Ref to OIG Evaluation                          Auditee Comments

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 5

### The Partnership's Responsibilities (continued)

Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in the representation letters that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the Partnership's financial statements taken as a whole.

Management and Sterling are responsible for making all financial records and related information available to us. The Partnership, its General Partner and Sterling agree to release, indemnify, defend, and hold harmless LGC&D and its principals and personnel from any liability or claim, and pay any legal fees and other costs incurred by LGC&D, as a result of LGC&D's reliance on any misrepresentations made by the Partnership, its General Partner or Sterling.

We will provide Ms. Jeanne Frappier with a list of required schedules before the audit begins. Ms. Frappier and the Partnership's staff will prepare the requested schedules and analyses. Timely completion of the audit depends on preparing schedules and analyses timely and accurately, and providing us on a concurrent basis with trial balances, subsidiary listings of accounts receivable and accounts payable, and other supporting data for the year ended December 31, 2001. If there are delays in preparing this material, if schedules must be continually revised, and/or if we are not able to perform on a concurrent basis the financial statement audit, our fees will increase. We will advise Mr. Montecalvo of any difficulties or delays in completing the engagement.

### Fees and Payment Arrangements

Our fee for the aforementioned services will be $30,000, plus out-of-pocket costs. Invoices will be submitted every two weeks as the work progresses. We shall make every effort to keep our time and expenses to the absolute minimum commensurate with the needs of this engagement.

The Partnership will continue to make minimum weekly payments to LGC&D of $2,000. Should the Partnership fail to make any required weekly payment, we reserve the right to suspend our audit and/or not release the financial statements until such time as the Partnership brings the weekly payments current on a cumulative basis.

<u>Ref to OIG Evaluation</u>                     <u>Auditee Comments</u>

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 6

### <u>Additional Services</u>

We will compile, from information you provide, the Partnership's third-party cost reporting forms for Medicaid (Form BM-64) and Medicare (Form CMS-2540) for the year ended December 31, 2001. We will not audit or review these cost reports and will not express an opinion or any other form of assurance on them.

We will electronically submit the Partnership's annual financial statements and supplemental data to HUD.

We will also compile, from information provided by your staff, the Partnership's Medicaid Labor Cost Report for the periods July 1, 2001 through December 31, 2001 and January 1, 2002 through June 30, 2002. We will not audit or review these cost reports and will not express an opinion or any other form of assurance on them.

Our fee for these services will be based on our customary rates, plus out-of-pocket costs. Invoices will be submitted every two weeks as the work progresses.

We will use our judgment in resolving questions where either the reimbursement rules or tax law are unclear or where there may be conflict between the reimbursement or taxing authorities' interpretation of the law and what seem to be other supportable positions. We will resolve such questions in your favor, if there is a reasonable justification for the position being taken, and discuss alternatives with you.

We shall also be available for meetings, in person or via telephone, and as you may request, to discuss tax and reimbursement matters relating to the aforementioned companies.

We shall issue separate engagement letters for any additional services you may request, not covered by this letter.

Ref to OIG Evaluation                          Auditee Comments

Mr. Antone L. Giordano, General Partner
January 25, 2002
Page 7

### Agreement

Please sign and return the enclosed two copies of this letter to signify your understanding of the arrangements and as authorization for us to proceed.

We look forward to a continuing and mutually beneficial association.

Very truly yours,

Lefkowitz, Garfinkel, Champi & DeRienzo P.C.

*Michael E Criscione*

Michael E. Criscione, Principal
Certified Public Accountant

MEC/mp

ACCEPTED:

By: _____

Date: _____2-22-02_____

G:\Client Data\07\0300-0070\00945 00 AA, St Francis Health Center Associates\Correspondence\0617\Engagement Letter.DOC

58

Ref to OIG Evaluation                    Auditee Comments



**DAVID BERDON & CO. LLP**
*Certified Public Accountants*

A member of Horwath International

415 Madison Avenue
New York, NY 10017-1178
Tel: (212) 832-0400
Fax: (212) 371-1159
www.dberdon.com

One Jericho Plaza
Jericho, NY 11753-1635
Tel: (516) 931-3100
Fax: (516) 931-0034

June 7, 2001

To the Shareholders
Lefkowitz, Garfinkel, Champi and DeRienzo P.C.

