Ref to OIG Evaluation                    Auditee Comments

---

**Management Entity Profile**

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0305 (exp. 7/30/92)

Public reporting burden for this collection of information is estimated to average 2 hours for an initial response and 0.5 hours for an updated response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0305), Washington, D.C. 20503.

Privacy Act Statement: The Department of Housing and Urban Development (HUD) is authorized to collect this information by the U.S. Housing Act of 1937, as amended, and the Social Security Numbers (SSN) by the Housing and Community Development Act of 1987, 42 U.S.C. 3543. The information concerning management documents for Multifamily Housing projects is being collected by HUD to: (1) determine the acceptability of proposed management agents, (2) ensure compliance with program requirements, (3) provide leverage for removing poor managers, and (4) recover excessive management fees. The information is being used as a management tool to avoid the misuse of HUD subsidies and defaults against the FHA insurance fund by management agents. Specifically, the information will provide for improved project management by ensuring that subsidy funds are administered in accordance with HUD rules, project expenses are reasonable, maintenance of documented records, and use of project funds only in accordance with HUD requirements. The SSN is used as a unique identifier. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide the information could result in HUD's denial of proposed management or fees or cancellation of management contracts for noncompliance with HUD procedures. Providing the SSN is mandatory, and failure to provide it could affect your participation in HUD programs.

Instructions: The management entity may develop its own format for providing the information requested in this form. Independent fee managers and identity-of-interest management agents must provide all the information requested. Owner-managers and administrators of projects for the elderly must provide responses only to the asterisked items. They must also state whether they have previously managed insured and/or HUD-held projects and, if so, list such projects.

| *1a. Name of Management Entity | *1b. Management Entity Type |
|---|---|
| Sterling Health Care Management Co., LLC. | ☐ Owner/Manager  ☐ Project Administrator  ☒ Independent Fee Agent  ☒ Identity-of-Interest Agent |
| *1c. Employer Identification Number (EIN) | *1d. Organization Type |
| ▓▓▓▓▓▓ | ☐ Corporation  ☐ Partnership  ☐ Individual  ☒ Other (specify) Limited Liability Co. |

2. Give names, titles and Social Security Numbers of firm's principals (e.g., general partner, president, treasurer, etc.)

| Name | Title | Social Security Number |
|---|---|---|
| Juliette A. Vaccaro | General Manager | ▓▓▓▓▓▓ |
| Catherine Diedrich | Comptroller | ▓▓▓▓▓▓ |
|  |  |  |

Provide mailing addresses for the Company's home office and any branch offices involved in management of HUD-related multifamily projects. Specify the geographic area covered by each office.

190 Broad Street
Providence, RI 02903

| *4. What year did the company begin managing: 1994 | | | | 5. Estimate what percent of company's activities involve management at: | | | |
|---|---|---|---|---|---|---|---|
| a. HUD-subsidized projects | b. HUD-related unsubsidized projects | c. Conventional projects | | a. Conventional projects | b. HUD-related projects | c. Commercial space | d. Other |
| Nursing Homes | 1995 | | | % | 100 % | % | % |

6a. How many of the following projects does the company manage? (Both rentals and cooperatives)

| HUD-unsubsidized projects | HUD-unsubsidized beds | HUD-subsidized projects | HUD-subsidized units | HUD-owned projects | HUD-owned units | 6b. How many of the projects included in 6a: Have HUD-held mortgages | Are non-insured | Are subsidized co-ops | Are unsubsidized co-ops |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 378 | | | | | | | | |

6c. Approximately what percent of the projects in 6a fall into the following categories:

| Elderly | Family | Owned by a non-profit or coop | Core city | Troubled neighborhood | Suburban | Rural area |
|---|---|---|---|---|---|---|
| 100 % | % | % | % | % | 100 % | % |

7. Indicate where each of the following activities are administered. Use the following codes: C = central office; A = regional office; P = project site

| Bookkeeping | Landscaping | Maintenance | Purchasing | Tenant application | Certifications/recertifications | Regular monthly subsidy billings | Special claims subsidy billings |
|---|---|---|---|---|---|---|---|
| P | P | P | P | | N/A | N/A | N/A |

8. How many of the company's full-time employees serve in the following supervisory or advisory roles? (Owner-managers and administrators of projects for the elderly should provide this information on project employees.)

| Engineers | Maintenance supervisors | Occupancy supervisors | Training specialists | Social service coordinators | Regional property managers | How many are minorities | What percentage are minority |
|---|---|---|---|---|---|---|---|
| | 1 | | | 1 | | | % |

9. Identify any professional memberships, licenses, certificates or accreditations which are related to property management activities and are held by the company, company executives, or the employees considered in Item 8.

General Manager - CPM Key #8491, Senior RAM, Real Estate Salesman's License #S13746
Comptroller - Certified Public Accountant
Rhode Island Health Care Association

Ref to OIG Evaluation                    Auditee Comments

10. Describe any purchasing procedures you have ~ ~mented to control or reduce costs (e.g., bulk purchasing, paying early to take ~ ~ge of discounts, cost comparisons or bids, etc.)

Became member of Health Share Associates, Inc. which is a group purchasing program. No purchases without a purchase order request approved by Administrator. Cost comparisons and bids are obtained when applicable.

11a. List any companies which regularly supply goods or services to your HUD-related projects and have an identity-of-interest with the management entity or its principals (e.g., officers, general partners). Specify the type of goods and services provided. (See paragraph 2 - 3D of HUD Handbook 4381.5 for a definition of the term "identity-of-interest.") If these companies do not provide goods/services to all your HUD-related projects, identify the projects that do not deal with these companies.

Management Realty Services, Inc.
Gregory Building Company
Simon & Windsor Interiors, Inc.
My Place Inc.
Consultants Inc.

11b. Do any of the identity-of-interest companies listed in 11a. function as "pass-throughs" -- i.e., does the identity-of-interest company purchase goods or services from another party and pass those goods or services through to the project? For each pass-through arrangement:
(1) Name the identity-of-interest company involved.
(2) Explain how the identity-of-interest company's compensation is determined.
(3) Explain why it is more advantageous for the project to use the pass-through arrangement than to purchase directly from the ultimate supplier.

N/A

12. What types of property management procedures or operating manuals are used by on-site or supervisory staff?

HUD Handbooks
Written State and Company Policies
Health Department Regulations

13. What types of recurring written reports are prepared on project operations (e.g., maintenance, move-in/outs, payables, comparisons of budgeted and actual expenses)? Specify who (by position title) prepares the report, frequency of the report, and who reviews the report.

Weekly administration reports sent to General Manager of management company. Site problem reports prepared monthly by Maintenance Supervisor and submitted to Administrator and General Manager of management company. Payables are computer generated and submitted weekly to Administrator by Accounts Payable clerk. Monthly income/expense reports prepared by bookeeper and sent to General Manager and Owner. Admission reports submitted to Administrator and Gener. Manager of management company by Admissions person.

| 14a. How frequently do company executives or supervisory staff visit the projects the company manages? | 14b. Specify who (by position title) conducts the on-site visits or reviews. |
|---|---|
| Weekly - at a minimum | General Manager Comptroller |

15. If the company manages subsidized projects, identify by job title who prepares and reviews the HUD-required documents listed below. Specify the frequency of review.

| | Prepares documents | Reviews documents | Frequency of review |
|---|---|---|---|
| a. Form HUD-50059, Initial Certifications | N/A | | |
| b. Form HUD-50059, Recertifications | N/A | | |
| c. Regular Monthly Subsidy Billings | N/A | | |
| d. Special Claims Subsidy Billings | N/A | | |
| e. Proposals to terminate tenant assistance payments | N/A | | |
| f. Proposals to evict | N/A | | |
| g. Monthly Accounting Reports (Forms HUD-93479, 80, 81) | N/A | | |
| h. Form HUD-949, Civil Rights Tenant Characteristics/Occupancy Reports | N/A | | |

107

Ref to OIG Evaluation                    Auditee Comments

---

Agent Name    **Sterling Health Car   Management Company, LLC**                    Date 2/11/97 (Revised Forn

16.  If applicable, describe how the home office supervises supervisory staff
     (e.g., property managers, occupancy specialists, maintenance supervisors), who operate out of branch offices.

Weekly meetings with Department Heads.

17.  Describe how the company trains its employees in the areas listed below. Discuss both on-going training and initial training provided when the employee is hired. Specify the frequency
     and duration of the training and who/what organization conducts the training. Discuss training for both supervisory and front-line staff.
     a.  Property management practices.

N/A

b.  Financial and recordkeeping requirements.

Comptroller and independent CPA instruct all employees.  New employees would also receive
training by out-going personnel

c.  Civil rights and fair housing laws.

New employees are given copies of Executive Order 11063 and Title VIII of the Civil Rights
Act of 1968 as well as the Fair Housing Laws of Rhode Island.

d.  Occupancy requirements in HUD Handbook 4350.3, Occupancy Requirements of Subsidized Multifamily Housing Programs (if the company manages subsidized projects).

