**Exhibit 3**

## Regulatory Agreeme for Multifamily Housing Projects

U.S. Departme Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

**Under Sections 207, 229, 221(d)(4), 231 and 232, Except Nonprofits**

Project No.   016-43071

Mortgagee   Suburban Mortgage Associates Incorporated

Amount of Mortgage Note   $15,308,700.00

Date May 24, 19

Mortgage Recorded:                    State   Rhode Island     County   Kent     Date May 24, 19
                                      Book                      Page

Originally endorsed for insurance under Section   232

This Agreement entered into this   24th   day of   May   , 19 94, between

Coventry Health Center Associates
whose address is   10 Woodland Drive, Coventry, Rhode Island 02816

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgage property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 7,907.83 per month unless a different date or amount is approved in writing by the Secretary.

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the

loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in Schedule A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232).

4. [illegible struck-through text]

[illegible struck-through text]

~~(e) Restriction upon conveyance, transfer or encumbrance. The obligations and restrictions hereinabove set forth shall be binding upon and subsisting against and binding upon the applicable by subordinating~~

~~(b) any approval as to amount of bond premium or hazard insurance premiums or operating organization or interest, or payments and terms and not be less interest any required payment, cash indebtedness in any wise or enlarge or extend or charges against any person owner of the project corporation~~

~~(c) Deny any indebtedness or outstanding or reason of interest~~

5. ~~(a) If the owners are or is originally a corporation or trust money, mortgage, stock or any party indebtedness or corporation or any any trust money, or interest in any corporation indebtedness or any party and terms of money or any borrower or income or determination against any person or corporation or interest or of the or or occurrences whatsoever or the family;~~

~~(b) If such indebtedness is originally a corporation or trust under Section 5(b) Company shall shall such occurring account or to displace equal income or any families or whatsoever or prior occurrence or outstanding or of the project whatsoever required indebtedness follows:~~

~~(1) the corporation or stock or within 60 days from the date of such indebtedness is outstanding or any period or of which is within or any during or by other or ownership or individual whatsoever or indebtedness or not or which outstanding or application or insurance or high or not or remain any indebtedness or outstanding or to any required application;~~

~~(2) Commencement or within one year period or income or required indebtedness or within one any of the or corporation or or any occurrence or applications or within or within or please or occurrences or whatsoever or to be maintained by the owners; and~~

~~(3) Through any such further or within or indebtedness or whatsoever or indebtedness.~~

~~(c) Within or the or corporation or appoint or within or of or whatsoever or any indebtedness or whatsoever or to be whatsoever or project or insurance or indebtedness or within or whatsoever or project or person or whatsoever or such or within whatsoever or indebtedness or whatsoever;~~

~~(d) If the indebtedness or or or effects or occurrence or project or within or whatsoever or within Section under or indebtedness or whatsoever or indebtedness or whatsoever or whatsoever or or outstanding or whatsoever or indebtedness or whatsoever or persons.~~

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

P. 04

(b) Payment for services, supplies, or ma[   ]shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If the mortgage is insured under Section 232:

1. The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

2. The Owners shall suitably equip the project for nursing home operations.

3. The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

(i) If the mortg[   ]insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note – declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary – notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

HUD-92466 (10-85)
HB 4571.1

12. As security for the payment due under Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary

when a violation of this Agreement is not corrected to the satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not affect the validity or the remaining portions thereof.

17. The following Owners: Coventry Health Center Associates, and any of its partners, together with their respective successors, executors, administrators, heirs or assigns, do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

*(To be executed with formalities for recording a deed to real estate)*

P. 03

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first hereinabove written.

ATTEST:

Coventry Health Center Associates,
a Rhode Island Limited Partnership

By: _Robert A. Rocchio_ General Partner
Robert A. Rocchio, General Partner

SECRETARY OF HOUSING AND URBAN
DEVELOPMENT acting by and through
THE FEDERAL HOUSING COMMISSIONER

By: _Anthony F. Britto_
ANTHONY F. BRITTO
ACTING DIRECTOR, HSG DEVEL DIV

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared Robert A. Rocchio to me known and known by me to be the General Partner of Coventry Health Center Associates, a Rhode Island Limited Partnership, who executed the foregoing instrument in his said capacity, and he acknowledged the foregoing Regulatory Agreement so executed to be his free act and deed in his said capacity and the free act and deed of said partnership.

_Eugene A. Liberati_
Notary Public
Eugene A. Liberati

My Commission Expires: January 7, 1996

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared ANTHONY F. BRITTO , to me known and known by me to be the duly authorized agent of the Federal Housing Commissioner and the person described herein, who executed the foregoing Regulatory Agreement by virtue of the authority vested in him as such authorized agent, and he acknowledged said instrument so executed to be his free act and deed on behalf of the Federal Housing Commissioner as such authorized agent.

_Eugene A. Liberati_
Notary Public
Eugene A. Liberati

My Commission Expires: January 7, 1996

See Schedule A attached hereto for a description of the real property covered by this Agreement.

