**<u>Exhibit 4</u>**

# AUDIT REPORT



Coventry Health Center
Federal Housing Administration Loan Number 016-43071
Coventry, Rhode Island

2006-BO-1006

March 28, 2006

OFFICE OF AUDIT, REGION I
Boston, Massachusetts



| Issue Date | |
|---|---|
| | March 28, 2006 |
| Audit Report Number | |
| | 2006-BO-1006 |

TO:      Ellen R. Connolly, Director of Boston Multifamily Housing Hub, 1AHMLA
         Margarita Maisonet, Director of Departmental Enforcement Center, CV

FROM:    John A. Dvorak, Regional Inspector General for Audit, 1AGA

SUBJECT: Coventry Health Center
         Federal Housing Administration Loan Number 016-43071
         Coventry, Rhode Island

We reviewed the books and records of Coventry Health Center (project). The objective of our review was to determine whether Coventry Health Center Associates, L.P. (owner), and-or Sterling Health Care Management Company, an identity-of-interest management agent, used the project's funds in compliance with the regulatory agreement and the U.S. Department of Housing and Urban Development's (HUD) requirements. The review was conducted based upon our fiscal year 2004 annual audit plan. The review resulted in one finding.

In accordance with HUD Handbook 2000.06, REV-3, within 60 days, please provide us, for each recommendation without a management decision, a status report on (1) the corrective action taken, (2) the proposed corrective action and the date to be completed, or (3) why action is considered unnecessary. Additional status reports are required at 90 days and 120 days after report issuance for any recommendation without a management decision. Also, please furnish us copies of any correspondence or directives issued because of the audit.

Should you or your staff have any questions, please contact Michael Motulski, Assistant Regional Inspector General for Audit or me at (617) 994-8380.

# Executive Summary

We reviewed the books and records of Coventry Health Center (project) to determine whether Coventry Health Center Associates, L.P. (owner), and-or Sterling Health Care Management Company, an identity-of-interest management agent, used the project's funds in compliance with the regulatory agreement and the U.S. Department of Housing and Urgan Development's (HUD) requirements. The review was performed based upon our fiscal year 2004 annual audit plan.

We found that the project's owner and/or management agent used project funds for inappropriate and unsupported disbursements. The inappropriate and unsupported disbursements occurred while the project was in a non-surplus-cash position and/or in default of its HUD-insured loan. HUD sold the project's note and lost more than $6.3 million.

**Owner/Management Agent Improperly Used Project's Funds**

We identified $1,858,100 in questionable cash disbursements made by the project's owner and/or management agent between January 1998 and February 2001. The project's owner and/or management agent disbursed these funds and paid for non-project-related expenses, loan repayments, management fees, and unnecessary services while the project was in a non-surplus-cash position and/or in default of its HUD-insured loan.

The owner and/or management agent caused the conditions identified above by failing to operate the project in accordance with its regulatory agreement and other applicable laws and regulations. The owner and/or management agent disregarded prudent business practices and exploited weak management controls.

**Recommendations**

We recommend that the director of HUD's Boston Multifamily Housing Hub,

- Pursue the recovery of double the amount of questionable cash disbursements to identities-of-interest as stipulated in 12 U.S.C. [*United States Code*] Sec. 1715z-4a.
- Obtain from the owner justification supporting the cash disbursements for unsupported costs.
- Obtain from the owner adequate justification for disbursements that were deemed unnecessary to the nursing home.
- Pursue the recovery of questionable distributions to non-identities-of-interest.

2

We provided our draft audit report to the auditee for formal comment on November 10, 2005.  On November 21, 2005, we received a letter from the owner's counsel dated November 17, 2005 requesting a 60 day extension to provide written comment.  On November  23, 2005, we replied, in writing, granting a 15 day extension with a response date of December 14, 2005.  We received no response to our offer to hold an exit conference.  We received the auditee's written response through its attorneys on December 14, 2005.  Appropriate revisions were made to the report where deemed necessary.  The complete response is included as Appendix B

# Table of Contents

Management Memorandum                                                        1

Executive Summary                                                           2

Introduction                                                                5

Findings

1.    Owner and/or Management Agent Diverted Project Funds                  8

Management Controls                                                        19

Appendixes

    A.  Schedule Of Questioned Costs                    21

    B.  Auditee Comments and OIG's Evaluation           22

    C.  Key Events                                       84

4

# Introduction

Coventry Health Continuum, Inc., was a 344-bed for-profit nursing home located in Coventry, Rhode Island. The original owner and borrower under the U.S. Department of Housing and Urban Development (HUD)-insured mortgage was Coventry Health Center Associates, L.P. (owner), a Rhode Island limited partnership. The mortgage was financed and serviced through Suburban Mortgage Associates, Incorporated, an identity-of-interest company, through common ownership. The amount of the HUD-insured mortgage was $15,308,700.

