Appendix B

Ref to OIG Evaluation                    Auditee Comments

ADLER POLLOCK & SHEEHAN P.C.

December 14, 2005
Page 6

disclosed to and monitored on a monthly basis by HUD. Simon & Windsor services, including, without limitation, interior decorating and design, were reasonable and necessary for operation of the nursing home.

## Summary

In conclusion, as set forth above, the underlying predicate of the Audit Report that the "questionable cash distributions violated the underlying Regulatory Agreement" is not correct. Such costs were incurred by Continuum, the lessee/operator of the nursing home, and pursuant to the clear language of the Continuum Regulatory Agreement there is no restriction as identified in the Audit Report. Moreover, all of the costs were disclosed to HUD, approved by HUD, monitored on a monthly basis, and were reasonable and necessary for the operation of the nursing home. For these reasons, Coventry disagrees with each of the findings and asks that they be revised to accurately reflect 1) compliance with the applicable regulatory agreement, 2) that the services rendered to the nursing home were necessary and reasonable, and were disclosed to and approved by HUD, and 3) that the recommendations be rescinded.

Should you have any questions, please contact us.

Sincerely,

PATRICIA K. ROCHA

PKR:dh

Attachments

cc:    Antone Giordano
       Allan M. Shine, Esq.
       Edward L. Maggiacomo, Esq.

*364519_1.doc*

Ref to OIG Evaluation                    Auditee Comments

Tab A

Regulatory Agreeme  for
Multifamily Housing Projects

U.S. Departme  Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits

Project No.  016-43071

Mortgagee  Suburban Mortgage Associates Incorporated

Amount of Mortgage Note  $15,308,700.00                                   Date: May 24, 19

Mortgage Recorded:          State  Rhode Island    County    Kent      Date May 24, 19
                            Book                    Page

Originally endorsed for insurance under Section  232

This Agreement entered into this    24th    day of    May                  , 19 __, between
Coventry Health Center Associates
whose address is  10 Woodland Drive, Coventry, Rhode Island 02816

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and
Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgage property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $ 7,907.83 per month unless a different date or amount is approved in writing by the Secretary.

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the

loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in Schedule A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232).

4. [struck-through/illegible text]

[struck-through/illegible text]

Replaces FHA-2466 which May be Used Until Supply Exhausted    Page 1 of 6                    HUD-92466 (10-80)

28

| Ref to OIG Evaluation | Auditee Comments |
|---|---|

[illegible]

[illegible]

[illegible]

5. [illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution [illegible] any income of any kind of the project except surplus [illegible] and except on the following conditions:

(1) All distributions shall be made only as of [illegible] the end of a semiannual or annual fiscal [illegible] only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or [illegible] is any default under this Agreement or [illegible] or mortgage;

(3) Any distribution of any funds of the project, [illegible] the party receiving such funds is not entitled [illegible] hereunder, shall be held in trust separate and [illegible] from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

Page 4 of 8

Appendix B

Ref to OIG Evaluation                    Auditee Comments

(b) Payment for services, supplies, or material shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If the mortgage is insured under Section 232:

1. The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

2. The Owners shall suitably equip the project for nursing home operations.

3. The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

(i) If the mortgage insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note – declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary – notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, as its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

Page 5 of 6

HUD-92466 (10-85)
HB 4671.1

30

Appendix B

Ref to OIG Evaluation                    Auditee Comments

12. As security for the payment due under    Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein, Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(c) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary

when a violation of this Agreement is not corrected to the satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that; in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not affect the validity or the remaining portions thereof.

17. The following Owners: **Coventry Health Center Associates, and any of its partners, together with their respective successors, executors, administrators, heirs or assigns,** do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

(To be executed with formalities for recording a deed to real estate)

Page 6 of 6

31

Appendix B

Ref to OIG Evaluation                    Auditee Comments

IN WITNESS WHEREOF, the parties have set their hands and seals on the date first hereinabove written.

ATTEST:                                    Coventry Health Center Associates,
                                           a Rhode Island Limited Partnership

_____                  By: _____
                                               Robert A. Rocchio, General Partner

                                           SECRETARY OF HOUSING AND URBAN
                                           DEVELOPMENT acting by and through
                                           THE FEDERAL HOUSING COMMISSIONER

                                           By: _____
                                               ANTHONY F. BRITTO
                                               ACTING DIRECTOR, Hsg Devel Div

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared  Robert A. Rocchio  to me known and known by me to be the General Partner of Coventry Health Center Associates, a Rhode Island Limited Partnership, who executed the foregoing instrument in his said capacity, and he acknowledged the foregoing Regulatory Agreement so executed to be his free act and deed in his said capacity and the free act and deed of said partnership.

                                           _____
                                               Notary Public
                                           Eugene A. Liberati

                                           My Commission Expires: January 7, 1998

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared   ANTHONY F. BRITTO   , to me known and known by me to be the duly authorized agent of the Federal Housing Commissioner and the person described herein, who executed the foregoing Regulatory Agreement by virtue of the authority vested in him as such authorized agent; and he acknowledged said instrument so executed to be his free act and deed on behalf of the Federal Housing Commissioner as such authorized agent.

                                           _____
                                               Notary Public
                                           Eugene A. Liberati

                                           My Commission Expires: January 7, 1998

See Schedule A attached hereto for a description of the real property covered by this Agreement.

32

Appendix B

Ref to OIG Evaluation                    Auditee Comments

Schedule A

LEGAL DESCRIPTION

COVENTRY HEALTH CENTER

That certain tract or parcel of land with all buildings and improvements thereon, located in the Town of Coventry, County of Kent, State of Rhode Island, being bounded and described as follows:

Beginning at a point in the southerly line of Nooseneck Hill Road (State Route 3), said point being the northwest corner of the herein described parcel, said point also being the intersection of the westerly line of Woodland Drive and the southerly line of Nooseneck Hill Road, said point also being located in the arc of a curve to the right having a central angle of 0° 23' 22", and a radius of 5885.25 feet, and arc distance of forty feet easterly of a Rhode Island State Highway bound at Station 206+76.60 on Nooseneck Hill Road as shown on RI Highway Plat No. 563, said bound being at the point of curvature of a curve; said point also being the northeasterly corner of land now or formerly of V.S.H. Realty, Inc.

thence running a course of South 41° 15' 06" East, a distance of three hundred and 01/100 (300.01) feet to a point; the first 149.86 feet of said first course is bounded westerly by land now or formerly of V.H.S. Realty, Inc. and the remainder of said first course is bounded westerly by land now or formerly of Boston Neck Realty Corp.;

thence turning and running South 48°, 44' 54" West, a distance of six hundred twenty-six and 64/100 (626.64) feet to a point of curvature, said last course being bounded northerly in part by land now or formerly of Boston Neck Realty Corp., in part by Route 3 Investments and in part by Stanton Associates;

thence turning and running along an arc of a curve to the left having a radius of 2812.54 feet and a central angle of 3° 37' 20", a distance of 177.81 feet to a point of tangency;

thence turning and running South 45° 07' 34" West, a distance of twenty-five and 99/100 (25.99) feet to a point at land now or formerly of Bonnie Lee Assalone, said last two courses being bounded northerly by land now or formerly of Stanton Associates;

thence turning and running South 80° 57' 01" East, a distance of one hundred fifty eight and 20/100 (158.20) feet to a point; said last course being bounded southerly by land now or formerly of aforementioned Assalone;

thence turning and running South 42° 40' 25" East, a distance of four hundred eighty-nine and 92/100 (489.92) feet to a point; said last course being bounded westerly by land now or formerly of Leisure Village, Inc.,

