Ref to OIG Evaluation                    Auditee Comments

v)   Hobby and Crafts Representative.
vi)   Childcare Representative.
vii)  Counseling Representative.
viii) Motivational Representative.
ix)   Uniform Representative.
x)    Massage Therapist Representative.
xi)   Other or by Special Request.
c)   Provide each attendant with giveaways such as:
i)    T-shirts
ii)   Hats
iii)  Bags
d)   Set-up Carnival Games (At least 3)
i)    Provide Prizes such as the following examples:
(1)   Stuffed Animals
(2)   Lollipops
(3)   Chocolate Bars
(4)   Flowers
(5)   Key-chains
(6)   Coffee Mugs
(7)   Pens/Pencils
(8)   Miniature Tool Sets
(9)   Fanny Packs
(10)  Lunch Bags
(11)  Frisbees
e)   Set-up Carnival Activities (At Least 3)
i)    Balloons
ii)   One minute craft
iii)  Tattoo's and Face Painting
iv)   Other ie pie eating contest
f)   Set-up Food Concessions (At Least 3)
i)    Candy
ii)   Complimentary Lunch
iii)  Coffee
iv)   Pastry
v)    Other
g)   Provide Seminars on a variety of topics such as the following examples:
i)    Employee Seminars
(1)   How to Budget a Single Paycheck
(2)   Understanding Attitudes of The Aging
(3)   Communication Workshop – How to Work with Resident's Families
(4)   Stress Workshop
(5)   Team Building
(6)   Stress on The Job
(7)   Relationships – Who? What? And Why?
(8)   How to Create a Positive Environment
(9)   Little Things Make a Difference

Page 5 of 7

Appendix B

Ref to OIG Evaluation                    Auditee Comments

(10)   Time Management
(11)   Understanding Different Personality Types
(12)   Assertive Communication
(13)   Caring For the Elderly
(14)   Having Patience With Your Patient
(15)   Resident Skin, Nail and Hair Care
(16)   Massage Therapy—How to Give a Massage
(17)   Reflexology—Care of Resident Hands and Feet
(18)   The Importance of Wearing a Nursing Uniform
ii) Corporate mandatory Seminars
  (1)   Hire Vision- Secrets to Reducing Absenteeism & Turnover or If You want
       Eagles, Stop Hiring Turkeys
  (2)   How to Motivate Employees to do More Than is Expected!
  (3)   Beyond Superior Customer Service – The Competitive Edge
  (4)   Dynamic Community Relations That Work and Win Support!
  (5)   How to Help People Work Together More Effectively!
iii) Facility Seminars
  (1)   Achieving The Ultimate Winning Team!
  (2)   I Do Make a Difference
13) Set-Up employee picnic
  a) Provide the Following:
    i) Games
    ii) Prizes
    iii) Raffle
    iv) Organization and Oversite of events such as:
      (1) Baseball
      (2) Volley Ball
      (3) Relay Races
      (4) Etc.
    v) Clowns, Magicians, & Holiday Characters when requested
    vi) Provide at least two personnel for the Event.
14) Provide entertainment or prizes for the community when the facility is holding open houses
  for new patients during their outreach weeks.
  a) Entertainment could be following:
    i) Magicians
    ii) Musicians
    iii) Other
15) Provide flyers to employees explaining the employee assistance program available to them

16) Promotional Activities Monthly.
  a) Door Prizes provided for each seminar.
    b) Each month the facility is provided with a raffle for every employee. Some examples
    are as follows:
    i) Thanksgiving Turkey Raffle
    ii) St. Patty's Day Raffle
    iii) Mother's Day Raffle

Page: 6 of 7

Appendix B

Ref to OIG Evaluation                    Auditee Comments

iv) Father's Day Raffle
v) 4th of July Raffle
vi) Christmas Raffle
vii) Easter Hunts
Each employee would receive a free raffle ticket with their pay check to enter. Prizes consisted of the following:
viii)     Alexander Uniform Shopping Spree
ix) A Turkey Basket, Easter Basket or other gift basket themes
x)  Pawtucket Red Sox, Broadway Plays or other event tickets
xi) Gift certificates to grocery stores
xii)Free Gift Certificates to stores and restaurants
xiii)     Carnation Gifts
xiv)      Employee Carnival Day
xv)Candy Giveaways
xvi)      Movie Passes
b)  Each month each employee would receive a small perishable gift to thank them for their dedication and hard work. (gourmet chocolates or lemonade on hot days).

Page: 7 of 7

59

## OIG Evaluation of Auditee Comments

**Comment 1**     We disagree that Coventry Health Continuum, Inc., the operator/lessee, was not subject to the restrictions outlined in paragraph 6(b) of the Regulatory Agreement for Multifamily Housing Projects. Although the auditee is correct in the wording of the regulatory agreement, based on our interviews and audit work, the same parties controlled the owning entity, operator, and management company. For example, John Montecalvo held various positions within these entities and ran the day-to-day activities of Coventry Health Continuum, Sterling Health Care Management and Construction Software Inc.

Also, based on interviews, the officers for Coventry Health Continuum did not have an active role in the operations of the nursing home, yet the entity signed as the owner on HUD documents that brought Sterling Health Care Management into the organization. Overall direction came from Antonio L. Giordano, a general partner. Based on the day-to-day activities performed by this owner, we often could not determine for which entity he was making decisions. For this reason, we are treating all the entities as one and holding the acts of each commonly owned entity to the requirements of the owner's regulatory agreement. Any separation of these entities' responsibilities was only for the clear circumvention of regulations by the owner.

We have added attachment H to show the relationship between the owner, operator, management company, and related companies.

**Comment 2**     Coventry Health Continuum repaid various loan amounts to identity-of-interest companies while the project was in a non-surplus position and-or in default of its HUD insured loan, without HUD approval. HUD Handbook 4370.2, chapter 2, clearly outlines an owner's responsibility regarding repayments advanced by owner's, or affiliates of owner's, as required by the HUD regulatory agreement. These advances cannot be repaid unless they are scheduled and approved in advance by HUD.

**Comment 3**     As stated in comment 1, the Management Agent's Certification Agreement supplied in the auditee's response expired on June 30, 1996, and was superseded by a subsequent Management Agreement signed and dated April 1, 1997 (see attachment A). Section 4 of the revised agreement entitled "Special Fees" does not provide for compensation to Consultants, Inc., or Giordano, Assalone, and Confreda (Partnership Fees). Therefore, $89,400 in fees paid to Consultants, Inc., and $182,500 paid to Giordano, Assalone and Confreda (Partnership Fees) were clearly ineligible.

**Comment 4**     HUD's receipt of monthly accounting reports did not constitute approval of the project's actions. The auditee's response suggests that HUD conducted long term ongoing monthly monitoring of project disbursements. This was not the case. The local HUD office officially requested monthly accounting reports on August 19,

60

1999, one month after the owner defaulted on its HUD insured loan. Although cash disbursement data was submitted, detailed supporting documentation was not required. Therefore, HUD had limited understanding or visibility of project activity.

**Comment 5**   We identified $132,721 (see attachment C) in various legal and $147,183 (see attachment D) in accounting firm payments for the period January 1998 through December 2000. During our audit we were not provided nor could we locate supporting documentation for the numerous payments. The substantial legal and accounting fees paid by the project do not appear to be necessary and/or reasonable given the size of the operation. Also, some of these services were to be provided by the management agent.

Furthermore, $53,880 was paid to Construction Software, Inc., an identity-of-interest company. Construction Software, Inc., was paid for services that the auditee's response described as systems specialization. However, according to various monthly accounting reports submitted to HUD, the services were described as either consulting, management fees, service contract, or purchased services. Construction Software, Inc., invoices billed to the project described the services as accounting related. The invoices further detailed the services as follows:

1. Accounting and General Ledger Review.
2. Review of Monthly Reports.
3. Submission of Monthly Reports to HUD
4. Review of Input for Financial Statements
5. Review of Quarterly Operations Report.

The services provided by Construction Software, Inc., duplicated those that were to be provided by the management agent that was receiving a management fee. The management agreement, signed and dated July 1, 1997, between Coventry Health Continuum, as the "Owner," and Sterling Health Care Management Company, LLC, as the "Manager" (see attachment B), stated that the management agent was responsible for providing all financial aspects of the operation of the facility including operating and management statements showing all income, expense and cash flow and management review.

Details of expenditures of $136,145 to unidentified payees (see attachment E), and payroll transactions totaling $20,192 (see attachment F) are provided at the end of our response.

**Comment 6**   The auditee's response indicated that these disbursements would normally be for the continuum's share of shared expenses. We could not determine the reasonableness or necessity of these costs based on available documentation. Details of expenditures to Mt. St. Francis Health Center are provided at the end of our response (see attachment G).

**Comment 7**  The auditee's response implied that HUD performed lengthy ongoing monitoring through monthly accounting reports of Gregory Building, My Place, Inc, and Simon and Windsor Interiors.  This was not the case.  HUD began monitoring the project only after it defaulted on its HUD insured loan.  As stated in comment 4, the submission of monthly accounting reports to HUD did not constitute approval of the project's actions.

Based on information outlined in the audit report we consider the payments of $54,300 to Gregory Building as unnecessary, and $5,510 to be unsupported.  In addition, the monthly fees of $9,554 paid to My Place, Inc., were excessive and unnecessary for the project.  Also, we consider the payments of $7,816 and $15,000 to Simon and Windsor to be unsupported and ineligible, respectively.  Finally, repayment of loans to affiliates during a period when the HUD loan was in default or the project was in a non-surplus cash position was a violation of the HUD regulatory agreement, and therefore, ineligible.

