UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


UNITED STATES OF AMERICA
       Plaintiff,


      v.                               C.A. No. 09-432 ML

ANTONIO L. GIORDANO,
JOHN MONTECALVO,
PASQUALE CONFREDA,[1] and
COVENTRY HEALTH CENTER
ASSOCIATES,
       Defendants.


**MEMORANDUM AND ORDER**

    The United States of America ("Government"), on behalf of the United States

Department of Housing and Urban Development ("HUD"), has filed a six-count complaint

against Defendants alleging equity skimming in violation of 12 U.S.C. § 1715z-4a.  The matter is

now before the Court on the Government's motion for summary judgment against Defendants

Antonio L. Giordano ("Giordano"), John Montecalvo ("Montecalvo"), and Coventry Health

Center Associates ("CHCA"), on counts 1 through 4 of the complaint.[2]  The Government alleges

that Defendants implemented a scheme wherein they diverted millions of dollars away from two

---

[1] Mr. Confreda passed away on October 1, 2010, and counsel filed a suggestion of death.

[2] On February 22, 2012, the Government filed a motion for entry of default against Montecalvo because Montecalvo did not answer the complaint or file a motion under Fed. R. Civ. P. 12.  On March 13, 2012, the Court entered default against Montecalvo.  CHCA answered the complaint; however, it did not respond to the Government's motion for summary judgment.  The Government contends that summary judgment should enter against Montecalvo and CHCA because they did not oppose the motion.  In the First Circuit, however, the Court must make a determination that entry of summary judgment is appropriate.  See generally Carmona v. Toldeo, 215 F.3d 124, 134 n.9 (1st Cir. 2000); see also Fed. R. Civ. P. 56(e)(3) (if party fails to respond, the Court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it").

HUD-insured Rhode Island nursing homes in order to enrich Defendants and certain members of

Giordano's family.  Giordano denies the allegations.

## I.  Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  An issue is "genuine" if the pertinent evidence is such that a rational factfinder

could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to

sway the outcome of the litigation under the applicable law."  National Amusements, Inc. v.

Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

The moving party bears the initial burden of showing the Court that no genuine issue of

material fact exists.  Id.  Once the moving party makes this showing, the nonmoving party must

point to specific facts demonstrating a trialworthy issue.  Id.  The Court views all facts and draws

all reasonable inferences in the light most favorable to the nonmoving party.  Continental

Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1991).

To aid the Court in identifying genuine issues of material fact, this District has adopted

Local Rule Cv 56.  "Valid local rules are an important vehicle by which courts operate.  Such

rules carry the force of law, and they are binding upon the litigants and upon the court itself[.]"

Air Line Pilots Association v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994)

(citations and footnote omitted).  Local Rule Cv 56 provides that in addition to a memorandum

of law, the moving party in a motion for summary judgment "shall" also file a separate statement

of undisputed facts.  D.R.I. LR Cv 56(a)(1).  An "objecting party that is contesting the movant's

Statement of Undisputed Facts shall file a Statement of Disputed Facts, which shall be numbered

correspondingly to the Statement of Undisputed Facts, and which shall identify the evidence establishing the dispute . . . ."  Id. at (a)(3).  "[A]ny fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted unless expressly denied or otherwise controverted by a party objecting to the motion."  Id.   Parties who ignore Local Rule Cv 56 do so at their own peril.  Gosselin v. Webb, 242 F.3d 412, 415 n.2 (1st Cir. 2001); see also Pope v. Potter, No. 03-544, 2005 WL 3178179 (D.R.I. November 28, 2005) (attempt to dispute facts by merely incorporating them into a memorandum opposing a motion for summary judgment does not meet the requirements of the local rule; a separate statement must be filed).

The Government filed a 38-page statement of undisputed facts, supported by 44 exhibits, which contained 181 fact statements.  Giordano filed a one and a half page "statement of disputed facts" containing 7 "disputed facts."  For the most part, Giordano's statement contains immaterial and conclusory statements.  As a result, the facts as delineated in the Government's statement of undisputed facts are deemed by this Court to be admitted by Giordano.  See D.R.I. LR Cv 56; Indian Harbor Ins. Co. v. Assurance Co. of America, No. CA 08-146 ML, 2010 WL 2365571 (D.R.I. May 21, 2010), report and recommendation adopted, No. CA 08-146 ML, 2010 WL 2346654 (D.R.I. June 9, 2010).[3]

## II.  Facts

### A.  Mt. St. Francis Health Center–General Overview

On or about September 27, 1983, Mt. Saint Francis Associates, ("MSFA"), was formed in order to acquire and operate Mt. St. Francis Health Center ("Mt. St. Francis" or "project"), a

---

[3]Because Montecalvo and CHCA did not respond to the motion, the facts are also deemed admitted by both parties.

nursing home in Woonsocket, Rhode Island.  Giordano was a general partner in MSFA.  On or about November 9, 1983, MSFA purchased Mt. St. Francis and executed a mortgage deed and note in the amount of $6,129,900.  On or about July 13, 1995, MSFA refinanced the mortgage through Suburban Mortgage Associates, Inc. ("Suburban Mortgage"), in the amount of $8,622,900.  MSFA subsequently borrowed an additional amount from Suburban Mortgage resulting in a mortgage debt of approximately $9,700,000.  The Mt. St. Francis' mortgages were insured by HUD under title II of the National Housing Act.  See generally 12 U.S.C. § 1701 et seq.  As a general partner in MSFA, Giordano was one of the owners of Mt. St. Francis.  At his deposition, Giordano testified that he had extensive experience with HUD insured properties and he described himself as the regional "leader in the industry" among those working with HUD properties.  Government Exhibit 1, Tab (e) at 135.

On or about July 14, 1995, as a condition of HUD's mortgage insurance, MSFA entered into a regulatory agreement with HUD.  Giordano signed the regulatory agreement as a general partner of MSFA.  The regulatory agreement states that "[o]wners shall not[,] without the prior written approval of [HUD] . . . assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs."  Government Statement of Undisputed Facts ("SUF") at ¶ 15; Government Exhibit 8 at ¶ 6(b) (emphasis added).  The agreement defines the term "owners" as "[MSFA] and any of its partners, together with their respective successors[,] executors, administrators, heirs and assigns."  Id. at ¶ 14; Government Exhibit 8 at ¶ 17 (emphasis added).  Generally, the agreement defines the term "surplus cash" as the cash remaining after the payment of

4

[1] [a]ll sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary; [2] [a]ll amounts required to be deposited in the reserve fund for replacements; [and 3] [a]ll obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary. . . .

Id. at ¶ 17; Government Exhibit 8 at ¶ 13(f).

On or about April 20, 1993, MSFA and Giordano submitted to HUD a Project Owner's & Management Agent's Certification of Multifamily Housing Projects for Identity-of-Interest or Independent Management Agents.  The certification was signed by Giordano.  In the certification, MSFA disclosed that it would pay Giordano, as managing general partner, a "special fee" equal to 3 percent of net patient revenue.  In exchange for the fee, Giordano agreed to perform various services that were "peculiar to the project's status as a special-purpose and regulated facility[.]" SUF at ¶ 21.  A substantial portion of those services, however, were subcontracted to Consultants, Inc., an entity controlled by Giordano.  The certification also stated that MSFA and Giordano would comply with the regulatory agreement and HUD handbooks.

On or about January 1, 1995, MSFA entered into a management agreement with Sterling Health Care Management Company, LLC ("Sterling"), and agreed to pay Sterling a management fee equal to 3 percent of net patient revenue.  The management agreement provided that Sterling had "complete authority to manage and control all health care and financial aspects of the operation of" Mt. St. Francis.  Government Exhibit 12 at ¶ 2.1.  The agreement also provided that it was to be performed in conformity with Department of Human Services guidelines and the regulatory agreement.  Montecalvo was the general manager of Sterling.[4]

---

[4]Montecalvo was comptroller of every company owned by Giordano.  Montecalvo reported to Giordano and talked to him on a daily basis during the time they worked together.

From 1999-2004 Peter Fournier ("Fournier") was the administrator of Mt. St. Francis. Mt. St. Francis hired Montecalvo as the assistant administrator and Giordano set his compensation at $42.70 per hour. In his deposition, however, Fournier testified that Mt. St. Francis did not have an assistant administrator's position and that Montecalvo acted as the administrator only when Fournier was on vacation, which was between two to three weeks per year. Fournier testified that Mt. St. Francis regularly had difficulty meeting its payroll obligations. Giordano testified that he constantly made loans to Mt. St. Francis. Ultimately, Fournier left the employ of Mt. St. Francis because he believed Mt. St. Francis' finances required more attention than they were receiving.

Mt. St. Francis defaulted on its mortgage loans in 2008. The mortgages were assigned to HUD which subsequently sold them for a loss of $7,842,300.