We have reviewed the system of quality control for the accounting and auditing practice of Lefkowitz, Garfinkel, Champi and DeRienzo P.C. (the firm) in effect for the year ended March 31, 2001. A system of quality control encompasses the firm's organizational structure and the policies adopted and procedures established to provide it with reasonable assurance of complying with professional standards. The elements of quality control are described in the Statements of Quality Control Standards issued by the American Institute of Certified Public Accountants (the "AICPA"). The design of the system, and compliance with it, are the responsibilities of the firm. In addition, the firm has agreed to comply with the membership requirements of the SEC Practice Section of the AICPA Division for CPA Firms (the Section). Our responsibility is to express an opinion on the design of the system, and the firm's compliance with that system and the Section's membership requirements based on our review.

Our review was conducted in accordance with standards established by the Peer Review Committee of the Section. In performing our review, we obtained an understanding of the system of quality control for the firm's accounting and auditing practice. In addition, we tested compliance with the firm's quality control policies and procedures and with the membership requirements of the Section to the extent we considered appropriate. These tests covered the application of the firm's policies and procedures on selected engagements. Because our review was based on selective tests, it would not necessarily disclose all weaknesses in the system of quality control or all instances of lack of compliance with it or the membership requirements of the Section. As is customary in a peer review, we are issuing a letter of comment relating to certain policies and procedures or compliance with them. This matter was not considered to be of sufficient significance to affect the opinion expressed in the report.

Because there are inherent limitations in the effectiveness of any system of quality control, departures from the system may occur and not be detected. Also, projection of any evaluation of a system of quality control to future periods is subject to the risk that the system of quality control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

59

Ref to OIG Evaluation                    Auditee Comments

In our opinion, the system of quality control for the accounting and auditing practice of Lefkowitz, Garfinkel, Champi and DeRienzo P.C., in effect for the year ended March 31, 2001 has been designed to meet the requirements of the quality control standards for an accounting and auditing practice established by the AICPA, and was complied with during the year then ended to provide the firm with reasonable assurance of complying with professional standards.  Also, in our opinion, the firm has complied with the membership requirements of the Section in all material respects.

Certified Public Accountants

Ref to OIG Evaluation                    Auditee Comments



September 26, 2001


Jerome L. Lefkowitz, CPA
Lefkowitz, Garfinkel, Champi
& DeRienzo, P. C.
10 Weybosset St
Providence, RI  02903

Dear Mr. Lefkowitz:

It is my pleasure to notify you that on September 17, 2001 the
SECPS Peer Review Committee accepted the report on the most
recent peer review of your firm, the related letter of comments,
and your firm's response thereto.  Those documents will now be
placed in the public files of the SEC Practice Section. The exit
conference on your next review must occur by December 31, 2004.

As you know, the reviewer's opinion was unmodified. The
Committee asked me to convey its congratulations to the firm.

Sincerely,

Richard L. Miller, CPA
Chair
SECPS Peer Review Committee

cc:  Robert M Sattler, CPA


Firm Number:  10115075                    Review Number:  173653


American Institute of Certified Public Accountants
Harborside Financial Center, 201 Plaza Three, Jersey City, NJ 07311-3881
(201) 938-3030 • (888) 817-3277 (public files) • fax (201) 521-5436 • www.aicpa.org
ISO 9001 Certified

61

Ref to OIG Evaluation                              Auditee Comments

 Lefkowitz, Garfinkel, Champi & DeRienzo P.C.
Certified Public Accountants / Business Consultants

Principals
Jerome L. Lefkowitz, CPA
Stephen M. Garfinkel, CPA
Frank J. Champi, CPA
Richard J. DeRienzo, CPA
Jerrold N. Dorfman, CPA, PFS
Peter Mezei, CPA
Stephen W. Gerentia, CPA
Susan R. Johnson, CPA
Michael E. Criscione, CPA

May 14, 2002

Mr. Antone L. Giordano, General Partner
Mount St. Francis Health Center Associates
4 St. Joseph Street
Woonsocket, RI 02895

RE:    *Mount St. Francis Associates, LP d/b/a Mount St. Francis Health Center 401(k) Plan*

Dear Mr. Giordano:

Thank you for the opportunity for Lefkowitz, Garfinkel, Champi & DeRienzo P.C. (LGC&D) to provide services for the Mt. St. Francis Associates, LP d/b/a Mount St. Francis Health Center 401K Plan (the Plan) for the year ended December 31, 2001. This letter confirms our understanding of the terms and objectives of our engagement and the nature of the services we will provide.