N/A

18.  Has an owner of a HUD-related project, at any time during the past five years, cancelled a property management contract held by the company?  ☐ Yes  ☒ No

During the past five years, how many HUD-related projects have not renewed their management contracts with the company? (Number)  N/A

Explain the reasons for any cancellations or failure to renew and identify the projects involved.

---

108

<u>Ref to OIG Evaluation</u>                <u>Auditee Comments</u>

19a.  List all HUD Field Offices that have jurisdiction over the projects included in 6a. For companies that operate in more than five Field Office jurisdictions, identify the five jurisdictions where the greatest number of your HUD-related projects are located.

HUD - Providence Service Office

19b.  List all State Agencies in whose jurisdiction you have managed or are managing State Agency-financed projects. For companies that operate in more than five States, identify the five where the greatest number of your State Agency projects are located.

Rhode Island Housing & Mortgage Finance Corp.
Providence HUD Office
State of Rhode Island Department of Health

19c.  List all FmHA offices in whose jurisdiction you have managed or are managing FmHA projects. For companies that operate in more than five FmHA jurisdictions, identify the five where the greatest number of your FmHA projects are located.

N/A

Certification:  The undersigned hereby certifies that the statements and information contained in this profile are true and correct.

Warning: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Signed by Management Entity Representative

| Signature | Date |
|---|---|
| _Juliette A. Vaccaro_ | 2/11/97 (Revised Form |
| Print Name  Juliette A. Vaccaro | Title  General Manager |

Ref to OIG Evaluation                    Auditee Comments

SCHEDULE A
(Management Entity Profile - Sterling Health Care Management Company, LLC
(SHCMC): Staff Salaries)

| Employee Name | Salary* | % of Salary Charged to SHCMC | |
|---|---|---|---|
| Juliette A. Vaccaro General Manager | $24,180 | 50% | (adjusted to actual hours worked on ongoing basis) |
| Martine Medeiros Administrative Assistant | 17,550 | 50% | (adjusted to actual hours worked on ongoing basis) |
| Catherine Diedrich Comptroller | 52,380 | 100% | |
| Patricia Heaney Assistant Comptroller | 33,040 | 100% | |
| Laurie Chivarini Clerk | 9,100 | 50% | |

* This is the portion of salary attributed to SHCMC, but in no way is indicative of the actual amount of time spent managing the facilities under the management contract.

110

Ref to OIG Evaluation

Auditee Comments

Tab 4

My Place Inc.'s Services

Ref to OIG Evaluation                    Auditee Comments

## My Place Inc.

**Daily & Weekly Responsibilities:**
1) company representative available from 9:00 AM to 5:00 PM five days a week

Representative capable of answering phones in a professional manor and be able to direct calls to the proper department accessing an available answering service during off hours for messages.

    a) Representative able to help employees with any social service questions or needs regarding:
        i) social agencies,
        ii) state agencies,
        iii) psychological services,
        iv) health programs,
        v) adult programs,
        vi) childcare programs,
        vii) federal programs,
        viii) dependence programs,
        ix) and other financial aid programs.
    b) This representative will also make the first introduction of the employee and/or their families to the agencies that they have requested. Further, they will follow-up with the employee to see if they are happy with the agency or program they have chosen and if they would like to be directed to another agency.

2) Counseling
    a) Provide Short-Term and Long-Term Counseling models to better service employees needs. Access to these programs is provided through the In-Service Coordinator, Personnel Director and the Administrator at the request of an employee or the request of an Administrator for an under performing employee. The Counseling services provided will aid employees with the following:
        i) Coping with juggling daily responsibilities.
        ii) Coping with Life's Problems.
        iii) Dealing with an unexpected crisis.
        iv) Dependence issues.
        v) Dealing with stress.
        vi) Dealing with self esteem.
        vii) Dealing with relationships.
        viii) Dealing with Health issues.
        ix) Dealing with job performance issues.
    b) Counselor made available on site once a month or on a as need basis for evaluations and/or guidance on which counseling direction would be best suited for an employee.

3) Health and Wellness Program
    a) Set-up Exercise Weight Loss Programs on a need basis

4) Make available a Comprehensive Child Care Referral Program for all employees on a daily as needed basis. This program unites employees with the proper child care, educational, and social agencies necessary to suit their child care needs. Note, the program contains the following components and sub-activities.

Page 2 of 7

Ref to OIG Evaluation                    Auditee Comments

a) Need Assessment Program: with the ability to conduct a survey to determine need;

Set-up a Referral Network Program

    i) Aide families in the selection for an appropriate child care service by making the selection process more informed and easier. Further, the goal of the referral network program is to help parents understand the following:

        (1) The different types of child care offered;

            (a) For Profit or Non-profit

            (b) In-Home Care

            (c) Family Day Care Homes

            (d) Day Care Centers and Nurseries

        (2) The advantages and disadvantages to each type of child care.

        (3) The importance of certification and licensure of child care facilities.

        (4) What to look for when choosing a child care facility.

        (5) Questions to ask child care providers when researching child care facilities.

        (6) How to monitor your child's progress in the day care setting you have chosen.

b) Set-up Screening Services

    i) The purpose of this service is to help parents identify, at an early age, potential problems with their children which could interfere with their natural growth and development. Further, to unite parents with the appropriate agencies that could help them. With early identification, many of these problems may be alleviated before the child is ready for school. The following are some of the Screening services we offer:

        (1) Hearing Screening

        (2) Vision Screening

        (3) Speech and Language Screening

        (4) Development Screening

c) Hotline

    i) Employees are able to call any time during business hours and ask staff for assistance in finding child care services or just talk about a simple parental concern.

d) Corporate Liaison

    i) maintaining a list of all licensed and certified day care centers in the State of Rhode Island in order to act as a resource for employee child care options.

    ii) a ready and available list of specialists for children who are found during the testing period to have special needs.

e) Financial Child Care Assistance

    i) providing employees who are in need of subsidized child care information, to determine eligibility, and determine which program best suits family's needs, circumstances.

Monthly Responsibilities:

5) Educational & Motivational programs:

a) Provide (2) ½ hour seminars per month.

    i) Hold Meetings with the In-Service Director, social service department, employee relations department, administrators, and employees to determine seminar topics that will meet their needs or the facility needs.

    ii) All Seminars provided by a Licensed Therapist, Psychiatrist, or Certified Specialist.

Page 3 of 7

Ref to OIG Evaluation                    Auditee Comments

6) Newsletters and Flyers
    a) Produce Communication and Management bulletins for the administrator, and management.
    b) Produce Health newsletters for employees.
7) Produce Monthly Social Event calendars in conjunction with the state Department of Tourism for all employees on up coming family events within the State.
8) Administrative Consulting Services
    a) Work with administrators to help implement top-down management policies, company policies, company procedures, and additional concerns.
9) Employee Assistance Program suggestion box
    a) Provide suggestion Box for employees to make comments and suggestions.
    b) Analyze all comments/suggestions and formalize a report to Owners, Administrator, and Management Company.
10) Stress Reduction In-Services
    a) Provide (2) ½ hour seminars per month.
        i) The Goal is to provide employees and management with an opportunity to work together in a relaxing and fun atmosphere through in-service activities.
        ii) Some examples are as follows:
            (1) Arts-n-crafts
            (2) Mini-projects

**Yearly Responsibilities**
11) Children Activities
    a) Provide (2) Holiday Activities per year for the parents and their children to get together and enjoy each others company.
        i) Activities consist of following and include clowns, magicians, and holiday characters
            (1) dinner and or lunch
            (2) beverages and party favors
        ii) Providing at least two personnel for the event.
12) Provide an annual employee appreciation/ health fair in the form of a carnival atmosphere. It held on a Pay Day and begining at 6:00am and ending at 4:30pm.
    a) providing all:
        i)    Outdoor Tents
        ii)   Tables
        iii)  Electircal equipment needed
        iv)  Chairs
        v)   Table Cloths
        vi)  Table skirts
        vii) Provide at least six personnel for the event.
        viii) Breakdown of equipment
    b) Set-Up booths with outside agencies targeting the employees well being. Following are some examples:
        i)  Health Representative.
        ii) Nutrition and/or Weight Control Representative.
        iii) Athletic Club Representative.
        iv) Insurance Coverage Representative.