Schedule A

LEGAL DESCRIPTION

COVENTRY HEALTH CENTER

That certain tract or parcel of land with all buildings and improvements thereon, located in the Town of Coventry, County of Kent, State of Rhode Island, being bounded and described as follows:

Beginning at a point in the southerly line of Nooseneck Hill Road (State Route 3), said point being the northwest corner of the herein described parcel, said point also being the intersection of the westerly line of Woodland Drive and the southerly line of Nooseneck Hill Road, said point also being located in the arc of a curve to the right having a central angle of 0° 23' 22", and a radius of 5885.25 feet, and arc distance of forty feet easterly of a Rhode Island State Highway bound at Station 206+76.60 on Nooseneck Hill Road as shown on RI Highway Plat No. 563, said bound being at the point of curvature of a curve; said point also being the northeasterly corner of land now or formerly of V.S.H. Realty, Inc.

thence running a course of South 41° 15' 06" East, a distance of three hundred and 01/100 (300.01) feet to a point; the first 149.86 feet of said first course is bounded westerly by land now or formerly of V.H.S. Realty, Inc. and the remainder of said first course is bounded westerly by land now or formerly of Boston Neck Realty Corp.;

thence turning and running South 48°, 44' 54" West, a distance of six hundred twenty-six and 64/100 (626.64) feet to a point of curvature, said last course being bounded northerly in part by land now or formerly of Boston Neck Realty Corp., in part by Route 3 Investments and in part by Stanton Associates;

thence turning and running along an arc of a curve to the left having a radius of 2812.54 feet and a central angle of 3° 37' 20", a distance of 177.81 feet to a point of tangency;

thence turning and running South 45° 07' 34" West, a distance of twenty-five and 99/100 (25.99) feet to a point at land now or formerly of Bonnie Lee Assalone, said last two courses being bounded northerly by land now or formerly of Stanton Associates;

thence turning and running South 80° 57' 01" East, a distance of one hundred fifty eight and 20/100 (158.20) feet to a point; said last course being bounded southerly by land now or formerly of aforementioned Assalone;

thence turning and running South 42° 40' 25" East, a distance of four hundred eighty-nine and 92/100 (489.92) feet to a point; said last course being bounded westerly by land now or formerly of Leisure Village, Inc.,

GS GEISSER

Schedule A Continued

thence turning and running North 52° 31' 24" East, a distance of four hundred ninety-nine and 99/100 (499.99) feet to a point;

thence turning and running North 11° 12' 47" East, a distance of seventy-two and 43/100 (72.43) feet to a point;

thence turning and running North 75° 14' 48" East a distance of one hundred twenty-five and 00/100 (125.00) feet to a point;

thence turning and running North 14° 45' 22" West, a distance of thirty-five and 58/100 (35.58) feet to a point; said last four courses being bounded generally southerly and easterly by land now or formerly of Mapleroot Development, WM Associates IP, and GRA Associates with the exception of the last 4.54 feet of said last described course being bounded easterly by land now or formerly of Woodland Manor II Assoc.;

thence proceeding along the arc of a curve to the right having a central angle of 19° 28' 50" and a radius of one hundred thirty (130.00) feet, a distance of forty-four and 20/100 (44.20) feet to a point;

thence turning and running along a radial line having a bearing of North 4° 43' 38" East, a distance of twenty (20.00) feet to a point;

thence turning and running North 79° 52' 36" West, a distance of twenty-one and 96/100 (21.96) feet to a point;

thence turning and running along a radial line having a bearing of South 16° 11' 11" West, a distance of twenty (20.00) feet to a point;

thence proceeding along the arc of a curve to the right having a central angle of 51° 31' 20" and a radius of one hundred thirty (130.00) feet, a distance of one hundred sixteen and 90/100 (116.90) feet to a point of tangency; said last five courses being along the easterly line of Woodland Drive;

thence turning and running North 22° 17' 26" West, a distance of one hundred and fifteen (115.00) feet to a point;

thence turning and running North 67° 42' 34" East, a distance of eleven (11.00) feet to a point;

thence turning and running North 22° 17' 26" West, a distance of sixty (60.00) feet to a point;

thence turning and running North 67° 42' 34" West, a distance of eleven (11.00) feet to a point;

thence turning and running North 22° 17' 26" West, a distance of two hundred sixty-one and 28/100 (261.28) feet to a point;

GEISSER

## Schedule A Continued

thence turning and running North 48° 44' 54" East, a distance of eighteen and 07/100 (18.07) feet to a point;

thence turning and running North 41° 15' 06" West, a distance of sixty (60.00) feet to a point; the last said seven courses being bounded generally easterly by land now or formerly of Woodland Manor II Associates;

thence turning and running North 41° 33' 14" West, a distance of three hundred and 29/100 (300.29) feet to a point along the southerly line of Nooseneck Hill Road; the last described course being bounded easterly in part by land now or formerly of Woodland Manor II Associates and in part by land now or formerly of Coventry Credit Union;

thence proceeding along an arc of a curve to the left in the southerly line of Nooseneck Hill Road, having a central angle of 00° 35' 03" and a radius of 5,885.25 feet, a distance of sixty (60.00) feet to the point and place of beginning.

Said parcel containing 10.62 acres more or less.

Said above described parcel is shown on that plan entitled: "Plan of As-Built Survey, Coventry Health Center Associates, Coventry Health Center, Coventry, Rhode Island, by George J. Geisser Jr., Co., Consulting Engineers, 227 Wampanoag Trail, Riverside, RI 02915, Dated: 5/30/86, Revised: 5/19/94, Scale: 1"=40', Project No. F-592".

GS GEISSER

Schedule A Continued

Legal Description (Continued)
Coventry Health Center

The above-described parcel is conveyed together with RIGHTS OF WAY and EASEMENT RIGHTS as set forth in that deed from Mapleroot Development Corporation to Coventry Health Center Associates recorded in the Land Evidence Records of the Town of Coventry, Rhode Island, on October 16, 1981, at 1:43 p.m. in Book 138 at page 1088.

The above described parcel is conveyed together with EASEMENT RIGHTS as set forth in that certain deed from Woodland Manor Improvement Association to Coventry Health Center Associates recorded in the Land Evidence Records of the Town of Coventry, Rhode Island, on October 16, 1981, at 1:44 p.m. in Book 138 at page 1098.

Subject to and together with covenants, agreements, easements and restrictions of record.