Section 232 of the National Housing Act authorized a mortgage insurance program for residential care facilities. The Housing and Community Development Act of 1987 extended Section 232 eligibility to the refinancing or purchase of currently insured Section 232 facilities. Federal regulations at 24 CFR [*Code of Federal Regulations*] Part 232 contains the program's regulatory guidelines.

The nursing home was first established in the early 1980s under the ownership of Coventry Health Center Associates, L.P. After completion, the nursing home was leased to an operator not related to the owner. In 1986, the original HUD-insured loan of $8,667,300 was refinanced to $9,835,000. The owner, through a series of complex company restructurings, had Coventry Health Continuum (operator), an identity-of-interest company, operate the nursing home in 1987. A management agent was also brought in during 1987; however, the agent had no identity-of-interest relationship with the nursing home's owner or operator.

In 1994, the $9,835,000 HUD-insured loan was again refinanced to $15,308,700. These funds, in part, were used to add an additional 34 beds to the nursing home. By 1997, the contract with the management agent had expired, creating the opportunity for the owner to establish its own management agent. Sterling Health Care Management Company, an identity-of-interest management agent, took over as the nursing home's agent in 1997. At this point, the owner had full control over the nursing home's ownership, operations, and management. For the next two years, the nursing home's financial condition deteriorated. By August 1999, HUD required monthly financial monitoring due to the nursing home's default on its HUD-insured mortgage and dire financial condition. The note was assigned to HUD on June 28, 2000. By February 19, 2001, the nursing home was placed into receivership.

Before being placed in receivership, the nursing home consisted of three identity-of-interest entities, controlled and operated through common ownership and management as follows:

- Coventry Health Center Associates, L.P. – owner,
- Coventry Health Continuum, Inc. – operator, and
- Sterling Health Care Management Company - management agent.

Coventry Health Continuum, Inc., operated as Coventry Health Center until October 6, 2000, when it was changed to Brookside Villa.

HUD sold the project's non-recourse note for a $6,292,520 loss in September 2002. A detailed chronological list of key events is outlined in appendix C of this report.

**Audit Objectives**

The objective of our review was to determine whether the owner and/or Sterling Health Care Management Company, an identity-of-interest management agent, used project funds in compliance with the regulatory agreement and HUD's requirements.

**Audit Scope and Methodology**

To accomplish the audit objectives, we

- Reviewed federal requirements, including the *Code of Federal Regulations*, HUD handbooks, and the *U.S. Code*.

- Reviewed the project's files maintained by HUD's Providence field office. We reviewed the reserve fund for replacement account, mortgage instruments, management certification/management agreement, regulatory agreement, monthly accounting reports, and independent public accountants' reports for fiscal years ending December 31, 1992, through 2001.

- Performed limited testing of management controls relevant to the audit, through inspection, review, and analysis of documents and records, and evaluated the effects of any exceptions. Our testing was limited because the management controls in place during our audit period were replaced due to the project's bankruptcy.

- Reviewed the project's books and records to determine a) the reliability of information and b) the appropriateness of disbursements for the necessity and reasonableness of costs.

- Tested payroll items, payments to individuals, and unusual transactions from the operating account. Our sample was based on high dollar value and risk. Our results relate only to those items reviewed.

- Reviewed 100 percent of disbursements to a) identity-of-interest vendors and individuals; b) non-identity-of-interest vendors providing legal, audit, and accounting

6

services; c) vendors for renovations; and d) activity from the project's reserve for replacement account.

- Reviewed the project's inspection reports performed by HUD's Real Estate Assessment Center on March 6, 2000, and July 2, 2002.

The audit was conducted between July 2003 and February 2004 and covered the period from May 5, 1995, to August 22, 2003. Our audit fieldwork was conducted on site while the project was under the control of a receiver. When appropriate, the audit was extended to include other periods. We conducted our audit in accordance with generally accepted government auditing standards.

7

Finding 1

# Owner and/or Management Agent Diverted Project Funds

The owner and/or management agent of the project directed the payment of $1,858,100 in questionable cash distributions between January 1998 and February 2001. Of the $1,858,100, the owner diverted $1,421,859 in operating funds to identity-of-interest entities of the project, of which $865,121 was paid for non-project-related expenses, loan repayments, and ineligible services while the project was in a non-surplus-cash position and/or in default of its HUD-insured loan. The project's owner and/or management agent violated HUD's regulatory agreement by making these questionable cash distributions. The remaining $556,738 paid to identity-of-interest entities was not supported. In addition, $436,241 in unsupported distributions was disbursed to non-identity-of-interest entities. The owner and management agent disregarded prudent business practices and exploited weak management controls. As a result, the project ceased being a profitable entity and suffered significant financial problems, including a default on its HUD-insured mortgage in August of 1999. Due to the questionable cash distributions and the resulting cash flow problems encountered, the project was unable to sufficiently meet its operating expenses.