GS GEISSER

33

Appendix B

Ref to OIG Evaluation                    Auditee Comments

Schedule A Continued

thence turning and running North 52° 31' 24" East, a distance of four hundred ninety-nine and 99/100 (499.99) feet to a point;

thence turning and running North 11° 12' 47" East, a distance of seventy-two and 43/100 (72.43) feet to a point;

thence turning and running North 75° 14' 48" East a distance of one hundred twenty-five and 00/100 (125.00) feet to a point;

thence turning and running North 14° 45' 22" West, a distance of thirty-five and 58/100 (35.58) feet to a point; said last four courses being bounded generally southerly and easterly by land now or formerly of Mapleroot Development, WM Associates IP, and GRA Associates with the exception of the last 4.54 feet of said last described course being bounded easterly by land now or formerly of Woodland Manor II Assoc.;

thence proceeding along the arc of a curve to the right having a central angle of 19° 28' 50" and a radius of one hundred thirty (130.00) feet, a distance of forty-four and 20/100 (44.20) feet to a point;

thence turning and running along a radial line having a bearing of North 4° 43' 38" East, a distance of twenty (20.00) feet to a point;

thence turning and running North 79° 52' 36" West, a distance of twenty-one and 96/100 (21.96) feet to a point;

thence turning and running along a radial line having a bearing of South 16° 11' 11" West, a distance of twenty (20.00) feet to a point;

thence proceeding along the arc of a curve to the right having a central angle of 51° 31' 20" and a radius of one hundred thirty (130.00) feet, a distance of one hundred sixteen and 90/100 (116.90) feet to a point of tangency; said last five courses being along the easterly line of Woodland Drive;

thence turning and running North 22° 17' 26" West, a distance of one hundred and fifteen (115.00) feet to a point;

thence turning and running North 67° 42' 34" East, a distance of eleven (11.00) feet to a point;

thence turning and running North 22° 17' 26" West, a distance of sixty (60.00) feet to a point;

thence turning and running North 67° 42' 34" West, a distance of eleven (11.00) feet to a point;

thence turning and running North 22° 17' 26" West, a distance of two hundred sixty-one and 28/100 (261.28) feet to a point;

Gℭ GEISSER

Appendix B

Ref to OIG Evaluation                     Auditee Comments

## Schedule A Continued

thence turning and running North 48° 44′ 54″ East, a distance of eighteen and 07/100 (18.07) feet to a point;

thence turning and running North 41° 15′ 06″ West, a distance of sixty (60.00) feet to a point; the last said seven courses being bounded generally easterly by land now or formerly of Woodland Manor II Associates;

thence turning and running North 41° 33′ 14″ West, a distance of three hundred and 29/100 (300.29) feet to a point along the southerly line of Nooseneck Hill Road; the last described course being bounded easterly in part by land now or formerly of Woodland Manor II Associates and in part by land now or formerly of Coventry Credit Union;

thence proceeding along an arc of a curve to the left in the southerly line of Nooseneck Hill Road, having a central angle of 00° 35′ 03″ and a radius of 5,885.25 feet, a distance of sixty (60.00) feet to the point and place of beginning.

Said parcel containing 10.62 acres more or less.

Said above described parcel is shown on that plan entitled: "Plan of As-Built Survey, Coventry Health Center Associates, Coventry Health Center, Coventry, Rhode Island, by George J. Geisser Jr., Co., Consulting Engineers, 227 Wampanoag Trail, Riverside, RI  02915, Dated: 5/30/86, Revised: 5/19/94, Scale: 1"=40', Project No. F-592".

G5 GEISSER

Appendix B

Ref to OIG Evaluation                    Auditee Comments

Schedule A Continued

Legal Description (Continued)
Coventry Health Center

The above-described parcel is conveyed together with RIGHTS OF WAY and EASEMENT RIGHTS as set forth in that deed from Mapleroot Development Corporation to Coventry Health Center Associates recorded in the Land Evidence Records of the Town of Coventry, Rhode Island, on October 16, 1981, at 1:43 p.m. in Book 138 at page 1088.

The above described parcel is conveyed together with EASEMENT RIGHTS as set forth in that certain deed from Woodland Manor Improvement Association to Coventry Health Center Associates recorded in the Land Evidence Records of the Town of Coventry, Rhode Island, on October 16, 1981, at 1:44 p.m. in Book 138 at page 1098.

Subject to and together with covenants, agreements, easements and restrictions of record.

36

Appendix B

Ref to OIG Evaluation                          Auditee Comments

Tab B

---

BK599PG0242

**Regulatory Agreement Nursing Homes**

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

| Project Number | Mortgagee |
|---|---|
| 016-43071 | Suburban Mortgage Associates Incorpora |
| Amount of Mortgage Note | Date |
| $15,308,700.00 | May 24, 1994 |
| Mortgage Recorded (State) | County | Date |
| Rhode Island | Kent | 5/31/94 |
| Book | Page | |
| 461 | 0071 | |

This Agreement entered into th[is]/as of        24        day of        May                , 19 94

between        Coventry Health Continuum, Inc.

whose address is        10 Woodland Drive, Coventry, Rhode Island 02816

(jointly and severally, hereinafter referred to as Lessee) and the undersigned Federal Housing Commissioner, (hereinafter called Commissioner).

In consideration of the consent of the Commissioner to the leasing of the aforesaid project by Coventry Health Center Associates, L.p.                        , Mortgagor,
and in order to comply with the requirements of the National Housing Act and the Regulations adopted by the Commissioner pursuant thereto Lessees agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the Contract of Mortgage Insurance continues in effect, and during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage, or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property.