Appendix B

Attachment A

Project Owner's & Management Agent's Certification for Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

COPY

OMB Approval No. 2502-0305 (exp. 10/31/97)

Public reporting burden for this collection of information is estimated to average 0.16 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0305), Washington, D.C. 20503. Do not send this completed form to either of the above addresses.

| Project name: | FHA project no. | Date: |
|---|---|---|
| Coventry Health Center | 016-43071 | 4/1/97 |
| City, State: | | Section 8 no.: |
| Coventry, Rhode Island 02816 | | N/A |

Acting on behalf of **Coventry Health Continum, Inc.** the Project Owner (Owner), and **Sterling Health Care Management** as Management Agent (Agent) we make the following certifications and agreements to the United States Department of Housing and Urban Development (HUD) regarding management of the above project.

1. We certify that:

a. We will comply with HUD requirements and contract obligations, and agree that no payments will be made to the owner in return for awarding the management contract to the agent, and that such payments will not be made in the future.

b. We have executed or will execute, within 30 days after reaching the approval(s) required by paragraph 1c below, a Management Agreement for this project. The Agreement provides/will provide that the Management Agent will manage the project for the term and fee described below. Changes in the fee will be implemented only in accordance with HUD's requirements.

(1) Term of Agreement: Coterminous with Partnership Agreement;

(2) Fees: to expire when Partnership Agreement expires;

(a) N/A % of residential income collected;

(b) N/A % of commercial income collected;

(c) N/A % of miscellaneous income collected (The percentage must not exceed the percentage in (2)(a) above).

(d) Special Fees: No ☐ Yes ☒ (if yes, describe in paragraph 4 of Attachment 1).

(3) Calculation of Estimated Yield (See Attachment 1).

c. We will disburse management fees from project income only after:

(1) We have submitted this Certification to HUD;

(2) HUD has approved the Agent to manage this project; and

(3) HUD has approved the management fee (if required).

d. We understand that no fees may be earned or paid after HUD has terminated the Management Agreement.

e. If HUD notifies me of an excessive management fee, I, the Agent, will within 30 days of HUD's notice either:

(1) Reduce the compensation to an amount HUD determines to be reasonable and

(2) Require the administration to refund to the project all excessive fees collected, or

(3) Appeal HUD's decision and abide by the results of the appeal process, making any required reductions and refunds within 30 days after the date of the decision later on the appeal.

f. If HUD holds the residential management fee yield harmless under the transition provisions of Chapter 3, Section 4 of HUD Handbook 4381.5.

(1) We understand that HUD will adjust the management fee percentage each time HUD approves a rent increase.

(2) We agree to be bound by that percentage until the next rent increase or until HUD approves a different fee, pursuant to our request.

2. We will, if the project is subsidized by HUD, select and admit tenants, compute tenant rents and assistance payments, recertify tenants and carry out other subsidy contract administration responsibilities in accordance with HUD Handbook 4350.3 and other HUD instructions.

3. We agree to:

a. Comply with the project's Regulatory Agreement, Mortgage & Mortgage note, and any Subsidy Contract or Workout/Modification Agreement.

b. Comply with HUD Handbooks, notices or other policy directives that relate to the management of the project.

c. Comply with HUD requirements regarding payment and reasonableness

of management fees and allocation of management costs between the management fee and the project account.

d. Refrain from purchasing goods or services from entities that have identity-of-interest with us unless the costs are as low as or lower than arms-length open-market purchases.

4. The Agent agrees to:

a. Assure that all expenses of the project are reasonable and necessary.

b. Exert reasonable effort to maximize project income and to take advantage of discounts, rebates and similar money-saving techniques.

c. Obtain contracts, materials, supplies and services, including the preparation of the annual audit, on terms most advantageous to the project.

d. Credit the project with all discounts, rebates or commissions (including any sales or property tax relief granted by the State or local government received.

e. Obtain the necessary verbal or written cost estimates and document the reasons for accepting other than the lowest bid.

f. Maintain copies of such documentation and make such documentation available for your inspection during normal business hours.

g. Invest project funds that HUD policies require to be invested and take reasonable effort to invest other project funds unless the owner specifically directs the Agent not to invest these other funds.

5. We certify that the types of insurance policies checked below are in force and will be maintained to the best of our ability at all times. Fidelity bonds and hazard insurance policies will name HUD as an additional payee in the event of loss. Note: For any box not checked, attach an explanation as to why you cannot obtain the type of insurance. Such situations should be extremely rare.

a. ☒ Fidelity bond or employee dishonesty coverage for

(1) all principals of the Agent and;

(2) all persons who participate directly or indirectly in the management, maintenance of the project and its assets, accounts and records. Coverage will be at least equal to the project's gross potential income for two (2) months.

b. ☒ Hazard insurance coverage in an amount required by the project Mortgage.

c. ☒ Public liability coverage with the Agent designated as one of the insured.

6. The Agent agrees to:

a. Furnish a response to HUD's management review reports, physical inspection reports and written inquiries regarding the project's annual financial statements or monthly accounting reports within 30 days after receipt of the report or inquiry.

b. Establish and maintain the project's accounts, books and records in accordance with:

(1) HUD's administrative requirements;

(2) generally accepted accounting principles; and

(3) in a condition that will facilitate an audit.

7. We agree that:

a. All records related to the operation of the project, regardless of where they are housed, shall be considered the property of the project.

b. HUD, the General Accounting Office (GAO), and these agencies' representatives may inspect:

(1) any records which relate to the project's purchase of goods or service;

(2) the records of the Owner and the Agent; and

(3) the records of companies having an identity-of-interest with the owner and the agent.

Comment 1

form HUD-9839-B (10/92)

Appendix B

Attachment A

The following clause will be included in any contract entered into with an entity, affiliate or individual or business for the provision of goods or services to the project: "Upon request of HUD or (name of owner or Agent), (name of contractor or supplier) will make available to HUD, at a reasonable time and rate, its records and records of identity-of-interest companies which relate to goods and services charged to the project. Records and information will be made to permit HUD to determine the services performed, the dates the services were performed, the location at which the services were performed, time consumed in providing the services, the charges made for materials, and the per-unit and total charges levied for said services." The owner agrees to request such records within seven (7) days of receipt of HUD's request to do so.

I certify that my Management Agreement does not contain the type of "identity-of-interest" clause prohibited by HUD.

I agree to include the following provisions in the Management Agreement and be bound by them:

HUD has the right to terminate the Management Agreement for failure to comply with the provisions of this Certification, or other good cause, thirty days after HUD has mailed the owner a written notice of its desire to terminate the Management Agreement.

In the event of a default under the Mortgage, Note or Regulatory Agreement, HUD has the right to terminate the Management Agreement immediately upon HUD's issuance of a notice of termination to the Owner and Agent.

If HUD exercises this right of termination, I, the Owner, agree to promptly make arrangements for providing management that is satisfactory to HUD.

If there is a conflict between the Management Agreement & HUD's rights and requirements, HUD's rights & requirements will prevail.

If the Management Agreement is terminated, the Agent will give to the owner all the project's cash, trust accounts, investments and records within thirty (30) days of the date the Management Agreement is terminated.

I, the Owner, agree to submit a new Management Certification to HUD before taking any of the following actions:

Authorizing the agent to collect a level different from the percentages, fees and/or special fees specified in Paragraph 1 of this Certification;

...ding the expiration date of the Management Agreement

...wing the Management Agreement.

Permitting a new Agent to operate the project.

Permitting a new Agent to collect a fee.

Undertaking self-management of the project.

I agree to:

Comply with all Federal, state, or local laws prohibiting discrimination against any persons on grounds of race, color, creed, familial status, handicap, sex or national origin, including Title VII of the Civil Rights Act of 1964, Fair Housing Act, Executive Order 11063 and/or regulations implementing those laws.

When the handicapped is otherwise eligible, give families with children equal consideration for admission.

Give handicapped persons priority for subsidized units that were built and equipped specifically for the handicapped.

If the project receives any form of direct Federal financial assistance, comply with the provisions of Section 504 of the Rehabilitation Act of 1973, as mended, the Age Discrimination Act of 1975 and all regulations and administrative instructions implementing these laws. The Agent understands that these laws and regulations prohibit discrimination against applicants or ...nts who are handicapped or of a certain age.

Furnish HUD's Office of Fair Housing and Equal Opportunity any reports and information required to monitor the project's compliance with HUD's fair ...sting and affirmative marketing requirements (including HUD Form 949, if applicable).

Not discriminate against any employee, applicant for employment or contractor because of race, color, handicap, religion, sex or national origin.

Provide minorities, women and socially and economically disadvantaged firms equal opportunity to participate in the project's procurement and contracting activities.

If a project receives any form of direct Federal financial assistance, comply with Section 3 of the Housing and Urban Development Act of 1968 and its implementing regulations. I, the Agent, understand that this law and the regulations require the project to make training, employment and contracting opportunities available, to the greatest extent feasible, to lower-income project area residents and small businesses.

...ious editions are obsolete.

10. We certify that we have read and understand HUD's definition of "identity-of-interest" and that the statement(s) checked and information entered below are true. (Check box a or boxes b and/or c.)

a. ☐ No identity-of-interest exists among the Owner, the Agent and any individuals or companies that regulary do business with the project

b. ☒ Only individuals and companies listed in Section 11a of the agement Entity Profile have an identity-of-interest with the Agent.

c. ☒ Only the individuals and companies listed below have an identity-of-interest with the Owner. (Show the name of the individual or company, list the services rendered, and describe the nature of the identity-of-interest relationship. Attach additional sheets, if necessary.)