### B. Coventry Health Center–General Overview

Beginning in 1987, Coventry Health Continuum, Inc., ("Coventry Continuum"), leased and operated Coventry Health Center, ("Coventry Health Center" or "project"), a nursing home in Coventry, Rhode Island. Coventry Health Center Associates, ("CHCA"), was created to own and develop Coventry Health Center. Giordano, Pasquale Confreda ("Confreda"), and John Assalone ("Assalone") were general partners in CHCA. On or about May 24, 1994, CHCA refinanced its mortgage on Coventry Health Center through Suburban Mortgage in the amount of $15,308,700.

The Coventry Health Center mortgage was also insured by HUD under title II of the National Housing Act. On or about May 24, 1994, CHCA entered into a regulatory agreement with HUD. That regulatory agreement contained the same language regarding disposition of

6

project funds: "[o]wners shall not[,] <u>without the prior written approval of [HUD]</u> . . . assign,

transfer, dispose of, or encumber any personal property of the project, including rents, or pay out

any funds <u>except from surplus cash, except for reasonable operating expenses and necessary</u>

<u>repairs</u>." SUF at ¶ 39; Government Exhibit 9 at ¶ 6(b) (emphasis added). The agreement defines

the term "owners" as "<u>Coventry Health Center Associates, and any of its partners</u>, together with

their respective successors, executors, administrators, heirs or assigns." <u>Id.</u> at ¶ 38; Government

Exhibit 9 at ¶ 17 (emphasis added). Generally, the agreement defines the term "surplus cash" as

the cash remaining after the payment of

> [1] [a]ll sums due or currently required to be paid under the terms of any mortgage
> or note insured or held by the Secretary; [2] [a]ll amounts required to be deposited
> in the reserve fund for replacements; [and 3] [a]ll obligations of the project other
> than the insured mortgage unless funds for payment are set aside or deferment of
> payment has been approved by the Secretary. . . .

<u>Id.</u> at ¶ 14; Government Exhibit 9 at ¶ 13(f).

On or about April 1, 1997, Coventry Continuum and Sterling signed and submitted to

HUD a Project Owner's & Management Agent's Certification of Multifamily Housing Project

for identity-of-interest or Independent Management Agent. The certification stated that Coventry

Continuum was the owner of Coventry Health Center and that Sterling would receive a fee equal

to 3 percent of patient revenue. The certification also stated that Coventry Continuum and

Sterling would comply with the regulatory agreement and HUD handbooks. On or about July 1,

1997, Coventry Continuum entered into a management agreement with Sterling and agreed to

pay Sterling a 3% management fee. The management agreement provided that Sterling had

"complete authority to manage and control all health care facilities and financial aspects of the

operation of" Coventry Health Center. Government Exhibit 17 at ¶ 2.1. The agreement also

provided that it was to be performed in conformity with Department of Human Services guidelines and the regulatory agreement. The agreement identified Coventry Continuum as the owner of Coventry Health Center. Montecalvo signed the agreement as president of Coventry Continuum.

In July 1999 Coventry Health Center hired Carol Mancini ("Mancini") and she became the administrator in 2001. At her deposition, Mancini testified that when she arrived, Coventry Health Center was having financial difficulties, the "books . . . were in shambles[,]" and there was a "severe crisis in staffing." SUF at ¶ 47; Government Exhibit 4, Tab (a) at 8, 17. Mancini testified that Montecalvo took his direction from Giordano and "whatever [Giordano] wanted or asked him to do, he did." Id. at ¶ 61; Government Exhibit 4, Tab (b) at 45. Based upon her conversations with Montecalvo and her observations, Mancini believed that Giordano had ultimate authority over Coventry Health Center, including authority over which expenses were paid. In August 1999, CHCA defaulted on the Coventry Health Center mortgage. On or about June 28, 2000, the mortgage was assigned to HUD. On or about September 6, 2002, HUD sold the mortgage for a loss of $6,292,520.

### C.  Identity-of-Interest Entities[5]

Coventry Continuum was incorporated under the laws of Rhode Island. In 2001, Assalone was president of Coventry Continuum and Confreda was vice president, secretary and treasurer. Giordano had an ownership interest as a shareholder in Coventry Continuum and he sat on the board of directors. Montecalvo held executive positions at Coventry Continuum and

---

[5]An identity-of-interest entity is an entity that is owned and/or controlled through common ownership and/or management.

he reported to the Coventry Continuum board at weekly meetings.  During these meetings he communicated with Giordano regarding Coventry Health Center's finances and operations.

Consultants Inc., was incorporated under the laws of Rhode Island.  Giordano's son, Antonio A. Giordano ("Giordano, Jr."), was president of Consultants Inc.; Giordano's daughter, Mary D. Gentili ("Gentili"); was vice president, and Montecalvo was treasurer.  Giordano subcontracted with Consultants, Inc., to provide some of the services he had agreed to perform for Mt. St. Francis.  Consultants, Inc. also made loans to Mt. St. Francis and Coventry Health Center and it was repaid from project funds.

Consultants Associates, Inc., was incorporated under the laws of Rhode Island.  Giordano, Jr. was president of Consultants Associates, Inc.; Gentili was vice president; and Giordano's other daughter, Madonna Giordano, was secretary.  Consultant Associates, Inc., made loans to Mt. St. Francis and was repaid from project funds.

My Place, Inc., ("My Place") was incorporated under the laws of Rhode Island.  Gentili was president of My Place, Inc.; and Giordano, Jr. was treasurer.  Giordano testified that My Place handled "personnel problems of health facilities as it relates to the inner workings of the labor."  SUF at ¶ 69; Government Exhibit 1, Tab (f) at 161-62.  The services purportedly provided by My Place to Mt. St. Francis and Coventry Health Center included such things as seminars, raffles, and other activities.  Fournier testified that Mt. St. Francis paid My Place $5,500 per month for "about one seminar a month."  Id. at 74; Government Exhibit 3, Tab (c) at 66.  Fournier believed that the fees paid to My Place were excessive.  Coventry Health Center paid My Place $9,554 per month.  Mancini testified that My Place did not provide any benefit to Coventry Health Center.

Construction Software, Inc. ("Construction Software"), was incorporated under the laws of Rhode Island.  Montecalvo was president of Construction Software and Giordano, Jr. was treasurer.  Giordano testified that Construction Software worked with computers and created computer printouts of accounting records.  Fournier testified that he was not sure what Construction Software did. Mancini testified that she never saw Construction Software employees at Coventry Health Center and that she did not know what Construction Software did. Both Mt. St. Francis and Coventry Health Center made monthly payments to Construction Software.

Hillside Health Center, LLC ("Hillside") was a limited liability company organized under the laws of Rhode Island.  Giordano developed Hillside and was an investor in Hillside. Montecalvo was Hillside's manager.  Hillside made a loan to Mt. St. Francis and it was repaid from project funds.

Giordano testified that Peter Castriotta ("Castriotta"), an individual Giordano knew for 65 years, was Mt. St. Francis' purchasing director.  Mt. St. Francis paid Castriotta $47 per hour. Fournier testified that Castriotta did not spend much time at Mt. St. Francis.  Fournier believed that Castriotta was an employee of Sterling.

Management Realty Service, Inc., ("Management Realty") was incorporated under the laws of Rhode Island.  Gentili was president of Management Realty and Giordano, Jr. was treasurer.  Giordano testified that Management Realty was a real estate management company.  It is not clear what type of service Management Realty provided to Mt. St. Francis and Coventry Health Center, however, it received payments from both projects.

Gregory Building Company ("GBC") was incorporated under the laws of Rhode Island.

10

Giordano, Jr. was president of GBC; Castriotta was vice president; and Gentili was secretary.

Giordano testified that GBC performed landscaping and construction-related services.  Coventry

Health Center paid GBC a monthly fee for landscaping services.  Mancini testified that GBC was

"supposed to cut the grass and trim the bushes and cut . . . trees but [Coventry Health Center's]

maintenance crew did [that]."  SUF at ¶ 100; Government Exhibit 4, Tab (d) at 91.  Mancini

"very rarely" saw GBC performing work at Coventry.  Id.; Government Exhibit 4, Tab (d) at 93.

Simon & Winsor Interiors, Inc. ("S&W"), an interior design firm, was incorporated under

the laws of Rhode Island.  Gentili was president of S&W; Giordano, Jr. was vice president; and

Montecalvo was treasurer.   S&W made a loan to Coventry Health Center and was repaid from

project funds.

Suburban Mortgage was a mortgage company and was the mortgagee for both Mt. St.

Francis and Coventry Health Center.  Giordano was the executive vice president and he held a

fifty percent ownership interest in Suburban Mortgage.  Mt. St. Francis was sometimes late in

making mortgage payments to Suburban Mortgage and in those instances Suburban Mortgage

charged Mt. St. Francis a late fee.