#### Our Responsibilities

We will audit the statement of net assets available for benefits of the Plan as of December 31, 2001, and the related statement of changes in net assets available for benefits for the year then ended.

We will plan and perform the audit in accordance with auditing standards generally accepted in the United States. Those standards require that we obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Accordingly, a material misstatement might remain undetected. In our audit, we will examine, on a test basis, evidence supporting the amounts and disclosures in the financial statements, and evaluate the overall financial statement presentation. Using professional judgment, we will decide what, how much and when to test, and what the results mean.

We will obtain an understanding of the Plan's internal control. Our purpose is to plan the audit and determine the nature, timing, and extent of the audit procedures needed to be performed to express our opinion on the financial statements and not to provide assurance on, or identify significant deficiencies in, internal control.

10 Weybosset Street ▪ Suite 700 ▪ Providence, Rhode Island 02903 ▪ Tel (401) 421-4800 ▪ 1-800-927-LGCD ▪ Fax (401) 421-0643

Ref to OIG Evaluation                          Auditee Comments

Mr. Antone L. Giordano, General Partner
May 14, 2002
Page 2

#### Our Responsibilities (continued)

An audit is not designed to detect error or fraud, including irregularities, illegal acts or theft that is immaterial to the financial statements. Accordingly, we will not design our audit or perform procedures to detect error or fraud that is not material to the financial statements. Error or fraud is considered to be material only if its magnitude, individually or in the aggregate, is such that a reasonable person relying on management's presentation of the Plan's financial statements would be influenced by its inclusion or omission. Materiality is determined annually and applies to the Plan's financial statements taken as a whole. Our engagement excludes services designed to detect error or fraud that is not material to the Plan's financial statements, which are available under a separate engagement at substantial additional cost.

We understand that the Plan has elected the method of compliance permitted by Section 2520.103-8 of the Department of Labor Rules and Regulations for Reporting and Disclosure under ERISA. Accordingly, as permitted under such election, we will not perform any audit procedures with respect to information certified by the Trustee's agent of the Plan, except that we will compare such information to the related information included in the financial statements. We understand that the Trustee's agent holds the Plan's investment assets and executes transactions therein, and that the Plan will obtain a certificate from the Trustee's agent that the information provided by the Trustee's agent is complete and accurate.

Our auditing procedures will include tests of documentary evidence supporting the transactions recorded in the accounts and direct confirmation of investments, except those certified to by the Trustee's agent, and certain other assets and liabilities by correspondence with selected participants, legal counsel and financial institutions.

Because of the significance of the information that we will not audit, we will be unable to express an opinion on the financial statements taken as a whole.

The purpose of our audit will be to permit us to render an opinion as to the compliance of information included in the financial statements, other than the information certified by the Trustee's agent, with the Department of Labor Rules and Regulations for Reporting and Disclosure under ERISA.

In accordance with requirements of the Secretary of Health and Human Services (HHS), we will retain our books and records (that are necessary to certify the nature and extent of the fee for our services) for the necessary time periods and allow the necessary access to such books and records by duly authorized agents of the Secretary of Health and Human Services (HHS), the Comptroller General and their duly authorized representatives.

Ref to OIG Evaluation                    Auditee Comments

Mr. Antone L. Giordano, General Partner
May 14, 2002
Page 3

### Our Responsibilities (continued)

Our workpapers for this engagement are the property of Lefkowitz, Garfinkel, Champi & DeRienzo P.C. and constitute confidential information. However, we may be requested by the United States Department of Labor (DOL) pursuant to authority given to it by law to make certain workpapers and other documents in our possession related to this engagement (or photocopies thereof) available to authorized representatives of the DOL, and the DOL may intend or decide to distribute the photocopies of information provided to them to others including other governmental agencies. Also, we may be requested by third party auditors to make certain workpapers and other documents in our possession related to this engagement (or photocopies thereof) available to duly authorized agents of Secretary of HHS, the Comptroller General and their duly authorized representatives and/or representative of the third party auditors. We will retain our workpapers for the necessary time periods and provide to the appropriate duly authorized agents and their representatives access to requested workpapers and other documents under the supervision of LGC&D audit personnel and at a location designated by our firm.