Page 4 of 7

114

Ref to OIG Evaluation                    Auditee Comments

> v) Hobby and Crafts Representative.
> vi) Childcare Representative.
> vii) Counseling Representative.
> viii) Motivational Representative.
> ix) Uniform Representative.
> x) Massage Therapist Representative.
> xi) Other or by Special Request.
> c) Provide each attendant with giveaways such as:
> i) T-shirts
> ii) Hats
> iii) Bags
> d) Set-up Carnival Games (At least 3)
> i) Provide Prizes such as the following examples:
> (1) Stuffed Animals
> (2) Lollipops
> (3) Chocolate Bars
> (4) Flowers
> (5) Key-chains
> (6) Coffee Mugs
> (7) Pens/Pencils
> (8) Miniature Tool Sets
> (9) Fanny Packs
> (10) Lunch Bags
> (11) Frisbees
> e) Set-up Carnival Activities (At Least 3)
> i) Balloons
> ii) One minute craft
> iii) Tattoo's and Face Painting
> iv) Other ie pie eating contest
> f) Set-up Food Concessions (At Least 3)
> i) Candy
> ii) Complimentary Lunch
> iii) Coffee
> iv) Pastry
> v) Other
> g) Provide Seminars on a variety of topics such as the following examples:
> i) Employee Seminars
> (1) How to Budget a Single Paycheck
> (2) Understanding Attitudes of The Aging
> (3) Communication Workshop -- How to Work with Resident's Families
> (4) Stress Workshop
> (5) Team Building
> (6) Stress on The Job
> (7) Relationships -- Who? What? And Why?
> (8) How to Create a Positive Environment
> (9) Little Things Make a Difference

> Page 5 of 7

Ref to OIG Evaluation                    Auditee Comments

(10) Time Management
(11) Understanding Different Personality Types
(12) Assertive Communication
(13) Caring For the Elderly
(14) Having Patience With Your Patient
(15) Resident Skin, Nail and Hair Care
(16) Massage Therapy – How to Give a Massage
(17) Reflexology – Care of Resident Hands and Feet
(18) The Importance of Wearing a Nursing Uniform
ii) Corporate mandatory Seminars
(1) Hire Vision- Secrets to Reducing Absenteeism & Turnover or If You want Eagles, Stop Hiring Turkeys
(2) How to Motivate Employees to do More Than is Expected!
(3) Beyond Superior Customer Service – The Competitive Edge
(4) Dynamic Community Relations That Work and Win Support!
(5) How to Help People Work Together More Effectively!
iii) Facility Seminars
(1) Achieving The Ultimate Winning Team!
(2) I Do Make a Difference

13) Set-Up employee picnic
a) Provide the Following:
i) Games
ii) Prizes
iii) Raffle
iv) Organization and Oversite of events such as:
(1) Baseball
(2) Volley Ball
(3) Relay Races
(4) Etc.
v) Clowns, Magicians, & Holiday Characters when requested
vi) Provide at least two personnel for the Event.
14) Provide entertainment or prizes for the community when the facility is holding open houses for new patients during their outreach weeks.
a) Entertainment could be following:
i) Magicians
ii) Musicians
iii) Other
15) Provide flyers to employees explaining the employee assistance program available to them

16) Promotional Activities Monthly.
a) Door Prizes provided for each seminar.
b) Each month the facility is provided with a raffle for every employee. Some examples are as follows:
i) Thanksgiving Turkey Raffle
ii) St. Patty's Day Raffle
iii) Mother's Day Raffle

Page 6 of 7

116

Ref to OIG Evaluation                                    Auditee Comments

iv) Father's Day Raffle
v)  4th of July Raffle
vi) Christmas Raffle
vii) Easter Hunts
Each employee would receive a free raffle ticket with their pay check to enter. Prizes consisted of the following:
viii)    Alexander Uniform Shopping Spree
ix) A Turkey Basket, Easter Basket or other gift basket themes
x) Pawtucket Red Sox, Broadway Plays or other event tickets
xi) Gift certificates to grocery stores
xii) Free Gift Certificates to stores and restaurants
xiii)    Carnation Gifts
xiv)    Employee Carnival Day
xv) Candy Giveaways
xvi)    Movie Passes
b)  Each month each employee would receive a small perishable gift to thank them for their dedication and hard work. (gourmet chocolates or lemonade on hot days).

Page 7 of 7

117

Ref to OIG Evaluation                    Auditee Comments

Tab 5

# I – General Information

## A – The Chaîne in Brief

* History

Confrérie de la Chaîne des Rôtisseurs, the world's largest and, with the second of its two karmas, the oldest gastronomic society, was founded in Paris in the year 1248, under St. Louis, King of France, as the Royal Guild of Oyers Rôtisseurs. Limited at first to the "Masters" in the art of roasting geese, the object of the Guild was to perpetuate the standards of quality befitting the royal table.

The Guild developed rapidly, soon encompassing the preparation of all the various meats and fowls destined for the spit or rack. Eventually, the activities of the Guild, always under royal patronage, enlarged to include the development of an apprentice program, wage and work standards, and the conferment of appropriate honors. In 1509, the Rôtisseurs formally adopted statutes defining their profession, as well as a Coat of Arms. This increasingly wealthy monopoly continued until 1776, when the King declared freedom of work laws in an effort to forestall the French Revolution. A bit too late, unfortunately, and in 1791, the Chaîne was disbanded.

One hundred sixty years passed until three amateurs and two professionals joined in Paris in 1950 with a common goal — to restore the pride in culinary excellence lost during wartime shortages. The Chaîne des Rôtisseurs was re-incorporated and the Coat of Arms of the ancient guild restored by the French Government. Among the founders were Jean Valby, who served as Grand Chancelier until his retirement in 1993, and Curnonsky, known as the "Prince of Gastronomes."

* Purposes

The purposes of the Confrérie de la Chaîne des Rôtisseurs are: to promote, foster, and encourage the culinary arts and particularly the techniques of cooking by spit, rotisserie, barbecue, broiling and grilling; to collect and disseminate information with respect to the preparation and serving of foods, and the enjoyment, tasting and understanding of wines and distilled spirits; and, to encourage educational institutions to teach all phases of the culinary arts, enology and viticulture.

* Membership and Philosophy

Throughout the world, membership includes persons of the highest talent and distinction. There are Chaîne members in well over 100 countries. With the approval of the International President, countries

2/23/95                              I–1

118

<u>Ref to OIG Evaluation</u>                          <u>Auditee Comments</u>

establish their own Bailliages (Chapters) and coordinate their programs through the Chaîne's International Office in Paris.

The Bailliage des Etats-Unis is made up of approximately 140 Local Bailliages, with over 6,500 Members sharing the special bond Chaîne membership affords. Membership is by invitation only and is extended to both men and women, with rank being signified by Ribbons bestowed at formal Induction Ceremonies. Organized as a not-for-profit New York corporation and operated by a Board of Directors, the Bailliage des Etats-Unis is endowed with stability, prestige and the knowledge that the Chaîne des Rôtisseurs is a recognized leader in the support and appreciation of the gastronomic arts.

Underlying its phenomenal growth and success is that which distinguishes the Chaîne from other organizations involved in wine or food — the unique interfacing of professionals and amateur connoisseurs. Professional Members, for whom the Chaîne affords the opportunity to demonstrate exceptional skills, include the finest chefs, as well as hotel and restaurant owners and managers. Amateur Members provide the highly-trained professionals with an appreciative and knowledgeable learning audience.

Because the Chaîne offers opportunities to meet people who share an extraordinary and lively interest in the gastronomic arts, Members can cultivate richly rewarding friendships locally, regionally, nationally and internationally. Fellow Members can anticipate being made especially welcome when visiting Chaîne Member establishments displaying the Chaîne Plaque, a symbol of culinary excellence recognized around the world.

- **The Pledge of the Rôtisseurs**

"I do solemnly pledge to follow the rules of the Chaîne des Rôtisseurs, to honor my fellow Members and join in harmony with them at the table."

- **Chaîne Events**

Chaîne Bailliages schedule a variety of events to provide not only the camaraderie experienced by gathering around the table to enjoy the pleasures of the fine food and wine, but also to honor the chefs, restaurateurs, and service personnel responsible for providing these pleasures. Harkening back to its origins, the focus is often on regional and foreign cuisines and features fish, fowl, meat and game that has been roasted. Planning and execution of a Chaîne event involves an extraordinary effort on the part of a Bailliage as well as the host establishment. Whether it's an informal "Diner Amical" or a formal black tie eight-course dinner with white glove service, the concentration is on exceptional food, well-matched wines and impeccable service.

2/23/95                          I-2

119

Ref to OIG Evaluation                    Auditee Comments

Appropriate food and wine commentaries are often offered during an event, and at the event's conclusion, the chefs and waitstaff are usually introduced, allowing the guests to show their appreciation.

• **The Ordre Mondial**

The Ordre Mondial des Gourmets Dégustateurs is an adjunct of the Chaîne devoted to specialized wine activities. Its membership is comprised of Chaîne professional and amateur Members who are advanced connoisseurs of wine, and its purpose is to encourage the collection and dissemination of information on wines and crafted spirits. Members may elect to take part in various excursions and educational events and are encouraged to schedule their own events within their respective Bailliages. This adjunct organization has its own traditions and Induction Ceremony and offers an added enriching dimension to the Chaîne experience.

• **The Chaîne Foundation and Outreach Efforts**

In keeping with its purpose of encouraging the professional and academic pursuit of culinary excellence, the Bailliage des Etats-Unis has established the Chaîne Foundation, a separate not-for-profit, tax exempt corporation. Its funds are used to further career development, including providing scholarships and sponsoring culinary competitions. In addition, many Bailliages design their own educational and outreach programs.