On February 19, 2001, the owner petitioned the Rhode Island Superior Court to appoint a receiver to take over the project's assets and operations. By the time of receivership, the project had accumulated nearly $4.6 million and $400,000 in federal and state tax liens, respectively.

**Federal Requirements**

The project's regulatory agreement, paragraph 6, mandated that the owner may not, without the prior written approval of the Secretary of Housing and Urban Development, assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs and make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash.

Paragraph 13(g) of the regulatory agreement defines distribution as any withdrawal or taking of cash or any assets of the project excluding payment for reasonable expenses incident to the operation and maintenance of the project.

HUD Handbook 4370.2, REV-1, CHG-1, paragraph 2-10, section A, states that if the owner takes distributions when the project is in default or when the project is in a non-

surplus-cash position, the owner is subject to criminal and/or civil penalties.

Federal regulations at 24 CFR [*Code of Federal Regulations*] 24.110 permits HUD to take administrative sanctions against employees or recipients under HUD assistance agreements that violate HUD's requirements. The sanctions include debarment, suspension, or limited denial of participation that are authorized by 24 CFR [*Code of Federal Regulations*] 24.300, 24.400, or 24.700, respectively. HUD may impose administrative sanctions based upon the following conditions:

- Failure to either honor contractual obligations or to proceed in accordance with contract specifications or HUD regulations (limited denial of participation);

- Deficiencies in ongoing construction projects (limited denial of participation);

- Violation of any law, regulation, or procedure relating to the application for financial assistance, insurance, or guarantee or to the performance of obligations incurred pursuant to a grant of financial assistance or pursuant to a conditional or final commitment to insure or guarantee (limited denial of participation);

- Violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program such as a history of failure to perform or unsatisfactory performance of one or more public agreements or transactions (debarment);

- Any other cause so serious or compelling in nature that it affects the present responsibility of a person (debarment); or

- Material violation of a statutory or regulatory provision or program requirements applicable to a public agreement or transaction including applications for grants, financial assistance, insurance, or guarantees or to the performance of requirements under a grant, assistance award, or conditional or final commitment to insure or guarantee (debarment).

9

Title 12, *United States Code*, section 1715z-4a, "Double Damages Remedy for Unauthorized Use of Multifamily Housing Project Assets and Income," allows the Attorney General to recover double the value of any project assets or income that were used in violation of the regulatory agreement or any applicable regulation, plus all costs relating to the action, including but not limited to reasonable attorney and auditing fees.

Title 12, *United States Code*, section 1735f-15, "Civil Money Penalties Against Multifamily Mortgagors," allows the Secretary of Housing and Urban Development to impose a civil money penalty of up to $25,000 per violation against a mortgagor with five or more living units and a HUD-insured mortgage. A penalty may be imposed for any knowing and material violation of the regulatory agreement by the borrower, such as paying out any funds for expenses that were not reasonable and necessary project operating expenses or making distributions to owners while the project is in a non-surplus-cash position.

**Summary of Cash Disbursements**

The Project's owner and/or management agent made distributions in the form of loan repayments and payments for services that were ineligible, unsupported, and/or unnecessary. The owner and/or management agent also paid themselves fees that were not supported by contractual obligation, nor was there evidence of actual services provided. Of the $1,858,100 in distributions, we identified $489,900 in ineligible costs, $992,979 in unsupported costs, and $375,221 in unnecessary and/or unreasonable costs as shown in the following table.

10

| Summary of questionable cash distributions | | | | | |
|---|---|---|---|---|---|
| Payee | Distribution | Questioned costs | | | Total paid |
| | | Ineligible | Unsupported | Unnecessary | |
| **Identity-of-Interest** | | | | | |
| Owner | Loan payment | $15,000 | | | $15,000 |
| Construction software | Accounting fees | | | $53,880 | 53,880 |
| Consultants, Inc. | Executive/owners' fees | 89,400 | | | 89,400 |
| Partnership fees | Executive fees | 182,500 | | | 182,500 |
| Gregory Building Company. | Landscaping fees | | $5,510 | 54,300 | 59,810 |
| Management Reality Service | Loan payments | 130,000 | 120,025 | | 250,025 |
| My Place, Inc. | Employee relations | | | 267,041 | 267,041 |
| Simon & Windsor Interiors | Loan & building improvements | 15,000 | 7,816 | | 22,816 |
| Sterling Health Care Management Company | Management fees | 58,000 | 406,700 | | 464,700 |
| Mount Saint Francis | Advertising & management fees | | 16,687 | | 16,687 |
| **Sub-Totals** | | **$489,900** | **$556,738** | **$375,221** | **$1,421,859** |
| **Non-Identity-of-Interest** | | | | | |
| Various legal firms | Legal fees | | $132,721 | | $132,721 |
| Various accounting firms | Accounting fees | | 147,183 | | 147,183 |
| Unidentified payees | Various individuals | | 136,145 | | 136,145 |
| Payroll transactions | Operating account | | 20,192 | | 20,192 |
| **Subtotals** | | **$0** | **$436,241** | **$0** | **$436,241** |
| **Grand totals** | | **$489,900** | **$992,979** | **$375,221** | **$1,858,100** |