(1) The lease shall be subject and subordinate to the mortgage securing the note or other obligation endorsed for insurance by the commissioner;

(2) Lessee shall make payments under lease when due;

(3) Payments by the lessee to the lessor shall be sufficient to pay all mortgage payments including payments to reserves for taxes, insurance, etc., payments to the Reserve for Replacements, and to take care of necessary maintenance. If at the end of any calendar year, or any fiscal year if the project operates on the basis of a fiscal year, payments under the lease have not been sufficient to take care of the above items, the lessor and lessee upon request in writing from the Commissioner shall renegotiate the amounts due under the lease so that such amounts shall be sufficient to take care of such items; the Commissioner shall be furnished by the lessee, within thirty days after being called upon to do so, with a financial report in form satisfactory to the Commissioner covering the operations of the mortgaged property and of the project;

(4) The lessee shall not sublease the project or any part thereof without the consent of the Commissioner;

(5) The lessee shall at all times maintain in full force and effect a license from the State or other licensing authority to operate the project as a nursing home, but the owner shall not be required to maintain such a license;

(6) Lessee shall maintain in good repair and condition any parts o the project for the maintenance of which lessee is responsibl under the terms of the lease;

(7) Lessee shall not remodel, reconstruct, add to, or demolish an part of the mortgaged property or subtract from any real o personal property of the project;

(8) Lessee shall not use the project for any purpose except th operation of a nursing home;

(9) If a default is declared by the Commissioner under the provi sions of Paragraph 10 of the Regulatory Agreement entered int by the lessor-mortgagor and the Commissioner on the
24        day of        May        , 19 94  , a copy o notice of default having been given to the lessee, the lessee wi thereafter make all future payments under the lease to th Commissioner;

(10) The lease may be cancelled upon thirty days written notice by th Commissioner given to the lessor and the lessee for a violatio of any of the above provisions unless the violation is correcte to the satisfaction of the Commissioner within said thirty da period.

(11) The Commissioner must approve any change in or transfer o ownership of the lessee entity, and any change in or transfer o the management operation, or control of the project.

Previous Editions Are Obsolete                        Page 1 of 2                        form HUD-92466-NHIL (1992

37

Appendix B

Ref to OIG Evaluation                    Auditee Comments

BK599PG0243

ATTACHMENT "A"

IN WITNESS WHEREOF, Coventry Health Continuum, Inc., a Rhode Island Corporation, has caused this instrument to be executed by its duly authorized officer and the Secretary of Housing and Urban Development, acting by and through his authorized agent, has executed this Regulatory agreement, on the date first above written.

ATTEST:                                    Coventry Health Continuum Inc.

                                           John Assalone, Vice President

                                           SECRETARY OF HOUSING AND URBAN
                                           DEVELOPMENT acting by and through
                                           THE FEDERAL HOUSING COMMISSIONER

STATE OF RHODE ISLAND                      Luisa G. Osborne
COUNTY OF PROVIDENCE                       Director, MultiFamily
                                           Division

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared John Assalone to me known and known by me to be the Vice-President of Coventry Health Continuum Inc., a Rhode Island Corporation, who executed the foregoing instrument in his said capacity, and he acknowledged the foregoing Regulatory Agreement so executed to be his free act and deed in his said capacity and the free act and deed of said corporation.

                                           Notary Public
                                           My Commission Expires:    7-9-97

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In Providence, in said County, on the 24th day of May, 1994, before me personally appeared Luisa Osborne to me known and known by me to be the duly authorized agent of the Federal Housing Commissioner and the person described herein, who executed the foregoing Regulatory Agreement by virtue of the authority vested in him as such authorized agent, and he acknowledged said instrument so executed to be his free act and deed on behalf of the Federal Commissioner as such authorized agent.

                                           Notary Public
                                           My Commission Expires:    6/0/97

Appendix B

Ref to OIG Evaluation

Auditee Comments

BK599PG0244

07661
MAB 03/24/91

FIRST AMENDED
LEASE AGREEMENT

THIS AMENDED LEASE AGREEMENT ("Lease") is made a entered into on the date, between the parties and upon the terms and conditions hereinafter set forth.

a. Date of Lease: July 8, 1987
   Date of Amendment: March 2__, 1991

b. Lessor:    Coventry Health Center Associates,

c. Lessee:    Coventry Health Continuum, Inc.

d. Term of Lease:

   (1) From:  July 8, 1987.

   (2) To and including:  December 31, 1997

e. Description of Premises:  The real property located off Nooseneck Hill Road in Coventry, Rhode Island known as Coventry Health Center and all personal property located at that facility. A description of the real property is more fully described on Exhibit A attached hereto and made a part hereof.

f. Rental:  From commencement of term to expiration date of original term:

   Annual:    $18,000 plus an amount equal to all mortgage and other debt service payments, including escrows, paid by Lessor with respect to indebtedness of Lessor during the applicable year, including payments to reserves for taxes and insurance, etc., payments to the Reserve for Replacements, payments to the Lessee by the Rhode Island Department of Human Services (Medicade) & Federal Medicare System via its intermediary, Blue Cross, for depreciation expense reimbursement ("Depreciation

39

Appendix B

<u>Ref to OIG Evaluation</u>

<u>Auditee Comments</u>

BK599PG0245

Reimbursement") and payments to take care of necessary maintenance and other necessary property – related expenses including legal, auditing and accounting expenses, less an amount equal to all principal and interest paid by Lessee to Lessor during the applicable year pursuant to that certain Promissory Note executed by Lessee in favor of Lessor in the original principal amount of $400,000 (the "Note"). If at the end of any calendar year, or any fiscal year if the project operates on the basis of a fiscal year, payments under the Lease have not been sufficient to take care of the above items, the Lessor and Lessee, upon request in writing from the Federal Housing Commissioner ("Commissioner"), shall renegotiate the amounts due under the Lease so that such amounts shall be sufficient to take care of such items; the Commissioner shall be furnished by the Lessee, within thirty (30) days after being called upon to do so, with a financial report in a form satisfactory to the Commissioner covering the operations of the mortgaged property and of the project.

Monthly: $1,500 plus an amount equal to all debt service, including escrows, paid by Lessor with respect to indebtedness of Lessor during the applicable month, & Depreciation Reimbursement paid to Lessee during the applicable month, less an amount equal to all principal and interest paid by Lessee to Lessor during the applicable month pursuant to the Note.

40

Appendix B

Ref to OIG Evaluation                    Auditee Comments

BK599PG0246

g.   Option to Renew:

       (1)  Additional years:   Five (5)

       (2)  Notice prior to end of original term:
            three (3) months.

       (3)  Rent:

                 (a) Annual:   See paragraph 24 hereof.

                 (b) Monthly: See paragraph 24 hereof.

### TERMS AND CONDITIONS

**1.   PREMISES**

       Lessor, in consideration of the rents, covenants and agreements to be paid, kept and performed by Lessee as herein provided, hereby demises and leases unto Lessee the premises described above.

**2.   PURPOSE**

       Said premises may be used only for the operation of a nursing home. Any use of said premises in violation of this provision may be enjoined by Lessor without prejudice to any other remedy therefor.

**3.   RENTAL**

       Lessee shall pay the rental set forth above in consecutive monthly installments, in arrears, at the office of Lessor, on the last business day of each month during said term. The rent for the calendar month during which rent shall begin to accrue and for the last calendar month of the term, if either is not a full month, shall be apportioned.