   See Attached.

13. I, the Agent, certify & agree:

a. that the Management Entity Profile, dated  4/1/97  is accurate and current as of the date of this Certification.

b. To submit an updated profile whenever there is a significant change in the organization or operations of the Management Entity;

14. The items checked below are attached:

☒ Attachment I—Calculation of Est. Yield from Proposed Mgt Fees

☒ New Management Entity Profile

☐ Updated Management Entity Profile

☐ Other (Specify)

**Warnings:**

There are fines and imprisonment—$10,000/5years—for anyone who makes false, fictitious, or fraudulent statements or entries in any matter within the jurisdiction of the Federal Government (18 U.S.C. 1001).

There are fines and imprisonment—$250,000/5years—for anyone who misuses rents & proceeds in violation of HUD regulations relative to this project. This applies when the mortgage note is in default or when the project is in a non-surplus cash position (12 U.S.C. 1715z-9).

HUD may seek a "double damages" civil remedy for the use of assets or income in violation of any Regulatory Agreement or any applicable HUD regulations (12 U.S.C. 1715z-4a).

HUD may seek additional civil money penalties to be paid by the mortgagor through personal funds for:

(1) Violation of an agreement with HUD to use non-project funds for certain specified purposes as a condition of receiving transfers of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms or workout. The penalties could be as much as the HUD Secretary's loss on foreclosure sale or sale after foreclosure.

(2) Certain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15).

By Project Owner: Name, title, signature, date:
Coventry Health Continuum, Inc.
John J. Montecalvo, President

By Managment Agent: Name, title, signature, date:
Juliette A. Vaccaro, General Manager
Sterling Health Care Management Company, LLC.

4/1/97

form HUD-9839-B (03/25/98)
ref. Handbook 4381.5 & 4571.1
U.S.A. & 4571.4

64

Appendix B

Attachment A

| Project Name: Coventry Health Center | FHA Project Number: 016-43071 | Date: 4/1/97 |

For Field Office Use Only (Check all boxes that apply)

Prior review of the management fee was:  ☐ Required  ☒ Not required

☒ The management fees quoted in paragraph 1a and explained in Attachment I of this Certification are approved.

☐ The management fees quoted in Paragraph 1a and explained in Attachment I of this Certification are not approved. The attached letter, dated _____, explains the reasons for this disapproval and sets forth the allowable management fees.

☐ The residential management fee Percentage is held harmless at _____%.

☐ The residential management fee Yield is capped at $_____ PUPM. Each time you approve a rent increase, adjust the management fee Percentage to maintain this yield and enter the information required below:

| Effective Date of New Fee % * | Monthly Rent Potential | Collections % Assumed ** | Adjusted Management Fee Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* This should be the same date the rent increase is effective.
** 95% unless you approve a different percentage.

Loan Servicer

| Signature: [signature] | Date: 4/1/97 |
| Name: Christine Keshura | |
| Title: Asset manager | |

By Supervisory Lead Servicer/Loan Management Branch Chief

| Signature: [signature] | Date: 4/1/97 |
| Name: MICHAEL G. WATSON | |
| Title: CHIEF, ASSET MANAGEMENT BRANCH | |

Previous editions are obsolete.  Page 9 of 9  form HUD-9839-B (03/25/96)

65

Appendix B

Attachment A

Attachment E—Calculation of Estimated Yields from Proposed Management Fees

| Project Name: Coventry Health Center | FHA Project No.: 016-43071 | Date: 4/1/97 |
|---|---|---|

| Residential Fee | | | Commercial Fee (Describe commercial space, how it is used and what services management provides.) |
|---|---|---|---|
| 1. Monthly residential rent potential (from Part A of the most recent HUD-approved Rent Schedule) | $ N/A | | |
| 2. Line 1a times 0.95 * | $ | | |
| 3. Percentage fee | % | | |
| 4. Monthly residential fee yield (Line 1b times 1c) | $ | | |
| 5. Total number of residential units (include rent-free units.) | N/A units | | a. Monthly commercial rent potential (from Part E of the most recent HUD-approved Rent Schedule) | $ N/A |
| 6. Residential fee yield per unit per month (Line 1d divided by 1e.) | $ PUPM | | b. Percentage fee | % |
| | | | c. Commercial fee yield (Line 2a times 2b) | $ |

* Note: Generally collections must be estimated at 95% of gross potential. If you use a lower percentage, attach an explanation for the collections percentage used. Make sure that any assumption of a lower collections base does not compensate the agent for services for which a special fee will be paid.

3. Miscellaneous Fee

a. Percentage fee (not to exceed the residential income fee percentage in Line 1c)

   N/A

b. List any miscellaneous income on which HUD allows a fee to be taken, but on which you have agreed a fee will not be paid.

   N/A

4. Special Fees
Show dollar amount(s), purpose(s) and time period(s) covered. Describe performance standards and target dates for accomplishment of special tasks. (Attach additional sheets, if needed.)

   The Management Agent is compensated at the rate of 3% of Net Patient Revenue under Management Agreement dated 7/1/97.  In addition, the agent is reimbursed for additional services provided including Quality Assurance, Dietary Consulting, Systems Specialist, and other services not contemplated in the Management Agreement.

**Comment 3**

previous editions are obsolete                    Page 4 of 4                    form HUD-9833-E (09/2596)

66

Appendix B

Attachment B

## MANAGEMENT AGREEMENT

This agreement made and entered into as of July 1, 1997 by and between Coventry HealthContinuum, Inc., Rhode Island Corporation (hereinafter called "OWNER"), and Sterling Health Care Management Company, LLC, a Rhode Island Limited Liability Company, (hereinafter called "Manager").

### 1.    INTRODUCTION

1.1    OWNER desires to arrange for the management and operation of Coventry Health Center, a 344 bed nursing facility located in Coventry, Rhode Island, (hereinafter called the "FACILITY").

1.2    MANAGER is in the business of operating and furnishing management and other services to nursing facilities in Rhode Island.

### 2.    MANAGEMENT SERVICES

2.1 MANAGER shall have complete authority to manage and control all health care facilities and financial aspects of the operation of the FACILITY. MANAGER'S authority shall include, without limitation thereto, the powers to select, employ, fix the compensation and from time to time change all accounting, bookkeeping, record keeping, and reporting activities; to effect the purchase, and control the disposition of, all supplies and equipment; and from time to time institute, implement and effectuate such policies, rules, regulations and procedures for the rendering of nursing care as it deems necessary or appropriate for the proper and orderly functioning of the FACILITY.

2.2    MANAGER shall provide all necessary services for the operation of the FACILITY, including but not limited to the following:

a.    Select, employ and supervise one or more administrators, a director of nursing, a chef, and all other personnel required to operate the FACILITY;

b.    Act as a liaison between FACILITY and outside State, Federal and Private entities;

c.    Arrange for contracts for the purchase of all medical supplies, dietary, office and other items required to operate the FACILITY;

67

d.   Establish standardized personnel and operational policies and procedures;

e.   Provide management review of costs of all departments of the FACILITY;

f.   Arrange for in-service training seminars for all personnel;

g.   Provide continuous review of all operational aspects of the FACILITY;

h.   Advise on all laws and regulations with respect to compliance requirements for licensee of the FACILITY;

i.   Establish and maintain banking relationships for said FACILITY including but not limited to bank financing if necessary;

j.   Provide management review for all interior, exterior and equipment maintenance for the FACILITY;

k.   Do everything necessary to ensure the continued operation of the FACILITY.

3.     **STATEMENTS AND REPORTS**

3.1   MANAGER shall furnish or cause to be furnished to OWNER:

a.   Computerized operating and management statements within twenty-one (21) days after the end of each month showing all income, expense, and cash flow;

b.   Prepare and file quarterly payroll tax returns within twenty-five (25) days after the end of each quarter, unless delayed by circumstances beyond its control.

3.2   MANAGER shall prepare of cause to be prepared for the FACILITY Medicare and Medicaid reports, budgets, internal financial reports, and MANAGER shall supervise the preparation of such other reports or statements as may be required by City, State and Federal laws and regulations. MANAGER shall submit to OWNER for prior review any such report ten (10) days before such report is filed with the proper City, State or Federal agency. If OWNER does not notify MANAGER of any changes to such report within five days, then it shall be assumed OWNER has approved such report.

3.3   OWNER shall appoint independent certified public accountants to perform and annual audit and prepare annual certified financial statements and all tax returns except payroll tax returns which shall be prepared and filed by MANAGER.

2

68

## 4.   TERM OF AGREEMENT

4.1   This Agreement shall be co-terminous with the Partnership Agreement and will expire when the Partnership Agreement expires.

4.2   At the termination of this Agreement, OWNER hereby grants to MANAGER the right to employ directly of in any other nursing facility owned or managed by MANAGER all key and/or supervisory employees of the FACILITY, including, but not limited to , the Administrator, and assistant Administrator or Co-Administrator, the Director of Nurses, and the Chef. Any employee leaving the employ of OWNER at termination of this Agreement to then be employed by MANAGER as above shall give OWNER at least four(4) months written notice of termination.

4.3   The United States Department of Housing & Urban Development (HUD) may terminate this agreement:

a.   For failure to comply with the provisions of the management certification or other good cause, 30 days after HUD has mailed the OWNER and MANAGER a written notice of its desire to terminate the agreement.

b.   In the event of a default under the mortgage note or regulatory agreement, immediately upon HUD's issuance of a notice of termination to the OWNER and MANAGER. If HUD terminates the agreement, the OWNER will promptly make arrangements for providing management satisfactory to HUD. HUD's rights and requirements will prevail in the event the management agreement conflicts with their requirements. The MANAGER will turn over to the OWNER all of the FACILITY'S cash, trust accounts, investments, and records within 30 days of the date the management agreement is terminated.