### D.  Non Identity-of-Interest Entities

Adler Pollack & Sheehan ("APS") is a law firm that provided legal services to Mt. St.

Francis.  APS represented Mt. St. Francis in discussions with the Internal Revenue Service over

delinquent payroll taxes and in a zoning appeal.  APS also represented Giordano in a transaction

involving Edmund Place Associates, another nursing home developed by Giordano.

Chaine des Rotisseurs ("CDR") is a "culinary society" that operates throughout the

United States and Europe.  SUF at ¶ 126.  Giordano invited Mt. St. Francis employees to a CDR

event "to try to up their level of enthusiasm . . . ."  Government Exhibit 1, Tab (h) at 203.  Mt. St. Francis paid for the event which cost in excess of $75 per employee.  Fournier testified, however, that the event did not benefit the operation of Mt. St. Francis.

O. Ahlborg & Sons, Inc., ("Ahlborg") is a construction firm that provided services to Mt. St. Francis in connection with a HUD-approved rehabilitation project.  The rehabilitation exceeded the HUD-approved mortgage amount, so Mt. St. Francis issued a $200,000 promissory note to Ahlborg which accrued interest at 10% annually.  HUD, however, never approved the Ahlborg promissory note.

Last, Lefkowitz, Garfinkel, Champi & DeRienzo, P.C. (LGC&D) is an accounting firm that provided services to Mt. St. Francis.

### E.  Preferential Payment to Identity-of-Interest Entities

Montecalvo instructed the administrators at Mt. St. Francis and Coventry Health Center on the order in which expenses should be paid.  For Mt. St. Francis, Fournier testified that before any other monthly expenses were paid, Mt. St. Francis had to pay (1) the 3% fee to Giordano, (2) the 3% fee to Sterling, (3) $960 to Construction Software, and (4) $5,500 to My Place.  Fournier testified that only after these expenses were paid could Mt. St. Francis pay other monthly expenses, including but not limited to food, payroll, taxes, and supplies.  Montecalvo also directed that loans be repaid quickly.

Fournier testified that Mt. St. Francis regularly had difficulty making payroll and he described it as a weekly "tug of war[.]" SUF at ¶ 108; Government Exhibit 3, Tab (c) at 68.  Fournier stated that making payroll and being able to pay other vendors would have been much easier if Mt. St. Francis did not have to first pay 6% of its total revenue to Giordano and Sterling.

12

He testified that making the monthly payments to Construction Software and My Place hampered Mt. St. Francis' ability to meet other expenses.

For Coventry Health Center, Mancini testified that before any other monthly expenses could be paid Coventry Health Center had to first pay Sterling, My Place, Construction Software, and GBC. After those expenses were paid, staff at Coventry Health Center would prepare a list of expenses that needed to be paid – including payroll – and send the list to Montecalvo for direction on which expenses to pay. Even though there was not enough money to cover the nursing home's monthly operating expenses, Mancini could not recall a month when My Place, Construction Software or GBC did not get paid. Mancini testified that although it was part of her responsibilities to identify vendors that could offer the nursing home better prices, My Place, Construction Software, and GBC were "untouchable." SUF at ¶ 114; Government Exhibit 4, Tab (d) at 99. In order to ensure that Coventry Health Center could make payroll, Mancini frequently lied to Montecalvo about the amount in Coventry Health Center's operating account. She feared that if Montecalvo knew the correct amount in the operating account he would transfer funds out of the account making it more difficult to meet payroll.

Montecalvo admitted that identity-of-interest entities were paid first because either he, Giordano, or Giordano's family members were involved with the entities. Montecalvo also testified that the priority payment system was in place before he became Sterling's general manager and that "the owners [of the nursing homes] were aware of the priority payment [system]." SUF at ¶ 117; Government Exhibit 2, Tab (d) at 109.

### F.  The HUD Audits

From September 2003 to March 2004, HUD's Office of Inspector General, ("OIG"),

13

conducted an audit of Mt. St. Francis to determine whether the project assets were used in compliance with the Mt. St. Francis regulatory agreement. OIG's audit covered the period from January 1, 2000 to December 31, 2003 ("audit period"). OIG published its findings in an audit report on March 3, 2006. The report was addressed to the Director of HUD's Boston Multifamily Housing Hub. OIG concluded that Giordano, as the owner, and Sterling, as the management agent, disregarded prudent business practices and exploited weak management controls. OIG also concluded that the identity-of-interest relationships created an environment that made it possible for Giordano and Sterling to divert questionable cash disbursements with little risk of detection. OIG determined that $4,402,305 in project assets were used in violation of the regulatory agreement.[6] OIG also found that, by December 31, 2003, Mt. St. Francis had made late mortgage payments, lacked funds to meet its payroll obligations, and failed to pay $3,700,000 in payroll taxes. OIG concluded that Mt. St. Francis was in a non-surplus cash position during the audit period.

From July 2003 to February 2004, OIG conducted an audit of Coventry Health Center. The audit covered the period from May 5, 1995, to August 22, 2003 ("audit period"). OIG published its findings in an audit report on March 28, 2006. The report was addressed to the Director of HUD's Boston Multifamily Housing Hub. OIG concluded that Giordano, as the owner, and Sterling as the management agent, circumvented policies and procedures to divert project funds to pay for ineligible, unsupported, and unnecessary expenses. OIG determined that $1,858,100 in project assets were used in violation of the regulatory agreement.[7] OIG concluded

---

[6]Due to errors discovered in the audit report, however, the Government seeks to recover $4,246,793.

[7]Due to errors discovered in the audit report, however, the Government seeks to recover $1,811,849.

that Coventry Health Center was in a non-surplus cash position during the audit period.  Not surprising, OIG also concluded that, during this time, living conditions at Coventry Health Center deteriorated.  In the end, OIG concluded that the identity-of-interest relationships between Giordano and the operators and managers of Coventry Health Center created an environment whereby Giordano had direct control over all aspects of the nursing home.

### G.  Mt. St. Francis —  Disbursements

As a result of the Mt. St. Francis audit, OIG determined that MSFA used Mt. St. Francis' assets to make the following disbursements, during the audit period, in violation of the Mt. St. Francis regulatory agreement:

1.    $69,247 to Consultants ($61,247 for a loan repayment without HUD consent and $8,000 in unsupported expenses);

2.    $224,720 to Consultants Associates for loan repayments without HUD consent;

3.    $272,200 to My Place ($268,200 for items or services that were unnecessary to the operation or repair of Mt. St. Francis and $4,000 in unsupported expenses);

4.    $47,280 to Construction Software ($46,080 for items or services that were unnecessary to the operation or repair of Mt. St. Francis and $1,200 in unsupported expenses);

5.    $104,520 to Hillside for a loan repayment without HUD consent;

6.    $109,812 to Sterling ($95,000 for loans to Sterling without HUD consent, $8,672 in unsupported expenses and $6,140 in unauthorized management fees);

7.    $22,326 to Suburban Mortgage for items or services that were unnecessary to the operation or repair of Mt. St. Francis;

15

8.      $108,570 to Castriotta for items or services that were unnecessary to the operation or repair of Mt. St. Francis;

9.      $1,241,780 to Giordano ($1,235,780 for services that Giordano was to provide to Mt. St. Francis that were identical or similar to the services outlined in Sterling's management agreement (neither Giordano or Sterling actually provided the services to Mt. St. Francis) and $6,000 for a management loan without any support);

10.     $1,338,707 to Sterling for management fees for services that Mt. St. Francis' staff and/or consultants performed and were paid for by Mt. St. Francis;

11.     $17,691 to Management Realty in unsupported expenses;

12.     $112,254 to Montecalvo for items or services that were unnecessary to the operation or repair of Mt. St. Francis;

13.     $78,786 to APS ($78,536 for legal services that were unnecessary to the operation or repair of Mt. St. Francis and $250 in unsupported expenses);

14.     $3,525 to CDR for items or services that were unnecessary to the operation or repair of Mt. St. Francis;

15.     $133,500 to Ahlborg for items or services that were unnecessary to the operation or repair of Mt. St. Francis;

16.     $361,875 to various other payees ($96,051 for items or services that were unnecessary to the operation or repair of Mt. St. Francis and $265,824 in unsupported expenses).