Your signing this letter constitutes both your acknowledgement of our requirement to provide such access and your permission to make requested workpapers and other documents, or to provide photocopies thereof, available to the appropriate duly authorized agents and their representatives for the purposes described in the preceding two paragraphs. We will advise you if such requests are made.

If, for any reason, we are unable to complete the engagement or are unable to form or have not formed a limited-scope opinion as permitted by Regulation 2520.103-8 of the DOL's Rules and Regulations for Reporting and Disclosure under ERISA, we may decline to express such an opinion or to issue a report as a result of this engagement.

### Our Communications to the Plan's Administrator

We will communicate in writing to the Plan's Administrator any matters coming to our attention that, in our judgment, represent significant deficiencies in the Plan's internal control, which could adversely affect its ability to record, process, summarize, and report financial data.

We also will communicate in writing to the Plan's Administrator any significant irregularities or fraud that may come to our attention.

Ref to OIG Evaluation                              Auditee Comments

Mr. Antone L. Giordano, General Partner
May 14, 2002
Page 4

### The Plan's Responsibilities

The management of the Plan is responsible for the financial statements and for maintaining effective internal control over financial reporting that will, among other things, help assure the preparation of financial statements in conformity with the principles generally accepted in the United States. Management also is responsible for identifying and ensuring that the Plan complies with all laws and regulations related to its activities.

Although we can advise the Plan, it is management's responsibility to adopt sound accounting policies, maintain an adequate and efficient accounting system, safeguard assets, and devise policies to prevent fraud.

Management's responsibility for financial reporting includes establishing a process to prepare the accounting estimates included in the financial statements. Management judgments are necessary, and are typically based on its knowledge and experience about past and current events, and its expected courses of action.

At the completion of our audit, management will provide us with a representation letter confirming, among other things, that management is responsible for the Plan's financial statements and, should any misstatements not be corrected do to immateriality, that management considers such uncorrected misstatements as immaterial, individually and in the aggregate, in relation to the Plan's financial statements taken as a whole.

Management and the Plan Administrator are responsible for making all financial records and related information available to us. The Plan and Mt. St. Francis Health Center Associates (the Center) agree to release, indemnify, defend, and hold harmless LGC&D and its principals and personnel from any liability or claim, and pay any legal fees and other costs incurred by LGC&D, as a result of LGC&D's reliance on any misrepresentations made by the Plan or management of the Center.

Mr. Peter Fournier, Administrator of the Center and his staff will provide us with the Plan's Form 5500 and all other requested schedules and analyses. Timely completion of the audit depends on preparing schedules and analyses timely and accurately. If there are delays in preparing this material or if schedules must be continually revised, our fees will increase. We will advise you of any difficulties or delays in completing the engagement.

We understand that The Hartford Life Insurance Company will prepare Form 5500 for the year ended December 31, 2001. We will read the Form 5500 as it relates to our audit. If our reading of the Form 5500 leads us to believe there is an inconsistency between the return and our audited financial statements we will advise you accordingly.

Ref to OIG Evaluation                    Auditee Comments
_____

Mr. Antone L. Giordano, General Partner
May 14, 2002
Page 5


#### Fees

Our fee for the above mentioned services will be based on our customary rates for these services, plus out-of-pocket costs. An invoice will be submitted at the completion of the audit and is due when presented.

Should services other than those covered by this letter be required or requested, we will discuss with you before beginning the work the extent of these services and the basis for additional fees.

#### Additional Services

Both parties may agree that we perform additional services not contemplated by this engagement letter. If this occurs, we will communicate with you regarding the scope and estimated cost of these additional services. Engagements for additional services may necessitate that we issue a separate engagement letter to reflect the obligations of both parties. In the absence of any other written communications from us documenting such additional services, our services will be governed by the terms of this engagement letter.

#### Agreement

Please sign and return the enclosed two copies of this letter to signify your understanding of the arrangements and as authorization for us to proceed.

We look forward to a continuing and mutually beneficial association.

Very truly yours,

LEFKOWITZ, GARFINKEL, CHAMPI & DeRIENZO P.C.