2/23/95                    I-3

120

Ref to OIG Evaluation                    Auditee Comments

Tab 6

---

*Mt. Saint Francis Health Center*

Job Description
Position: Director of Purchasing

**Supervisor:** General Partner, Mt. Saint Francis

**Description:** To oversee the purchasing function for Mt. Saint Francis Health Center

**Duties:**

- Ongoing review and analysis of competitive pricing with all vendors
- Meet with vendors and/or their representatives; attend pertinent industry trade shows
- Review master mailing and price lists for all primary and secondary vendors
- Review inventory levels maintained by facility. Review necessary year end inventory reports for Controller
- Review master list of house stock inventory items and par levels for each nursing station.
- Review month end inventory reports received from facility.
- Ongoing communication with business office on current pricing information
- Assist Controller with establishing and reviewing supply markup to ensure proper cost to charge ratios are in place
- Review construction bids and oversee actual construction work.
- Review a Capital Needs Assessment for building.
- Work with Maintenance Supervisor as to Scope of Work and priority of projects.

**Qualifications:**

- Bachelor Degree in Business Administration or related field
- Three to five years purchasing experience in health care or related field
- Excellent communication skills

---

121

Ref to OIG Evaluation                    Auditee Comments

Tab 7

---

### MT. SAINT FRANCIS HEALTH CENTER

#### Job Description

**POSITION:**    Assistant Administrator

DEPARTMENT:    Administration

SUPERVISOR:    Administrator

DESCRIPTION:    The primary purpose of this position is to assist in directing the day-to-day functions of the facility in accordance with current federal, state and local standards, guidelines and regulations that govern the Long term care facility and as may be directed by the Administrator to assure that the highest degree of quality care is maintained at all times.

SUPERVISION EXERCISED:    As the Assistant Administrator, you are delegated the administrative authority, responsibility and accountability necessary for carrying out your assigned duties. In the absence of the Administrator, act on his/her behalf.

SUPERVISION RECEIVED: Under the direction of the Administrator, Owner & Sterling Health Care Management Co.

### DUTIES:

### ADMINISTRATIVE FUNCTIONS:

- Act on behalf of the Administrator during his/her absence.

- As part of its commitment to providing quality care in accordance with the laws and regulations applicable to Nursing homes, Mt. Saint FrancisHealth Center has adopted a Compliance plan. You will be expected to be familiar with the Compliance plan and to abide by its provisions.

- Assume overall administrative responsibility for all the departments and programs at Mt. Saint FrancisHealth Center.
    Accounts Receivable, Accounts Payable & Resident accounts, Medical Records, Housekeeping, Rehab, Purchasing, Admissions, and Risk Management.

122

Ref to OIG Evaluation                          Auditee Comments

2

Develop and implement a Quality Assurance program in the facility to continuously strive toward providing the highest quality of care.

♦ Assist Administrator in planning, developing, organizing, implementing and directing the day-to-day functions of the facility, its programs and activities.

♦ Assist in the development and implementation of our written policies and procedures that govern the operation of the facility.

♦ Assist department directors assigned to you in the development and use of department policies and procedures, and establishes a rapport in and among departments so that each can realize the importance of teamwork.

♦ Assist in establishing policies that govern the resident's right to quality of life and care as defined by the resident's comprehensive assessment and care plan.

♦ Interpret the facilities policies and procedures to employees, residents, family members, visitors, government agencies, etc. as necessary or instructed.

♦ Attend department head meetings etc., as scheduled or as may be called.

♦ Work with department heads and committees to help ensure the facility is in compliance with all state and federal guidelines i.e.: (OBRA, OSHA, ADA, JACHO).

♦ Assume the administrative authority, responsibility and accountability of directing the activities and programs for the assigned departments.

♦ In the absence of the Administrator, represent the facility at and participate in to-level meetings as may be assigned.

♦ When requested, represent the facility in dealings with outside agencies, including governmental agencies and third party payers or provide an authorized representative of the facility when unable to attend such meetings.

♦ Make written and oral reports/recommendations to the Administrator concerning the operation of the facility.

♦ Accept and perform temporary or long-term assignments/projects to various departments within the facility as required by the Administrator.

♦ Participate in facility surveys (inspections) made by authorized government agencies.

123

Ref to OIG Evaluation                    Auditee Comments

3

- Assist in developing a plan of correction for deficiencies noted during survey inspections and provided a written copy of such plan to the Administrator for his/her review/approval.

- Maintain an adequate liaison with families and residents.

- Assist in developing and maintaining a good public relations program that serves the best interest of the facility and community alike.

## COMMITTEE FUNCTIONS:

- Serve on various committees of the facility (i.e.: Infection Control, Quality Assurance, Safety etc. as appointed by the Administrator) and provide written/oral reports of such committee meetings to the Administrator as necessary.

- Assist the Quality Assurance committee in developing and implementing appropriate plans of action to correct identified quality deficiencies.

- Evaluate and implement recommendations from the facility's committees as necessary or as may be directed.

## PERSONNEL FUNCTIONS:

- Assist in the recruitment and selection of competent department directors, supervisors, consultants and other auxiliary personnel. Make recommendations to the Administrator.

- Delegate administrative authority, responsibility, and accountability to other staff personnel as deemed necessary to perform their assigned duties.

- Work with the facility's consultants as necessary and implement recommended changes as approved by the Administrator.

- Consult when necessary with department directors concerning the operation of their departments to assist in eliminating/correcting problem areas and/or improvement of services. Report such findings/solutions to the Administrator.

- Assist in scheduling department working hours, personnel, work assignments, etc. as necessary or required.

- Counsel/discipline personnel as requested or as may become necessary.

Ref to OIG Evaluation                    Auditee Comments

4

♦ Ensure that disciplinary action is administered fairly and without regard to race, color, creed, national origin, age, sex, religion, handicap, or marital status.

♦ Terminate employment of personnel when necessary, documenting and coordinating such actions with the Administrator and/or Human Resource Manager.

♦ Conduct performance evaluations as necessary

♦ Schedule and participate in departmental meetings.

♦ Serve as liaison to the Administrator, medical staff and other professional and supervisory staff.

♦ Maintain an excellent working relationship with the medical profession and other health related facilities and organizations through formal working and transfer agreements.

## STAFF DEVELOPMENT:

♦ Attend and participate in workshops, seminars, etc. to keep abreast of current changes in the long-term care field, as well as to maintain a professional status.

♦ Ensure that all personnel attend and participate in annual OSHA AND CDC in-service training programs for hazard communication, TB management and bloodborne pathogens standard and other mandatory in-service programs.

♦ Create and maintain an atmosphere of warmth, personal interest and positive emphasis as well as a calm environment throughout the facility.

## SAFETY & SANITATION:

♦ Assist in insuring that the building and grounds are maintained in good repair.

♦ Participates in insuring that facility personnel follow established ergonomics policies and procedures (i.e., a back brace and/or a mechanical lifter is used when lifting or moving heavy objects.)

♦ Assist in insuring that personnel follow established policies governing the use/disposal of personal protective equipment, and disposal of infectious wastes.

## EQUIPMENT & SUPPLY FUNCTIONS:

125

<u>Ref to OIG Evaluation</u>                    <u>Auditee Comments</u>

- ♦ Recommended to the Administrator equipment and supply needs.

- ♦ Assist in insuring that the facility is maintained in a clean and safe manner for resident comfort and convenience by assuring that necessary equipment and supplies are maintained in an operable manner to perform such duties/services.

- ♦ Assist in insuring that adequate supplies and equipment are on hand to meet the day-to-day operational needs of the facility and resident.

## BUDGET & PLANNING FUNCTIONS:

- ♦ Assist in preparing an annual operating budget for approval by the Administrator and allocate the resources to carry out programs and activities of the facility.

- ♦ Assist all department heads in the review and planning of their department's annual or periodic budgets.

- ♦ Assist Administrator in financial negotiations with outside entities such as lenders, purchasers, suppliers, etc.

## WORKING CONDITIONS:

- ♦ Works in office areas as well as throughout the facility and its premises.

- ♦ Moves intermittently during working hours.

- ♦ Is subject to frequent interruptions.

- ♦ Is involved with residents, family members, personnel, visitors, government agencies/personnel etc. under all conditions/circumstances.

- ♦ Is subject to hostile and emotionally upset residents, family members, personnel and visitors.

- ♦ Works beyond normal working hours and on weekends and holidays when necessary.

- ♦ Is subject to call-back during emergency conditions (i.e.: severe weather, evacuation, post-disaster, etc.)

- ♦ May be involved in community/civic health matters/projects.

126

Ref to OIG Evaluation                    Auditee Comments

6

- Attends and participates in continuing education programs.

- Is subject to injury from falls, burns from equipment, odors, etc. throughout the work day, as well as reactions from dust, disinfectants, tobacco smoke and other air contaminants.