The project was in serious financial decline from 1993 until receivership in February 2001. During this period, the project defaulted on its $15,308,700 HUD-insured mortgage and ran up substantial debt payable to vendors and federal and state tax authorities. We identified $1,858,100 in questionable cash distributions between January 1998 and February 2001.

We determined that the project's owner and management agent circumvented their own established policies and procedures to divert project funds to pay for ineligible, unsupported, and unnecessary expenses.

The project's cash flow troubles made it difficult for the project to meet current operating expenses. As a result, both financial and living conditions at the project deteriorated. In January 1998, the Rhode Island Health Department cited the project for several violations under state and federal healthcare care guidelines. In addition, from 1997 to 2001, the project was under the administration of five different interim and permanent administrators.

11

From July 1, 1997, until the receivership in February 2001, the identity-of-interest relationships between the project's owner, operator, and management agent created an environment giving the owner direct control of all aspects of the project. We believe this ability to override the daily operations of each entity contributed to the questionable expenditures of $1,858,100.

We identified several identity-of-interest companies having business connections with the project, for example, a payment to the project's owner for $15,000 while the project was in non-surplus-cash position. The regulatory agreement defines any withdrawal or taking of cash or any assets of the project excluding payment for reasonable expenses incident to the operation and maintenance of the project as a distribution. Distributions to owners while in a non-surplus-cash position are a violation of the regulatory agreement.

**Construction Software**

The project's owner and/or management agent paid Construction Software, an identity-of-interest company, $53,880 for services that were not provided. According to the project's administrator, no services were provided for the payments made. The monthly invoices from Construction Software indicate that the following services were allegedly provided to the project:

- Accounting and general ledger review,
- Review of monthly reports,
- Submission of monthly reports to HUD,
- Review of input for financial statements, and
- Review of quarterly operations report.

The project's administrator said these tasks were performed in house. The administrator acknowledged that Construction Software employees never worked or came to the project at any time, although the company was paid $1,720 per month. Again, no evidence of an agreement or contract was provided for these services. Therefore, we consider the $53,880 as unnecessary.

**Consultants, Inc.**

We found evidence within the project's general ledger and cash disbursements journal of payments totaling $89,400 to Consultants, Inc., another identity-of-interest company. The notes detailing the payments showed these payments were for owners' fees, executive service fees, and loans.

12

Contrary to the project's regulatory agreement, these payments were made while the project was in a non-surplus-cash position and/or after it defaulted on its HUD-insured loan. No agreement between the project and Consultants, Inc., was provided by the project. We determined the total $89,400 in payments to be ineligible.

**Partnership Fees**

Payments totaling $182,500 were made to the owner's partners. These payments were noted in disbursement records as partnership or executive fees. The notes to the project's audited financial statements for 1992 to 1999 indicated these fees were part of an executive fee agreement. However, an agreement could not be provided to support these costs. We determined the $182,500 costs to be ineligible.

**Gregory Building Company**

The project's operator had a landscaping contract with Gregory Building Company, another identity-of-interest entity. Based on an interview with the project's maintenance staff, we determined that Gregory Building Company subcontracted the effort with Sure Cuts Landscaping. As a subcontractor, Sure Cuts Landscaping performed landscaping services at the project that were previously performed in house. We did not find evidence of a related party interest with Sure Cuts Landscaping. The project's maintenance staff argued the service was not necessary because they had the equipment and manpower to do the work. In addition, the maintenance staff said Sure Cuts Landscaping spent minimal time performing such tasks as grass cutting, which at times was unnecessary. Because the project had performed the landscaping before contracting with Gregory Building Company for minimal cost, we determined the payments totaling $54,300 to be unnecessary. In addition, we consider one payment to Gregory Building Company for $5,510 to be unsupported due to lack of documentation.

**Management Reality Services**

Our audit disclosed payments totaling $250,025 to Management Realty Services, another identity-of-interest company. No evidence of a contractual agreement between the project and Management Realty was provided. We determined that $130,000 was for the repayment of a loan to the owner, an ineligible expense of the project. These loan payments were in direct violation of the regulatory agreement because the project was in a non-surplus-cash position and/or in default of its HUD-insured loan at the time. We were

13

unable to clearly identify the purpose of the remaining $120,025 and classified the payment as unsupported.