**4.   USE OF PREMISES**

       Lessee shall comply with and observe all statutes, ordinances, regulations, orders and/or decrees of the federal, state and city governments, or any departments, bureaus or agencies thereof, or of any Insurance Inspection or Rating Bureau in any way affecting the use and maintenance of said premises, including obtaining a license from the state or other licensing authority to operate the project as a nursing home, but the Lessor shall not be required to maintain such a license. Lessee shall forever hold and keep Lessor harmless and indemnified on account of any loss, cost, damage or liability resulting from the violation by Lessee of any such statute, ordinance, regulation, order or decree or

41

Ref to OIG Evaluation                    Auditee Comments

BK599PG0247

based or in any way arising out of the use and occupancy of
said premises by Lessee. At the expiration or other
termination of this Lease, Lessee shall remove from said
premises all goods and effects, and peaceably and quietly
surrender to Lessor possession of the premises and of all
erections and additions made to the same, whether made in
replacement, substitution of, or addition to, existing
facilities, including, without limitation, piping, electrical
installations, switch boxes, transformers, lighting fixtures,
all wiring both for light and power up to the point that the
same may be attached to any machines, and partitions and
constructions of all kinds, broom clean and in good repair,
order and condition in all respects, reasonable use and wear
and damage by fire or other casualty only excepted.

5.    UTILITIES

Lessee shall provide and pay for all heat, water
for drinking and other purposes, electricity, gas and any
other utilities consumed on the demised premises and sewer
charges connected therewith.

6.    MAINTENANCE, REPAIRS AND REPLACEMENTS

During the term of the Lease, Lessee shall be
responsible for all interior and exterior maintenance and
repairs to the premises, fixtures and parking areas and
driveways, and shall make all structural repairs and
replacements of integral and component parts of the
structure, premises and fixtures, toward the end that Lessor
shall not be responsible for any maintenance, repairs or
replacements of the premises, structure and/or fixtures.

7.    TAXES, ASSESSMENTS AND CHARGES

During the term of the Lease, Lessee shall pay to
the Lessor, as Rental payments provided for in paragraph f.
herein, all taxes upon the premises. Such taxes shall
include: all taxes and special assessments of every kind and
nature assessed and levied against the building (as a
completed taxable entity), land and fixtures including, but
not limited to, any taxes upon the building, land or fixtures
levied or imposed by any governmental tax authority in
addition to, in lieu of or as a substitute for real estate or
personal property taxes, installments and interest on
assessments for public betterments or public improvements
(such assessments to be paid over the longest period
permitted by law), all personal property taxes upon air
conditioning equipment or similar building appurtenances and
expenses, including but not limited to reasonable legal
expenses, of any proceedings for abatement of taxes and
assessments with respect to the first or any subsequent
calendar year or fraction of a calendar year.

Ref to OIG Evaluation                          Auditee Comments

BK599PG0248

8.    SERVICE CONTRACTS

Lessee shall not enter into any service, maintenance or other contracts relating to the premises which shall terminate after the expiration of the term hereof, without Lessor's written consent. Each service, maintenance or other contract entered into by Lessee shall provide that it shall be assigned to Lessor, effective only upon termination of this Lease (pursuant to paragraph 20 hereof or otherwise) and only if Lessor accepts such assignment by notice in writing to the contractor.

9.    FIRE AND CASUALTY

In case the premises shall be destroyed or damaged by fire or other casualty, this Lease may be terminated at the election of Lessor but if not so terminated and said premises shall be rendered unfit for occupation on account of said fire or casualty, the Rental hereinbefore reserved, or a just and proportionate part thereof according to the nature and extent of the injury sustained, shall be abated until said premises shall have been put in proper condition by Lessor. Otherwise, this Lease shall continue in full force and effect under its terms.

10.    CONDEMNATION

In the event the whole or any part of the premises or any interest therein shall be taken or condemned by any competent authority for any public or quasi-public use or purpose, the term of this Lease shall cease and terminate on the date when the possession of the part or interest so taken shall be required for such use or purpose or on the date of such taking or condemnation (at Lessor's option) and without apportionment of the award, it being agreed that Lessor shall be entitled to the entire amount of the award for the premises; provided, however, if only a part of the premises is so taken, and if Lessee can without necessity of any substantial repairing or alteration, carry on its business in the part of the premises not so taken or condemned, this Lease shall continue in full force and effect as to the part not so taken or condemned but there shall be a proportionate adjustment of the Rental to be paid hereunder.

11.    PROPERTY LOSS OR DAMAGE

All merchandise, furniture and property of any kind, nature and description, belonging to Lessee or any person claiming by, through or under it, which may be in, on or about said premises during the continuance of this Lease, or any extension or renewal thereof, is to be at the sole risk and hazard of Lessee; and if the whole or any part

43

Appendix B

Ref to OIG Evaluation

Auditee Comments

BK599PG0249

thereof shall be destroyed or damaged by fire, water, steam, smoke, by the leakage or bursting of water pipes, or in any other way or manner, no part of said loss or damage is to be charged to or to be borne by Lessor in any case whatsoever.

12.    **INDEMNITY**

Lessee agrees to save Lessor harmless from, and indemnify Lessor against any and all injury, loss or damage of whatever nature, to persons or property arising out of the use or occupancy of the premises, or out of any act, omission or negligence of Lessee or anyone claiming under Lessee.

13.    **SUBORDINATION**

This Lease is subject and subordinate to the mortgage securing the note and/or any other obligations endorsed for insurance by the Commissioner, and to all renewals, modifications, consolidations, replacements and extensions thereof.  This clause shall be self-operative and no further instrument of subordination shall be required by any mortgagee.

14.    **QUIET ENJOYMENT**

Lessee, paying the rent and performing all the covenants, terms and conditions in this Lease contained to be performed on the part of Lessee, may peacefully hold and enjoy said premises during the term hereof without any lawful let or hindrance by Lessor or any person claiming by, through or under her.

15.    **NO REPRESENTATIONS BY LESSOR**

No representations or promises with respect to the premises, except as herein expressly set forth, have been made by Lessor, and Lessee agrees that it takes the same in their present condition and state of repair.  The taking of possession by Lessee shall be conclusive evidence as against Lessee that the real estate and personal property were in satisfactory condition at the time such possession was so taken.

16.    **LESSOR'S RIGHT TO PAY MONEY TO EFFECT PERFORMANCE**

If Lessee at any time, or from time to time, shall fail to perform any of the covenants, terms and conditions in this Lease contained to be performed on the part of Lessee, Lessor may immediately, or at any time thereafter without notice, perform the same for the account of Lessee, and in any such event, any monies paid by Lessor for such purpose shall be deemed to be additional rent due hereunder and shall be payable forthwith to Lessor upon rendition of an invoice therefor.

44

Appendix B

Ref to OIG Evaluation                    Auditee Comments

BK599PG0250

### 17.    NO WAIVER

The failure of Lessor to seek redress for violation of, or to insist upon the strict performance of, any covenant, term or condition of this Lease shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. The receipt by Lessor of rent, with knowledge of the breach of any such covenant, term or condition shall not be deemed a waiver of such breach and no provision of this Lease shall be deemed to have been waived by Lessor unless such waiver be in writing signed by Lessor. No act or thing done by Lessor, Lessor's servants and agents, during the term of this Lease shall constitute an eviction by Lessor, nor shall it be deemed an acceptance of a surrender of said premises, and no agreement to accept such surrender shall be valid unless in writing, signed by Lessor. The various rights, powers and remedies of Lessor herein contained shall not be considered as exclusive of, but shall be considered cumulative to any of the rights, powers and remedies now or hereafter existing at law, in equity, by statute or by contract between said parties.