## 5.   COMPENSATION OF MANAGER

5.1   As its compensation for providing services under this Agreement, Owner shall pay to MANAGER, commencing July 1, 1997, three percent (3%) of net patient revenue reduced by any costs that are directly reimbursed to the operating management company for services provided by its employees and designees. Compensation shall be due and payable by the OWNER to MANAGER by the twentieth (20th) day of each month for the services rendered in that month.

## 6.   EXPENSES

FACILITY shall reimburse MANAGER for all proper, reasonable, and reimbursable out-of-pocket expenses incurred or paid by MANAGER in connection with performance under this Agreement, including, but not limited to, reproduction costs, telephone charges, and items which OWNER would normally purchase on its own, but which are purchased by MANAGER on behalf of OWNER. MANAGER

shall cause vendors of all items purchased for the FACILITY to bill the FACILITY directly on a net basis including any pro rata credits which may be due by virtue of pooled or joint purchases. The FACILITY shall promptly pay all such charges. MANAGER shall under no circumstances be required to advance any funds, or to obligate itself in any manner, to employees of OWNER or to third parties for or on behalf of OWNER.

### 7.    INSURANCE

MANAGER will arrange for all insurance coverage normally in effect for the operation of a nursing facility, including, but not limited to, fire and extended coverage, workers' compensation, and malpractice. MANAGER will be named a co-insured under all liability and other insurance policies covering any phase of the operation of the FACILITY. All such insurance policies will be with reputable companies, and in amounts reasonably satisfactory to MANAGER.

### 8.    REPRESENTATIONS AND WARRANTY OF OWNER

OWNER hereby represents and warrants as follows:

8.1    That OWNER is a duly formed Rhode Island Limited Partnership and is in compliance with all applicable Federal, State and local laws and regulations.

8.2    That Antonio L. Giordano is the general partner and that he is authorized to enter into this Agreement on behalf of OWNER.

### 9.    REPRESENTATIONS AND OBLIGATION OF MANAGER

Based upon all representations and warranties of OWNER as set forth in this Agreement, and on condition that OWNER fulfills and continues to fulfill all such representations and warranties on a timely basis, MANAGER hereby represents as follows:

a.    That MANAGER is a duly formed Rhode Island Limited Liability Company and is in compliance with all applicable Federal, State and local laws and regulations.

### 10.    RESERVES FOR REPLACEMENT

The FACILITY'S mortgage is insured by HUD, therefore, MANAGER will use its best efforts to insure that all capital improvements, major repairs and replacement of major movable equipment (as defined by HUD) are paid for from available cash flow of the FACILITY; however, if such capital improvements, major

4

repairs, and major and/or minor movable replacement cannot be so funded, then OWNER shall be responsible for obtaining funding for said items.

### 11. INDEMNIFICATION

OWNER agrees to indemnify and hold harmless the MANAGER in any situation arising out of or from this agreement, where the MANAGER has notified the OWNER, by certified mail, return receipt requested, of any event, occurrence of happening which places the OWNER or MANAGER in non-compliance with any Federal, State or local notice or where the OWNER instructs the MANAGER not to take any action.

### 12. OTHER ACTIVITIES

OWNER acknowledges that MANAGER is engaged in the business of owning, operating and advising nursing facilities, some of which may be in the geographical area of the FACILITY. MANAGER may continue all such activities and may at some time in the future acquire, advise or manage other such facilities in the geographic area of the FACILITY, provided that it will in no way favor any of such other facilities of the FACILITY.

### 13. DISPUTES

Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration conducted in Rhode Island, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court, Federal or State.

### 14. NOTICES

Notices required or permitted to be given thereunder shall be in writing and shall be deemed sufficient only if sent by United States registered or certified mail, return receipt requested, postage prepaid, as follows:

If to OWNER:        Coventry Health Continuum, Inc.
                    190 Broad Street
                    Providence, RI 02906

If to MANAGER:      Sterling Health Care Management Company, LLC.
                    190 Broad Street
                    Providence, RI 02903

or at such other addresses as the respective parties designated by written notice.

5

Appendix B

Attachment B

15.   PARTIES BOUND AND BENEFITED; ASSIGNMENT; SUBCONTRACTS

This Agreement shall bind the parties hereto, their successors and assigns. This Agreement is solely for the benefit of OWNER and MANAGER, their successors and assigns; no other person or entity shall acquire or have any right under or by virtue of this Agreement; and MANAGER shall have no obligation or liability to any person or entity other than OWNER in connection with this Agreement or the providing of services thereunder.

16.   MISCELLANEOUS

This Agreement contains the complete understanding of the parties and incorporates all prior agreements, oral or written. Any modification of this Agreement shall be ineffective unless made in writing and signed by both parties. The headings used before the various paragraphs of this Agreement are for ease of reference only and do not constitute parts of this Agreement. If any provision of this Agreement shall be declared invalid or unenforceable, the remaining terms of this Agreement shall not be affected thereby. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island applicable to contracts made and to be performed therein in conformity with the Department of HUMAN Services Guidelines or HUD Regulatory Agreement or any other Federal/State requirements. "Upon request of HUD or OWNER, MANAGER will make available to HUD, at a reasonable time and place, its records and records of identity-of-interest companies which relate to goods and services charged to the project. Records and information will be sufficient to permit HUD to determine the services performed, the dates the services were performed, the location at which the services were performed, the time consumed in providing the services, the charges made for materials, and the per-unit and total charges levied for said services." The OWNER agrees to make available such records within seven (7) days of receipt of HUD's request to do so.

In the event of non-compliance with any of the aforesaid, then said parties to this Agreement shall have ninety (90) days to cure said non-compliance.

18.   SEVERABILITY CLAUSE

Wherever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law. Should any portion of this Agreement be declared invalid for any reason in any jurisdiction, such declaration shall have no effect upon the remaining portions of this Agreement. Furthermore, the entirety of this Agreement shall continue in full force and effect in all other jurisdictions and said remaining portions of this Agreement had been executed with the invalid portions thereof deleted.

6

72

In Witness Whereof, OWNER, by its duly authorized general partner, and MANAGER, by its duly authorized officer, have executed this Agreement in multiple originals as of

WITNESS:                                    Coventry Health Continuum, Inc.

By:
                                            John J. Montecalvo, President

                                            Starling Health Care Management
                                            Company, LLC.

By:
                                            Juliette A. Vaccaro, General Manager

Appendix B

Attachment C

**Comment 5**

FY 1998 - 2000
QUESTIONABLE LEGAL
PAYMENTS

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 12392 | 1/19/1998 | 2,827.40 |
| 15403 | 11/19/1999 | 5,000.00 |
| 14303 | 3/12/1999 | 645.95 |
| 15586 | 12/20/1999 | 5,000.00 |
| 15089 | 9/3/1999 | 10,000.00 |
| 15321 | 11/1/1999 | 15,000.00 |
| 15486 | 11/30/1999 | 17,000.00 |
| 15492 | 11/30/1999 | 100.00 |
| 14819 | 6/23/1999 | 7.50 |
| 15433 | 11/22/1999 | 2,000.00 |
| 16854 | 9/14/2000 | 10,000.00 |
| 16855 | 9/14/2000 | 5,000.00 |
| 17184 | 12/15/2000 | 5,000.00 |
| 17197 | 12/15/2000 | 15,000.00 |
| 15822 | 2/4/2000 | 2,500.00 |
| 15894 | 2/18/2000 | 2,500.00 |
| 16028 | 3/17/2000 | 2,500.00 |
| 16186 | 4/20/2000 | 2,500.00 |
| 16164 | 4/21/2000 | 15,000.00 |
| 16343 | 5/19/2000 | 5,000.00 |
| 16256 | 5/1/2000 | 799.62 |
| 15942 | 2/28/2000 | 823.54 |
| 16491 | 6/13/2000 | 805.50 |
| 16125 | 4/6/2000 | 1,000.00 |
| 17434 | 11/20/2000 | 500.00 |
| 17518 | 12/18/2000 | 500.00 |
| 17224 | 8/21/2000 | 1,211.25 |
| 15756 | 1/24/2000 | 1,000.00 |
| 16013 | 3/17/2000 | 3,500.00 |
| | **Total** | **$ 132,720.76** |