### H.  Coventry Health Center – Disbursements

As a result of the Coventry Health Center audit, OIG determined that CHCA used Coventry Health Center assets to make the following disbursements, during the audit period, in violation of the regulatory agreement:

1.   $84,400 to Consultants ($20,000 for a loan repayment without HUD consent and $64,400 in unsupported expenses);

2.   $267,041 to My Place for items or services that were unnecessary to the operation or repair of Coventry Health Center;

3.   $53,880 to Construction Software for items or services that were unnecessary to the operation or repair of Coventry Health Center;

4.   $425,816 to Sterling ($58,000 for loans or loan repayment without HUD consent and $367,816 in unsupported expenses and for items or services that were unnecessary to the operation or repair);

5.   $59,810 to GBC ($54,300 for items or services that were unnecessary to the operation or repair of Coventry Health Center and $5,510 in unsupported expenses);

6.   $250,025 to Management Realty ($130,000 for a loan repayment without HUD consent and $120,025 in unsupported expenses);

7.   $16,687 to Mt. St. Francis in unsupported expenses;

8.   $15,000 to Giordano for a loan repayment without HUD consent;

9.   $182,500 to Giordano, Confreda, and Assalone in unsupported expenses;

10.   $451,690 to various other payees ($15,000 for a loan repayment without HUD

consent and $436,690 in unsupported expenses).

I.  The Criminal Proceedings

On June 8, 2006, the Government filed a one-count Information against Giordano and

Montecalvo, charging them with criminal equity skimming.  See 12 U.S.C. § 1715z-19.  The

Information charged that Giordano and Montecalvo, acting as agents, managers, and persons in

custody, control and possession of Mt. St. Francis, Coventry Health Center, and Hillside Health

Center,[8] willfully paid $780,539 of project assets to My Place for purposes other than to meet

reasonable and necessary expenses of the nursing homes.  On June 21, 2006, Giordano and

Montecalvo plead guilty to violating 12 U.S.C. § 1715z-19.  Giordano was sentenced to thirty

months imprisonment, fined $100,000 and ordered to pay restitution.  Montecalvo was sentenced

to twenty-four months imprisonment and ordered to pay restitution.  The guilty pleas, however,

did not resolve civil liability relating to the operation of Mt. St. Francis or Coventry Health

Center.

III.  Analysis

A.  Statute Of Limitations

Giordano first argues that the Government filed the complaint outside of the statute of

limitations.  The Government filed its complaint on September 16, 2009.  Giordano, however,

argues that the statute of limitations expired just prior to September 2009.

Giordano bears the burden of proving that the statute of limitations has expired.  United

States v. Flake, 783 F. Supp. 762, 766 (E.D.N.Y.1992); Forrester Environmental Services, Inc. v.

---

[8]Hillside Health Center was another nursing home operated by Giordano.  Although Hillside is an identity-of-interest entity, Hillside is not a party to this action.

Wheelabrator Technologies, Inc., Civil No. 10-cv-154-JL, 2012 WL 3420185 (D.N.H. August 15, 2012).  "Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."  Badaracco v. Commissioner of Internal Revenue, 464 U.S. 386, 391 (1984) (internal quotation marks and citation omitted). Under the statutory scheme, the Government may bring a claim "at any time up to and including 6 years after the latest date the Secretary discovers any use of a property's assets and income in violation of the regulatory agreement. . . ."  12 U.S.C. § 1715z-4a(d) (emphasis added).

In support of his argument, Giordano points to the actions of Lloyd Currie ("Currie"), an employee of OIG and the auditor in charge of the audits at both Mt. St. Francis and Coventry Health Center.[9]  Giordano contends that because Currie filed a Financial Crimes Enforcement Network Inquiry on July 11, 2003, it is reasonable to conclude that the Government "knew of the facts it contends amount to a violation of [§] 1715z-4a on July 11, 2003. . . ."  Memorandum of Law in Support of Giordano's Objection to Government's Motion for Summary Judgment at 10. Based on this premise, Giordano concludes that the filing of the complaint on September 16, 2009, was out of time.

Giordano's argument is not persuasive.  The Financial Crimes Enforcement Network inquiry Giordano attaches to his memorandum is an unsigned document which has not been authenticated.  Thus, it will not be considered by the Court.  See generally Feliciano v. Rhode Island, 160 F.3d 780 (1st Cir. 1998) (Rule 56 requires that parties submit admissible evidence). However, even if the Court were to consider the document, Currie made the request to determine

---

[9]Currie became the auditor-in-charge of the Mt. St. Francis audit during the drafting of the audit report.  He was the auditor-in-charge of the Coventry Health Center audit.

"what individuals and business entities Giordano was associated with so that [the audit] field

work would be as thorough as possible."  Currie Supplemental Affidavit at ¶ 4.  The limitations

period begins to run when "a senior administrator learns of a transfer of HUD funds to another

entity and has a duty to share this knowledge with his superior."  Flake, 783 F. Supp. at 767

(emphasis added).  Even if Currie had a suspicion of equity skimming by Giordano at the time he

submitted the Financial Crimes Network Request, Currie was an OIG auditor and not a HUD

senior administrator.  See id.; see also  United States v. Retirement Services Group 302 F.3d 425,

430 (5th Cir. 2002) (the statutory scheme requires "something more than to suspect but

something less than to confirm with absolute certainty as to all possible material details"); United

States v. Envicon Development Corp., 153 F. Supp. 2d 114 (D. Conn. 2011) (HUD must have

actual knowledge, rather than constructive knowledge, of improper payments before limitations

period begins to run).  Giordano has offered no evidence to suggest that the Secretary discovered

that project funds were being used in violation of the regulatory agreement prior to September

16, 2003.  Thus, Giordano has failed to create a genuine issue of material fact as to the

Government's contention that the action was timely filed.

### B.  The Statutory Scheme

12 U.S.C. § 1715z-4a provides that the Government may bring suit in district court "to

recover any assets or income used by any person in violation" of a regulatory agreement covering

a HUD insured mortgage.  12 U.S.C. § 1715z-4a(a)(1) (emphasis added); United States v.

Cofield, 215 F.3d 164 (1st Cir. 2000).  There is little case law interpreting § 1715z-4a.  The

statutory scheme defines the term "any person" as "any person or entity that owns or operates a

property, as identified in the regulatory agreement, including but not limited" to:

1. "any officer, director, or partner of an entity owning or controlling the property;"

2. "any nursing home lessee or operator;"

3. "any other person or entity that controls the property, regardless of that person or entity's official relationship to the property;" and

4. "any . . . assignee . . . or agent of any person or entity described in the preceding [sections]."  12 U.S.C. §§ 1715z-4a(a)(2)(C), (D), (F) & (G).

A use of assets or income in violation of a regulatory agreement includes "any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the property and has not been maintained in accordance with the requirements of the Secretary and in reasonable condition for proper audit."  Id. at § 1715z-4a(a)(1).  The Government "may recover double the value of the assets and income of the property that the court determines to have been used in violation of the regulatory agreement . . . plus all costs related to the action, including but not limited to reasonable attorney and auditing fees."  Id. at § 1715z-4a(c) (emphasis added).

### 1.  Are the Defendants "Person[s]" Under the Statute?

It is undisputed that MSFA owned Mt. St. Francis.  It is also undisputed that Giordano was a general partner in MSFA, and as such, he was an owner of Mt. St. Francis.  Thus, Giordano is a "person" as defined in the statute.  See 12 U.S.C. § 1715z-4a(a)(2)(C) (any person includes "any . . . partner of an entity owning or controlling the property").  It is also undisputed that CHCA owned Coventry Health Center and Giordano was a general partner in CHCA.  Again, as such, Giordano is a "person" under the statute.  See id.  In addition, as noted later in this decision, it is also clear that Giordano is a "person" under the statute because he "controlled"

21

the nursing homes.  See 12 U.S.C. § 1715z-4a(a)(2)(F) (noting that a "person" under the statute

is any person who "controls the property regardless of that person['s]. . . relationship to the

property").[10]  Furthermore, the regulatory agreements identify MSFA, and it partners, and CHCA,

and its partners, as owners of the projects.

It is also clear that Montecalvo, as the general manager of Sterling, and as Giordano's

right-hand man, controlled the finances of both Mt. St. Francis and Coventry Health Center.

Montecalvo, as general manager of Sterling, had complete authority to manage and control all

health care and financial aspects of the operation of both nursing homes.  He dictated which

vendors got paid and when they received payment.  As such, Montecalvo is also a "person" under

the statute.  See 12 U.S.C. § 1715z-4a(a)(2)(F) (noting that a "person" under the statute is any

person who "controls the property regardless of that person['s]. . . relationship to the property").[11]

It is also undisputed that CHCA was created to own and develop Coventry Health Center.

The regulatory agreement identifies CHCA as the owner of Coventry Health Center.  At his

deposition Giordano testified that CHCA owned Coventry Health Center.  Consequently, CHCA

is a "person" under the statute as an "entity that owns or operates the property." 12 U.S.C. §

---

[10]At his plea colloquy on the criminal charge of equity skimming, Giordano admitted that he owned and operated Mt. St. Francis and Coventry Health Center.  By pleading guilty to the criminal equity skimming charge, Giordano is collaterally estopped from claiming that he is not a "person" (in this instance, an owner of the projects) pursuant to 12 U.S.C. § 1715z-4a(a)(2).  See generally Webb v. Internal Revenue Service, 15 F.3d 203, 208 n.6 (1st Cir. 1994) ("guilty pleas are conclusive against a defendant in subsequent civil suit as to all facts necessarily decided for criminal conviction") (internal quotation marks and citation omitted).