Michael E. Criscione

Michael E. Criscione, Principal
Certified Public Accountant

MEC/mp


ACCEPTED:

By: _____

Date: ___6-17-07___

Ref to OIG Evaluation                          Auditee Comments



**Lefkowitz, Garfinkel, Champi & DeRienzo P.C.**
Certified Public Accountants / Business Consultants

Principals
Jerome L. Lefkowitz, CPA
Stephen M. Garfinkel, CPA
Frank J. Champi, CPA
Richard J. DeRienzo, CPA
Jerrold N. Dorfman, CPA, PFS
Peter Merel, CPA
Stephen W. Gerenia, CPA
Susan R. Johnson, CPA
Michael E. Criscione, CPA

January 13, 2003

Mr. Antone L. Giordano, General Partner
Mount St. Francis Health Center Associates
4 St. Joseph Street
Woonsocket, RI 02895

RE:    *Mount St. Francis Associates, LP d/b/a Mount St. Francis Health Center 401(k) Plan*

Dear Mr. Giordano:

Thank you for continuing to use Lefkowitz, Garfinkel, Champi & DeRienzo P.C. (LGC&D) as the independent auditors for the Mt. St. Francis Associates, LP d/b/a Mount St. Francis Health Center 401(k) Plan (the Plan) for the year ended December 31, 2002. This letter confirms our understanding of the terms and objectives of our engagement and the nature of the services we will provide.

### Our Responsibilities

We will audit the statement of net assets available for benefits of the Plan as of December 31, 2002, and the related statement of changes in net assets available for benefits for the year then ended.

We will plan and perform the audit in accordance with auditing standards generally accepted in the United States. Those standards require that we obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud. Accordingly, a material misstatement might remain undetected. In our audit, we will examine, on a test basis, evidence supporting the amounts and disclosures in the financial statements, and evaluate the overall financial statement presentation. Using professional judgment, we will decide what, how much and when to test, and what the results mean.

We will update our understanding of the Plan's internal control. Our purpose is to plan the audit and determine the nature, timing, and extent of the audit procedures needed to be performed to express our opinion on the financial statements and not to provide assurance on, or identify significant deficiencies in, internal control.

10 Weybosset Street • Suite 700 • Providence, Rhode Island 02903 • Tel (401) 421-4800 • 1-800-927-LGCD • Fax (401) 421-0643

67

Ref to OIG Evaluation                               Auditee Comments

Mr. Antone L. Giordano, General Partner
January 13, 2003
Page 2

### Our Responsibilities (continued)

An audit is not designed to detect error or fraud, including irregularities, illegal acts or theft that is immaterial to the financial statements. Accordingly, we will not design our audit or perform procedures to detect error or fraud that is not material to the financial statements. Error or fraud is considered to be material only if its magnitude, individually or in the aggregate, is such that a reasonable person relying on management's presentation of the Plan's financial statements would be influenced by its inclusion or omission. Materiality is determined annually and applies to the Plan's financial statements taken as a whole. Our engagement excludes services designed to detect error or fraud that is not material to the Plan's financial statements, which are available under a separate engagement at substantial additional cost.

We understand that the Plan has elected the method of compliance permitted by Section 2520.103-8 of the Department of Labor Rules and Regulations for Reporting and Disclosure under ERISA. Accordingly, as permitted under such election, we will not perform any audit procedures with respect to information certified by the Trustee's agent of the Plan, except that we will compare such information to the related information included in the financial statements. We understand that the Trustee's agent holds the Plan's investment assets and executes transactions therein, and that the Plan will obtain a certificate from the Trustee's agent that the information provided by the Trustee's agent is complete and accurate.

Our auditing procedures will include tests of documentary evidence supporting the transactions recorded in the accounts and direct confirmation of investments, except those certified to by the Trustee's agent, and certain other assets and liabilities by correspondence with selected participants, legal counsel and financial institutions.

Because of the significance of the information that we will not audit, we will be unable to express an opinion on the financial statements taken as a whole.

The purpose of our audit will be to permit us to render an opinion as to the compliance of information included in the financial statements, other than the information certified by the Trustee's agent, with the Department of Labor Rules and Regulations for Reporting and Disclosure under ERISA.

In accordance with requirements of the Secretary of Health and Human Services (HHS), we will retain our books and records (that are necessary to certify the nature and extent of the fee for our services) for the necessary time periods and allow the necessary access to such books and records by duly authorized agents of the Secretary of Health and Human Services (HHS), the Comptroller General and their duly authorized representatives.