- Is subject to exposure to infectious waste, diseases, conditions etc. including TB and AIDS and Hepatitis B viruses.

- May be subject to the handling of exposure to hazardous chemicals.

- Communicates with the medical staff, nursing personnel and other department supervisors.

- Maintains a liaison with the residents, their families, support personnel etc., to assure that the resident's needs are continually met.

**EDUCATIONAL REQUIREMENTS;**

- Must have a Bachelor's degree in Health Care Administration, Accounting or in Business Administration from an accredited college or university.

**EXPERIENCE:**

- Must have a minimum of 3 years in a supervisory capacity in a hospital or long-term care facility.

- Must possess a working knowledge of long-term care operational standards set forth in the Federal Register, Requirements of Participation.

**SPECIFIC REQUIREMENTS:**

- Must hold a current Rhode Island Nursing Home Administrator's License.

- Must be able to read, write, speak and understand the English language.

- Must possess the ability to make independent decisions when circumstances warrant such action.

- Must possess the ability to deal tactfully with personnel, residents, family members, visitors, government agencies/personnel and the general public.

- Must be knowledgeable of reimbursement regulations, nursing and medical practices and procedures, as well as laws, regulations and guidelines pertaining to long-term care administration.

Ref to OIG Evaluation                    Auditee Comments

7

- ♦ Must possess the ability to work harmoniously with and supervise other personnel.

- ♦ Must have patience, tact, cheerful disposition and enthusiasm, as well as be willing to handle residents, staff and visitors based on whatever maturity level at which they are currently functioning.

**HIPAA POLICY:**

The Assistant Administrator shall have unlimited access to treatment, payment and operations.

*ESSENTIAL ELEMENTS

OIG Evaluation of Auditee Comments

**Comment 1**    HUD did not approve the $305,967 in advances or repayments while Mount Saint Francis was in a non-surplus cash position. The Mount Saint Francis regulatory agreement prohibited the owner or management agent from using project revenue to engage in any other business or activity not related and essential to the operation of the project. The agreement also stated that the owners shall not assign, transfer, dispose of, or encumber any personal property of the project.

No matter what the reason for the advances, they require prior approval and, therefore, the $305,967 is an ineligible cost. In addition, submission of monthly accounting reports does not constitute approval of those items from HUD.

In reviewing the detail of the $305,967 disbursed from Mt. Saint Francis Health Center, we realized we inadvertently combined the total disbursements under Consultants Inc. There were two companies operating out of 190 Broad Street in Providence, Rhode Island with similar registered names. We determined that $61,247 was paid to Consultants, Inc. The remaining $244,720 was paid to Consultants Associates, Inc., another identity of interest company. We have revised the report to reflect the two companies.

**Comment 2**    The repayment of the Hillside Health Center, LLC's advance of $104,520 to Mount Saint Francis was not approved by HUD. In addition, when Hillside Health Center, LLC, a related HUD insured property, made the loan, it violated its regulatory agreement with HUD since the Mount Saint Francis mortgage payment was not a reasonable and necessary cost of Hillside Health Center, LLC. Also, as stated in Comment 1 above, the Mount Saint Francis regulatory agreement prohibits such activity. In addition, submission of monthly accounting reports does not constitute approval of those items from HUD. Therefore, the $104,520 is an ineligible cost.

**Comment 3**    $95,000 of the $109,812 in questionable payments to Mount Saint Francis represent loans made to Sterling Health Care Management. We have attached details of the remaining $14,812 (see Attachment A), of which $8,671 is unsupported.

HUD approved a Mount Saint Francis request to borrow funds from the Reserve Fund for Replacement account to cover payroll expenses of the project. The $95,000 was subsequently wired by Suburban Mortgage Associates, Inc., to Mount Saint Francis' bank account. Mount Saint Francis then transferred $45,000 of the $95,000 to Sterling Health Care Management's bank account. Sterling Health Care Management ultimately transferred the $45,000 to Hillside Health Center, LLC (a related nursing home) for their payroll. The Mount Saint Francis regulatory agreement prohibited the owner or management agent from

129

using project revenue to engage in any other business or activity not related and essential to the operation of the project. The agreement also stated that the owners shall not assign, transfer, dispose of, or encumber any personal property of the project.

Additionally, the following list of check disbursements by Mount Saint Francis to Sterling Health Care Management represents the balance of the $95,000 in questionable payments:

| Check No. | Check Date | Amount |
|-----------|-----------|--------|
| 15678 | 5/18/2001 | $20,000 |
| 15730 | 6/14/2001 | $25,000 |
| 15953 | 10/4/2001 | $ 5,000 |
| | Total | $50,000 |

No approvals were made by HUD for these loans. The fact that payments to Sterling Health Care Management were noted in monthly accounting reports to HUD is not an authorization of such loans and does not constitute HUD approval. In fact, the monthly reports filed with HUD show the disbursement description simply as "Management." This would not necessarily raise suspicion since the same description was used every month for Sterling Health Care Management's management fee payments. As stated above, the Mount Saint Francis regulatory agreement prohibits such a transfer. Therefore, these costs are ineligible costs.

**Comment 4**    Mount Saint Francis was well aware of it cash flow cycle given the nature of its revenue stream, and should have planned accordingly. For the project to incur and pay $22,326 in late fees was avoidable and unreasonable. The fact that the late fees ultimately go to an investor is irrelevant.

**Comment 5**    Payroll taxes are not an optional business expense. Mount Saint Francis used monies earmarked for the Internal Revenue Service to support their operations. Mount Saint Francis's failure to submit payroll taxes and subsequently incur legal costs to defend possible litigation was not a reasonable operating expense of the project since they should have been paid when due and payable. Therefore, the $44,226 in legal fees to Adler, Pollock & Sheehan is an ineligible cost.

Legal fees pertaining to a proposed project expansion are development costs, not project operating costs. Therefore, this cost is ineligible as an operating cost. Also according to HUD records, there was no approval consenting to the $19,310 in legal fees to pay for development costs.

Mount Saint Francis paid $15,000 (Check # 14025, dated 4/18/2000) in legal fees to Adler, Pollock, & Sheehan that were invoiced to Sterling Health Care Management. The payment was made for non-project expenses to remove Antonio L. Giordano as general partner from Edmund Place, another nursing home. We determined these costs were not related to the project.

130

Also, the unsupported disbursement for $250.00 (Check # 14752, dated 7/28/2000) was made to Adler, Pollack, & Sheehan.

**Comment 6**    The auditee's response indicated that the $9,249 in legal fees paid to Mr. Babcock were covered under a policy of insurance. Mount Saint Francis should have sought recovery from the insurer and repaid the costs to the project. In addition, the auditee's response did not provide supporting documentation indicating the removal of $6,775 in accruals to Mr. Babcock.

**Comment 7**    In 1995, Mount Saint Francis executed a $200,000 promissory note, at an interest rate of 10%, with O. Ahlborg & Sons, Inc., for construction costs. Mount Saint Francis did not obtain HUD approval for this note and had it done so, the note would have required payments only from surplus cash. The rehabilitation should have been paid for out of development funds and not operating funds. Additionally, as noted above, Mount Saint Francis's regulatory agreement stated that the owners shall not assign, transfer, dispose of, or encumber any personal property of the project or pay out any funds except from surplus cash, and except for reasonable operating expenses and necessary repairs. Therefore, payments could only have been made from surplus cash and Mount Saint Francis's note repayments from operating funds totaling $223,308 violated the project's regulatory agreement with HUD. Disclosure of payments to HUD in monthly accounting reports did not constitute approval of such loans. Additionally, the principal balance remaining at December 31, 2003 of $85,524 is an ineligible cost.

**Comment 8**    The details of the $86,802 in non identity-of-interest payments are provided in Attachment B.

**Comment 9**    We determined that payments to My Place Inc., Construction Software, and Antonio L. Giordano were made in addition to their regular monthly billing and payment cycle. Also, all of these payments were expensed to general ledger account 5340 "Other Expense", including the one made to Consultants, Inc. These costs were paid at the direction of the Mount Saint Francis' administrator as noted in an interoffice memo to the business office (See Attachment E). None of the payments had any supporting documentation. Therefore, our position that these costs are unsupported remains unchanged.

**Comment 10**    The auditee's response contained several engagement letters from Lefkowitz, Garfinkel, Champi & DeRienzo (Tab 1) to support disbursements totaling $263,832 for accounting services. The primary engagement letters were for audits of Mount Saint Francis' financial statements for calendar years 1999, 2000, 2001, and 2002 with estimated fees totaling $112,000 plus out of pocket expenses. Based on these documents it appears that significant additional services were performed/billed for which no support was provided. Also, invoices obtained at the audit site lacked sufficient detail to allow reconciliation back to contracted amounts. Although we believe some of the costs may be eligible, until

detailed backup and reconciliation is provided for all expenditures we consider the $263,832 to be unsupported.