**My Place, Inc.**

My Place, Inc., owned and operated by the daughter of the project's owner, had an employee relations contract with the project. The contract, valued at $9,554 per month, was to provide social services, educational services, administrative consulting services, promotional activities, and a comprehensive child-care program. My Place, Inc., also offered incentive programs for the project's employees to show appreciation for the staff. My Place, Inc., held parties for the staff and their families, conducted raffles, and provided gifts of nominal value.

My Place, Inc., did not provide child-care services. It only provided referrals for child-care needs and for support services on an as-needed basis. It also provided seminars for the project's staff, which were later subcontracted out to Delta Consultants. Our audit did not disclose an identity-of-interest relationship with Delta Consultants. However, one seminar was presented by the wife of the project's owner, who was also the mother of the owner of My Place, Inc.

As a benefit to employees, we determined that the services were not necessary and reasonable operating expense of the project. In addition, the $9,554 per month costs appeared to be excessive considering that the project was struggling to make payroll and lease payments. The payments occurred while the project was in a non-surplus-cash position and/or defaulted on its HUD-insured loan. For the audit period covered, we identified $267,041 in payments to My Place, Inc., and consider the costs unnecessary.

**Simon & Windsor Interiors**

Simon & Windsor Interiors was an identity-of-interest company also owned by the daughter of the project's owner. We determined that disbursements totaling $22,816 paid to Simon & Windsor were both unsupported and ineligible under the provisions of the regulatory agreement.

An invoice did not support one payment for $7,816. Another payment for $15,000 was posted in the project's general ledger account as a due to/due from Sterling Health Care Management Company and later reclassified out. However, because there was a notation listing this payment as a loan payment, we consider the $15,000 ineligible under the HUD regulatory agreement.

14

Sterling Health Care
Management Company

Sterling Health Care Management Company, an Identity-of-interest company, took over as the project's management agent on July 1, 1997. From that point, the project's owner had complete control of every aspect of the project. The owner controlled ownership, operations, and the management agent. As the management agent, Sterling Health Care Management Company was responsible for keeping the project running smoothly and in conformity with HUD's requirements. The management agreement stated that Sterling Health Care Management Company was entitled to 3 percent of net patient revenue for its services.

The project's administrator said the project's staff carried out the majority of Sterling Health Care Management Company's management agent functions. Those functions included such tasks as analyzing and solving project problems, recruiting, hiring, supervising project personnel, and monitoring project operations by visiting the project or analyzing performance reports.

According to the administrator, the only contacts between the project's business office and the management agent were the periodic weekly telephone calls to see how much money came in. The administrator was then directed to disburse checks, and in most instances, the checks were made to identity-of-interest companies.

Our review disclosed that Sterling Health Care Management Company did not perform the services required by its management agreement. As a result, it failed to earn its management fees. Instead, the project's staff and consultants managed the project by performing the services described in Sterling Health Care Management Company's management agreement.

A total of $464,700 was paid to Sterling Health Care Management Company. The payments included two disbursements for loan-related activities. One payment for $23,000 was made payable to Sterling Health Care Management Company for a management loan, and the other payment for $35,000 was noted in disbursement records as a loan to Hillside Health Center. Hillside Health Center was another identity-of-interest entity. The project was used as a conduit for loan activity at a time when it was in default on its HUD-insured mortgage. Therefore,

we consider the loan activity total of $58,000 ($23,000 plus $35,000) to be ineligible.

We believe the balance of $406,700 ($464,700 minus $58,000) paid to Sterling Health Care Management Company to be unsupported because there was no evidence of or clear distinction of duties of its personnel and the project's staff.

**Mount Saint Francis Health Center**

Our audit disclosed $16,687 in payments to Mount Saint Francis Health Center, another identity-of-interest entity. The payments were listed in the cash disbursement journal with various descriptions such as weekly management, weekly payroll, marketing, and management fees. Adequate documentation was not provided to support these payments. Therefore, we considered the payments unsupported.

**Disbursements to Non-Identity-of-Interest Vendor and Individuals**

Our audit further identified $436,241 in questionable cash disbursements to a non-identity-of-interest vendor and individuals for services and other costs that were unsupported. These disbursements violated the project's regulatory agreement. The cash disbursements were for various legal, auditing, and accounting services; unidentified payees; and payroll transactions.

**Project in Receivership**

On February 19, 2001, the project's owner was granted an order by the Rhode Island Superior Court to have a receiver appointed to take over the project's assets and operations. Court records showed the project was unable to obtain the payments from governmental regulatory agencies, which were necessary for it to stay current on its operations. This caused a cash flow crisis that led the project's owner to seek the protection of the court. Court records did not reveal the true nature for the project's failure. We believe that the questionable cash distributions were the root cause for the inadequate cash flow problems.