### 18.    ASSIGNMENT

Lessee shall not assign, mortgage, pledge or otherwise encumber this Lease or its interest therein or sublet the whole or any part of the premises without obtaining on each occasion the consent in writing of the Lessor and the Secretary of the Department of Housing and Urban Development ("Secretary") and/or Commissioner; provided however, that the Lessor and Secretary and/or Commissioner shall not unreasonably withhold their consent to any assignment of this Lease or subletting of the demised premises. In case of any such assignment, the Assignee shall assume in writing to Lessor the performance and observance of all the covenants, terms and conditions in this Lease contained, to be kept and performed on the part of Lessee, and such writing of assumption shall be delivered to Lessor simultaneously with said assignment. In the event of any such assignment or subletting, notwithstanding any assumption hereof by the Assignee or sublessee, Lessee shall remain primarily liable for the performance of all of the covenants, terms and conditions hereof. Lessee further agrees not to sublease the Premises or any part thereof without the consent of the Commissioner.

### 19.    PAYMENTS

All sums due Lessor or any other party under the provisions hereof shall be deemed to be rent due hereunder and Lessor shall have all the rights and remedies relative to the nonpayment thereof as Lessor has for the nonpayment of rent.

-7-

45

Appendix B

Ref to OIG Evaluation                    Auditee Comments

BK599P60251

20.   DEFAULTS OF LESSEE AND REMEDIES OF LESSOR

In case of failure on the part of Lessee to pay the rent and all other charges herein provided within fifteen (15) days subsequent to the time when the same shall become due and payable (and it shall not be required that any demand shall be made for the same); or in case Lessee shall neglect or fail to perform or observe any of the other covenants, terms or conditions imposed upon Lessee by this Lease and fail to remedy and/or remove said breach, within fifteen (15) days of the receipt of notice thereof from Lessor the term of this Lease shall terminate, provided that Lessor shall not be deemed to have accepted a surrender thereof. In any such event Lessee shall indemnify and hold harmless Lessor against all loss of rent or other payments due hereunder or which Lessor may suffer by reason of such termination, including damages for anticipatory breach.

21.   ACCESS TO PREMISES

Lessor, Lessor's servants and agents, shall have the right to enter upon the premises or any part thereof, without charge, at all reasonable times to inspect the same, to show the demised premises to prospective purchasers or tenants, or to make or facilitate any repairs or alterations to the premises.

22.   NO BROKER

Lessee represents that the premises, or any portion of the premises, were not presented to it or to any person representing it by any broker or other person and that no broker or other person was involved in the leasing of the premises, and warrants that no claim for commission for said leasing shall be presented to Lessor.

23.   NOTICE

All notices and other communications authorized or required hereunder shall be in writing and shall be given by mailing the same by certified or registered mail, return receipt requested, postage prepaid, to the parties at their addresses set forth above, or in the case of Lessee, to the demised premises, or in either case, to such other person or at such other address as either party may hereafter designate by notice to the other party.

24.   OPTION TO RENEW

If this Lease is then in full force and effect as to Lessee and Lessee is not in default under any of the terms hereof, Lessee shall have the option to renew the term of

46

Appendix B

BK599PG0252

this Lease for the period set forth above, by giving notice
in writing to Lessor no later than the number of months prior
to the end of the original term hereof set forth above. The
terms and conditions applicable to the original term hereof
shall also apply to the renewal term hereof.

25. PARTIES AND DEFINITIONS

The terms Lessor and Lessee wherever used in this
Lease shall include the heirs, executors, administrators,
successors and assigns of said parties, wherever the context
requires or permits of such construction, and all of the
covenants, terms and conditions herein contained shall be
binding upon and inure to the benefit of the heirs,
executors, administrators, successors and assigns of said
parties in the same manner as if they were expressly
mentioned. The term Lessor as used in this Lease means only
the owner for the time being of the premises, so that in the
event of any sale, Lessor shall be and Lessor hereby is
entirely freed and relieved of all covenants and obligations
of Lessor hereunder, it being understood and agreed that the
purchaser has assumed and agreed to carry out any and all
obligations of Lessor hereunder.

26. DEFAULT DECLARED BY HUD COMMISSIONER

If a default is declared by the Commissioner under
the provisions of Paragraph 11 of the Regulatory Agreement
entered into by the Lessor (mortgagor) and the Commissioner
on June 2, 1986, a copy of notice of default having been
given to the Lessee, the Lessee will thereafter make all
future payments under the Lease to the Commissioner.

27. TERMINATION

The Lease may be cancelled upon thirty (30) day
written notice by the Commissioner given to the Lessor and
the Lessee for a violation of any of the provisions contained
herein unless the violation is corrected to the satisfaction
of the Commissioner within said thiry (30) day period.

28. LESSEE MANAGEMENT AGREEMENTS

The Lessee shall not enter into any management
contract involving the project, unless such contract shall
contain a provision that in the event of default under the
Regulatory Agreement as recited in paragraph 26 of this
Agreement, the management contract shall be subject to
termination without penalty upon written request of the
Commissioner. Upon such request, the Lessee shall
immediately arrange to terminate the contract within a period
of not more than thirty (30) days and shall make arrangements
satisfactory to the Commissioner for proper management of the
project.

47

Appendix B

Ref to OIG Evaluation                    Auditee Comments

BK599PG0253

29.   NOTICE OF LEASE

At any time following the execution hereof, the parties shall at the request of Lessee also execute a Notice of Lease in form reasonably satisfactory to both parties, which Lessee may record.

30.   AMENDMENTS, ADDITIONS AND DELETIONS TO ABOVE LEASE

Any alterations or deletions herein were made in the Lease before execution, and any additional provisions to which the parties have agreed and which are added herein or in any addendum attached hereto shall be considered a part hereof.

31.   LESSEE REGULATORY AGREEMENT

The parties hereto acknowledge that the Lessee and Commissioner have entered into a Regulatory Agreement (FHA From 2466-NHL) dated March 2#, 1991, provided further, that the parties agree that in the event of a conflict between th aforesaid Regulatory Agreement and the provisions of this Lease, the provisions of the Regulatory Agreement will control.

IN WITNESS WHEREOF, the parties have executed thi Lease on the date set forth above.

WITNESSES:                          COVENTRY HEALTH CENTER
                                    ASSOCIATES, l.p.

                                    By: _____
                                          General Partner

                                    COVENTRY HEALTH CONTINUUM, INC.