74

Appendix B

Attachment D

**Comment 5**

### FY 1998 - 2000 QUESTIONABLE ACCOUNTING PAYMENTS

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 12317 | 1/2/1998 | 1,000.00 |
| 12343 | 1/9/1998 | 1,000.00 |
| 12381 | 1/16/1998 | 1,000.00 |
| 12426 | 1/23/1998 | 1,000.00 |
| 12452 | 1/30/1998 | 1,000.00 |
| 12483 | 2/6/1998 | 1,000.00 |
| 12512 | 2/13/1998 | 1,000.00 |
| 12532 | 2/20/1998 | 1,000.00 |
| 12572 | 2/27/1998 | 1,000.00 |
| 12606 | 3/6/1998 | 1,000.00 |
| 12637 | 3/12/1998 | 1,000.00 |
| 12692 | 3/20/1998 | 1,000.00 |
| 12723 | 3/27/1998 | 1,000.00 |
| 12743 | 4/3/1998 | 1,000.00 |
| 12795 | 4/17/1998 | 1,000.00 |
| 12837 | 4/24/1998 | 1,000.00 |
| 12859 | 5/1/1998 | 1,000.00 |
| 12883 | 5/8/1998 | 1,000.00 |
| 12912 | 5/15/1998 | 1,000.00 |
| 12945 | 5/21/1998 | 1,000.00 |
| 12969 | 5/29/1998 | 1,000.00 |
| 12992 | 6/5/1998 | 1,000.00 |
| 13042 | 6/19/1998 | 2,000.00 |
| 13067 | 6/26/1998 | 1,000.00 |
| 13111 | 7/2/1998 | 1,000.00 |
| 13139 | 7/10/1998 | 1,000.00 |
| 13160 | 7/17/1998 | 1,000.00 |
| 13192 | 7/24/1998 | 1,000.00 |
| 13215 | 7/31/1998 | 1,000.00 |
| 13253 | 8/7/1998 | 1,000.00 |
| 13279 | 8/14/1998 | 1,000.00 |
| 13295 | 8/21/1998 | 1,000.00 |
| 13334 | 8/28/1998 | 1,000.00 |
| 13374 | 9/4/1998 | 1,000.00 |
| 13396 | 9/11/1998 | 1,000.00 |
| 13417 | 9/18/1998 | 1,000.00 |
| 13453 | 9/25/1998 | 1,000.00 |
| 12765 | 4/13/2000 | 1,000.00 |
| 13525 | 10/16/1998 | 1,000.00 |
| 13693 | 11/20/1998 | 195.00 |
| 15276 | 10/20/1999 | 5,800.00 |
| 14424 | 4/2/1999 | 586.00 |
| 14632 | 5/7/1999 | 2,500.00 |
| 15553 | 12/16/1999 | 1,102.00 |
| 15760 | 12/17/1999 | 3,372.50 |
| 15588 | 12/21/1999 | 1,000.00 |
| 16230 | 4/27/2000 | 5,000.00 |
| 16293 | 5/5/2000 | 492.00 |
| 16293 | 5/5/2000 | 4,508.00 |
| 16318 | 5/12/2000 | 5,000.00 |
| 16344 | 5/19/2000 | 5,000.00 |
| 16427 | 6/1/2000 | 5,000.00 |
| 16479 | 6/9/2000 | 5,000.00 |
| 16511 | 6/16/2000 | 5,000.00 |
| 16556 | 6/23/2000 | 5,000.00 |
| 16630 | 7/20/2000 | 10,000.00 |
| 16690 | 8/4/2000 | 5,000.00 |
| 16724 | 8/17/2000 | 5,000.00 |
| 16767 | 8/25/2000 | 5,000.00 |
| 16814 | 9/1/2000 | 5,677.00 |
| 17183 | 12/15/2000 | 5,000.00 |
| 15952 | 3/2/2000 | 750.00 |
| 15994 | 3/10/2000 | 1,000.00 |
| 16027 | 3/17/2000 | 1,000.00 |
| 16079 | 3/24/2000 | 1,000.00 |
| 16106 | 3/31/2000 | 1,000.00 |
| 16286 | 5/5/2000 | 1,000.00 |
| 16341 | 5/19/2000 | 2,000.00 |
| 17130 | 7/20/2000 | 5,000.00 |
|  |  | 4,000.00 |
|  | **Total** | **$  147,182.50** |

75

Appendix B

Attachment E

**Comment 5**

FY 1998 - 2000
QUESTIONABLE PAYMENTS TO
INDIVIDUALS

| CHECK NUMBER | CHECK DATE | AMOUNT | CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|---|---|---|
| 12215 | 1/2/1998 | 60.54 | 13501 | 10/9/1998 | 600.00 |
| 12216 | 1/2/1998 | 1,438.07 | 13511 | 10/15/1998 | 224.95 |
| 12241 | 1/8/1998 | 66.95 | 13530 | 10/15/1998 | 600.00 |
| 12252 | 1/8/1998 | 118.00 | 13531 | 10/15/1998 | 400.00 |
| 12254 | 1/14/1998 | 340.00 | 13532 | 10/15/1998 | 280.00 |
| 12262 | 1/15/1998 | 200.00 | 13533 | 10/15/1998 | 76.00 |
| 12280 | 1/16/1998 | 66.98 | 13534 | 10/15/1998 | 77.92 |
| 12282 | 1/16/1998 | 133.00 | 13553 | 10/23/1998 | 240.00 |
| 12296 | 1/19/1998 | 318.42 | 13554 | 10/23/1998 | 600.00 |
| 12298 | 1/19/1998 | 45.00 | 13568 | 10/23/1998 | 40.00 |
| 12299 | 1/19/1998 | 45.00 | 13569 | 10/23/1998 | 90.00 |
| 12400 | 1/19/1998 | 280.00 | 13573 | 10/27/1998 | 162.13 |
| 12412 | 1/23/1998 | 330.00 | 13577 | 10/29/1998 | 45.00 |
| 12426 | 1/23/1998 | 511.01 | 13592 | 10/20/1998 | 60.00 |
| 12426 | 1/26/1998 | 217.00 | 13593 | 10/20/1998 | 42.67 |
| 12437 | 1/29/1998 | 36.87 | 13597 | 10/20/1998 | 600.00 |
| 12438 | 1/29/1998 | 82.00 | 13623 | 11/5/1998 | 45.80 |
| 12439 | 1/29/1998 | 110.00 | 13635 | 11/6/1998 | 172.55 |
| 12440 | 1/30/1998 | 166.00 | 13636 | 11/6/1998 | 600.00 |
| 12451 | 1/30/1998 | 66.96 | 13650 | 11/13/1998 | 600.00 |
| 12460 | 2/3/1998 | 212.68 | 13651 | 11/13/1998 | 62.54 |
| 12463 | 2/5/1998 | 21.36 | 13662 | 11/13/1998 | 156.30 |
| 12469 | 2/5/1998 | 1,200.00 | 13654 | 11/16/1998 | 22.41 |
| 12470 | 2/5/1998 | 600.00 | 13674 | 11/20/1998 | 171.75 |
| 12492 | 2/6/1998 | 62.91 | 13656 | 11/20/1998 | 332.19 |
| 12496 | 2/6/1998 | 96.81 | 13659 | 11/20/1998 | 148.64 |
| 12511 | 2/13/1998 | 50.01 | 13690 | 11/20/1998 | 195.30 |
| 12531 | 2/20/1998 | 62.23 | 13691 | 11/20/1998 | 181.44 |
| 12535 | 2/20/1998 | 70.59 | 13701 | 11/23/1998 | 239.20 |
| 12536 | 2/20/1998 | 45.00 | 13702 | 11/23/1998 | 247.13 |
| 12642 | 2/23/1998 | 398.74 | 13709 | 11/24/1998 | 100.39 |
| 12647 | 2/23/1998 | 130.00 | 13716 | 11/24/1998 | 52.13 |
| 12648 | 2/23/1998 | 59.00 | 13725 | 11/25/1998 | 1,909.58 |
| 12649 | 2/23/1998 | 327.00 | 13749 | 11/27/1998 | 1,200.00 |
| 12656 | 2/24/1998 | 196.29 | 13779 | 12/4/1998 | 102.10 |
| 12657 | 2/24/1998 | 520.00 | 13780 | 12/4/1998 | 3,275.00 |
| 12671 | 2/27/1998 | 62.93 | 13781 | 12/4/1998 | 600.00 |
| 12672 | 2/27/1998 | 138.00 | 13801 | 12/10/1998 | 85.56 |
| 12692 | 3/5/1998 | 83.00 | 13803 | 12/10/1998 | 125.00 |
| 12693 | 3/5/1998 | 62.91 | 13816 | 12/11/1998 | 600.00 |
| 12699 | 3/5/1998 | 60.00 | 13819 | 12/12/1998 | 350.00 |
| 12699 | 3/12/1998 | 3,547.50 | 13921 | 12/14/1998 | 691.00 |
| 12641 | 3/12/1998 | 17.00 | 13937 | 12/16/1998 | 110.00 |
| 12650 | 3/16/1998 | 43.00 | 13946 | 12/16/1998 | 100.00 |
| 12654 | 3/16/1998 | 52.92 | 13947 | 12/16/1998 | 60.00 |
| 12656 | 3/18/1998 | 73.35 | 13949 | 12/17/1998 | 119.63 |
| 12676 | 3/20/1998 | 690.00 | 13950 | 12/18/1998 | 600.00 |
| 12676 | 3/20/1998 | 116.46 | 13969 | 12/24/1998 | 84.03 |
| 12691 | 3/20/1998 | 39.35 | 13993 | 12/30/1998 | 25.00 |
| 12704 | 3/25/1998 | 2,520.00 | 13995 | 12/22/1998 | 2,970.00 |
| 12706 | 3/25/1998 | 250.00 | 13914 | 12/31/1998 | 72.68 |
| 12709 | 3/26/1998 | 90.73 | 13915 | 12/31/1998 | 1,200.00 |
| 12710 | 3/26/1998 | 66.25 | 13917 | 12/31/1998 | 200.00 |
| 12722 | 3/27/1998 | 68.40 | 13918 | 12/31/1998 | 320.00 |
| 12742 | 4/5/1998 | 62.21 | 13964 | 1/15/1999 | 1,711.24 |
| 12764 | 4/13/1998 | 49.24 | 14012 | 1/19/1999 | 93.21 |
| 12769 | 4/13/1998 | 12.46 | 14028 | 1/21/1999 | 63.56 |
| 12772 | 4/13/1998 | 13.31 | 14049 | 1/25/1999 | 231.36 |
| 12776 | 4/14/1998 | 222.50 | 14055 | 1/29/1999 | 500.35 |
| 12797 | 4/17/1998 | 49.00 | 14069 | 1/29/1999 | 125.01 |
| 12812 | 4/21/1998 | 229.34 | 14071 | 1/29/1999 | 40.00 |
| 12817 | 4/22/1998 | 100.25 | 14074 | 1/29/1999 | 632.50 |
| 12839 | 4/28/1998 | 60.00 | 14075 | 1/29/1999 | 34.36 |
| 12849 | 1/29/1998 | 48.79 | 14079 | 2/2/1999 | 60.00 |
| 12861 | 5/4/1998 | 7,234.79 | 14098 | 2/5/1999 | 25.42 |
| 12862 | 5/4/1998 | 33.83 | 14100 | 2/5/1999 | 130.85 |
| 12866 | 5/5/1998 | 45.00 | 14106 | 2/8/1999 | 2,700.00 |
| 12896 | 5/9/1998 | 60.00 | 14133 | 2/12/1999 | 174.50 |
| 12899 | 5/11/1998 | 60.00 | 14134 | 2/12/1999 | 60.00 |
| 12916 | 5/15/1998 | 60.00 | 14160 | 2/19/1999 | 206.34 |
| 12919 | 5/15/1998 | 200.00 | 14163 | 2/19/1999 | 63.95 |
| 12926 | 5/18/1998 | 500.00 | 14166 | 2/19/1999 | 84.08 |
| 12927 | 5/18/1998 | 500.00 | 14337 | 3/19/1999 | 266.52 |
| 12946 | 5/21/1998 | 45.00 | 14340 | 3/19/1999 | 45.00 |
| 12958 | 5/28/1998 | 125.00 | 14341 | 3/19/1999 | 58.62 |
| 12974 | 5/29/1998 | 56.71 | 14343 | 3/22/1999 | 106.63 |
| 12975 | 5/29/1998 | 120.20 | 14347 | 3/23/1999 | 17.57 |
| 12982 | 6/4/1998 | 100.52 | 14353 | 3/24/1999 | 40.00 |
| 12997 | 6/5/1998 | 359.20 | 14354 | 3/24/1999 | 58.57 |
| 13001 | 8/11/1998 | 139.61 | 14375 | 3/26/1999 | 108.52 |
| 13044 | 8/19/1998 | 60.00 | 14421 | 4/2/1999 | 144.93 |
| 13046 | 8/22/1998 | 118.35 | 14444 | 4/8/1999 | 129.50 |
| 13047 | 8/22/1998 | 119.13 | 14489 | 4/15/1999 | 500.00 |
| 13055 | 8/25/1998 | 57.70 | 14490 | 4/15/1999 | 500.00 |
| 13056 | 8/25/1998 | 150.49 | 14525 | 4/19/1999 | 33.53 |