[11]At his plea colloquy on the criminal charge of equity skimming, Montecalvo admitted that he controlled the finances at both Mt. St. Francis and Coventry Health Center.  By pleading guilty to the criminal equity skimming charge, Montecalvo is collaterally estopped from claiming that he is not a "person" (in this instance, controlling the projects) pursuant to 12 U.S.C. § 1715z-4a(a)(2).  See generally Webb, 15 F.3d 203, 208 n.6 (1st Cir. 1994).

1715z-4a(a)(2).[12]

## 2.  Did the Defendants Use Project Assets or Income
in Violation of the Regulatory Agreement?

To prevail on its claim, the Government must show that assets or income belonging to the project were used in violation of the regulatory agreement.  United States v. Coleman, 200 F. Supp. 2d 561 (E.D.N.C. 2002); Retirement Services Group, 302 F.3d at 436 (noting that for a person "as defined by the statute, to be liable it must be shown that the person 'used' (indeed, that the person misused) the assets or income").  Congress, by enacting 12 U.S.C. § 1715z-4a, emphasized that regulatory agreements are a "fundamental and essential component of the Federal financing scheme for multifamily housing projects under the National Housing Act." Coleman, 200 F. Supp. 2d at 563 n.2.  Under the financing scheme, HUD agrees to exculpate mortgagors from personal liability for repayment of the mortgage in return for the mortgagors' agreement to operate the project in accordance with the regulatory agreement.  Id.  The terms of the regulatory agreement restrict the owner's use of project funds.  Id.  The "restrictions on the use of project income [are] part and parcel of the financing for the acquisition of the [nursing homes], particularly in light of the waiver of personal liability."  Id.  (internal quotation marks and citation omitted).   Thus, "the importance HUD attaches to the project's ironclad observance of the terms of the [r]egulatory [a]greement cannot be contested."  United States v. Harvey, 68 F. Supp. 2d 1010, 1017 (S.D. Ind. 1998) (emphasis added).  In essence, the purpose of the regulatory agreement is to protect HUD's interest in the project and to protect the Government

---

[12]The record is crystal clear that Giordano controlled both nursing homes.  However, in the case of Coventry Health Center, the lines between CHCA and Giordano as owners, and Coventry Continuum, as the operator, were so blurred by Giordano that Coventry Continuum identified itself as the owner of Coventry Health Center in some agreements.

from waste or mismanagement and to require that owners observe sound financial practices.  See generally  Lovejoy v. Saldanha, 838 F. Supp. 1120 (S.D.W. Va. 1993).  Commercial developers who assume responsibilities under regulatory agreements "presumably possess the resources and sophistication to make agreements they will be able to live with."  United States v. Schlesinger, 88 F. Supp. 2d 431, 456 (D. Md. 2000).

Pursuant to the regulatory agreements, both MSFA and CHCA agreed that, "without the prior written approval" of HUD, they would not "[a]ssign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs."  Government Exhibits 8, 9 at ¶ 6(b) (emphasis added).  As a result, both Mt. St. Francis and Coventry Health Center were prohibited "from using any [p]roject funds except for surplus cash for any purpose other than reasonable operating expenses and necessary repairs without the prior written approval from HUD."  Coleman, 200 F. Supp 2d at 564; see also United States v. West Street Associates Ltd. Partnership, No. Civ. A. 3:96-CV-01864, 1998 WL 34193430 (D. Conn. July 20, 1998) (regulatory agreement prohibited owner from using project funds for anything other than payment of reasonable expenses necessary for proper operation and maintenance of project unless there is surplus cash); In re Beneath the Trees, LLC, 377 B.R. 151 (Bankr. E.D.N.C. 2007) (same).  It is undisputed that both Mt. St. Francis and Coventry Health Center were in a non-surplus cash position for the applicable audit period.  Thus, without the prior written approval from HUD, the projects could only make disbursements for reasonable operating expenses or necessary repairs.

There is no definition of the phrase "reasonable operating expenses" in the regulatory

agreement.  The First Circuit has stated that interpreting the term "reasonable operating

expenses" in a regulatory agreement is challenging.  See Cofield, 215 F.3d at 171 (noting that the

term "give[s] rise to . . . uncertainty in [its] application to particular circumstances").

> Regard must be had to the context in which the term [operating expenses] is used
> and to the nature of the business under consideration.  In present context the Court
> is convinced that the term must be construed with at least reasonable strictness
> and the concept of 'operating expenses' should be limited to expenses paid or
> incurred in connection with the actual operation of the [project] as a going
> concern.

Thompson v. United States, 408 F.2d 1075, 1080 (8th Cir. 1969) (emphasis added); see also

Coleman, 200 F. Supp. 2d at 567 (reasonable operating expenses arise from "everyday operation

and maintenance of the project" and are for the benefit of the project and not the benefit of the

owner); Independence Hill Ltd. v. Puller Mortgage Associates, Inc., 33 F.3d 1378, 1994 WL

486953 (5th Cir. 1994) (unpublished table decision) (expenditures for benefit of project

permissible; expenditures for benefit of investor impermissible); United States v. Frank, 587 F.2d

924 (8th Cir. 1978) (courts must distinguish between expenses incurred primarily for the benefit

of the personal interests of the investors from those expenses related to everyday operation of the

project).  In essence, an understanding of the phrase "reasonable operating expense" must

recognize that the National Housing Act was "primarily intended to benefit individuals who live

in [nursing homes], not commercial developers."  Harvey, 68 F. Supp. 2d at 1017-18 (internal

quotation marks and citation omitted).

Giordano first contends that HUD was aware in every instance of payment of all the

expenditures that the Government claims were in violation of the regulatory agreements.

Essentially, Giordano argues that the submission of HUD Form 93479 monthly to HUD made

HUD aware of the monthly expenditures, and because HUD never objected to the payments,

HUD's failure to object is somehow converted to a tacit "approval."

In support of his argument, Giordano submits what purports to be a Form 93479, however, it is not unauthenticated.  Because it is not authenticated, it will not be considered by the Court.  See generally Feliciano, 160 F.3d 780 (Rule 56 requires that parties submit admissible evidence).  However, even accepting that the form is a HUD form that was submitted monthly by both nursing homes, Giordano's argument is a non-starter and in direct contravention of the regulatory agreement.  The regulatory agreements provided that the project owner shall not "[a]ssign, transfer, dispose of . . . or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs" without the "prior written approval" of HUD.  Government Exhibits 8, 9 at ¶ 6(b) (emphasis added).  The HUD form that Giordano identifies as HUD Form 93479 is titled "[m]onthly [r]eport for [e]stablishing [n]et [i]ncome."  Giordano Memorandum of Law in Support of Objection to Summary Judgment, Exhibit B.  The document generally summarizes the project's monthly financial position and includes accounts receivable and payable schedules.  The accounts payable "check history listing" lists items by check number, date, vendor, amount, and leaves a small space for "notes," apparently to describe the expense.  Id. at 11.  The descriptions contained in the "notes" section are, at most, two to three words.  The descriptions are wholly general and non specific.  Without more information concerning the payee and the context of the payments, the document does not give notice that the expenses were for items or services other than reasonable operating expenses or necessary repairs.  Furthermore, the document does not represent HUD's prior written approval for expenditures.

Giordano's next assertion is that Montecalvo also received HUD's permission to take out

project loans.  Giordano asserts that "[i]n each instance the [loan] transaction was supported by a confirming email or fax between Montecalvo and HUD."  Giordano's Memorandum of Law in Support of Objection to Motion for Summary Judgment at 5.  In support of his assertion, Giordano generally points to ten pages in Montecalvo's deposition testimony transcript – without identifying any particular testimony.

In his deposition, Montecalvo testified that he did not recall whether he spoke to representatives of HUD each time a loan was made to Mt. St. Francis.  He testified that he *sought* approval for a loan by "call[ing] HUD . . . and it would be a telephone thing.  Sometimes I'm sure that it was placed in writing."  Giordano Memorandum of Law in Support of Objection to Summary Judgment, Exhibit D, Tab 1 at 51.  He testified the he remembered an occasion, although he could not recall the exact date, when he sought approval, by "either an e-mail or a letter that went to HUD that explained it, hand delivered, and then letter back saying that it was okay."  Id. at 52.  When pressed to clarify whether he sought approval by "phone call" or "formal letter" Montecalvo testified that he did not

> remember.  But I do remember calling.  I do remember several times, get me something in writing right away and receiving a letter back. [13]  Was it every time? I don't recall.  Was it put in writing every time?  I don't recall.  I guess it depended upon the emergency nature of the timing of when the money was needed.