**Comment 11**  The following list of check disbursements provide detail to unsupported payments made to various vendors:

| Check No. | Check Date | Amount |
|---|---|---|
| 13925 | 2/16/2000 | $   250.00 |
| 14679 | 7/21/2000 | $   500.00 |
| 15082 | 7/28/2000 | $   241.82 |
| 20660 | 6/13/2003 | $1,500.00 |
| | Total | $2,491.82 |

**Comment 12**  The management agent's certification for Mount Saint Francis and Antonio L. Giordano contained in the auditee's response expired, and was superseded by a subsequent management certification for Mount Saint Francis and Sterling Health Care Management dated January 1, 1995 (see Attachment C). Section 4 of the revised agreement (Special Fees) did not provide for compensation to the owner at 3% of net patient revenue, in addition to the 3% management agent fee, to Sterling Health Care Management. Therefore, the owner's fees were not approved by HUD as auditee's response claims.

In addition, copies of partnership management agreements and management agent profiles were not sufficient evidence to support the reasonableness and necessity of services actually provided. Although monthly accounting reports submitted to HUD indicated payments were made for the management fees, HUD's receipt of monthly accounting reports does not constitute approval.

**Comment 13**  The listing of My Place, Inc. on the management agent certification only identifies the business as an identity-of-interest company. However, HUD's approval of the management agent certification did not give My Place, Inc., authority to invoice and receive payment for services that were grossly inflated. The auditee did not provide any evidence to support or justify the need for My Place Inc.'s services.

The management agent's certification, dated January 1, 1995, signed by Mount Saint Francis and Sterling Health Care Management certified both parties agreed to comply with item 3(d) of the certification (see Attachment C). Item 3(d) states that, "both parties agree to refrain from purchasing goods and services from entities that have identity-of-interest with us unless the costs are low as or lower than arms-length, open market purchases." We could not locate any business that My Place, Inc., provided services to other than related nursing homes or affiliates owned by Antonio L. Giordano. The auditee did not provide documentation to assure that Mount Saint Francis was in fact receiving a competitive price for the services provided My Place Inc.

132

Furthermore, on March 29, 2005, Mount Saint Francis responded (see Attachment D) to HUD's concerns with various expenses related to Mount Saint Francis's January 2005 monthly accounting report. Mount Saint Francis's response stated that contracts with Sterling Health Care Management Co., My Place Inc., and Construction Software were canceled; effective July 1, 2004 a full 9 months before Mount Saint Francis issued the March 29, 2005 letter. After many years, the services provided by these companies were abruptly cut off by the auditee with no adverse impact to project operations. Therefore, it is obvious that the services were unnecessary. In addition to canceling the contracts, all accrued balances owed to the identity-of-interest companies were voluntarily written off. These facts further support our position that these services were unreasonable and unnecessary.

**Comment 14** As stated in comment 13 above, listing Construction Software Inc. in the management agent certification only notifies HUD that they are an identity-of-interest company. It does not indicate HUD had approved all payments and those payments are reasonable and necessary. We identified $46,080 in payments to Construction Software Inc. Construction Software Inc. was paid for services that the auditee's response described as systems specialization. However, according to various monthly accounting reports submitted to HUD by Mount Saint Francis, the services were described simply as either "management" or "management fees." Construction Software Inc., invoice billings to the Mount Saint Francis describe the services as accounting related. The invoices list the services provided as follows:

1. Accounting and General Ledger Review
2. Review of Monthly Reports
3. Submission of Monthly Reports to HUD
4. Review of Input for Financial Statements
5. Review of Quarterly Operations Report

The services provided by Construction Software Inc., overlap and/or conflict with services provided by Sterling Health Care Management, which was receiving a management fees to perform these functions. Also, Mount Saint Francis' accountants, Lefkowitz, Garfinkel, Champi & DeRienzo, as well as Mount Saint Francis staff were paid to perform accounting services.

In the management agent's certification, both parties certified that all expenses of the project would be necessary and reasonable. During our audit, we interviewed the nursing home administrator and the management agent's general manger and neither could provide requested, contracts or adequate explanation of the services provided by Construction Software, Inc. Therefore, our position remains that these costs were unnecessary and unreasonable.

**Comment 15** We concur that Chaine Des Rotisseurs was not an "IOI company." We have revised the report to reflect this change. However, Antonio L. Giordano does

133

have an affiliation and exerts control over the Rhode Island chapter. According to the organizations web site "www.chaineus.org/rhodeisland," Antonio L. Giordano is the Rhode Island's chapter President.

Gatherings to Chaine De Rotisseurs events were at the request of the project owner. Administrators and selected staff were strongly encouraged to attend the various events. The cost per attendee varied from $75 to as much as $125 per person, a fee the project paid. Given the fact the project was in a non-surplus cash position and had failed to pay over $3,700,000 in federal taxes attendance at these events was clearly unnecessary to reward management in what resulted in unreasonable project expenses.

**Comment 16**    Mount Saint Francis's response did not provide adequate documentation to justify payment of $108,580 to the Director of Purchasing at Mount Saint Francis. During our audit, we determined that Mount Saint Francis had adequate staff in place to support purchasing duties. The director of purchasing position was created in late 2001. Mount Saint Francis had been in existence since the early 1980's. Since the project ran almost 20 years without a purchasing director we disagree that this position was even required. We have also demonstrated the most services performed by identity-of-interest companies were not properly procured. In addition, the management agent's agreement stated that one of the services to be provided was "Arrange for contracts for the purchase of all medical supplies, dietary, office and other items required to operate the Facility." Therefore, $108,580 paid for a director of purchasing position was clearly unnecessary and unreasonable. Lastly, the audits performed by the State of Rhode Island Medicaid program are not relevant, since we do not know the scope and objectives of their audit.

**Comment 17**    The assistant administrator's position should have been compensated on an as needed basis. It was unnecessary and unreasonable for the project to pay for a position that was required periodically. The general manager could not justify his hours and duties to warrant payment of 20 hours per week as assistant administrator. The general manager was already receiving compensation from Construction Software and Sterling Health Care Management.

**Comment 18**    As detailed in our previous comments, all costs were not adequately disclosed to HUD, nor approved by HUD. Moreover, receipt of an operating loss (working capital) loan insured by HUD does not constitute approval of all prior expenses. Therefore, we continue to maintain that the costs claimed were unnecessary/unreasonable or unsupported.

Attachment A

**Comment 3**

FY 2000 - 2003
QUESTIONABLE PAYMENTS TO
STERLING HEALTH CARE MGMT

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 12838 | 1/3/2000 | 107.69 |
| 12863 | 1/10/2000 | 1,399.00 |
| 12882 | 1/17/2000 | 1,399.00 |
| 13009 | 1/24/2000 | 1,399.00 |
| 13041 | 1/31/2000 | 1,399.00 |
| 13044 | 1/31/2000 | 1,558.30 |
| 16312 | 5/2/2001 | 1,500.00 |
| 20739 | 6/27/2003 | 6,050.00 |
| | TOTAL | $ 14,811.99 |

135

Attachment B

**Comment 8**

FY 2000 - 2003
QUESTIONABLE PAYMENTS TO
NON-IOI VENDORS

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 13868 | 01/06/00 | 1,078.50 |
| 13914 | 02/14/00 | 300.00 |
| 13917 | 02/14/00 | 230.99 |
| 13180 | 02/22/00 | 334.36 |
| 13179 | 02/22/00 | 450.00 |
| 14067 | 05/10/00 | 591.18 |
| 14469 | 06/16/00 | 401.36 |
| 14585 | 06/30/00 | 500.00 |
| 14930 | 08/22/00 | 646.00 |
| 15140 | 08/24/00 | 500.00 |
| 15143 | 08/24/00 | 1,500.99 |
| 15191 | 09/12/00 | 289.00 |
| 15190 | 09/12/00 | 329.66 |
| 15205 | 09/15/00 | 287.00 |
| 15415 | 11/22/00 | 252.90 |
| 15407 | 12/15/00 | 300.00 |
| 15401 | 12/15/00 | 2,716.09 |
| 15403 | 12/15/00 | 209.50 |
| 15435 | 01/09/01 | 334.52 |
| 15714 | 01/23/01 | 367.01 |
| 15481 | 01/31/01 | 350.00 |
| 15496 | 02/08/01 | 1,176.12 |
| 16509 | 06/18/01 | 377.90 |
| 15752 | 06/21/01 | 250.90 |
| 15828 | 08/08/01 | 225.00 |
| 15837 | 08/10/01 | 225.00 |
| 15912 | 09/14/01 | 500.00 |
| 15910 | 09/14/01 | 1,280.79 |
| 16019 | 10/29/01 | 289.57 |
| 17583 | 11/16/01 | 327.34 |
| 16111 | 12/14/01 | 225.00 |
| 16110 | 12/14/01 | 588.50 |
| 16115 | 12/14/01 | 227.50 |
| 16120 | 12/14/01 | 1,569.30 |
| 16122 | 12/18/01 | 2,100.00 |
| 17767 | 12/21/01 | 442.36 |
| 16267 | 03/08/02 | 1,173.79 |
| 16276 | 03/08/02 | 123.82 |
| 16417 | 05/16/02 | 1,203.87 |
| 18707 | 06/24/02 | 259.11 |
| 16539 | 07/12/02 | 866.70 |
| 16552 | 07/19/02 | 994.57 |
| 19322 | 09/20/02 | 375.47 |
| 16769 | 10/24/02 | 994.57 |
| 16839 | 11/21/02 | 1,147.58 |
| 16863 | 12/06/02 | 250.00 |
| 16901 | 12/19/02 | 4,195.75 |
| 16904 | 12/19/02 | 5,674.39 |
| 16903 | 12/19/02 | 875.00 |
| 19812 | 12/23/02 | 273.88 |
| 17059 | 02/21/03 | 230.00 |
| 17482 | 08/15/03 | 9,396.47 |
| 17557 | 09/19/03 | 206.40 |
| 17566 | 09/19/03 | 10,870.80 |
| 17584 | 10/01/03 | 750.00 |
| 244920 | 10/17/03 | 5,169.20 |
| 244920 | 10/17/03 | 869.31 |
| 111403 | 11/14/03 | 15,000.00 |
| 17739 | 11/26/03 | 354.32 |
| 17772 | 12/12/03 | 2,000.83 |
| 17797 | 12/18/03 | 350.00 |
| 17784 | 12/19/03 | 260.00 |
| 17800 | 12/19/03 | 875.00 |
| 17821 | 12/29/03 | 313.24 |