The receiver took control of the project's operation on February 19, 2001. He kept two key business office personnel on staff to assist him with the day-to-day operations. An April 20, 2001, Providence Journal newspaper article quoted the receiver as saying he cut $790,000 from the operating budget. The project's administrator said that once payments to the identity-of-interest companies stopped, the financial viability of the

16

project improved. The receiver remained in control of the project until August 22, 2003, when the project was sold for $10,375,000.

**Auditee Comments**

We received the auditee's comments to our audit on December 15, 2005 and are located in appendix B of this report.

**OIG Evaluation of Auditee Comments**

Our evaluation of the auditee's comments has not changed our audit position. Our responses are located within appendix B of this report, starting on page 60.

**Recommendations**

We recommend that the director of HUD's Boston Multifamily Housing Hub assure the owner

1A.  Reimburses HUD $865,121 for the inappropriate disposition of project assets.

1B.  Provides documentation to support the $992,979 in unsupported payments cited in this audit report. If adequate documentation cannot be provided, the owner should reimburse HUD for the appropriate amount.

We recommend that the director of HUD's Boston Multifamily Housing Hub, in conjunction with the HUD Office of Inspector General (OIG),

1C.  Pursue double damages remedies if the owner does not reimburse HUD for the inappropriate disposition of project assets.

We also recommend that the Director of HUD's Departmental Enforcement Center and/or Associate General Counsel for Program Enforcement

1D.  Impose civil money penalties against the owner for the inappropriate disposition of project assets cited in this audit report that violated the project's regulatory agreement.

17

1E.    Pursue administrative sanctions against the owner for the inappropriate disposition of project assets cited in this audit report.

# Management Controls

Management controls include the plan of organization, methods, and procedures adopted by management to ensure that its goals are met. Management controls include the processes for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance.

**Relevant Management Controls**

We determined the following management controls were relevant to our audit objectives:

- Program operations - Policies and procedures that management has implemented to reasonably ensure that a program meets its objectives.

- Validity and reliability of data - Policies and procedures that management has implemented to reasonably ensure that valid and reliable data are obtained, maintained, and fairly disclosed in reports.

- Compliance with laws and regulations - Policies and procedures that management has implemented to reasonably ensure that resource use is consistent with laws and regulations.

- Safeguarding resources - Policies and procedures that management has implemented to reasonably ensure that resources are safeguarded against waste, loss, and misuse.

We performed limited testing of management controls relevant to the audit through inspection, review, and analysis of documents and records and evaluated the effects of any exceptions. Our testing was limited because the management controls in place during the audit period were replaced due to the project's bankruptcy. In addition, the availability of source documents was limited; however, we determined that the limited data obtained were reliable.

It is a significant weakness if management controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet an organization's objectives.

19

Significant Weaknesses

Based on our review, we believe the following items were significant weaknesses:

- Program Operations

The project was not operated according to program requirements. The project's owner and/or management agent disbursed funds that were for non-project-related expenses, loan repayments, unearned management fees, and unnecessary services while the project was in a non-surplus-cash position.

- Validity and Reliability of Data

The project's owner and/or management agent did not maintain accurate books and records.

- Safeguarding Resources

The project's owner and/or management agent failed to safeguard the project's resources when it disbursed more than $1.8 million for ineligible, unsupported, and unnecessary expenses.

Appendix A

# Summary of Questioned Costs

| Recommendation number | Type of questioned costs | |
|---|---|---|
| | Ineligible costs 1/ | Unsupported costs 2/ |
| 1A | 865,121 | |
| 1B | | $992,979 |

1/    Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law; contract; or federal, state, or local policies or regulations.

2/    Unsupported costs are costs charged to a HUD-financed or HUD-insured program or activity when we cannot determine eligibility at the time of audit. Unsupported costs require a decision by HUD program officials. This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of departmental policies and procedures.

# Auditee Comments and OIG's Evaluation

<u>Ref to OIG Evaluation</u>                              <u>Auditee Comments</u>

ADLER POLLOCK & SHEEHAN P.C.