                                    By: _____
                                          President

- 10 -

48

Appendix B

Ref to OIG Evaluation                    Auditee Comments

Tab C

---

## Project Owner's & Management Agent's Certification for Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents

U.S. Department of Housing and Urban Development
Office of Housing

OMB Approval No. 2502-0305 (exp. 7/31/92)

Public reporting burden for this collection of information is estimated to average 0.16 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0305), Washington, D.C. 20503.

| Project name: | FHA project no: | Date: |
|---|---|---|
| Coventry Health Center | 016-43050-PM | 05/28/93 |
| City, State: | | Section 8 no: |
| Coventry, Rhode Island | | |

Acting on behalf of Coventry Health Continuum, Inc. the Project Owner (Owner), and Health Management Services, Co. the Management Agent (Agent), we make the following certifications and agreements to the United States Department of Housing and Urban Development (HUD) regarding management of the above project.

1. We certify that:

a. We have executed or will execute, within 30 days after receiving the approval(s) required by paragraph b below, a Management Agreement for this project. This Agreement provides / will provide that the Management Agent will manage the project for the term and fee described below. Changes in the fee will be implemented only in accordance with HUD's requirements:

(1) Term of Agreement: 07/01/87 – 06/30/96.

(2) Fees:

(a) _____% of residential income collected;

(b) _____% of commercial income collected;

(c) _____% of miscellaneous income collected (This percentage must not exceed the percentage in (2)(a) above).

(d) Special Fees: No ☐ Yes ☒. If yes, describe in paragraph 4 of Attachment 1.

(3) Calculation of Estimated Yield (See Attachment 1.)

b. We will disburse management fees from project income only after:

(1) We have submitted this Certification to HUD;

(2) HUD has approved the Agent to manage this project; and

(3) HUD has approved the management fee (if required).

c. We understand that no fees may be earned or paid after HUD has terminated the Management Agreement.

d. If HUD notifies me of an excessive management fee, I, the Agent, will within 30 days of HUD's notice either:

(1) Reduce the compensation to an amount HUD determines to be reasonable and

(2) Require the administrator to refund to the project all excessive fees collected, or

(3) Appeal HUD's decision and abide by the results of the appeal process, making any required reductions and refunds within 30 days after the date of this decision letter on the appeal.

e. If HUD holds the residential management fee yield harmless under the transition provisions of Chapter 2, Section VII of HUD Handbook 4381.5,

(1) We understand that HUD will adjust the management fee percentage each time HUD approves a rent increase.

(2) We agree to be bound by that percentage until the next rent increase or until HUD approves a different fee, pursuant to our request.

2. We will, if the project is subsidized by HUD, select and admit tenants, compute tenant rents and assistance payments, recertify tenants, and carry out other subsidy contract administration responsibilities in accordance with HUD Handbook 4350.3 and other HUD instructions.

3. We agree to:

a. Comply with this project's Regulatory Agreement, Mortgage & Mortgage Note, and any Subsidy Contract or Workout / Modification Agreement.

b. Comply with HUD handbooks, notices or other policy directives that relate to the management of the project.

c. Comply with HUD requirements regarding payment and reasonableness of management fees and allocation of management costs between the management fee and the project account (This does not apply to projects listed in Paragraph 2-19 of HUD Handbook 4381.5).

d. Refrain from purchasing goods or services from entities that have identity-of-interest with us unless the costs are as low as or lower than arms-length, open market purchases.

4. The Agent agrees to:

a. Assure that all expenses of the project are reasonable and necessary.

b. Exert reasonable effort to maximize project income and to take advantage of discounts, rebates and similar money-saving techniques.

c. Obtain contracts, materials, supplies and services, including the preparation of the annual audit, on terms most advantageous to the project.

d. Credit the project with all discounts, rebates or commissions (including any sales or property tax relief granted by the state or local government) received.

e. Obtain the necessary verbal or written cost estimates and document the reasons for accepting other than the lowest bid.

f. Maintain copies of such documentation and make such documentation available for your inspection during normal business hours.

g. Invest project funds that HUD policies require to be invested and take reasonable effort to invest other project funds unless the owner specifically directs the Agent not to invest those other funds.

5. We certify that the types of insurance policies checked below are in force and will be maintained to the best of our ability at all times. Fidelity bonds and hazard insurance policies will name HUD as an additional loss payee. Note: For any box not checked, attach an explanation as to why you cannot obtain that type of insurance. Such situations should be extremely rare.

a. ☒ Fidelity bond or employee dishonesty coverage for $300,000.

(1) all principals of the Agent and See Attached Letter 10/23

(2) all persons who participate directly or indirectly in the management and maintenance of the project and its assets, accounts and records. Coverage will be at least equal to the project's gross potential income for two (2) months.

b. ☒ Hazard insurance coverage in an amount required by the project's Mortgage.

c. ☒ Public liability coverage with the Agent designated as one of the insured.

6. The Agent agrees to:

a. Furnish a response to HUD's management review reports, physical inspection reports and written inquiries regarding the project's annual financial statements, or monthly accounting reports within 30 days after receipt of the report or inquiry.

b. Establish and maintain the project's accounts, books and records in accordance with:

(1) HUD's administrative requirements;

(2) generally accepted accounting principles; and

(3) in a condition that will facilitate audit.

7. We agree that:

a. All records related to the operation of the project, regardless of where they are housed, shall be considered the property of the project.

b. HUD, the General Accounting Office (GAO), and those agencies' representatives may inspect:

(1) any records which relate to the project's purchase of goods or services,

Appendix B

Ref to OIG Evaluation                    Auditee Comments

(2) the records of the Owner and the Agent; and

(3) the records of companies having an identity-of-interest with the owner and the agent.

c. The following clause will be included in any contract entered into with an identity-of-interest individual or business for the provision of goods or services to the project: "Upon request of HUD or (name of owner or Agent), (name of contractor or supplier) will make available to HUD, at a reasonable time and place, its records and records of identity-of-interest companies which relate to goods and services charged to the project. Records and information will be sufficient to permit HUD to determine the services performed, the dates the services were performed, the location at which the services were performed, the time consumed in providing the services, the charges made for materials, and the per-unit and total charges levied for said services." The owner agrees to request such records within seven (7) days of receipt of HUD's request to do so.

8. We certify that any Management Agreement does not contain the type of "hold harmless" clause prohibited by HUD.

9. We agree to include the following provisions in the Management Agreement and to be bound by them:

a. HUD has the right to terminate the Management Agreement for failure to comply with the provisions of this Certification, or other good cause, thirty days after HUD has mailed the owner a written notice of its desire to terminate the Management Agreement.

b. In the event of a default under the Mortgage, Note or Regulatory Agreement, HUD has the right to terminate the Management Agreement immediately upon HUD's issuance of a notice of termination to the Owner and Agent.

c. If HUD exercises this right of termination, I, the Owner, agree to promptly make arrangements for providing management that is satisfactory to HUD.

d. If there is a conflict between the Management Agreement & HUD's rights and requirements, HUD's rights & requirements will prevail.

e. If the Management Agreement is terminated I, the Agent, will give to the Owner all of the project's cash, trust accounts investments and records within thirty (30) days of the date the Management Agreement is terminated.