Appendix B

Attachment E

Continued

| CHECK NUMBER | CHECK DATE | AMOUNT | CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|---|---|---|
| 13057 | 6/25/1998 | 100.00 | 14559 | 4/22/1999 | 500.00 |
| 13074 | 6/26/1998 | 1,563.63 | 14578 | 4/23/1999 | 82.20 |
| 13077 | 6/30/1998 | 235.20 | 14579 | 4/23/1999 | 145.52 |
| 13080 | 7/1/1998 | 25.00 | 14613 | 5/5/1999 | 1,500.00 |
| 13081 | 7/1/1998 | 25.00 | 14620 | 5/6/1999 | 93.52 |
| 13082 | 7/1/1998 | 25.00 | 14637 | 5/10/1999 | 50.00 |
| 13083 | 7/1/1998 | 25.00 | 14652 | 5/20/1999 | 1,108.50 |
| 13084 | 7/1/1998 | 25.00 | 14653 | 5/20/1999 | 2,505.00 |
| 13086 | 7/1/1998 | 25.00 | 14655 | 5/21/1999 | 2,422.58 |
| 13095 | 7/1/1998 | 25.00 | 14695 | 5/24/1999 | 504.31 |
| 13097 | 7/1/1998 | 25.00 | 14719 | 6/1/1999 | 300.00 |
| 13092 | 7/1/1998 | 25.00 | 14738 | 6/4/1999 | 40.21 |
| 13088 | 7/1/1998 | 25.00 | 14743 | 6/9/1999 | 10,380.00 |
| 13090 | 7/1/1998 | 25.00 | 14750 | 6/10/1999 | 150.00 |
| 13091 | 7/1/1998 | 25.00 | 14753 | 6/11/1999 | 150.00 |
| 13093 | 7/1/1998 | 25.00 | 14752 | 6/18/1999 | 35.52 |
| 13094 | 7/1/1998 | 25.00 | 14920 | 6/23/1999 | 7.50 |
| 13096 | 7/1/1998 | 25.00 | 14922 | 6/23/1999 | 7.50 |
| 13098 | 7/1/1998 | 25.00 | 14929 | 6/23/1999 | 65.84 |
| 13097 | 7/1/1998 | 25.00 | 14850 | 7/2/1999 | 444.56 |
| 13098 | 7/1/1998 | 25.00 | 14850 | 7/6/1999 | 567.79 |
| 13099 | 7/1/1998 | 25.00 | 14871 | 7/13/1999 | 14.58 |
| 13100 | 7/1/1998 | 25.00 | 14920 | 7/16/1999 | 144.95 |
| 13115 | 7/6/1998 | 116.00 | 14921 | 7/16/1999 | 139.00 |
| 13116 | 7/6/1998 | 650.00 | 14920 | 7/16/1999 | 45.00 |
| 13125 | 7/9/1998 | 90.60 | 14897 | 7/16/1999 | 227.77 |
| 13127 | 7/9/1998 | 234.43 | 14946 | 7/30/1999 | 261.96 |
| 13128 | 7/9/1998 | 255.00 | 14947 | 7/30/1999 | 94.30 |
| 13144 | 7/10/1998 | 80.44 | 14965 | 8/6/1999 | 109.28 |
| 13148 | 7/16/1998 | 372.03 | 14971 | 8/11/1999 | 995.40 |
| 13165 | 7/17/1998 | 135.00 | 15100 | 9/10/1999 | 209.96 |
| 13170 | 7/21/1998 | 265.00 | 15101 | 9/10/1999 | 56.85 |
| 13195 | 7/24/1998 | 235.00 | 15133 | 9/17/1999 | 74.75 |
| 13200 | 7/28/1998 | 5,230.16 | 15165 | 9/24/1999 | 69.95 |
| 13204 | 7/28/1998 | 3,241.80 | 15176 | 9/28/1999 | 318.56 |
| 13207 | 7/30/1998 | 77.68 | 15197 | 10/1/1999 | 29.02 |
| 13210 | 7/30/1998 | 326.00 | 15235 | 10/8/1999 | 63.13 |
| 13228 | 8/3/1998 | 66.36 | 15241 | 10/8/1999 | 2,976.00 |
| 13229 | 8/3/1998 | 169.91 | 15276 | 9/17/1999 | 62.76 |
| 13231 | 8/3/1998 | 36.36 | 15210 | 10/25/1999 | 75.47 |
| 13232 | 8/3/1998 | 40.00 | 15333 | 11/4/1999 | 109.95 |
| 13237 | 8/4/1998 | 51.92 | 15373 | 11/17/1999 | 100.00 |
| 13238 | 8/4/1998 | 250.70 | 15379 | 11/15/1999 | 259.42 |
| 13243 | 8/6/1998 | 62.00 | 15414 | 11/22/1999 | 1,780.31 |
| 13254 | 8/7/1998 | 16.40 | 15460 | 11/29/1999 | 175.90 |
| 13255 | 8/7/1998 | 60.00 | 15487 | 11/30/1999 | 538.85 |
| 13261 | 8/12/1998 | 25.00 | 15510 | 12/3/1999 | 200.00 |
| 13287 | 8/13/1998 | 50.00 | 15511 | 12/3/1999 | 100.00 |
| 13288 | 8/13/1998 | 120.00 | 15512 | 12/3/1999 | 50.00 |
| 13289 | 8/13/1998 | 215.00 | 15546 | 12/15/1999 | 100.00 |
| 13295 | 8/21/1998 | 25.00 | 15549 | 12/17/1999 | 637.00 |
| 13297 | 8/21/1998 | 25.00 | 15550 | 12/17/1999 | 492.24 |
| 13302 | 8/21/1998 | 220.14 | 15554 | 12/16/1999 | 30.00 |
| 13305 | 8/21/1998 | 53.00 | 15555 | 12/17/1999 | 500.00 |
| 13213 | 8/26/1998 | 159.16 | 15556 | 12/17/1999 | 500.00 |
| 13215 | 8/26/1998 | 250.17 | 15583 | 12/30/1999 | 55.00 |
| 13220 | 8/27/1998 | 25.00 | 15642 | 1/6/2000 | 100.00 |
| 13221 | 8/27/1998 | 4411.80 | 15790 | 1/28/2000 | 407.00 |
| 13223 | 8/27/1998 | 39.00 | 15832 | 2/6/2000 | 500.00 |
| 13238 | 8/28/1998 | 50.00 | 15857 | 2/19/2000 | 15.47 |
| 13239 | 8/28/1998 | 50.00 | 16054 | 3/20/2000 | 62.64 |
| 13240 | 8/28/1998 | 50.00 | 16119 | 4/6/2000 | 72.44 |
| 13241 | 8/28/1998 | 50.00 | 16133 | 4/7/2000 | 155.92 |
| 13242 | 8/28/1998 | 50.00 | 16152 | 4/10/2000 | 48.16 |
| 13243 | 8/28/1998 | 25.00 | 16256 | 5/2/2000 | 110.59 |
| 13244 | 8/28/1998 | 25.00 | 16270 | 5/4/2000 | 142.17 |
| 13245 | 8/28/1998 | 25.00 | 16370 | 5/19/2000 | 65.46 |
| 13245 | 8/28/1998 | 25.00 | 16459 | 6/6/2000 | 39.90 |
| 13247 | 9/28/1998 | 25.00 | 16480 | 6/6/2000 | 2,666.56 |
| 13248 | 8/28/1998 | 25.00 | 16478 | 6/9/2000 | 362.86 |
| 13252 | 9/31/1998 | 178.55 | 16557 | 6/30/2000 | 4,195.00 |
| 13255 | 9/3/1998 | 3,756.04 | 16656 | 7/27/2000 | 406.39 |
| 13286 | 9/10/1998 | 73.38 | 16696 | 8/7/2000 | 40.46 |
| 13296 | 9/11/1998 | 802.50 | 16749 | 8/21/2000 | 19.95 |
| 13437 | 9/22/1998 | 48.15 | 16810 | 9/6/2000 | 74.56 |
| 13442 | 9/24/1998 | 640.00 | 16873 | 9/19/2000 | 2,565.27 |
| 13455 | 9/25/1998 | 50.00 | 16874 | 9/19/2000 | 717.07 |
| 13457 | 9/25/1998 | 60.00 | 16904 | 9/22/2000 | 231.56 |
| 13458 | 9/25/1998 | 487.90 | 16948 | 11/6/2000 | 151.90 |
| 13451 | 9/28/1998 | 60.00 | 16963 | 10/20/2000 | 18.92 |
| 13482 | 9/29/1998 | 1,100.00 | 16964 | 10/20/2000 | 17.47 |
| 13492 | 10/6/1998 | 68.50 | 17066 | 11/7/2000 | 2,134.79 |
| 13496 | 10/6/1998 | 250.00 | 17076 | 11/10/2000 | 1,545.89 |
| 13490 | 10/28/1998 | 124.00 | 17157 | 12/15/2000 | 279.60 |
|  |  | $ 51,584.17 |  |  | $ 84,560.28 |
|  |  |  | Total | | $ 136,144.45 |