Id. at 53.  Montecalvo stated he followed the same "procedure" when it came to Coventry Health Center.   Other than pointing to Montecalvo's confusing and equivocal testimony, however, Giordano has not produced any document which represents HUD's written approval for any of the loan repayments.

---

[13]Giordano does not further elaborate on the "letter back."

Moreover, even if Montecalvo had testified that he always received written approval from HUD to make and repay loans, Giordano's use of that self-serving testimony fails to create a genuine fact dispute.  As noted above, because of the projects' non-surplus cash positions, the projects required HUD's prior written approval in order to use project expenses for anything other than reasonable operating expenses.  To defeat summary judgment, Giordano must demonstrate "through submissions of evidentiary quality" that a trialworthy issue exists. Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012) (internal quotation marks and citation omitted).  "Doing so, however, requires more than the frenzied brandishing of a cardboard sword."  Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir. 2006).  Giordano has not produced any email, fax, letter or other writing containing HUD's consent for repaying a loan or to use project assets for an item or services unrelated to the projects' reasonable operating expenses or necessary repairs.  Unsupported "deposition testimony setting forth ultimate or conclusory facts . . [is] insufficient to defeat a motion for summary judgment."  Clark v. America's Favorite Chicken Co. 110 F.3d 295, 297 (5th Cir. 1997); see also Saunders v. City of New York, 594 F. Supp. 2d 346 (S.D.N.Y. 2008) (deposition testimony recounting single incident where plaintiff claimed employer did not pay employee overtime and plaintiff asserted that time sheets would substantiate claim and reveal other occurrences, was not sufficient to defeat summary judgment where plaintiff did not produce any time sheets); Prudential Insurance Co. v. Whitney, 954 F.2d 516, 518 (8th Cir. 1992) (assertion that "signed writings . . . 'do or should exist[,]'" without more, was inadequate to raise genuine issue of material fact).

It is therefore undisputed that project funds were used in the manner listed in the Government's statement of undisputed facts.  The Court next proceeds to review those

disbursements based on the statutory language and the regulatory agreement.

### a. Mt. St. Francis

All of the disbursements discussed below were made by MSFA, on behalf of Mt. St.

Francis, and occurred during the audit period at a time when Mt. St. Francis lacked surplus cash:

1. Loan Repayments Without Written Approval from HUD:

| | |
|---|---|
| $ 61,247 | Consultants |
| 224,720 | Consultant Associates |
| 104,520 | Hillside |
| 95,000 | Sterling |
| $ 485,487 | |

Courts have held that disbursement of project funds to repay owner loans or advances are

not reasonable operating expenses. Coleman, 200 F. Supp. 2d at 567 ("[r]egardless of the

purpose for which the advances were made and the manner in which the advances were utilized

by the [p]roject, it seems unavoidable that the repayment of owner advances primarily benefitted

the owners and not the [p]roject"); Thompson, 408 F.2d at 1080 (repayment of bank loan and

prior advances to partners does not constitute reasonable expenses) (emphasis added); United

States v. Schlesinger, 88 F. Supp. 2d 431 (persuasive case law holds unequivocally that

repayments of owner loans are not reasonable operating expenses); Harvey, 68 F. Supp. 2d at

1018 (when surplus cash does not exist, repayment of owner advances is prohibited unless prior

approval from HUD).[14]  The Schlesinger court also held that even a repayment of a loan for the

benefit of the tenants is not a reasonable operating expense. Schlesinger, 88 F. Supp. 2d at 452

---

[14]Furthermore, the HUD Handbook for Financial Operations and Accounting Procedures for Insured Multifamily Projects states that "[r]epayment of owner advances when the project is in a non-surplus cash position will subject the owner to criminal and civil monetary penalties." HUD Handbook 4370.2 Rev-1, Chapter 2 at ¶ 2-11 A.  "To encourage owners to make advances to projects in critical situations, [HUD] may approve on a case-by-case basis requests to make advances for repayment of such advances on a monthly basis." Id.

(finding argument that since repayment of loan was for benefit of the tenants it was reasonable operating expense "lacks basis in the law").  Thus, unless a project has surplus cash or has received prior written approval from HUD, a payment made by a project to repay a loan violates the regulatory agreement.  The loan repayments that were made are not reasonable operating expenses; thus they violated the regulatory agreement.

    2.  Unsupported Disbursements:

| | |
|---|---|
| $    8,000 | Consultants |
| 4,000 | My Place |
| 1,200 | Construction Software |
| 8,672 | Sterling |
| 6,000 | Management loan |
| 17,691 | Management Realty |
| 250 | APS |
| 263,832 | LGC&D |
| 1,992 | Other |
| $ 311,637 | |

The regulatory agreements provided that the projects' "books, contracts, records, documents and other papers . . . shall at all times be maintained in reasonable condition for proper audit. . . ."   Government Exhibit 8, 9 at ¶ 9(c).  The agreements also provided that "[o]wners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all of which may be subject to inspection and examination by the Secretary . . . ."  Id.  The statutory scheme provides that a use of assets or income in violation of the regulatory agreement "shall include any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the property . . . ."  12 U.S.C. § 1715z-4a(a)(1).  Thus, under the statute and regulatory agreements, Defendants have the burden of demonstrating through the project books and records that the project expenses were for reasonable operating expenses.  Project owners

cannot escape civil liability for improper payment by failing to keep adequate records.

See generally Cofield, 215 F.3d at 169.  "[U]nexplained expenditures . . . [are] not reasonable

expenses."  West Street Associates, 1998 WL 34193430 at *5.  MSFA's unsupported

disbursements to the listed entities are not reasonable operating expenses.

    3.  Duplicative and Unreasonable Management Fees:

The HUD Management Agent handbook provides that management fees "may be paid

only to the person or entity approved by HUD to manage the project.  Management agents must

cover the costs of supervising and overseeing project operations out of the fee they receive."

HUD Handbook 4381.5 Rev-2 at ¶ 3.1; see also Harvey, 68 F. Supp. 2d at 1018-19 (fees for

market study should have been paid out of management fee).

MSFA paid Sterling $1,338,707 in duplicative and unreasonable management fees.  As

the management agent, Sterling was responsible for operating Mt. St. Francis in conformity with

the regulatory agreement and HUD guidelines.  Sterling had "complete authority to manage and

control all heath care and financial aspects" of Mt. St. Francis.  Government Exhibit 12 at ¶ 2.

Sterling was to provide all the necessary services for the operation of Mt. St. Francis and was

responsible for tasks such as analyzing and solving nursing home problems, recruiting, hiring,

and monitoring operations.  However, OIG auditors concluded that "all of the management

services described in the management agreement were performed by [Mt. St. Francis] staff and/or

consultants" and were paid from Mt. St. Francis funds.  Currie Affidavit at ¶ 16. Consequently,

Sterling did not comply with the management agreement because Sterling did not perform the

management services it had agreed to provide to the project.  Giordano admitted that project

funds should not have been used to pay a vendor which was not performing the services that the

vendor had agreed to perform. Because Sterling did nothing to earn the management fee, payment of the fee clearly violated the regulatory agreement. These payments were "unnecessary and unreasonable . . . [as Mt. St. Francis] made payments to a company not entitled to payments." Independence Hill, Ltd., 1994 WL 486953 at *27.

MSFA paid Giordano $1,235,780 which represented his 3% "special fee." According to the certification signed by Giordano, the services he was supposed to provide to Mt. St. Francis were peculiar to Mt. St. Francis' status as a special purpose and regulated facility. However, OIG auditors concluded that the services to be provided by Giordano were identical or similar to the services outlined in Sterling's management agreement. Furthermore, OIG also determined that neither Giordano nor Sterling provided the services described in their agreements. Because Giordano did nothing to earn the "special fee," payment of the fee violated the regulatory agreement. These payments were "unnecessary and unreasonable . . . [as Mt. St. Francis] made payments to [an individual] not entitled to payments." Independence Hill, Ltd., 1994 WL 486953 at *27.

### 4. Other Disbursements Not Related to the Reasonable Operating Expenses or Necessary Repairs of the Project:

MSFA disbursed $268,200 to My Place. My Place was an identity-of-interest entity that received priority payment each month, notwithstanding Mt. St. Francis' negative financial position. Throughout the audit period Mt. St. Francis made monthly payments to My Place for an employee benefit program that purportedly included seminars, crafts, raffles, and other activities. Fournier testified that My Place's fees were excessive. The My Place programs, ostensibly benefitted (if, at all) employees and not the patients living at Mt. St. Francis. See generally Harvey, 68 F. Supp. 2d at 1017-18. Additionally, the My Place disbursements did

not arise from the "everyday operation and maintenance of the project." Coleman, 200 F. Supp. 2d at 567. These disbursements certainly were not reasonable operating expenses.