Total    $    86,802.29

136

Attachment C

**Comment 12**

| Project Owner's & Management Agent's Certification for Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents | U.S. Department of Housing and Urban Development Office of Housing |
|---|---|

OMB Approval No. 2502-0305 (exp. 12/31/00)

| Project Name: Mount St. Francis Health Center | FHA project no: 4016-43044 | Date: 1/1/95 |
|---|---|---|
| City, State: Woonsocket, Rhode Island | | Section 8 no: |

PAGE 1 of 4

Form HUD-9839-B (11/26/90)

1/91

137

## Mount St. Francis Health Center

(2) the records of the Owner and the Agent, and

(3) the records of companies having an identity-of-interest with the owner and the agent.

t. The following clause will be included in any contract entered into with an identity-of-interest individual or business for the provision of goods or services to the project "Upon request of HUD or [name of owner or Agent]. (name of contractor or supplier) will make available to HUD, at a reasonable time and place, its records and records of [identity-of-interest companies which relate to goods and services charged to the project. Records and information will be sufficient to permit HUD to determine the services performed, the dates the services were performed, the location at which the services were performed, the time consumed in providing the services, the charges made for materials, and the per-unit and total charges levied for said services." The owner agrees to request such records within seven (7) days of receipt of HUD's request to do so.

8. We certify that any Management Agreement does not contain the type of "hold harmless" clause prohibited by HUD.

9. We agree to include the following provisions in the Management Agreement and to be bound by them:

a. HUD has the right to terminate the Management Agreement for failure to comply with the provisions of this Certification, or other good cause, thirty days after HUD has mailed the owner a written notice of its desire to terminate the Management Agreement.

b. In the event of a default under the Mortgage, Note or Regulatory Agreement, HUD has the right to terminate the Management Agreement immediately upon HUD's issuance of a notice of termination to the Owner and Agent.

c. If HUD exercises this right of termination, I the Owner agree to promptly make arrangements for providing management that is satisfactory to HUD.

d. If there is a conflict between the Management Agreement & HUD's rights and requirements, HUD's rights & requirements will prevail.

e. If the Management Agreement is terminated I, the Agent, will give to the Owner all of the project's cash, trust accounts investments and records within thirty (30) days of the date the Management Agreement is terminated.

10. I, the Owner, agree to submit a new Management Certification to HUD before taking any of the following actions:

a. Authorizing the agent to collect a fee different from the percentages, fees and any special fees specified in Paragraph 1 of this Certification;

b. Changing the expiration date of the Management Agreement.

c. Renewing the Management Agreement.

d. Permitting a new Agent to operate the project.

e. Permitting a new Agent to collect a fee.

f. Undertaking self-management of the project.

11. We agree to:

a. Comply with all Federal state, or local laws prohibiting discrimination against any persons on grounds of race, color, creed, familial status, handicap, sex or national origin, including Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, Executive Order 11063 and all regulations implementing these laws.

b. Give families with children equal consideration for admission, except in housing for older persons as determined by HUD.

c. Give handicapped persons priority for subsidized units that were built and equipped specifically for the handicapped.

d. If the project receives any form of direct Federal financial assistance, comply with the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, the Age Discrimination Act of 1975 and all regulations and administrative instructions implementing these laws. The Agent understands that these laws and regulations prohibit discrimination against applicants or tenants who are handicapped or of a certain age.

e. Furnish HUD's Office of Fair Housing and Equal Opportunity any reports and information required to monitor the project's compliance with HUD's fair housing and affirmative marketing requirements (including HUD Form 949, if applicable).

f. Not discriminate against any employee, applicant for employment or contractor because of race, color, handicap, religion, sex or national origin.

g. Provide minorities, women and socially and economically disadvantaged firms equal opportunity to participate in the project's procurement and contracting activities.

h. If the project receives any form of direct Federal financial assistance, comply with Section 3 of the Housing and Urban Development Act of 1968 and its implementing regulations, I, the Agent, understand that it's law and the regulations require the project to make training, employment and contracting opportunities available, to the greatest extent feasible, to lower-income project area residents and small businesses.

12. We certify that we have read and understand HUD's definition of "identity-of-interest" and that the statement(s) checked and information entered below are true. (Check box a or boxes b and / or c.)

a. ☐ No identity-of-interest exists among the Owner, the Agent and any individuals or companies that regularly do business with the project.

b. ☒ Only individuals and companies listed in Section 1 (a) of the Management Entity Profile have an identity-of-interest with the Agent.

c. ☒ Only the individuals and companies listed below have an identity-of-interest with the Owner. (Show the name of the individual or company; list the services rendered; and describe the nature of the identity-of-interest relationship. Attach additional sheets, if necessary.)

13. I, the Agent certify & agree:

a. that the Management Entity Profile, dated __1/1/95__, is accurate and current as of the date of this Certification.

b. To submit an updated profile whenever there is a significant change in the organization or operations of the Management Entity.

14. The items checked below are attached:
☒ Attachment 1—Calculation of Est. Yields from Proposed Mgt Fees
☒☒ New Management Entity Profile
☐ Updated Management Entity Profile
☐ Other (Specify)_____

Warnings:

There are fines and imprisonment—$10,000/5years—for anyone who makes false, fictitious, or fraudulent statements or entries in any matter within the jurisdiction of the Federal Government (18 U.S.C 1001).

There are fines and imprisonment—$250,000/5years—for anyone who misuses rents & proceeds in violation of HUD regulations relative to this project. This applies when the mortgage note is in default or when the project is in nonfull/full cash position (12 U.S.C 1715z-4a).

HUD may seek a "double damages" civil remedy for the use of assets or income in violation of any Regulatory Agreement or any applicable HUD regulations (12 U.S.C 1715z-4a).

HUD may seek additional civil money penalties to be paid by the mortgagor through personal funds for:

(1) Violation of an agreement with HUD to use nonproject funds for certain specified purposes as a condition of receiving transfers of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms or workout. The penalties could be as much as the HUD Secretary's loss at foreclosure sale or loss after foreclosure.

(2) Certain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C 1735f-15).

Date: 1/1/95

By Project Owner: Name, title, signature, date:
Antonio Giordano, General Partner

Date: 1/1/95

By Management Agent: Name, title, signature, date:
Juliette A. Vaccaro, General Manager
Sterling Health Care Management Company, LLC.

Page 2 of 4                    form HUD-9839-B (11/23/90)

PAGE 2 of 4

138

| Project Name: Mount St. Francis Health Center | FHA Project Number: 016-43044 | Date: 11/1/95 |
|---|---|---|

HUD Field Office Use Only (Check all boxes that apply)

An up-front review of the management fee was:    [X] Required    [ ] Not required

[ ] The management fees quoted in paragraph 1a and explained in Attachment 1 of this Certification are approved.

[ ] The management fees quoted in Paragraph 1a and explained in Attachment 1 of this Certification are not approved. The attached letter, dated _____, explains the reasons for this disapproval and sets forth the allowable management fees.

[ ] The residential management fee Percentage is held harmless at _____ %.