One Citizens Plaza, 8th floor
Providence, RI 02903-1345
Telephone 401-274-7200
Fax 401-751-0604 / 351-4607

175 Federal Street
Boston, MA 02110-2890
Telephone 617-482-0600
Fax 617-482-0604

www.apslaw.com

December 14, 2005

*VIA FACSIMILE AND REGULAR MAIL*

John A. Dvorak
Regional Inspector General for Audit
U.S. Department of Housing & Urban Development
Office of Inspector General for Audit, Region 1
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street, Room 370
Boston, MA 02222-1092

Dear Mr. Dvorak:

This office is counsel to Antonio L. Giordano, the former general partner of Coventry Health Center Associates, L.P. ("Coventry") in connection with the draft Audit Report by the Office of Inspector General, Department of Housing & Urban Development, referenced in your November 10, 2005 correspondence to Mr. Giordano.[1]  As requested, we are providing the following written comments.[2]

**Comment 1**

As you are aware, Coventry was the HUD insured mortgagor.  A copy of the Regulatory Agreement for Multifamily Housing Projects with Coventry is attached at Tab A (the Lessor Regulatory Agreement).  As noted in the Audit Report, the Lessor Regulatory Agreement at paragraph 6(b) contains certain restrictions including prior written approval of HUD with respect to the assignment, transfer, disposition of or encumbrance of any personal property of the project including rents, to pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.  It is this provision of the Lessor Regulatory Agreement that forms the basis of the Audit's principal conclusion that Coventry violated the agreement and its recommendation for reimbursement.  As discussed below, there is no violation of the Lessor Regulatory Agreement and, therefore, no basis for the recommended reimbursement and other relief.

---

[1]  By correspondence dated November 23, 2005 from you to Mr. Edward Maggiacomo, you enlarged the time within which to respond to the draft audit report to December 14, 2005.  This response is based on information presently available.

[2]  Coventry was petitioned into receivership in a proceeding brought in the Providence County Superior Court.  Final judgment entered on September 22, 2005 and the receivership proceeding has concluded.  Allan Shine, counsel to the receiver, is aware of the audit request and the submission of this response.



STATE CAPITAL
GLOBAL LAW FIRM GROUP

Member firms of the State Capital Global Law Firm Group practice independently and not in a relationship for the joint practice of law.

Appendix B

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 2

Coventry leased the real estate to Coventry Health Continuum, Inc., the lessee/operator of the nursing home ("Continuum"). HUD approved this lease with the signing of the applicable regulatory agreement.[3] Moreover, the restrictions cited in the Audit Report and described above, *do not* apply to Continuum. As set forth in the Regulatory Agreement Nursing Homes between Continuum and the Federal Housing Commissioner (the "Continuum Regulatory Agreement"), there is no similar restriction as cited in the Audit Report. A copy of the Continuum Regulatory Agreement is attached at Tab B.

The Audit Report on page 11 provides a summary of claimed questionable cash distributions incurred between January 1998 and February 2001. For each questioned cost, the following table identifies whether the questioned cost was incurred by the lessor or the lessee.

| Identity of Interest | Purpose | Amount of Questioned Cost | Lessor Cost | Lessee Cost |
|---|---|---|---|---|
| Owner | Loan Payment | $15,000 | $0 | $15,000 |
| Construction Software | Accounting Fees | $53,880 | $0 | $53,880 |
| Consultants, Inc. | Executive Fee | $89,400 | $0 | $89,400 |
| Partnership Fees | Executive Fee | $182,500 | $0 | $182,500 |
| Gregory Building Co. | Landscaping Fee | $9,810 | $0 | $9,810 |
| Management Realty Service | Loan Payment | $250,025 | $0 | $250,025 |
| My Place, Inc. | Employee Relations | $267,041 | $0 | $267,041 |
| Simon & Windsor Interiors | Loan & Building Improvements | $22,866 | $0 | $22,866 |
| Sterling Health Care | Management Fee | $464,700 | $0 | $464,700 |

---

[3] As noted on page 24 of the draft Audit Report, on March 15, 1989, HUD issued an audit report, which Coventry does not recollect receiving. However, the draft Audit Report states that such audit report "recommended that HUD assess the impact on HUD ... including a determination as to whether the lease and management agreement are in the best interest of the project and HUD." Since payments under the lease and management agreement were subsequently approved by HUD for many years, HUD determined that the arrangement was in the best interest of the Project and HUD.

23

Appendix B

Ref to OIG Evaluation                              Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 3

| Mt. St. Francis | Advertising & Management Fee | $16,687 | $0 | $16,687 |
|---|---|---|---|---|
| **Non-Identity of Interest** | | | | |
| Various Legal Firms | Legal Fees | $132,721 | $0 | $132,721 |
| Various Accounting Firms | Accounting Fees | $147,183 | $0 | $147,183 |
| Unidentified Payees | Various Individuals | $136,145 | $0 | $136,145 |
| Payroll Transactions | Operating Account | $20,192 | $0 | $20,192 |

**Comment 1**

A review of the federal income tax returns of Coventry for the years 1998, 1999, 2000, 2001 and 2002 reveals that none of the costs listed as questionable in the Audit Report was incurred or paid by Coventry, the lessor. All of the questioned costs were, in fact, incurred by Continuum, the operator/lessee, as reasonable and necessary costs in order to ensure quality of care to the residents of the nursing home. Since the "questioned costs" were incurred by Continuum, and not Coventry, there is no violation of the Lessor Regulatory Agreement and the Audit Report recommendation for reimbursement is without basis in fact or law.