10. I, the Owner, agree to submit a new Management Certification to HUD before taking any of the following actions:

a. Authorizing the agent to collect a fee different from the percentages, fees and any special fees specified in Paragraph 1 of this Certification;

b. Changing the expiration date of the Management Agreement.

c. Renewing the Management Agreement.

d. Permitting a new Agent to operate the project.

e. Permitting a new Agent to collect a fee.

f. Undertaking self-management of the project.

11. We agree to:

a. Comply with all Federal, state, or local laws prohibiting discrimination against any persons on grounds of race, color, creed, familial status, handicap, sex or national origin, including Title VIII of the Civil Rights Act of 1964, Fair Housing Act, Executive Order 11063 and all regulations implementing those laws.

b. When the head or spouse is otherwise eligible, give families with children equal consideration for admission.

c. Give handicapped persons priority for subsidized units that were built and equipped specifically for the handicapped.

d. If the project receives any form of direct Federal financial assistance, comply with the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, the Age Discrimination Act of 1975 and all regulations and administrative instructions implementing these laws. The Agent understands that these laws and regulations prohibit discrimination against applicants or tenants who are handicapped or of a certain age.

e. Furnish HUD's Office of Fair Housing and Equal Opportunity any reports and information required to monitor the project's compliance with HUD's fair housing and affirmative marketing requirements (including HUD Form 949, if applicable).

f. Not discriminate against any employee, applicant for employment or contractor because of race, color, handicap, religion, sex or national origin.

g. Provide minorities, women and socially and economically disadvantaged firms equal opportunity to participate in the project's procurement and contracting activities.

h. If the project receives any form of direct Federal financial assistance, comply with Section 3 of the Housing and Urban Development Act of 1968 and its implementing regulations. I, the Agent, understand that this law and the regulations require the project to make training, employment and contracting opportunities available, to the greatest extent feasible, to lower-income project area residents and small businesses.

12. We certify that we have read and understand HUD's definition of "identity-of-interest" and that the statement(s) checked and information entered below are true. (Check box a or boxes b and/or c.)

a. ☐ No identity-of-interest exists among the Owner, the Agent and any individuals or companies that regularly do business with the project.

b. ☒ Only individuals and companies listed in Section I of the Management Entity Profile have an identity-of-interest with the Agent.

c. ☒ Only the individuals and companies listed below have an identity-of-interest with the Owner. (Show the name of the individual or company; list the services rendered; and describe the nature of the identity-of-interest relationship. Attach additional sheets, if necessary.)

13. I, the Agent, certify & agree:

a. that the Management Entity Profile, dated 10/23/91 , is accurate and current as of the date of this Certification.

b. To submit an updated profile whenever there is a significant change in the organization or operations of the Management Entity.

14. The items checked below are attached:

☐ Attachment 1–Calculation of Est. Yields from Proposed Mgt Fees

☐ New Management Entity Profile

☒ Updated Management Entity Profile

☒ Other (Specify) Owner Identity of Interest Companies - Gregory Building Co., My Place, Inc., Construction Software, Inc. & Consultants, Inc.

Warnings:

There are fines and imprisonment—$10,000/5years—for anyone who makes false, fictitious, or fraudulent statements or entries in any matter within the jurisdiction of the Federal Government (18 U.S.C. 1001).

There are fines and imprisonment—$250,000/5years—for anyone who misuses rents & proceeds in violation of HUD regulations relative to this project. This applies when the mortgage note is in default or when the project is in a nonsurplus cash position (12 U.S.C. 1715z-9).

HUD may seek a "double damages" civil remedy for the use of assets or income in violation of any Regulatory Agreement or any applicable HUD regulations (12 U.S.C. 1715z-4a).

HUD may seek additional civil money penalties to be paid by the mortgagor through personal funds for :

(1) Violation of an agreement with HUD to use nonproject funds for certain specified purposes as a condition of receiving transfers of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms or workout. The penalties could be as much as the HUD Secretary's loss at foreclosure sale or sale after foreclosure.

(2) Certain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f15).

By Project Owner: Name, title, signature, date: 6/28/93

Health Management Services Co., Inc.

By Management Agent: Name, title, signature, date: 6-28-93

50

Appendix B

Ref to OIG Evaluation                    Auditee Comments

| Project Name: | FHA Project Number: | Date: |
|---|---|---|
| Coventry Health Center | 016-43050 -PM | 05/28/93 |

HUD Field Office Use Only (Check all boxes that apply):

An up-front review of the management fee was:  [X] Required:   [ ] Not required:

[X] The management fees quoted in paragraph 1a and explained in Attachment 1 of this Certification are approved:

[ ] The management fees quoted in Paragraph 1a and explained in Attachment 1 of this Certification are not approved. The attached letter, dated _____ explains the reasons for this disapproval and sets forth the allowable management fees.

[ ] The residential management fee Percentage is held harmless at _____ %.

[ ] The residential management fee Yield is capped at $_____ PUPM. Each time you approve a rent increase, adjust the management fee Percentage to maintain this yield and enter the information required below.

| Effective Date of New Fee %* | Monthly Rent Potential | Collections % Assumed** | Adjusted Management Fee Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* This should be the same date the rent increase is effective.
** 95% unless you approve a different percentage.

| By: Loan Servicer | | By: Supervisory Loan Servicer/Loan Management Branch Chief | |
|---|---|---|---|
| Signature: | Date: | Signature: | Date: |
| Christine Keshura | 8/9/93 | | 9/17/93 |
| Name: | | Name: | |
| Christine Keshura | | Claire Oberman | |
| Title: | | Title: | |
| Loan Management Specialist | | Chief, LM/PD | |

Page 3 of 4                                    form HUD-9839-B

51

Appendix B

Ref to OIG Evaluation                          Auditee Comments

---

\*Attachment 1—Calculation of Estimated Yields from Proposed Management Fees

| Project Name: | | FHA Project No.: | Date: |
|---|---|---|---|
| Coventry Health Center | | 016-43050-PM | 05/28/93 |

**1. Residential Fee**

a. Monthly residential rent potential (from Part A of the most recent HUD-approved Rent Schedule) — $ N/A

b. Line 1a times .95\*\* — $

c. Percentage fee — %

d. Monthly residential fee yield (Line 1b times 1c) — $

e. Total number of residential units (include rent-free units) — N/A units

f. Residential fee yield per unit per month (Line 1d divided by 1e) — $ PUPM

\*\*Note: Generally collections must be estimated at 95% of gross potential. If you use a lower percentage, attach an explanation for the collections percentage used. Make sure that any assumption of a lower collections base does not compensate the agent for services for which a special fee will be paid.

**2. Commercial Fee** (Describe commercial space, how it is used and what services management provides.)

N/A

a. Monthly commercial rent potential (from Part E of the most recent HUD-approved Rent Schedule) — $ N/A

b. Percentage fee — %

c. Commercial fee yield (Line 2a times 2b) — $

%

**3. Miscellaneous Fee**

a. Percentage fee (not to exceed the residential income fee percentage in Line 1c)

N/A

b. List any miscellaneous income on which HUD allows a fee to be taken, but on which you have agreed a fee will not be paid.