Appendix B

Attachment F

**Comment 5**

FY 1999 – 2000
QUESTIONABLE PAYMENTS
PAYROLL

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 14897 | 7/16/1999 | 237.77 |
| 15527 | 12/7/1999 | 18.16 |
| 15541 | 12/10/1999 | 162.10 |
| 15575 | 12/17/1999 | 42.35 |
| 15579 | 12/17/1999 | 50.00 |
| 14097 | 2/5/1999 | 105.27 |
| 15520 | 12/3/1999 | 176.60 |
| 15613 | 12/23/1999 | 173.75 |
| 15577 | 12/17/1999 | 36.08 |
| 17225 | 12/20/2000 | 70.00 |
| 16099 | 3/31/2000 | 449.98 |
| 16892 | 9/22/2000 | 218.78 |
| 16893 | 9/22/2000 | 263.79 |
| 15662 | 1/7/2000 | 122.89 |
| 15974 | 3/3/2000 | 512.62 |
| 17078 | 11/10/2000 | 60.00 |
| 16979 | 10/20/2000 | 92.69 |
| 16058 | 3/22/2000 | 96.00 |
| 16957 | 10/12/2000 | 86.45 |
| 17175 | 12/13/2000 | 35.00 |
| 16209 | 4/21/2000 | 144.91 |
| 16980 | 10/20/2000 | 46.10 |
| 16921 | 9/26/2000 | 329.70 |
| 16922 | 9/26/2000 | 329.70 |
| 17248 | 12/29/2000 | 40.00 |
| 17237 | 12/21/2000 | 50.00 |
| 17137 | 11/27/2000 | 150.00 |
| 16048 | 3/17/2000 | 702.89 |
| 15154 | 4/14/2000 | 327.30 |
| 16521 | 6/16/2000 | 259.64 |
| 16956 | 10/12/2000 | 286.06 |
| 15683 | 1/14/2000 | 181.41 |
| 16710 | 8/11/2000 | 66.56 |
| 17077 | 11/10/2000 | 182.68 |
| 16208 | 4/21/2000 | 30.70 |
| 16405 | 5/25/2000 | 309.38 |
| 17215 | 12/18/2000 | 50.00 |
| 16772 | 8/25/2000 | 450.72 |
| 16409 | 5/26/2000 | 204.31 |
| 16410 | 5/26/2000 | 204.31 |
| 16622 | 7/14/2000 | 18.42 |
| 16813 | 9/1/2000 | 224.05 |
| 15661 | 1/7/2000 | 62.83 |
| 16981 | 10/20/2000 | 33.83 |
| 16561 | 6/23/2000 | 50.00 |
| 16146 | 4/10/2000 | 300.00 |
| 17163 | 12/4/2000 | 200.00 |
| 17238 | 12/21/2000 | 551.65 |
| 16262 | 5/2/2000 | 476.07 |
| 16218 | 4/21/2000 | 265.99 |
| 17032 | 10/27/2000 | 228.95 |
| 16947 | 10/6/2000 | 189.15 |
| 15668 | 2/16/2000 | 6,552.25 |
| 15660 | 1/7/2000 | 109.64 |
| 16603 | 7/7/2000 | 107.41 |
| 17035 | 10/30/2000 | 30.81 |
| 16773 | 8/25/2000 | 245.14 |
| 17250 | 12/29/2000 | 148.77 |
| 17251 | 12/29/2000 | 148.77 |
| 16269 | 5/4/2000 | 556.61 |
| 16273 | 5/4/2000 | 699.77 |
| 16219 | 4/21/2000 | 274.34 |
| 16373 | 5/19/2000 | 118.87 |
| 15967 | 3/3/2000 | 167.50 |
| 15970 | 3/3/2000 | 72.19 |
| 16169 | 4/18/2000 | 373.97 |
| 16200 | 4/21/2000 | 86.75 |
| 15869 | 2/16/2000 | 250.00 |
| 15972 | 3/3/2000 | 285.59 |
| | Total | $20,191.75 |

78

Appendix B

Attachment G

**Comment 6**

FY 1998 - 2000
QUESTIONABLE PAYMENTS
TO MSF

| CHECK NUMBER | CHECK DATE | AMOUNT |
|---|---|---|
| 12393 | 1/19/1998 | 248.00 |
| 15274 | 10/20/1999 | 745.00 |
| 15303 | 10/26/1999 | 745.00 |
| 15331 | 11/4/1999 | 745.00 |
| 15371 | 11/19/1999 | 745.00 |
| 15372 | 11/19/1999 | 745.00 |
| 15551 | 12/17/1999 | 1,745.02 |
| 15544 | 1/6/2000 | 666.68 |
| 15572 | 1/12/2000 | 333.34 |
| 15697 | 1/20/2000 | 333.34 |
| 15755 | 1/24/2000 | 333.34 |
| 15795 | 2/1/2000 | 333.34 |
| 15825 | 2/7/2000 | 333.34 |
| 15856 | 2/14/2000 | 333.34 |
| 15904 | 2/21/2000 | 333.34 |
| 15948 | 2/29/2000 | 333.34 |
| 15976 | 3/7/2000 | 333.34 |
| 15999 | 3/13/2000 | 333.34 |
| 16052 | 3/20/2000 | 333.34 |
| 16085 | 3/28/2000 | 333.34 |
| 16108 | 4/3/2000 | 333.34 |
| 16149 | 4/10/2000 | 333.34 |
| 16161 | 4/20/2000 | 333.34 |
| 16251 | 4/28/2000 | 334.00 |
| 16269 | 5/5/2000 | 334.00 |
| 16302 | 5/9/2000 | 334.00 |
| 16335 | 5/19/2000 | 334.00 |
| 16591 | 8/4/2000 | 964.00 |
| 16481 | 6/9/2000 | 1,002.00 |
| 16531 | 6/19/2000 | 353.34 |
| 16536 | 7/20/2000 | 1,666.70 |
| | Total | $16,686.84 |

## Antonio L. Giordano Related Entities

1. **Antonio L. Giordano, Inc.**
   (Real estate business)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President:  Antonio L. Giordano
   Vice President: Antonio L. Giordano
   Secretary: Janice M. Strang, dates of service unavailable
   Treasurer: John J. Montecalvo, dates of service unavailable

2. **Construction Software Inc.**
   (Computer systems business)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: John J. Montecalvo, From 2000 to 2004
   Secretary: Janice M. Strang, From 2001 to 2004
   Treasurer: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)

3. **Consultants Associates, Inc.**
   (Real estate consulting firm)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2001 to 2003, (Son of Antonio L. Giordano)
   Vice President: Mary D. Gentili, From 2001 to 2003, (Daughter of Antonio L. Giordano)
   Secretary: Madonna D. Giordano, From 2001 to 2003, (Daughter of Antonio L. Giordano)
   Treasurer: Antonio A. Giordano, From 2001 to 2003, (Son of Antonio L. Giordano)
   President: Casimir Kolaski, From 2004 (Former Director of HUD Providence Office)
   Secretary: Janice M. Strang, From 2004

4. **Consultants, Inc.**
   (Real estate consulting firm)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2000 to 2004, (Son of Antonio L. Giordano)
   Vice President: Mary D. Gentili, From 2002 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Janice M. Strang, From 2000 to 2004
   Treasurer: John J. Montecalvo, From 2000 to 2004