MSFA disbursed $46,080 to Construction Software. Construction Software was an identity-of-interest entity that received priority payment each month, notwithstanding Mt. St. Francis' negative financial position. Fournier testified that he was not sure what Construction Software did. Throughout the audit period Mt. St. Francis made monthly payments to Construction Software for accounting services that Mt. St. Francis staff performed. It is certainly not reasonable to pay an outside vendor for a service that is being performed in-house. These payments "were unnecessary and unreasonable . . . [as Mt. St. Francis] made payments to a company not entitled to payments." Independence Hill, Ltd., 1994 WL 486953 at *27.

MSFA disbursed $22,326 to Suburban Mortgage. Suburban Mortgage was an identity-of-interest entity. Mt. St. Francis paid Suburban Mortgage $ 22,326 in late charges assessed by Suburban Mortgage for overdue mortgage payments. Payment of a late fee is not a reasonable operating expense as any late fee would not have been incurred if Mt. St. Francis had been making its payments on time. The fees did not arise from the "everyday operation and maintenance of the project." Coleman, 200 F. Supp. 2d at 567.

MSFA disbursed $108,570 to Castriotta. As Mt. St. Francis's purchasing director, Castriotta received $47 per hour based on a twenty-hour work week. Fournier testified, however, that Castriotta did not have an office at Mt. St. Francis and he did not spend much time there. Castriotta's time cards showed that he worked the same hours every week yet OIG never observed him at Mt. St. Francis. Furthermore, OIG concluded that Mt. St. Francis equipment purchases did not justify a position for twenty hours per week and that there was no clear

33

distinction between Castriotta's duties and the duties performed by other Mt. St. Francis's staff. These payments "were unnecessary and unreasonable . . . [as Mt. St. Francis] made payments to [an individual] not entitled to payments." Independence Hill, Ltd., 1994 WL 486953 at *27.

MSFA disbursed $112,254 to Montecalvo. As Mt. St. Francis's assistant administrator Montecalvo was paid $42.70 per hour based on a twenty-hour work week. Fournier testified, however, that Mt. St. Francis did not have an assistant administrator position. Montecalvo's time cards reflected that he worked the same hours every week yet OIG auditors never observed Montecalvo at Mt. St. Francis. Additionally, all tasks assigned to the assistant administrator were also assigned to the business manager and/or the administrator with the exception of assuming the responsibility for the facility when the administrator was away from the facility. Fournier testified that at most he was away from the facility for two to three weeks per year. OIG concluded that the position of assistant administrator was unnecessary. Once again the Court concludes that these payments to Montecalvo were "unnecessary and unreasonable . . . [as Mt. St. Francis] made payments to [an individual] not entitled to payments." Independence Hill, Ltd., 1994 WL 486953 at *27.

Mt. St. Francis paid APS $44,226 for legal services related to discussions with the Internal Revenue Service over delinquent payroll taxes. As noted above however, Mt. St. Francis paid identity-of-interest companies and other related individuals before payroll taxes. Giordano testified that had Mt. St. Francis not been delinquent on its taxes, these expenses would not have been incurred. The legal fees did not benefit the patients living at Mt. St. Francis. See Harvey, 68 F. Supp. 2d at 1017-18. Additionally, the disbursements did not arise from the "everyday operation and maintenance of the project." Coleman, 200 F. Supp. 2d at 567. Mt. St. Francis

34

also paid APS $15,000 for legal services related to another Giordano-related facility, Edmund

Place.  Giordano testified that these legal fees should not have been paid by Mt. St. Francis.  It is

certainly clear that this disbursement did not arise from the "everyday operation and maintenance

of the project."  Coleman, 200 F. Supp. 2d at 567; Envicon Development Corp., 153 F. Supp. 2d

at 125 ("use of project funds for legal . . . expenses for the benefit of the project owner is not a

reasonable and necessary cost of maintaining and operating the project") (internal quotation

marks and citation omitted).  Mt. St. Francis also paid APS $19,310 for legal services related to a

zoning appeal to expand the facility.  HUD, however, never approved the expansion project.  The

regulatory agreement provided that MSFA could not "without the prior written approval [of

HUD] . . . [r]emodel, add to, [or] reconstruct . . . any part of the . . . property. . . ." Government

Exhibit 8 at ¶ 6(d).  Without HUD's consent, costs associated with the planned expansion

violated the regulatory agreement.

MSFA disbursed $3,525 to CDR for an employee function.  Giordano testified that he

invited the employees to this event "to try to up their level of enthusiasm . . . ."  Government

Exhibit 1, Tab (h) at 203.  Fournier testified, however, that the event did not benefit the operation

of Mt. St. Francis.  The event ostensibly benefitted (if, at all) employees and not the patients

living at Mt. St. Francis.  See Harvey, 68 F. Supp. 2d at 1017-18.  Additionally, the disbursement

did not arise from the "everyday operation and maintenance of the project."  Coleman, 200 F.

Supp. 2d at 567.  This disbursement was not a reasonable operating expense.

MSFA paid Ahlborg $133,500 related to a promissory note.  Mt. St. Francis engaged

Ahlborg for construction services associated with a HUD approved rehabilitation of the project.

After the renovations, MSFA refinanced its mortgage and the rehabilitation exceeded the HUD

approved mortgage amount.  As a result, Mt. St. Francis issued Ahlborg a promissory note which accrued interest at 10% annually.  HUD, however, never approved the promissory note. Payments made to Ahlborg based on the unapproved promissory note are not reasonable operating expenses.

MSFA also disbursed $102,191 to various other non identity-of-interest vendors.  This amount includes disbursements for (1) services that were the responsibility of Sterling, (2) unrelated legal fees, (3) other "benefits" to employees (Christmas parties, luncheons, gifts, and flowers) and, (4) penalties and interest for late tax payments.  These expenses did not arise from the "everyday operation and maintenance of the project" and certainly were not reasonable operating expenses of the project.  Coleman, 200 F. Supp. 2d at 567.

The disbursements noted above were all made by MSFA on behalf of Mt. St. Francis. Giordano, however, controlled Mt. St. Francis' operations.  It is also clear that Giordano controlled Montecalvo.  Montecalvo was the comptroller of every company owned by Giordano and the two men communicated daily.  Montecalvo was Sterling's general manager and Giordano set Montecalvo's salary as assistant administrator at Mt. St. Francis.  Montecalvo testified that the priority payment system for identity-of-interest vendors was in place *before* he became manager of Sterling and that the project owners were well aware of the system.  Montecalvo dictated what expenses to pay and when to pay them.  OIG concluded that the web of identity-of-interest companies made it possible for Giordano to direct questionable cash payments with little risk of detection.  OIG concluded that Giordano and Sterling disregarded prudent business practices and exploited weak management controls.  The record reflects an intricate scheme, concocted by Giordano, where Giordano controlled all aspects of the operation of Mt. St. Francis

36

and used Montecalvo as his tool in effectuating his scheme.  The Court concludes that Giordano

and Montecalvo used the following funds in violation of the regulatory agreement:

| | |
|---|---:|
| Loan Repayments | $  485,487 |
| Unsupported Disbursements | 311,637 |
| Duplicative Management Fees | 2,574,487 |
| Other Unreasonable Expenses | 875,182 |
| Total | $ 4,246,793 |

### b.  Coventry Health Center

All of the disbursements discussed below were made by CHCA on behalf of Coventry

Health Center and occurred during the audit period at a time when Coventry Health Center

lacked surplus cash:

1.  Loan Repayments Without Written Approval from HUD:

| | |
|---:|---|
| $  20,000 | Consultants |
| 130,000 | Management Realty |
| 15,000 | Giordano |
| 15,000 | S&W |
| 58,000 | Sterling[15] |
| $ 238,000 | |

As noted above, disbursements of project funds to repay owner loans or advances are not

reasonable operating expenses.  See generally Coleman, 200 F. Supp. 2d at 567; Thompson, 408

F.2d at 1080; Schlesinger, 88 F. Supp. 2d 431; Harvey, 68 F. Supp. 2d at 1018.

2.  Unsupported Disbursements:

| | |
|---:|---|
| $ 64,400 | Consultants |
| 5,510 | GBC |
| 7,816 | S&W |
| 16,687 | Mt. St. Francis |
| 182,500 | Giordano, Confreda and CHCA |
| 120,025 | Management Realty |

---

[15]This disbursement was also unsupported.

367,816     Sterling
<u>428,874</u>     Various other non identity-of-interest entities
$ 1,193,628

As also noted above, unsupported expenditures are not reasonable expenses.  <u>West Street</u>

<u>Associates</u>, 1998 WL 34193430 at *5.