[ ] The residential management fee Yield is capped at $_____ PUPM. Each time you approve a rent increase, adjust the management fee Percentage to maintain this yield and enter the information required below.

| Effective Date of New Fee %* | Monthly Rent Potential | Collections % Assumed** | Adjusted Management Fee Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* This should be the same date the rent increase is effective.
** 95% unless you approve a different percentage.

| By Loan Servicer | By Supervisory Loan Servicer/Loan Management Branch Chief |
|---|---|
| Signature: _____ / 7/14/95 | Signature: Signed by MGW |
| Name: DAVID A. CLOUTTER | Name: 7/14/95 |
| Title: Asset Manager | Title: |

form HUD-9839-B (11/25/90)
Ref. Handbook 4381.5 Rev-1

1/91

'Attachment 1—Calculation of Estimated Yields from Proposed Management Fees

| Project Name: | | FHA Project No.: | Date: |
|---|---|---|---|
| Mount St. Francis Health Center | | 016-43044 | 1/1/95 |

1. Residential Fee

2. Commercial Fee (Describe commercial space, how it is used and what services management provides.)

a. Monthly residential rent potential (from Part A of the most recent HUD-approved Rent Schedule) $ N/A

b. Line 1a times .95" $

c. Percentage fee %

d. Monthly residential fee yield (Line 1b times 1c) $

e. Total number of residential units (include rent-free units.) N/A units

f. Residential fee yield per unit per month (Line 1d divided by 1e.) $ PUPM

"(Note: Generally collections must be estimated at 95% of gross potential. If you use a lower percentage, attach an explanation for the collections percentage used. Make sure that any assumption of a lower collections base does not compensate the agent for services for which a special fee will be paid.

a. Monthly commercial rent potential (from Part E of the most recent HUD-approved Rent Schedule) $ N/A

b. Percentage fee %

c. Commercial fee yield (Line 2a times 2b) $

3. Miscellaneous Fee %

a. Percentage fee (not to exceed the residential income fee percentage in Line 1c)

N/A

b. List any miscellaneous income on which HUD allows a fee to be taken, but on which you have agreed a fee will not be paid.

N/A

4. Special Fees
Show dollar amount(s), purpose(s) and time period(s) covered. Describe performance standards and target dates for accomplishment of special tasks. (Attach additional sheets, if needed.)

The Managing Agent is compensated at the rate of 3% of net patient service revenues, under Management Agreement dated as of 1/1/95.

'Note: Projects listed in Paragraph 2-1B of HUD Handbook 4381.5 REV-1 may quote management fees in ways other than as shown in this attachment.

Page 4 of 4                        form HUD-9839-B (11/28/90)

Attachment D



Mount Saint Francis
Health Center

▲

4 St. Joseph Street

▲

Woonsocket

▲

Rhode Island 02895

▲

401-765-5844

PROVIDENCE HUD
MULTIFAMILY HOUSING
2005 APR 11  P 2:17

March 29, 2005

Joseph Crisafulli
U. S. Department of Housing and Urban Development
10 Weybosset Street
Providence, RI 02903

Re:    Mt. Saint Francis - 016-15011

Dear Mr. Crisafulli,

I received your letter dated March 24, 2005 requesting an explanation of various items from the January, 2005 Monthly Accounting Report for Mt. Saint Francis.   You addressed your letter to Sterling Health Care Management Company.   Sterling is no longer managing Mt. Saint Francis Health Center.   I, as a representative of the owner, will attempt to answer them as best I can.   The answers are as follows:

1.    Debrah Putman is the Administrator at Mt. Saint Francis Health Center.   She has been since the date she was hired (May 17, 2004). I don't know where the confusion came in but this has not changed.

2.    We have reached an agreement with the Internal Revenue Service for payment of the payroll taxes (see attached).   Our attorney is working with the IRS on a revised payment plan.

3.    The contracts have been canceled between Mt. Saint Francis and Sterling Health Care Management co., My Place Inc., and Construction Software effective July 1, 2004.   As such, there are no dollars being accrued or paid.

4.    Aged Trial Balance for the following expenses:
   a.   Antonio L. Giordano - $213,974.30 – this is for loans and the monthly General Partner fees. Amount has been written off.
   b.   O. Ahlborg & Sons - $15,840.16 – this is for services rendered. A Payment arrangement was made for $3,000 per month until paid.

EQUAL HOUSING OPPORTUNITY

Professionally managed by Sterling Health Care Management Co., LLC

**Comment 13**

141

**Comment 13**

  c. Sundance Rehabilitation - $458,264.71 -- this is for Rehab services billed but disputed.  Since SunDance has filed Bankruptcy and closed, our attorneys have not heard from the attorney for SunDance in over two years.

  d. Sterling Health Care - $103,852.14 -- this was for services provided per contract.  Amount has been written off.

  e. My Place Inc. - $106,800 -- this is for services provided per contract.  Amount has been written off.

5. Operating Loss Loan payment is $7,187.61.  Our payment to Suburban Mortgage Associates Inc. for $7,781.36 includes $450.00 for MIP and $143.75 in late fees (see attached.)

6. Mortgage payment is $66,467.44, plus an additional $25,000 to the replacement reserve in January.  Our payment to Suburban Mortgage Associates Inc. in the amount of $117,096.79 includes $4,600 for MIP, $1,700 for insurance, $18,000 for taxes and $1,329.35 for late fees (see attached.)  (The regular replacement reserve deposit of $10,000 each month was not billed by Suburban in January or February in error due to some confusion on the repayment plan, and has been corrected and paid in full for both January and February.)

7. Check Sequencing: the jump in check numbering is due to having some checks written by hand and others computer generated.  They are both drawn from the same account.

8. Check number 31963211, PNA Computer Checks, is to cover checks written to various residents or residents' family members either for their monthly personal expenses or upon their death or discharge.

  I hope this answers your concerns about the monthly report and for future monthly reports.  Please feel free to contact me if you have any questions.

Sincerely,

John Montecalvo
For Antonio L. Giordano,
General Partner

JJM/crb

Attachment E

Comment 9



Attachment F

## Antonio L. Giordano Related Entities

1. **Construction Software Inc.**
   (Computer systems business) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: John J. Montecalvo, From 2000 to 2004
   Secretary: Janice M. Strang, From 2001 to 2004
   Treasurer: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)

2. **Consultants Associates, Inc.**
   (Real estate consulting firm) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2001 to 2003, (Son of Antonio L. Giordano)
   Vice President: Mary D. Gentili, From 2001 to 2003, (Daughter of Antonio L. Giordano)
   Secretary: Madonna D. Giordano, From 2001 to 2003, (Daughter of Antonio L. Giordano)
   Treasurer: Antonio A. Giordano, From 2001 to 2003, (Son of Antonio L. Giordano)
   President: Casimir Kolaski, From 2004 (Former Director of HUD Providence Field Office)
   Secretary: Janice M. Strang, From 2004

3. **Consultants, Inc.**
   (Real estate consulting firm) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2000 to 2004, (Son of Antonio L. Giordano)
   Vice President: Mary D. Gentili, From 2002 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Janice M. Strang, From 2000 to 2004
   Treasurer: John J. Montecalvo, From 2000 to 2004

4. **Gregory Building Company**
   (Construction company) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)
   Vice President: Peter Castriotta, From 2001 to 2004
   Secretary: Madonna D. Giordano, From 2002 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Mary D. Gentili, 2001, (Daughter of Antonio L. Giordano)
   Treasurer: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)

5. **Hillside Health Center Associates, LP**
   (Nursing home owner) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   General Partner: Consultants Inc. (See above)

6. **Hillside Health Center, LLC**
   (Nursing home operator) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   Manager: John J. Montecalvo, From 2000 to 2003

7. **Management Reality Services**
   (Real estate management agent) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Mary D. Gentili, From 2003 to 2004, (Daughter of Antonio L. Giordano)
   President: Mona Renchan, 2002
   President: Juliette A. Vaccaro, 2001
   Vice President: Mary D. Gentili, 2002, (Daughter of Antonio L. Giordano)
   Secretary: Mary D. Gentili, From 2002 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Janice M. Strang, From 2001 to 2004
   Treasurer: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)

8. **Mount Saint Francis Associates.**
   (Nursing home owner/operator) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   General Partner: Antonio L. Giordano

9. **My Place, Inc.**
   (Employee relations firm) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)
   Vice President: Madonna Giordano, From 2001 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Janice M. Strang, From 2001 to 2004
   Treasurer: John J. Montecalvo, From 2001 to 2004

10. **Simon and Windsor Interiors**
   (Interior design firm) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)
   Vice President: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)
   Secretary: Janice M. Strang, From 2001 to 2004
   Treasurer: John J. Montecalvo, From 2001 to 2004

11. **Sterling Health Care Management Company, LLC**
   (Nursing home management agent) **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   Manager: John J. Montecalvo, From 2000 to 2003

145

12. **Suburban Mortgage Associates Inc.**
(State of Maryland public records) **Giordano interest**
President: J. Walsh Richards, From 1978 to present
Vice President: Antonio L. Giordano, From 1978 to 2003
Vice President: Edmond Richards, dates of service unavailable,
Vice President: Kimberly Papuchis, dates of service unavailable
Vice President: David N. Eaton, dates of service unavailable
Treasurer: Ngyuet M. Pham, dates of service unavailable