Although the Continuum Regulatory Agreement does not contain the prohibition listed in the Audit Report, and without waiver of Coventry's rights, a discussion of each of the expenditures is discussed herein.

Loan Repayment – Various Parties:  $287,841

**Comment 2**

Affiliates of Coventry made emergency short-term advances to Continuum. None of the funds advanced was required to meet any obligations or demands made on Continuum by the lendor, HUD or any other party. The advances were made to allow Continuum to operate the nursing home and fulfill obligations on an emergency basis, *i.e.*, to allow Continuum to meet payroll expenses. The advances were repaid generally when Continuum received the monthly Medicaid payment. The owner would not have made these advances without the expectation of repayment. Moreover, there is no prohibition on the repayment of these advances in the Continuum Regulatory Agreement. Without these advances, Continuum would not have been able to meet its obligations to its employees, which could have compromised the care of the patients.

24

Appendix B

_____

Ref to OIG Evaluation                    Auditee Comments


ADLER POLLOCK & SHEEHAN P.C.


December 14, 2005
Page 4


Executive Fees and Management Fees: $736,600

**Comment 3**

These fees were approved by HUD, as set forth in the Management Agreement Certification entitled "Project Owner's & Management Agent's Certification for Multifamily Housing Projects for Identity of Interests or Independent Management Agreements." A copy of the agreement is at Tab C. As set forth in Section 4 entitled "Special Fees":

> The Management Agent is compensated at the rate of 3% of the net patient revenue under Management Agreement dated July 8, 1987 and as amended on November 30, 1988. In addition, the Agent is reimbursed for additional services provided including quality assurance, dietary consulting, and system specialists. The compensation to the Agent is exclusive of compensation to Consultants, Inc., also at the rate of 3% of net operating revenue for services required by the special purpose nature of the facility.

**Comment 4**

Subsequent to the approvals set forth in the Management Agent Certification Agreement, the Providence office of HUD closely monitored all cash disbursements through the required monthly reporting. The management fees were fully disclosed and the local office never questioned or objected to any of the disbursements for management fees, thereby giving its approval for such expenses.

Non-Identity of Interest: $436,241

**Comment 5**

The Audit Report does not provide any detail as to whom these questioned disbursements were made to, but simply states various legal firms, various accounting firms, unidentified payees, and payroll transactions. The report simply states that "These disbursements violated the Project's Regulatory Agreement. The cash disbursements were for various legal, auditing and accounting services, unidentified payees, and payroll transactions." As set forth above, such disbursements do not violate the Continuum Agreement. Moreover, all of Continuum's expenditures were ordinary and necessary for operation of Continuum's business. To the extent HUD can provide further detail, Coventry will respond accordingly.


25

Appendix B

Ref to OIG Evaluation                           Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 5

Mt. St. Francis Health Center

**Comment 6**

The Audit Report does not provide sufficient detail to allow a response. Normally, any disbursements to Mt. St. Francis would be for Continuum's share of shared expenses. For example, one employee identification badge system to be used for employee badge making at all managed nursing homes, resulting in cost savings.

Construction Software, Inc.

**Comment 5**

The Management Agent Certification Agreement approved by HUD expressly lists Construction Software, Inc. ("CSI") in paragraph 14. CSI was approved by HUD, was fully disclosed to and monitored on a monthly basis by HUD, and the services, including, without limitation, systems specialization, were ordinary and necessary for operation of the nursing home.

Gregory Building Company

**Comment 7**

The Management Agent Certification Agreement approved by HUD expressly lists Gregory Building Company in paragraph 14. Gregory Building Company was approved by HUD, was fully disclosed to and monitored on a monthly basis by HUD, and the services, including, without limitation, landscaping services, were ordinary and necessary for operation of the nursing home.

My Place, Inc.

**Comment 7**

The Management Agent Certification Agreement approved by HUD expressly lists My Place, Inc. in paragraph 14. My Place, Inc. was approved by HUD, was fully disclosed to and monitored on a monthly basis by HUD. A description of My Place, Inc.'s services is attached at Tab D and confirmed in the draft Audit Report at page 14. The services include, by way of example and without limitation, employee relations, morale, and counsel, all of which were reasonable and necessary for the operation of the nursing home. For example, among other things, the provision of such employee services ensured continuity of care, which would keep the costs down. Likewise, the provision of such services was instrumental in fighting union organization and the accompanying increased costs that would occur. My Place, Inc. services were reasonable and necessary for operation of the nursing home.

Simon & Windsor Interiors

**Comment 7**

The Management Agent Certification Agreement approved by HUD expressly lists Simon & Windsor Interiors in paragraph 14. Simon & Windsor was approved by HUD, was fully

26