N/A

**4. Special Fees**

Show dollar amount(s), purpose(s) and time period(s) covered. Describe performance standards and target dates for accomplishment of special tasks. (Attach additional sheets, if needed.)

The Management Agent is compensated at the rate of 3% of the Net Patient Revenue under Management Agreement dated July 8, 1987 and as amended on November 30, 1988. In addition the agent is reimbursed for additional Services provided including Quality Assurance, Dietary Consulting, and Systems Specialist. The compensation to the Agent is exclusive of compensation to Consultants, Inc., also at the rate of 3% of Net Operating Revenue for services required by the special-purpose nature of the facility.

\*Note: Projects listed in Paragraph 2-13 of HUD Handbook 4381.5 REV-1 may quote management fees in ways other than as shown in this attachment.

52

Appendix B

Ref to OIG Evaluation

Auditee Comments

Tab D

My Place Inc.'s Services

Ref to OIG Evaluation                              Auditee Comments

## My Place Inc.

**Daily & Weekly Responsibilities:**

1) company representative available from 9:00 AM to 5:00 PM five days a week

Representative capable of answering phones in a professional manor and be able to direct calls to the proper department accessing an available answering service during off hours for messages.

  a) Representative able to help employees with any social service questions or needs regarding:
   i) social agencies,
   ii) state agencies,
   iii) psychological services,
   iv) health programs,
   v) adult programs,
   vi) childcare programs,
   vii) federal programs,
   viii)   dependence programs,
   ix) and other financial aid programs.
  b) This representative will also make the first introduction of the employee and/or their families to the agencies that they have requested. Further, they will follow-up with the employee to see if they are happy with the agency or program they have chosen and if they would like to be directed to another agency.
2) Counseling
  a) Provide Short-Term and Long-Term Counseling models to better service employees needs. Access to these programs is provided through the In-Service Coordinator, Personnel Director and the Administrator at the request of an employee or the request of an Administrator for an under performing employee. The Counseling services provided will aid employees with the following:
   i)     Coping with juggling daily responsibilities.
   ii)    Coping with Life's Problems.
   iii)   Dealing with an unexpected crisis.
   iv)    Dependence issues.
   v)     Dealing with stress.
   vi)    Dealing with self esteem.
   vii)   Dealing with relationships.
   viii)  Dealing with Health issues.
   ix)    Dealing with job performance issues.
  b) Counselor made available on site once a month or on a as need basis for evaluations and/or guidance on which counseling direction would be best suited for an employee.
3) Health and Wellness Program
  a) Set-up Exercise Weight Loss Programs on a need basis
4) Make available a Comprehensive Child Care Referral Program for all employees on a daily as needed basis. This program unites employees with the proper child care, educational, and social agencies necessary to suit their child care needs. Note, the program contains the following components and sub-activities.

Page 2 of 7

Appendix B

Ref to OIG Evaluation                    Auditee Comments

a) Need Assessment Program: with the ability to conduct a survey to determine need;

Set-up a Referral Network Program
    i) Aide families in the selection for an appropriate child care service by making the selection process more informed and easier. Further, the goal of the referral network program is to help parents understand the following:
        (1) The different types of child care offered;
            (a) For Profit or Non-profit
            (b) In-Home Care
            (c) Family Day Care Homes
            (d) Day Care Centers and Nurseries
        (2) The advantages and disadvantages to each type of child care.
        (3) The importance of certification and licensure of child care facilities.
        (4) What to look for when choosing a child care facility.
        (5) Questions to ask child care providers when researching child care facilities.
        (6) How to monitor your child's progress in the day care setting you have chosen.
b) Set-up Screening Services
    i) The purpose of this service is to help parents identify, at an early age, potential problems with their children which could interfere with their natural growth and development. Further, to unite parents with the appropriate agencies that could help them. With early identification, many of these problems may be alleviated before the child is ready for school. The following are some of the Screening services we offer:
        (1) Hearing Screening
        (2) Vision Screening
        (3) Speech and Language Screening
        (4) Development Screening
c) Hotline
    i) Employees are able to call any time during business hours and ask staff for assistance in finding child care services or just talk about a simple parental concern.
d) Corporate Liaison
    i) maintaining a list of all licensed and certified day care centers in the State of Rhode Island in order to act as a resource for employee child care options.
    ii) a ready and available list of specialists for children who are found during the testing period to have special needs.
e) Financial Child Care Assistance
    i) providing employees who are in need of subsidized child care information, to determine eligibility, and determine which program best suits family's needs circumstances.

**Monthly Responsibilities:**
5) Educational & Motivational programs:
    a) Provide (2) ½ hour seminars per month.
    i) Hold Meetings with the In-Service Director, social service department, employee relations department, administrators, and employees to determine seminar topics that will meet their needs or the facility needs.
    ii) All Seminars provided by a Licensed Therapist, Psychiatrist, or Certified Specialist.

Page 3 of 7

Appendix B

---

Ref to OIG Evaluation                    Auditee Comments

6) Newsletters and Flyers
    a) Produce Communication and Management bulletins for the administrator, and management.
    b) Produce Health newsletters for employees.
7) Produce Monthly Social Event calendars in conjunction with the state Department of Tourism for all employees on up coming family events within the State.
8) Administrative Consulting Services
    a) Work with administrators to help implement top-down management policies, company policies, company procedures, and additional concerns.
9) Employee Assistance Program suggestion box
    a) Provide suggestion Box for employees to make comments and suggestions.
    b) Analyze all comments/suggestions and formalize a report to Owners, Administrator, and Management Company.
10) Stress Reduction In-Services
    a) Provide (2) ½ hour seminars per month.
        i) The Goal is to provide employees and management with an opportunity to work together in a relaxing and fun atmosphere through in-service activities.
        ii) Some examples are as follows:
            (1) Arts-n-crafts
            (2) Mini-projects

**Yearly Responsibilities**
11) Children Activities
    a) Provide (2) Holiday Activities per year for the parents and their children to get together and enjoy each others company.
        i) Activities consist of following and include clowns, magicians, and holiday characters
            (1) dinner and or lunch
            (2) beverages and party favors
        ii) Providing at least two personnel for the event.
12) Provide an annual employee appreciation/ health fair in the form of a carnival atmosphere. It held on a Pay Day and begining at 6:00am and ending at 4:30pm.
    a) providing all
        i) Outdoor Tents
        ii) Tables
        iii) Electrical equipment needed
        iv) Chairs
        v) Table Cloths
        vi) Table skirts
        vii) Provide at least six personnel for the event.
        viii) Breakdown of equipment
    b) Set-Up booths with outside agencies targeting the employees well being. Following are some examples:
        i) Health Representative.
        ii) Nutrition and/or Weight Control Representative.
        iii) Athletic Club Representative.
        iv) Insurance Coverage Representative.

Page 4 of 7

56