5. **Coventry Health Associates**
   (Nursing home owner)
   **Giordano interest**
   General Partner: John Assalone, Sr. dates of service unavailable
   General Partner: Pasquale Confreda, dates of service unavailable

General Partner: Domenick Delvecchio, dates of service unavailable
General Partner: Antonio L. Giordano, dates of service unavailable
General Partner: Robert Rocchio, dates of service unavailable

6. **Coventry Health Continuum, Inc.**
   (Nursing home operator)
   **Giordano interest**
   President: John J. Montecalvo, dates of service unavailable
   President: John Assalone, Sr., 2001
   Vice President: Pasquale Confreda, 2001
   Secretary: Pasquale Confreda, 2001
   Treasurer: Pasquale Confreda, 2001

7. **Coventry Sewage Associates**
   (Private sewer line in which serviced Coventry Health Center)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   General Partner: Antonio L. Giordano

8. **Gregory Building Company**
   (Construction company)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   President: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)
   Vice President: Peter Castriotta, From 2001 to 2004
   Secretary: Madonna D. Giordano, From 2002 to 2004, (Daughter of Antonio L. Giordano)
   Secretary: Mary D. Gentili, 2001, (Daughter of Antonio L. Giordano)
   Treasurer: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)

9. **Hillside Health Center Associates, LP**
   (Nursing home owner)
   **Giordano interest**
   RI Office of Secretary of State records indicate the officers as follows;
   General Partner: Consultants Inc. (See above)

10. **Hillside Health Center, LLC**
    (Nursing home operator)
    **Giordano interest**
    RI Office of Secretary of State records indicate the officers as follows;
    Manager: John J. Montecalvo, From 2000 to 2003

**11. Management Reality Services**
(Real estate management agent)
**Giordano interest**
RI Office of Secretary of State records indicate the officers as follows;
President: Mary D. Gentili, From 2003 to 2004, (Daughter of Antonio L. Giordano)
President: Mona Renchan, 2002
President: Juliette A. Vaccaro, 2001
Vice President: Mary D. Gentili, 2002, (Daughter of Antonio L. Giordano)
Secretary: Mary D. Gentili, From 2002 to 2004, (Daughter of Antonio L. Giordano)
Secretary: Janice M. Strang, From 2001 to 2004
Treasurer: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)

**12. Mount Saint Francis Associates.**
(Nursing home owner/operator)
**Giordano interest**
RI Office of Secretary of State records indicate the officers as follows;
General Partner: Antonio L. Giordano

**13. My Place, Inc.**
(Employee relations firm)
**Giordano interest**
RI Office of Secretary of State records indicate the officers as follows;
President: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)
Vice President: Madonna Giordano, From 2001 to 2004, (Daughter of Antonio L. Giordano)
Secretary: Janice M. Strang, From 2001 to 2004
Treasurer: John J. Montecalvo, From 2001 to 2004

**14. Simon and Windsor Interiors**
(Interior design firm)
**Giordano interest**
RI Office of Secretary of State records indicate the officers as follows;
President: Mary D. Gentili, From 2001 to 2004, (Daughter of Antonio L. Giordano)
Vice President: Antonio A. Giordano, From 2001 to 2004, (Son of Antonio L. Giordano)
Secretary: Janice M. Strang, From 2001 to 2004
Treasurer: John J. Montecalvo, From 2001 to 2004

**15. Sterling Health Care Management Company, LLC**
(Nursing home management agent)
**Giordano interest**
RI Office of Secretary of State records indicate the officers as follows;
Manager: John J. Montecalvo, From 2000 to 2003

16. **Suburban Mortgage Associates Inc.**
    (State of Maryland public records)
    **Giordano interest**
    President: J. Walsh Richards, From 1978 to present
    Vice President: Antonio L. Giordano, From 1978 to 2003
    Vice President: Edmond Richards, dates of service unavailable,
    Vice President: Kimberly Papuchis, dates of service unavailable
    Vice President: David N. Eaton, dates of service unavailable
    Treasurer: Ngyuet M. Pham, dates of service unavailable

17. **Woodland Manor Improvement Association**
    (Operates private sewer which serviced Coventry Health Center)
    **Giordano interest**
    RI Office of Secretary of State records indicate the officers as follows;
    Director: Antonio L. Giordano, From 2002 to 2003
    Director: Pasquale Confreda, From 2002 to 2003,
    Director: Domenic DelVecchio, From 2002 to 2003,
    President: Pasquale Confreda, From 2002 to 2003
    Secretary: Pasquale Confreda, From 2002 to 2003
    Treasurer: Antonio L. Giordano, From 2002 to 2003

# Key Events

The following is a chronological list of significant events that have taken place since the inception of the project:

**October 15, 1981,** initial construction of the nursing home was financed by a mortgage insured under Section 232 (Federal Housing Administration No. 016-43038), which was given final endorsement by HUD in March 1984 for $8,667,300. At the same time, the owner obtained a Section 223(d)-insured operating loss loan (working capital) for $1,167,700.

**October 1981,** a syndication of associates was effected through First Winthrop Corporation. The general partners of the associates were Antonio L. Giordano and several individuals (the Giordano Group). The Giordano Group also was the original limited partner. The Giordano Group remained general partners, and the owner, a District of Columbia limited partnership, was admitted as limited partner.

**March 1984,** after final endorsement, another amendment to the partnership agreement was filed, under which the members of the Giordano Group withdrew as general partners and became special limited partners. Winthrop Financial Co., Inc., an affiliate of First Winthrop Corporation, became sole general partner.

**June 1, 1984,** the nursing home was leased to Coventry Nursing Care, Inc., an operator that was not affiliated with the owner or related businesses.

**June 1986,** the original Section 232-insured first mortgage and the operating loss loan were refinanced, pursuant to Section 223(a)(7), by a new Section 232-insured first mortgage in the amount of $9,835,000 (Federal Housing Administration No. 016-43050).

**April 1987,** Winthrop Financial Co., Inc., withdrew as general partner due to disputes, including litigation, between the Giordano Group and First Winthrop Corporation. An agreement was reached along with the termination of the operating lease with Coventry Nursing Care, Inc.

**May 5, 1987,** HUD suspended processing of an April 30, 1987, transfer of physical assets for failure to provide required audited financial data regarding the operating loss loan. Later that month, the owner was suspended from participation in HUD housing programs pending completion of an investigation relating to alleged activities of an entity under his control as general contractor regarding several Rhode Island nursing homes.

**July 8, 1987,** the owner effected a transfer of physical assets without HUD approval. This had the effect of restructuring ownership interests of the partnership by moving the Giordano Group from limited partners to general partner. The transfer removed Winthrop Financial Co., Inc., as general partner and special limited partner to limited partner. Consideration for the transfer and resulting restructure was $1.00. A transfer in itself is not improper; however, the fact that HUD was not aware of the transaction is. There was potential risk to the government because HUD was not given the opportunity to review the action, especially in light of HUD defining the project as financially troubled.

84

**July 8, 1987,** the owner entered into a 10-year lease agreement regarding the nursing home with Coventry Health Continuum, Inc., d/b/a Coventry Health Center, an identity-of-interest operator, which expired on December 31, 1997. The nursing home was now owned and operated by related parties.

**July 8, 1987,** the owner entered into a management agreement with Health Management Services Company for a term that expired on July 1, 1997. Health Management Services Company was a Rhode Island-based management company not affiliated with the owner.

**December 1988,** the owner's suspension was terminated due to expiration of the maximum 18-month duration under 24 CFR [*Code of Federal Regulations*] 24.415(b) without initiation of further proceedings. In October 1989, the United States Attorney confirmed to HUD that it had declined prosecution.

**March 15, 1989,** we issued an audit report on the project (Audit No. 89 BO-212-1015). The report found that an unauthorized transfer of physical assets occurred and recommended that HUD assess the impact on HUD and risk associated with the various financing arrangements resulting from the transfer, including a determination as to whether the lease and management agreement are in the best interest of the project and HUD.

Due to the lapse of time and lack of records, we were unable to determine the final disposition of that audit.

**May 24, 1994,** initial endorsement was signed to refinance the June 1986 HUD-insured loan. The new HUD loan was insured for $15,308,700 under Section 232 of the National Housing Act (Federal Housing Administration Project Number 016-43071). The new loan, in part, financed a 34-bed addition to the nursing home. In addition, on May 24, 1994, a regulatory agreement for nursing homes (HUD Form 92466-NHL) was entered into between the owner and the operator. In May 1995, the loan was given final endorsement.

**July 1, 1997,** the operator contracted management services through Sterling Health Care Management Company, an identity-of-interest management agent through common ownership. The July 8, 1987, management agreement with Health Management Services Company was not renewed. The nursing home was now completely controlled (owned, operated, and managed) by related parties.

**August 1999,** the owner defaulted on its loan payment to Suburban Mortgage Associates, Incorporated. A few months later, HUD requested that the operator start submitting monthly accounting reports (HUD Form 93479).

**June 28, 2000,** Suburban Mortgage Associates, Incorporated, assigned the mortgage to HUD.

**February 19, 2001,** the Rhode Island Superior Court entered an order appointing a receiver to control the assets and business of the operator.

**September 6, 2002**, the $15,308,700 note was sold to Allied Capital, along with six other nursing homes, for $34,777,000. The loss to HUD was $6,292,520.

**August 25, 2003,** Haven Eldercare of New England, LLC, purchased the project for $10,375,000 and took control of the assets and operations from the receiver.