3.  <u>Other Disbursements Not Related to the Reasonable Operating Expenses or Necessary</u>
<u>Repairs of the Project</u>:

CHCA disbursed $267,041 to My Place.  As noted above, My Place was an identity-of-

interest entity that received priority payment each month, notwithstanding Coventry Health

Center's negative financial position.  Throughout the audit period Coventry Health Center made

monthly payments to My Place for an employee benefit program that included seminars, crafts,

raffles, and other activities.  OIG concluded that My Place's purported services did not benefit

the operation of the project.  The My Place programs, ostensibly benefitted (if, at all) employees

and not the patients living at Coventry Health Center.  <u>See</u> <u>Harvey</u>, 68 F. Supp. 2d at 1017-18.

Additionally, the My Place disbursements did not arise from the "everyday operation and

maintenance of the project."  <u>Coleman</u>, 200 F. Supp. 2d at 567.  These disbursements certainly

were not a reasonable operating expenses.

Coventry Health Center disbursed $53,880 to Construction Software.  As also noted

above, Construction Software was an identity-of-interest entity that received priority payment

each month, notwithstanding Coventry Health Center's negative financial position.  Mancini

testified that she did not know what Construction Software did and never saw an employee of

Construction Software at Coventry Health Center.  Throughout the audit period Coventry Health

Center  made monthly payments to Construction Software for accounting services that the

Coventry Health Center staff performed.  These payments "were unnecessary and unreasonable .

38

. . [as Coventry Health Center] made payments to a company not entitled to payments."
Independence Hill, Ltd., 1994 WL 486953 at *27.

Coventry Health Center disbursed $54,300 to GBC.  GBC purportedly performed
landscaping services for Coventry Health Center.  Mancini testified, however, that Coventry
Health Center's maintenance staff regularly cut the lawn and that she very rarely saw GBC
performing work at Coventry Health Center.  OIG concluded that Coventry Health Center had
the necessary staff and equipment to perform the services allegedly performed by GBC.  These
payments "were unnecessary and unreasonable . . . [as Coventry Health Center] made payments
to a company not entitled to payments."  Independence Hill, Ltd., 1994 WL 486953 at *27.

The disbursements noted above were all made by CHCA on behalf of Coventry Health
Center.  Consequently, it is clear that CHCA used project assets or income in violation of the
regulatory agreement.  It is also clear, however, that Giordano controlled Coventry Health Center
operations and Montecalvo.  As noted, Montecalvo was the comptroller of every company owned
by Giordano and the two men communicated daily.  Montecalvo was Sterling's general manager
and held executive positions at Coventry Continuum.  Montecalvo testified that the priority
payment system for identity-of-interest vendors was in place before he became manager of
Sterling and that the project owners were well aware of the system.  Montecalvo directed what
expenses to pay and when to pay them.  OIG determined that Giordano and Montecalvo
controlled the ownership entity, CHCA, the operator (Coventry Continuum), and the
management company (Sterling).  Furthermore, OIG concluded that the identity-of-interest
relationships between Giordano and the operators and managers of Coventry Health Center
created an environment where Giordano had direct control of all aspects of Coventry Health

Center.  "[A]ny separation of these entities' responsibilities was only for the clear circumvention of [HUD] regulations by the owner."  Id.  In summary, the Court concludes that CHCA, Giordano and Montecalvo used the following funds in violation of the regulatory agreement:

| | | |
|---|---|---|
| Loan Repayments | | $  238,000 |
| Unsupported Disbursements | | 1,193,628 |
| Other Unreasonable Expenses | | 375,221 |
| | Total | $ 1,806,849[16] |

### C.  Res Judicata

Finally, Giordano argues that the Government should be barred from bringing its claims under the doctrine of res judicata.[17]  Giordano argues that HUD had the opportunity to pursue the claims in this lawsuit in the Mt. St. Francis receivership action.  See generally Giordano v. Mt. St. Francis Associates, C.A. No. 08-48 S, 2010 WL 3703404 (D.R.I. Sept. 10, 2010).

Claim preclusion under res judicata applies if there is "(1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suits; and (3) an identity of parties or privies in the two suits."  Haag v. Shulman, 683 F.3d 26, 30 (1st Cir. 2012).  In bringing the receivership action, Giordano's sole purpose was the orderly disposition of Mt. St. Francis' assets.  The real party in interest in the receivership claim was MSFA and not Giordano personally.  The instant action is brought by HUD against Giordano, Montecalvo and Confreda, personally, and CHCA.  HUD's participation, rights and interests are fundamentally

---

[16]The Government seeks to recover $1,811,849, however the Court identified a $5,000 addition error in the summary of disbursements to Consultants section of the Government's SUF, thus the lower amount.

[17]The Government argues that Giordano has waived the defense of res judicata because he did not plead it in his answer.  "As an affirmative defense . . . normally res judicata is deemed waived unless raised in the answer." Davignon v. Clemmey, 322 F.3d 1, 15 (1st Cir. 2003) (emphasis added); but see Hastings v. Union Boiler, Co., 688 F. Supp. 63, 63 (D. Me. 1988) (noting that there are "numerous exceptions to the waiver rule").  The Court need not address the Government's waiver argument, because as noted below, Giordano's res judicata argument fails.

different in the two proceedings.

Furthermore, the receivership court in its ruling, ordered that MSFA's assets could be sold free and clear of all claims, liens, and encumbrances; Judge Smith also ruled that the "release and discharge shall not affect the liabilities of any other person and/or entities beyond the Buyer, including Antonio L. Giordano."   Giordano v. Mt. St. Francis Associates, L.P., C.A. No. 08-48 S, slip op at ¶¶ 3,6 (D.R.I. Feb. 9, 2011) (Docket # 137).  Res judicata does not apply where the claim is "expressly reserved" in the earlier proceeding.  In re Bankvest Capital Corp., 375 F.3d 51, 70 (1st Cir. 2004); see also Whitmire v. First Federal Savings & Loan Association of Hendersonville, 208 S.E.2d 248 (N.C. App. 1974) (res judicata did not apply as earlier decision expressly left the merits open for future adjudication); see also Envicon Development Corp., 153 F. Supp. 2d 114 (earlier bankruptcy proceeding did not bar HUD from brining claim under § 1715z-4a for violation of regulatory agreement in subsequent proceeding).  Giordano's res judicata argument is a non-starter.

## D.  Double Damages

Under the statute, the Government "may recover double the value of assets and income of the property that the court determines to have been used in violation of the regulatory agreement. . . ." 12 U.S.C. § 1715z-4a(c).  The double damages provision was adopted to provide a greater deterrent to violations.  Cofield, 215 F.3d at 171.  Whether to award double damages is left to the discretion of the Court.  Id.  Double damages "makes sense" where a defendant is guilty of "substantial or repeated fault."  Id.  Double damages, however, may not be appropriate where it is a "close-call" whether a disbursement is unreasonable or where a person authorizes payment of an expense in good faith but the documentation is later found not to be sufficient.  Id.

In this instance, the question of whether to award double damages is certainly *not* a close call.  Double damages are warranted against Giordano based on his repeated violations of the regulatory agreement and the sheer magnitude of the illegal disbursements.  Between the two audits, OIG uncovered over 1,500 payments made in violation of the regulatory agreements.  Furthermore, Giordano was certainly not a neophyte in the area of HUD financed properties.  On the contrary, Giordano used his expertise and guile to take advantage of a *particularly vulnerable* population and the United States' taxpayers.  He did this for one reason, to line his pockets, and the pockets of his business associates, friends, and family members with ill-gotten gains.  Giordano's pervasive and insidious web of identity-of-interest entities and individuals gave him plenary control of all of the operations of both Mt. St. Francis and Coventry Health Center.  Vested with control of the nursing homes, Giordano used identity-of-interest entities and individuals to divert project assets to himself, his family and friends.[18]  In the end, Giordano used the projects as his own personal piggybank.  Giordano was the architect of the scheme and he and his family members were the primary beneficiaries.  A double damage award is required against Giordano in order to further Congress' intent of deterring future violations by other individuals who may be tempted to corruptly raid publicly funded projects.

## IV.  Conclusion

For the reasons stated, the Government's motion for summary judgment is granted.  The Court finds that Giordano and Montecalvo used $4,246,793 of project funds in violation of the Mt. St. Francis regulatory agreement.  The Court also finds that Giordano, Montecalvo and

---

[18]Of the total amount identified as disbursements made in violation of the regulatory agreements, over 80% of the disbursements were made to identity-of-interest entities or individuals.

CHCA used $1,806,849 of project funds in violation of the Coventry Health Center regulatory agreement.  Finally, the Court finds that double damages against Giordano are warranted in this case.[19]


SO ORDERED

/s/ Mary M. Lisi
Mary M. Lisi
Chief United States District Judge
October 3, 2012

---

[19]The Government also moves for attorney's fees.  The Government is ordered to file a detailed brief (with time records) supporting its motion on or before October 23, 2012.  Defendants will have until November 14, 2012 to file a response to the motion.